# Exhibit A

EXECUTABLE COPY

# MASTER HOSTING AGREEMENT

This Master Hosting Agreement (**"Hosting Agreement"**) is entered into on this 26th of May 2022 by and between MO POW 3, LLC (**"MO POW 3"**) a limited liability corporation organized and existing under the laws of Wyoming, having its principal offices at 680 S. Cache Street, Suite 100-8640, Jackson, WY 83001 (hereinafter **"Host"**), and Crypto Infiniti LLC ("**Crypto Infiniti**"), a limited liability corporation organized and existing under the laws of Nevada, having its principal offices at 200 S. Virginia 8th Floor, Reno NV 89501 (hereinafter **"Client"**), with Host and the Client are collectively referred to as the **"Parties"**.

WHEREAS Client desires to co-locate fifteen (15) megawatts (MW) of digital currency equipment at Host's MO POW 3 facility in five (5) Smart Box 3000 containers (the **"Containers"**) manufactured by EZ Blockchain and provided by Host;

WHEREAS Client is also concurrently entering into a second hosting agreement (**the "2nd Agreement"**) with Host's affiliate MO POW 4, LLC for colocation at MO POW 4's facility located at 5501 East Farm Road 112, Strafford, Missouri 65757;

WHEREAS Client desires to "buy down" Host's typical Managed Services Fee and also MO POW 4's typical Managed Services Fee, by providing a two million dollars ($2,000,000.00) payment for discounted Managed Services in this Agreement and the 2nd Agreement during the Initial Term;

WHEREAS Host desires to accept such "buy down" and provide managed colocation services to Client for an initial term of three (3) years; and subsequent additional terms;

In consideration of the terms and conditions set forth in this Hosting Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Host and Client hereby agree as follows:

## ARTICLE 1

## COLOCATION SERVICES

1.1    Client Onboarding.

**A.**    **Client Responsibilities.**

(1)    *Equipment Delivery.* Client shall promptly deliver its digital currency mining equipment listed in Order Form included as Exhibit A and attached hereto (the **"Equipment" or "Client Equipment"**) to Host Facility located (the **"Facility" or "Host Facility"**). Client shall be solely liable for all expenses related to insuring, transporting, and shipping the Client Equipment to Host's Facility. 400 North Main, Springfield, Missouri, Springfield, MO 65802.

(2)    *Delivery Notice.* To provide Host adequate time to prepare for Client Equipment delivery to the Facility, once Client has arranged for the Equipment to be shipped to the Host Facility, Client shall provide Host written notice no later than one (1) week prior to the scheduled shipping date ("**Shipping Notice**"). In Client's Shipping Notice, Client shall include any tracking information provided to Client, and Host shall

be responsible for monitoring the tracking information for updates as to expected delivery date. Any costs incurred by the Host due to the Client's failure to provide the Shipping Notice for the Equipment shall be borne by the Client. Client's provision of the Shipping Notice shall be sufficient notice for Client to prepare the Facility for delivery and acceptance of the Equipment. Client shall bear responsibility for all loss or damage to the Equipment which is incurred prior to delivery and acceptance of the Equipment to the Host at the Host's Facility.

(3)     *Onboarding Policies.* Client shall comply with Onboarding Policies outlined in <u>Exhibit B</u>.

(4)     *Client Equipment.* Client shall be responsible for delivering all required Equipment to the Host Facility in good working order and suitable for use. Client shall be responsible for all costs associated with the troubleshooting and repair of Equipment received in non-working order or which deviates from the specifications outlined in <u>Exhibit A</u> **("Defective Equipment"),** including parts and labor. Client shall promptly restore or replace Defective Equipment in an expeditious manner. All Defective Equipment not repaired or replaced by Client prior to the Commencement Date shall be subject to the monthly Minimum Managed Services Fee as defined in <u>Section 2.3</u> and enumerated in <u>Exhibit A</u>.

(5)     *Temporary Hosting.* In the event Client Equipment is delivered to Host Facility earlier than the date on which a portion of, or all of Host Facility is deemed ready by the Host, and Client has not provided proper Shipping Notice as defined in <u>Section 1.1(A)(2)</u>, the Host may find other comparable facilities to host Client Equipment before the Facility is ready to accept the Equipment **("Client-Paid Temporary Relocation")** and all such costs related to the Client-Paid Temporary Relocation shall be the responsibility of Client. In the event Client Equipment is delivered to Host Facility, and Client has provided proper Shipping Notice as defined in <u>Section 1.1(A)(2)</u>, the Host may find other comparable facilities to host Client Equipment before the Facility is ready to accept the Equipment **("Host-Paid Temporary Relocation")** and all such costs related to the Host-Paid Temporary Relocation shall be the responsibility of Host.

## B.    Host Responsibilities.

(1)     *Testing.* Upon receipt of Equipment, Host shall perform commercially reasonable testing in accordance with prudent industry testing procedures. Such testing shall be completed within a reasonable time after delivery of Equipment. Host shall notify Client of any malfunctioning Client Equipment within thirty (30) calendar days and reserves the right to reject and remove Defective Equipment. Client shall not be responsible for any costs, fees, or penalties associated with Host's possession, hosting, and storage of the Equipment while Host conducts and completes such testing.

(2)     *Installation.* Host shall install all properly functioning Client Equipment in the Containers and ultimately at the Facility within thirty (30) calendar days of completing the testing as required by <u>Section 1.1(B)(1)</u>. Host shall not be liable for any defects or malfunctions in Client Equipment, or for failing to identify any hidden defects during installation or testing.

    (3)    *Commencement Date.* Host shall commence the provision of Managed Services ("Commencement Date") on the later of:

        (i)    Thirty (30) calendar days after Host's receipt all Client Equipment; or

        (ii)    a date agreed to by the Parties in writing as stated in <u>Exhibit A</u>; provided, however, that Host may extend the agreed-upon Commencement Date by up to ninety (90) days with prior written consent of Client.

1.2    <u>2nd Agreement.</u> The Rate Buy Down is being paid as consideration to "buy down" the Managed Services Rate of this Agreement and the 2nd Agreement.

1.3    <u>Managed Services.</u> Host shall provide rack space allocation for the Client Equipment (the **"Client Space")**, installation services, electrical power connection, power supply of at least fifteen (15) MW, network connectivity, security, maintenance, repair, and technical support, as outlined in this Agreement (the **"Managed Services"**).

**A.    Host Responsibilities.**

    (1)    *Data Analytics.* For the purposes of the Host providing Managed Services, Client acknowledges and agrees that Host may monitor Client's network usage and traffic.

    (2)    *Minimum Service Level.* Except in the event of a Service Failure as defined by this Agreement or occurrence of one of the following: (i) routine and necessary Maintenance and Repair (which necessity shall be determined by industry standards), (ii) Client Equipment failure (including the end of Client Equipment useful life), (iii) a Force Majeure Event, or (iv) other events beyond the Host's Control, Host warrants and guarantees that the Hosting and the Managed Services shall be uninterrupted for ninety five percent (95%) of the time per quarter of the Client's Term. **("Minimum Service Level")**. The Minimum Service Level shall be calculated every ninety (90) days from the Commencement Date and must be maintained for consecutive ninety-day periods during the Term; provided, however, in the event the Host receives notice of, and cures a Minimum Service Level deficiency, the ninety-day period shall restart after the thirty (30) day cure period.

    (3)    *Physical Access.* Access by Client to Facility shall require forty-eight (48) hour written notice to Host prior to the requested visit date. Only those persons, or a representative of a named entity, specifically identified in Client's written notice may access the Facility. All visits to the Facility must be supervised by a Host or its representative. Host shall promptly arrange supervision for the requested visit date and shall not use failure to arrange supervision as a reason to prevent Client from accessing the facility. Client shall be solely responsible for any damage or loss caused by any person acting for, or on its behalf, while at the Facility except to the extent that any such damage or loss is due in any part to the contributory negligence of Host.

    (4)    *Maintenance.* Host shall perform such building and Facility maintenance actions as Host deems necessary or desirable and as may be required to maintain Host's network **("Maintenance")**. Client acknowledges and agrees that the performance of Maintenance may cause Host's network, and the Managed Services, to be temporarily unavailable to Client. Host shall use commercially reasonable efforts to conduct such Maintenance in a manner which shall mitigate, avoid, or minimize the impact to the

Managed Services and Client Equipment. Host shall perform simple maintenance of Client Equipment in accordance with Host's Acceptable Use Policies enumerated Exhibit C.

(5) *Hazardous Conditions.* If, in the reasonable discretion of Host, an emergency or hazardous condition arises on, from, or affecting the Facility, Host is hereby authorized to: (i) temporarily suspend service under this Agreement for only the period of time necessary to address the emergency or hazardous condition, and (ii) rearrange, remove, or relocate Client Equipment.

(6) *Service Failures.* Client accepts that from time-to-time Managed Services may be temporarily interrupted for the reasons set forth specifically in this paragraph, and during such periods of temporary interruption may not be error-free, or secure. Host shall have no obligation to credit Client any amount for any Host's failure to provide Managed Services if Host can demonstrate that such failure was the result of: (i) Force Majeure, (ii) any actions or inactions of Client, including any activity under Client's control or within the obligations undertaken by Client including, without limitation, Hacking (as defined), provision of inaccurate or corrupt data, use of the Managed Services other than in accordance with the Host Acceptable Use Policy, or (iii) failure of the underlying software protocols of the Digital Currency networks and problems in Client's local environment.

(7) *Equipment Repairs.* At Client's request, Host shall facilitate the repair of Client Equipment with a Host-approved repair facility certified to perform the required repair work. If the Client Equipment is under a valid warranty, Host shall utilize the equipment provider honoring the warranty. Host may provide certain additional logistical services for a fee, to be approved in writing prior to Client incurring the fee, to prepare and ship Client Equipment for repair. Client shall be responsible for all approved Host and third-party costs and fees associated with Equipment repairs including packaging, storage, logistics, insurance, and delivery of Client Equipment to a repair facility. Client is responsible for all loss or damages related to any repair of Equipment, unless such loss or damage is related to the Host's negligence in facilitating the repair.

(8) *Equipment Relocation and Returns.*

    (i) **Relocation.** If it is necessary or desirable for Host's efficient use of the Facility to relocate the Client Equipment or Client Space to another area of the Facility or another Host Facility, Host shall provide Client thirty (30) days prior written notice of Host's intention to relocate Client Equipment or Client Space and following expiration of the thirty (30) day notice period the Parties shall cooperate in good faith to facilitate such relocation within a reasonable time. Host shall bear all liability and costs associated with any such relocation unless the request for relocation is made by the Client. Host shall use reasonable efforts to minimize and avoid any interruption in Managed Services during such relocation.

    (ii) **Equipment Return.** Provided that Client has paid all amounts then due and owing under this Agreement, Host shall decommission and make the Client

Equipment available to Client for pickup at, or shipment from, the Facility within thirty (30) calendar days of Client 's written request. Client shall be responsible for all reasonable, documented deinstallation, packing, storage, transportation, delivery, and other costs associated with removing and returning its Equipment. Host shall notify Client in writing when its Equipment is ready for pickup, and Client shall be responsible for arranging for pickup and removal of its Equipment within thirty (30) calendar days of receiving such written notice.

(iii) **Failure to Repair.** Failure by Client to initiate necessary repairs within fourteen (14) days of receiving notice of Defective Equipment or failure, may result in Host electing to exercise any remedy available to Host under Section 1.1(A)(4).

(9) *Insurance.* Client acknowledges that Host is not an insurer and Client Equipment is not covered by any insurance policy held by Host. Client is solely responsible for obtaining insurance coverage for its Equipment pursuant to the terms of the Agreement.

## B.    Client Responsibilities.

(1) *Acceptable Use Policy.* Client receipt of Managed Services and its use of Equipment pursuant to this Agreement is subject to Client's compliance with Host's then current Acceptable Use Policy, which may be reasonably updated from time to time and incorporated herein. A copy of Host's current Acceptable Use Policy has been attached hereto as Exhibit C. Client shall only be required to follow material changes in the Acceptable Use Policy if Client approves such changes in writing.

(2) *Compliance with Laws.* Client's use of the Host Facility shall conform to all applicable domestic and international laws, including jurisdictions where the Facility is located. Client is also responsible for obtaining any licenses, permits, consents, and approval from any authority having jurisdiction (the **"AHJ"**) that may be necessary to install, possess, own, or operate the Equipment. As used herein, **"Law"** means any law, statute, rule, protocol, procedure, exchange rule, tariff, decision, requirement, writ, order, decree, or judgment adopted by or any interpretation thereof by any court, government agency, regulatory body, instrumentality, or other entity, including an electric utility, retail electric provider, regional transmission organization or independent system operator. Client shall cooperate in a reasonable manner with any auditor review of Client's compliance with the terms hereof conducted by or on behalf of Host, including responding accurately and completely to all reasonable inquiries which relate directly to the Agreement or the obligations contained herein, and providing any reasonably requested documents so long as such documents relate directly to the Agreement or obligations contained herein, which shall occur no more frequently than once every two (2) years or as otherwise compelled by law.

(3) *Equipment Modifications.* Client shall notify and obtain prior written approval from Host before any material modifications, alterations, firmware adjustments, or other changes are made to Client Equipment (the **"Modified Equipment"**) that is intended to or might cause the Client Equipment's performance to deviate from the standard or factory specifications. Host's prior written approval shall not be unreasonably

withheld. Any approval required by this Section 1.2(B)(3) shall not be required in an emergency situation, which shall include situations in which the material modifications, alterations, firmware adjustments, or other changes are necessary to ensure continued function and safe operation of the Client Equipment.

(4)  *Transfer of Client Equipment.* Client shall provide prompt written notice to Host if the Client transfers legal title, ownership interests, or grants any third-party rights in any Equipment to an Affiliate (defined below) or other third party.

(5)  *Transfer of Managed Services.* Other than to a Client Affiliate, Client may sublease, sublicense, assign, delegate, or otherwise transfer its receipt of Managed Services under this Agreement to any third party by providing Host ten (10) days prior written notice.

(6)  *Insurance Requirements.* Client shall, at its own cost and expense, procure and maintain during this term of this Agreement, insurance policies sufficient to cover liability and losses arising out of the Equipment, including but not limited to any liability, damage, or losses suffered by Host arising out of or related to the Equipment, as well as Client's obligations under this Agreement. All policies must name Host as an additional insured, have policy limits of at least one million U.S. dollars ($1,000,000.00) which may be achieved through primary and umbrella policies, and, to the maximum extent permitted by law, be endorsed to waive all rights of subrogation against Host. Client is responsible for and shall pay all premiums and deductibles associated with the insurance required by this Agreement and shall provide Host with certificates of insurance along with required endorsement and other documentation reasonably necessary to ensure compliance with these insurance requirements, upon request. Client shall comply with its obligations under the insurance policies and shall cooperate with the insurer and Host in the event of an actual or potential claim.

## ARTICLE 2

## PAYMENT TERMS AND CONDITIONS

2.1  Initial Fees. The (a) down payment specified in the applicable Order Form (the **"Down Payment"**), and (b) rate buy down payment specified in the applicable Order Form (the **"Rate Buy Down Payment"**) shall be due and payable as of the date on which Host, and Client have both executed an Order Form in the same or a substantially similar form included as Exhibit A.

2.2  Managed Services Fees. Host shall invoice Client on a monthly basis for all Managed Service Fees as stated in this Agreement, or as agreed to by the Parties in writing from time to time.

2.3  Minimum Managed Services Fees.

A.  **Generally.** Client shall pay a minimum monthly Managed Services Fee equal to thirty percent (30%) of the estimated monthly Managed Service Fees (the **"Minimum Managed Services Fee"**) as calculated in Exhibit A in instances of part or all the Equipment not utilizing the Host's Managed Services. The Minimum Managed Services Fee is non-refundable, except as otherwise provided under this Agreement.

B.  **Adverse Market Conditions.** In the event that the CoinDesk reference rate for bitcoin digital currency (**"XBX"**) falls below twenty thousand dollars ($20,000.00) for more than thirty (30) consecutive calendar days (*hereinafter* **"Adverse Market Conditions"**), the Host shall reduce

EXECUTABLE COPY

any applicable Minimum Managed Service Fees by fifty percent (50%) until the XBX reference rate exceeds twenty thousand dollars ($20,000.00). Upon the end of any period of Adverse Market Conditions, an additional thirty (30) calendar days of Adverse Market Conditions is required to receive any further reduced Minimum Managed Services Fee.

2.4    <u>Modifications.</u> The Host reserves the right to modify its Managed Service Fees under the following circumstances:

    **A.**    **End of Term.** At the end of any Term, provided Host notifies Client at least sixty (60) calendar days in advance of the effective date of such rate change.; or,

    **B.**    **Pass-Throughs.** In the event of documented new or additional costs directly in connection with the Managed Services to be provided to Client, and so long as the new or additional costs do not equate to more than a twenty percent (20%) increase the Client's effective kilowatt hour **("kWh")** rate of $0.065 as enumerated in <u>Exhibit A</u>, which is equivalent to $0.078 c/kWh, the Host may pass through such costs to Client (the **"Passed-Through Amounts"**) with no additional markup to Client, and Client shall pay all such amounts in accordance herewith. Such costs shall be limited to newly enacted or amendments to existing state, federal, or international laws and/or regulations, compliance requirements, new or amended taxes, levies, utility tariffs, fees, or other charges, governmental or quasi-governmental fees, lease rates, or other charges with respect to the Managed Services or the Host Facility. Passed-Through Amounts shall not include any taxes, fees, or other amounts related to Host's income, employment related taxes or fees, or any taxes or fees related to the value of Host's Facility. In the event the Managed Services Fees, including Passed-Through Amounts, equal or exceed $0.078 c/kWh, then the Host shall reduce any applicable Minimum Managed Service Fees by fifty percent (50%) until the Managed Services, including Passed-Through Amounts, falls below $0.078 c/kWh.

2.5    <u>Payment.</u> Client's first payment of the Term is due within five (5) days of receiving a Host invoice and will be prorated based on the number of days left in the calendar month of the Commencement Date. On or around the first day of every month during the Term of this Agreement, Client shall pay Host the Managed Service Fees, as set forth in <u>Exhibit A</u>, as well as any prior repair services performed and invoiced by Host. Host shall "true-up" any difference between Client's estimated and actual monthly power usage through a debit or credit for the difference between Client's actual and estimated monthly power usage on the following month's invoice, as the Managed Service Fee is calculated based upon power usage.

2.6    <u>Payment Currency.</u> Except for payments made in United States Dollars (or equivalent USDT), Host reserves the right to reject any payment, or require additional payment based on the conversion rate of such payment to U.S. Dollars (if applicable).

2.7    <u>Taxes.</u> Each Party shall be responsible for the taxes (including, without limitation, sales, use, transfer, privilege, excise, consumption, and other taxes), fees, duties, governmental assessments, impositions, and levies that may be imposed or levied on it in connection with this Agreement and/or the provision of Managed Services hereunder under applicable law.

2.8    <u>Late Penalties.</u>

A.    **Client.** Any amounts due hereunder that remain unpaid for ten (10) days or more shall be payable on demand together with interest computed from the date payment was due at a rate of nine percent per annum (9%) or the maximum rate allowable by law, whichever is lesser.

B.    **Host.** Should Host not begin providing the Managed Services by the Commencement Date under the terms of <u>Section 1.1(B)(3)</u>, Client shall be entitled to, and Host shall pay to Client, interest, compounded on a monthly basis, on a principal amount equal to the total of any (i) Onboarding Fees and (ii) Down Payments paid pursuant to <u>Section 2.1</u> and enumerated in <u>Exhibit A</u> at a rate of fifteen percent (15%) per annum, or the maximum allowed by law, whichever is lesser.

## ARTICLE 3
## TERM AND TERMINATION

3.1    <u>Term.</u>

A.    **Initial Term.** The term of the Agreement shall begin on the Commencement Date and end on the date three (3) calendar year(s) following of the Commencement Date (the **"Initial Term"**). Should Host continue to offer Managed Services at the end of the Initial Term to Clients at the same or substantially similar terms and conditions of this Agreement Client shall have a right of first refusal **("ROFR")**, before any third parties, to renew this Agreement under such terms with the Host.

B.    **Renewal Terms.** At the end of the Initial Term, unless either Party issues a written notice of non-renewal within thirty (30) days prior to the expiration of the Initial Term, as applicable, this Agreement shall automatically renew for successive one (1) calendar year terms **("Renewal Terms")**. Should Host continue to offer Managed Services at the end of a Renewal Term to Clients at the same or substantially similar terms and conditions of this Agreement; Client shall have a ROFR before any third parties, to renew this Agreement under such terms with the Host.

C.    **Adverse Market Conditions.** In instance of Adverse Market Conditions, Host shall automatically extend Client's Initial or Renewal Term on a day for day basis equal to the length of the Adverse Market Conditions. All obligations and provisions contained in this Agreement shall be binding as of the date of execution of this Agreement.

3.2    <u>Expiration.</u> Upon expiration of this Agreement, Host shall have no further obligation to Client except to return the Client Equipment in accordance with this Agreement.

3.3    <u>Termination.</u>

A.    **Termination for Cause; Event of Default.** This Agreement may be terminated by either Party, at any time for one (1) or more of the following events of default:

(1)    The non-terminating Party breaches any material term of this Agreement and fails to cure such breach (if susceptible to cure) within thirty (30) calendar days after receipt of written notice of the same;

(2)    The non-terminating Party becomes the subject of a voluntary or involuntary proceeding relating to insolvency, bankruptcy, receivership, liquidation, or

reorganization for the benefit of creditors, and such petition or proceeding is not dismissed within sixty (60) calendar days of the filing thereof; or

(3)     A court or other government authority having jurisdiction over the Services prohibits Host from furnishing the Services to Client.

**B.**     **Termination for Non-Payment.** Host may immediately terminate this Agreement by written notice if Client fails to pay any sum for Managed Services when such payment is due (and such failure remains uncured for a period of ten (10) calendar days). In the event of Termination for Non-Payment, Host shall first apply any Down Payment as defined in <u>Section 2.1</u> and enumerated in <u>Exhibit A</u> to any termination payment due to Host under <u>Section 3.3(B)(1)</u> of this Agreement.

**C.**     **Termination in Consequence of Force Majeure Event**. If a Force Majeure Event shall have occurred that has affected a Party's performance of its obligations under this Agreement and that has continued for a continuous period of one hundred eighty (180) days, then the other Party shall be entitled to terminate this Agreement upon thirty (30) days' prior written notice to the Party whose performance is so affected by the Force Majeure Event. If at the end of the thirty (30) day notice period the Force Majeure Event shall still continue, this Agreement shall be deemed terminated in accordance with such notice of termination. Upon such termination for a Force Majeure Event, neither Party shall have any liability to the other under this Agreement other than any such liabilities that have accrued prior to such termination, which shall be refunded from thirty (30) days of the Host receiving a notice of termination under this Section. For clarity, Host shall return all deposits, Down Payments, and the remaining, pro rata portion of the Rate Buy Down Payment not applied to Client Payment's Schedule as of the date of termination to Client within thirty (30) days of termination under this Section.

3.4     <u>Effect of Default.</u>

**A.**     **Client Remedies.** Client may pursue any of the remedies in this Section for Host's non-performance of its obligations under this Agreement; however, these remedies do not constitute any limitation on Client seeking additional remedies available in law or equity, nor does Client's forbearance to enforce one or more of the remedies set forth herein constitute a waiver of the right to exercise such remedy at a later date. In the event of Host's non-performance of its obligations under this Agreement, Client shall be entitled to a refund of any and all fees paid to Host for— (i) the three (3) service month's preceding the then-current service month, (ii) any Down Payment of Managed Services not rendered during the Initial or Renewal Term, and (iii) the remaining, pro rata portion of the Rate Buy Down Payment not applied to the Client's Payment Schedule as enumerated in <u>Exhibit A</u> as of the date of termination, as applicable. Unless applicable law requires a longer period, any action against Host in connection with this Agreement must be commenced within two (2) years after the purported cause of the action has accrued. Client agrees to look first to Client's insurance to recover for injury or damages in the event the insurance policies required by <u>Article 1</u> cover the losses or injuries.

**B.**     **Host Remedies.** Host may pursue any of the remedies in this Section; however, these remedies do not constitute any limitation on Host seeking additional remedies available in law

or in equity, nor does Host's forbearance to enforce one or more of the remedies set forth herein constitute a waiver of the right to exercise such remedy at a later date.

(1)     *Termination Payment.* If any invoice amount shall be due and unpaid on the fifteenth (15th) calendar day following the deadline for payment as stated on the invoice and pursuant to this Agreement, the Host may:

    (i)     redirect and utilize the Client Equipment for the Host's benefit until such usage by the Host equals on the everyday exchange rate of Coinbase, after payment of all applicable digital currency taxes and compliance expenses, as well as all expenses incurred from the operation of the Client Equipment, the total unpaid Managed Service Fees remaining in the Initial or Renewal Term, as applicable (**"Mining Termination Payment"**), or

    (ii)    charge for the decommissioning, storage, and/or removal of Client Equipment at Client's expense and invoice the outstanding balance of the total Minimum Managed Service Fees (**"Removal Termination Payment"**) due to Host for the remainder of the then current Initial or Renewal Term, as applicable.

(2)     *Client Equipment Forfeiture.* In the event Client fails to cure a material breach within sixty (60) calendar days of the date of expiration or termination of the Agreement, title over such Client Equipment as is needed to offset the outstanding balance or Termination Payment shall transfer to Host. In such an event, Client shall have ten (10) business days to pay the outstanding balance of the deficiency, with interest, in which case title to the Client Equipment previously transferred to Host shall revert to Client.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES

4.1     Host Representations and Warranties. Host represents and warrants to Client that:

A.     Host has full power and authority to enter into this Agreement and perform Host's obligations hereunder;

B.     Host's performance of its obligations hereunder will not violate any applicable laws or require the consent of any third party; and,

C.     Host will provide the Managed Services at the Facility in a professional and workmanlike manner consistent with the terms and conditions of this Agreement.

D.     Host has no knowledge of any situation or condition that could cause the availability of utility services provided pursuant to Section 1.2 to the Client to not meet the terms of this Agreement or change in the future.

E.     Host presently has available at the Facility fifteen megawatts (15 MW) of power to provide to Client as part of the Managed Services and Host has no knowledge of any situation or condition that could cause the availability of such utility services provided pursuant to Section 1.2 to the Client to not meet the terms of this Agreement or change in the future.

**E.     Demand Response; Load Resource Participation Programs.** Host may participate in various utility Load Resource Participation Programs (**"LRP Programs"**) at the Facility. Client understands and agrees that an LRP Program provides the Facility's local grid operator

EXECUTABLE COPY

the critical ability to reduce grid demand in response to adverse grid conditions. Client agrees that the Managed Services Fees consider the Host' participation in the LRP Programs, and that Host shall have no liability to a Client for any actions or omissions due to or resulting from a Facility's participation in an LRP Program.

4.2    No Other Host Warranties. The Services (including all materials supplied and used therewith) are provided "as is," "where is", and Client's use of the Managed Services is at Client's own risk. Host does not make, and hereby disclaims, any and all representations and warranties, express or implied, whether in fact or by operation of law, statutory or otherwise, including, but not limited to, any representation or warranty regarding: (i) the impact of wind, humidity, and other weather-related variables on Facility operating conditions; (ii) the presence of mechanical cooling equipment or backup power, (iii) the price or liquidity of any Digital Currency, and (iv) either now or in the future, warranties of merchantability, habitability, marketability, profitability, fitness for a particular purpose, suitability, noninfringement, title, or arising from a course of dealing, or trade practice.

4.3    Client Representations and Warranties. Client represents and warrants to Host that:

A.    **Authority.** Client has full power and authority to enter into this Agreement and perform Client's obligations hereunder.

B.    **Information Security.** Client understands and agrees that use of telecommunications and data communications networks and the Internet may not be secure and that connection to and transmission of data and information over the Internet and such facilities provides the opportunity for unauthorized access to wallets, computer systems, networks, and all data stored therein. Information and data transmitted through the Internet or stored on any equipment through which Internet information is transmitted may not remain confidential, and Host does not make any representation or warranty regarding privacy, security, authenticity, and non-corruption or destruction of any such information. Host shall not be responsible for any adverse consequence or loss whatsoever to Client's (or its **"users"** or **"subscribers"**) use of the Services or the Internet. Use of any information transmitted or obtained by Client from Host is at Client's own risk. Host is not responsible for the accuracy or quality of information obtained through its network, including as a result of failure of performance, error, omission, interruption, corruption, deletion, defect, delay in operation or transmission, computer virus, communication line failure, theft or destruction or unauthorized access to, alteration of, or use of information or facilities, or malfunctioning of websites. Host does not control the transmission or flow of data to or from Host's network and other portions of the Internet, including the Digital Currency networks. Such transmissions and/or flow depend in part on the performance of telecommunications and/or Internet services provided or controlled by third parties. At times, actions, or inactions of such third parties may impair or disrupt Host or Client's connections to the Managed Services. Host does not represent or warrant that such events will not occur, and Host disclaims any and all liability resulting from or related to such acts or omissions. If Host suspects any security violations have occurred related to Client's account or Digital Currency, Host may suspend access to Client's account and hardware pending resolution;

C.    **Client Software.** Client will provide all end-user equipment, software, credentials, and/or related equipment that Client deems necessary or desirable for Client's receipt of Digital Currency.

EXECUTABLE COPY

D.  **Financial Service Laws.** Client will at all times comply with the laws, regulations and rules of any applicable governmental or regulatory authority, including, without limitation, Money Service Business regulations under the Financial Crimes Enforcement Network **("FinCen")**; state money transmission laws; laws, regulations, and rules of relevant tax authorities; applicable regulations and guidance set forth by FinCEN; the Bank Secrecy Act of 1970; the USA PATRIOT Act of 2001; AML/CTF provisions as mandated by U.S. federal law and any other rules and regulations regarding AML/CTF; issuances from the Office of Foreign Assets Control **("OFAC")**; the National Futures Association; the Financial Industry Regulatory Authority; and the Commodity Exchange Act;

E.  **Export Control Laws.** Client shall not export, re-export or otherwise transfer any products, commodities, or technology, in connection with its performance of this Agreement, that is inconsistent with any requirement of the Export Administration Regulations **(the "EAR")**, the International Traffic in Arms Regulation **(the "ITAR")**, or Foreign Assets Control Regulations, or the laws or regulations of the United States and (as applicable) the exporting country outside the United States.

F.  **Unauthorized Use.** Client will not use the Managed Services to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of third party privacy rights; use the Managed Services to store or transmit Viruses; attempt to gain unauthorized access to any Managed Services or its related systems or networks; permit direct or indirect access to or use of any Managed Service in a way that circumvents a contractual usage limit; copy a Managed Service or any part, feature, function, or user interface thereof except as permitted under this Agreement; or use the Managed Services in relation to any act which is unlawful. Client will use reasonable efforts to prevent unauthorized access to or unauthorized use of the Managed Services and shall notify Host promptly of any such unauthorized access of use. For purposes of this section, **"Viruses"** means any malicious data, code, program, or other internal component (e.g., computer worm, computer time bomb or similar component), which could damage, destroy, alter, or disrupt any computer program, firmware, or hardware, or which could, in any manner, reveal, damage, destroy, alter, or disrupt any data or other information accessed through or processed by the Service in any manner; and,

G.  **Equipment Title.** Client has clear title, free and clear of all security interests or liens, to Equipment, including the legal right to use, operate and locate Equipment in the Facility.

## ARTICLE 5

## LIMITATION OF LIABILITY

5.1  <u>Digital Currency.</u> Host does not own any Digital Currency or associated equipment and does not own the underlying software protocols of Digital Currency networks which govern the operation of such Digital Currency. Host is not responsible for the operation of the underlying protocols and makes no guarantees regarding their security, functionality, or availability. In no event shall Host be liable to Client or any other entity for any decision made, or action taken by Client in reliance on, or in connection with the Managed Services. This limitation on liability includes, without limitation, any damage or interruptions caused by any computer viruses, spyware, scamware, trojan horses, worms, or other malware that may affect Client's computer or other equipment, or any phishing, spoofing, domain typo squatting or other attacks (collectively, **"Hacking"**), or force majeure. If this disclaimer of liability section is deemed to conflict with any other section of this Agreement, this disclaimer of

liability section shall prevail and control to the extent of the conflict. For purposes of this Agreement, **"Digital Currency"** means any digital asset, cryptocurrency, virtual currency, digital currency, or digital commodity, which is based on the cryptographic protocol of a computer network that may be: centralized or decentralized; closed or open source; or used as a medium of exchange and/or store of value. Client further acknowledges that cryptocurrency price movements, difficulty, and legal and regulatory risks **("Market Risks")** could have a material adverse impact on the value of digital currencies, DC Data Centers, Client Equipment, and Managed Services. Client assumes responsibility for all such Market Risks, and Host hereby disclaims all liability for any losses that may arise as a result thereof.

5.2    Indemnification.

    A.    **Host Indemnification.** In addition to any other applicable rights under this Agreement, Client agrees to indemnify, defend and hold harmless Host and its officers, managers, partners, members, agents, employees, Affiliates, attorneys, heirs, successors and assigns **(collectively "Host Parties")** from any and all claims, demands, actions, suits, proceedings, and all damages, judgments, liabilities, losses, and expenses, including, but not limited to, reasonable attorney's fees **("Losses"),** arising from or relating to— (i) any legal, regulatory or governmental action against or including Client, (ii) the maintenance or operation of Client's Equipment, (iii) any Loss by any of Client, its officers, managers, partners, members, agents, employees, affiliates, attorneys, heirs, successors or assigns (collectively **"Client Parties"),** (iv) any claim by an Affiliate of the Client Parties, including a Client, relating to, or arising out of, this Agreement or the Managed Services (including claims arising from or relating to interruptions, suspensions, failures, defects, delays, impairments or inadequacies in any of the aforementioned Services), (v) any breach or nonperformance by Client Parties of any provision or covenant contained in this Agreement or the Managed Services, or (vi) any claim related to Hacking, unless such instances in (i) through (vi) inclusive involve the negligence or willful misconduct of Host.

    B.    **Client Indemnification.** The Host shall indemnify, defend and hold harmless the Client and its respective Affiliates, officers, directors, employees, agents, successors and assigns from and against any and all Indemnifiable Losses resulting from or arising out of: (i) any inaccuracy in or breach or non- performance of any of the Host's representations and warranties, or other covenants or agreements in this Agreement or any other transaction document by the Host, (ii) the failure of the Host to perform or observe fully any covenant, agreement or other provision to be performed or observed by it pursuant to this agreement or any other transaction document, or (iii) any other matters, things or events which give rise to any Indemnified Party suffering or incurring Indemnifiable Losses with respect to its or its Affiliates' investments in the Client. If and to the extent that such indemnification is unenforceable for any reason, the Host will make the maximum contribution to the payment and satisfaction of such indemnified liabilities permissible under applicable Law. Client shall support its obligations in this Article 5 with the insurance policies required by Article 1. Unless otherwise mandated by applicable law, all obligations set out in this Article 5 shall be without monetary limit, are independent of any insurance requirements, and such indemnity obligations shall not be limited by any insurance requirements, nor shall they be lessened by reason of Client's failure to obtain the required insurance covered or by any defenses asserted by Client's insurers.

5.3     Limitation of Liability.

    A.    HOST SHALL HAVE NO OBLIGATION, RESPONSIBILITY, OR LIABILITY FOR ANY OF THE FOLLOWING: (1) ANY INTERRUPTION OR DEFECTS IN THE CLIENT EQUIPMENT CAUSED BY FACTORS OUTSIDE OF HOST'S REASONABLE CONTROL; (2) ANY LOSS, DELETION, OR CORRUPTION OF CLIENT'S DATA OR FILES; (3) ANY LOST REVENUE OR PROFITS TO CLIENT DURING NETWORK OR POWER OUTAGES OR CURTAILMENT, CLIENT EQUIPMENT FAILURES, OR OTHER FACTORS OUTSIDE OF HOST'S DIRECT CONTROL; (4) DAMAGES RESULTING FROM ANY ACTIONS OR INACTIONS OF CLIENT OR ANY THIRD PARTY NOT UNDER HOSTS CONTROL; (5) DAMAGES RESULTING FROM CLIENT EQUIPMENT OR ANY THIRD-PARTY EQUIPMENT; OR (6) DAMAGES RESULTING FROM HOST FACILITATING REPAIRS OF CLIENT EQUIPMENT.

    B.    IN NO EVENT SHALL HOST BE LIABLE TO CLIENT OR ANY OTHER PERSON, FIRM, OR ENTITY IN ANY RESPECT, INCLUDING, WITHOUT LIMITATION, FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, RELIANCE, EXEMPLARY, OR PUNITIVE DAMAGES, INCLUDING LOSS OF PROFITS, LOSS OF REVENUE, LOSS OF BUSINESS, OR COST OF COVER OF ANY KIND OR NATURE WHATSOEVER, ARISING OUT OF OR RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT EVEN IF ADVISED OF THE POSSIBILITY THEREOF. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, HOST'S TOTAL CUMULATIVE LIABILITY UNDER OR RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT, WHETHER UNDER CONTRACT LAW, TORT LAW, WARRANTY, OR OTHERWISE INCLUDING ATTORNEYS' FEES, SHALL BE LIMITED TO THREE (3) MONTHS OF STANDARD MANAGED SERVICE FEE PAYMENTS (NOT AMENDED OR DISCOUNTED DUE TO ADVERSE MARKET CONDITIONS MINIMUM MONTHLY MANAGED SERVICE FEE PAYMENTS) PLUS RETURN OF ANY DEPOSITS, BUY DOWN PAYMENTS, AND CREDITS MADE TO HOST BY CLIENT.

    **C.**    **Damage to Client Equipment**. Host shall not be responsible for any cosmetic damage or operation deficiency from Client Equipment, or Client Containers, not due to Host's negligence, willful misconduct, intentional acts or omissions, and Host shall not repair or reimburse the Client for any such damage without Host's prior written consent.

    **D.**    **Unauthorized Access.** Host does not provide, and Client shall hold Host harmless from, user or access security with respect to any of Client's Equipment and shall be solely liable for user access security and network access to Client Equipment. Host will not provide any service to detect or identify any security breach of Client Equipment. Host will not provide any tests, tools, or techniques intended to gain unauthorized access to Client Equipment or Client's personal property.

## ARTICLE 6

## CONFIDENTIALITY

6.1    The Parties agree that any non-public technical or business information that is disclosed to one Party (the **"Receiving Party")** by or on behalf of the other Party (the **"Disclosing Party")** in connection

with this Agreement, whether orally or in writing, whether disclosed before or after the execution of this Agreement (the **"Effective Date"**), hereinafter **"Confidential Information"**, is to be treated as confidential and proprietary. Confidential Information shall not include the existence of this Agreement, its terms, and the transactions contemplated herein, but shall include any non-public information that is designated by the Disclosing Party as confidential, that the Receiving Party understands to be confidential, or that a reasonable person would understand to be confidential.

6.2    The Receiving Party shall maintain the Confidential Information in strict confidence and not use or disclose it for any purpose except as expressly permitted by this Agreement.

6.3    The Receiving Party will not use Confidential Information for any purpose whatsoever, except as necessary to perform its obligations under this Agreement. The Receiving Party shall limit access to Confidential Information to those of its employees who have a need to know such information for purposes of this Agreement provided that— (i) the employees are bound by confidentiality obligations at least as stringent as those set forth herein and (ii) the Receiving Party shall be liable for any act or omission by such employee that would constitute a breach of this Article 6 if such act or omission had been caused by the Receiving Party itself.

6.4    The Receiving Party may disclose Confidential Information as required by law or government process (including a subpoena); provided the Receiving Party— (i) provides advanced written notice, unless such notice is expressly prohibited by law, to the Disclosing Party prior to disclosure sufficient to allow the Disclosing Party to seek protection from such disclosure, and (ii) reasonably cooperates with the Disclosing Party in minimizing the extent of such disclosure. In any event, the Receiving Party shall disclose only that Confidential Information that is strictly required to be disclosed and such information shall remain protected as Confidential Information in accordance with this Agreement despite any disclosure pursuant to this Section.

6.5    The Receiving Party shall use the same standard of care to protect Confidential Information as it uses to protect its own information of similar nature and importance, and in any event, no less than a reasonable standard of care.

6.6    Upon termination of this Agreement or request of the Disclosing Party, the Receiving Party shall return or destroy all Confidential Information in its care, custody, possession, or control (including all copies thereof) and shall certify its compliance with this Section in writing within seven (7) days of such return or destruction.

6.7    The Receiving Party acknowledges and agrees that in the event of an actual or threatened breach of this Article 6, that money damages may not be a sufficient remedy and in any event would be difficult to calculate and therefore, the Disclosing Party may, in addition to any other remedies available to it whether under law, equity or otherwise, seek injunctive relief without the necessity of posting bond or surety.

6.8    Notwithstanding anything to the contrary in this Agreement, Confidential Information shall not include information that— (i) is publicly available, (ii) was in the possession of the Receiving Party prior to its relationship with the Disclosing Party, or (iii) is independently developed by the Receiving Party without reliance on or reference to Confidential Information.

6.9    The obligations to protect Confidential Information as set forth in this Agreement shall remain in place during the term of this Agreement and for a period of five (5) years thereafter or for so long as the Receiving Party retains possession of Confidential Information, whichever is longer, provided that

Confidential Information that is a trade secret shall remain protected for so long as such information remains a trade secret.

## ARTICLE 7

## MISCELLANEOUS

7.1    Entire Agreement. This Agreement, together with the documents referenced herein, is the entire agreement between the Parties regarding the subject matter hereof and supersedes and replaces all prior and contemporaneous agreements, representations, and promises between or among the Parties. Neither Party is relying on any statement, representation, or warranty except those expressly set forth in this Agreement. In the event of a conflict, inconsistency, or ambiguity between the provisions of the body of this Agreement and any Exhibit or document referenced herein, the provisions of this Master Agreement shall control.

7.2    Choice of Law. This Agreement, including performance hereunder, are governed by the laws of the State of Wyoming, irrespective of its conflict of laws rules.

7.3    Dispute Resolution. All disputes between Host and Client arising out of or related to (i) this Agreement, including without limitation the performance, interpretation, termination, (in)validity and/or breach thereof, (ii) Client Equipment; and/or (iii) Managed Services, shall be exclusively resolved in the state or federal courts, as applicable, located in Laramie, Wyoming. The Parties each hereby consent to the jurisdiction of such courts and waive any objection to such venue, including any objection based on *forum non conveniens* grounds.

7.4    Assignment. Either Party may assign, transfer, delegate, or subcontract any or all its rights or obligations under this Agreement upon notification in writing to the other Party within ten (10) days of any assignment or transfer. Subject to the restrictions on assignment of this Agreement, this Agreement shall be binding upon, and inure to the benefit of the Parties, their legal representatives, successors, and assigns.

7.5    Counterparts. This Agreement may be executed in counterparts, with all counterparty's signatures combined constituting a single executed Agreement. Electronic, scanned, faxed, or photocopied signatures shall be treated as original.

7.6    Amendment. This Agreement may not be amended or modified except in a writing, signed by both Parties. The Parties may execute revised versions of Exhibits A and B in the future, which if signed by both Parties, shall be deemed an amendment to this Agreement.

7.7    Survival. Those obligations that expressly or by their nature survive or extend beyond this Agreement, including any termination or expiration thereof, shall so survive. Those obligations include, without limitation, all indemnity, warranty, confidentiality, insurance, and risk allocation provisions. This Section applies irrespective of which Party terminates this Agreement.

7.8    Force Majeure. Neither Party shall be liable for any delay or failure of performance caused by, resulting from, or occasioned by a Force Majeure Event. Upon the occurrence of a Force Majeure Event, the Party claiming the Force Majeure protections under this Section shall give reasonably prompt notice thereof to the other Party and shall use commercially reasonable efforts to remove or mitigate the effects of the Force Majeure Event. A **"Force Majeure Event"** means any event beyond the reasonable control of the Party claiming the Force Majeure protections under this Section including but not limited to acts of God, storms, criminal acts, mudslides, earthquakes, avalanches,

weather, and other naturally occurring phenomena, war, fire, flood, industry wide strikes, acts of the public enemy, terrorism, insurrections, riots, illness, pandemic, endemic, epidemic, cyber-attacks, power grid outages, communication network outages, as well as laws, rules, or regulations of any governmental authority or utility, including public utility commissions, asserting jurisdiction or control, that render compliance with makes performance impossible or impracticable. Notwithstanding the foregoing, a Force Majeure Event does not include events caused by the negligence, intentional, or willful misconduct of the Party claiming the Force Majeure protections under this Section.

7.9     Mutual Drafting. This Agreement was jointly negotiated and drafted by the Parties. In the event any ambiguities should arise in the construction or interpretation of this Agreement, such ambiguities shall not be construed against either Party solely on account of authorship.

7.10    Notice. Whenever a written communication, notice, or confirmation is required or permitted by this Agreement, the same may be made via e-mail to an e-mail address provided by the party for the purpose of receiving notices and shall be deemed sent on the date sent, unless sender receives indicia of a failure of transmission.

7.11    No Waiver. None of the requirements of this Agreement will be considered as waived by either Party unless the same is done in writing and failure by either Party to enforce any rights will not waive those or other rights hereunder.

7.12    Publicity. Neither Party may use the name, trademark, logo, acronym, or other designation of the other party in connection with any press release, advertising, publicity materials or otherwise without the prior written consent of the other Party.

7.13    No Third-Party Beneficiaries. Nothing in this Agreement is intended to nor shall be construed as conferring any rights or benefits to anyone other than the Parties. All duties and responsibilities undertaken pursuant to this Agreement will be for the sole and exclusive benefit of the Parties and not for the benefit of any third party.

7.14    Relationship of the Parties. The relationship of the Parties is that of independent contractors. Nothing herein does or is intended to create an agency relationship, partnership, or joint venture. Neither Party has the authority to bind the other.

7.15    Interpretation. Each Article of this Agreement contains provision that are sometimes referred to as Section(s) of an Article. Unless context requires otherwise, a general reference to any Article includes the entire Article and a reference to any specific Section(s) of an Article refers only to the identified Section(s).

7.16    Time is of the Essence. Time is of the essence in performing all obligations under this Agreement, except in those instances which implement a specific deadline or timeline.

\* \* \*

*[Signatures on Next Page]*

\* \* \*

EXECUTABLE COPY

WITNESS THE SIGNATURES of the Parties to the Hosting Agreement as set forth below.

**MO POW 3, LLC**

By: _____

Name: Thomas D Guel

Title: AUTHORITY TO BIND

**Crypto Infiniti LLC**

By: _____

Name:  Yi Lin  (Director)

Title: AUTHORITY TO BIND

## EXHIBIT A

## ORDER FORM

**1.  Projected Deployment Schedule.**

|   | | Date | Notes |
|---|---|---|---|
| 1. | Agreement Execution | **May 2022** | Initial Fees Due |
| 2. | Equipment Shipping Period | **May 2022** | |
| 3. | Equipment Delivery Date | **July 2022** | Shipping Notice one (1) week Prior |
| 4. | Commencement Date | **July 2022** | Contingent on Equipment Delivery Date |
| 5. | Initial Term Expiration | **July 2025** | 36 Months |

**2.  Payment Terms.**

A.  <u>Due Upon Execution of this Agreement:</u> (i) Rate Buy Down, and (ii) Down Payment of Managed Service Fees as described in Payment Schedule.

B.  <u>Due Upon Commencement Date:</u> First month's invoice, including (if applicable), any fees, costs, or expenses incurred by Host – (i) due to Client's failure to meet Hosting Agreement onboarding responsibilities, and (ii) any repair costs incurred by Host due to Client's Defective Equipment prior to Commencement Date.

C.  <u>Due First of the Month During Term:</u> Payment for — (i) monthly Managed Service Fees as enumerated in <u>Section 4</u>, adjusted by "true up" of previous month's actual versus estimated Managed Services, (ii) any Minimum Managed Services Fees for unutilized Managed Services, and (iii) any repair costs incurred by Host invoiced to Client in previous month.

D.  <u>Due Upon Event of Default.</u> See Master Hosting Agreement <u>Section 3.4</u> for Client and Host Termination Payment Obligations.

E.  <u>Due at Term Expiration.</u> All remaining and unpaid Managed Service Fees, plus Equipment decommissioning and logistics expenses borne by Host.

3. **Payment Schedule.**

EXECUTABLE COPY

| Section 2.1 | Rate Buy Down | | |
|---|---|---|---|
| | $2,000,000 | | |

**Section 2.1 | Down Payment**

| Period | Month | Containers | Nameplate (MW) | Total Nameplate (MW) | Estimated Client Usage (kWh) | Effective Price ( $/kWh) | Managed Service Fee (Estimated) |
|---|---|---|---|---|---|---|---|
| 34 | Apr-25 | 5 | 3.0 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 35 | May-25 | 5 | 3.0 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 36 | Jun-25 | 5 | 3.0 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| Down Payment | | | | | | | $ 2,135,250 |

| | | | | | Due Upon Execution of Agreement | $ | 4,135,250 |
|---|---|---|---|---|---|---|---|

**Section 2.2 | Managed Services Fee Schedule**

| Period | Month | Containers | Nameplate (MW) | Total Nameplate (MW) | Estimated Client Usage (kWh) | Effective Price ( $/kWh) | Managed Services Fee (Estimated) |
|---|---|---|---|---|---|---|---|
| 1 | Jul-22 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 2 | Aug-22 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 3 | Sep-22 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 4 | Oct-22 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 5 | Nov-22 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 6 | Dec-22 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 7 | Jan-23 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 8 | Feb-23 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 9 | Mar-23 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 10 | Apr-23 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 11 | May-23 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 12 | Jun-23 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 13 | Jul-23 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 14 | Aug-23 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 15 | Sep-23 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 16 | Oct-23 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 17 | Nov-23 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 18 | Dec-23 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 19 | Jan-24 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 20 | Feb-24 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 21 | Mar-24 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 22 | Apr-24 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 23 | May-24 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 24 | Jun-24 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 25 | Jul-24 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 26 | Aug-24 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 27 | Sep-24 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 28 | Oct-24 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 29 | Nov-24 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 30 | Dec-24 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 31 | Jan-25 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 32 | Feb-25 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 33 | Mar-25 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |
| 34 | Apr-25 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | - |
| 35 | May-25 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | - |
| 36 | Jun-25 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | - |
| Total Managed Services Fees | | | | | 394,200,000 | $ 0.065 | $ 23,487,750 |

*For every MW (and fraction thereof) below Total Nameplate Capacity not utilizing Managed Services during Term

**Section 2.3 | Monthly Minimum Managed Services Fee Schedule**

| MW | Monthly Minimum Fee | $ /MW Calculation: |
|---|---|---|
| 1 | $ 14,235 | 30% * ($711,750 / 15 MW) |
| 2 | $ 28,470 | |
| 3 | $ 42,705 | |
| 4 | $ 56,940 | |
| 5 | $ 71,175 | |
| 6 | $ 85,410 | |
| 7 | $ 99,645 | |
| 8 | $ 113,880 | |
| 9 | $ 128,115 | |
| 10 | $ 142,350 | |
| 11 | $ 156,585 | |
| 12 | $ 170,820 | |
| 13 | $ 185,055 | |
| 14 | $ 199,290 | |
| 15 | $ 213,525 | |

BUSINESS CONFIDENTIAL INFORMATION

## EXHIBIT B

## ONBOARDING POLICIES

### Minimum Equipment Technical Specifications.

A. **New Gen Mining Equipment.** Client Equipment delivered to Host Facility must meet or exceed the minimum technical specifications of the following New Gen equipment:

    a. Antminer: S19 series, S21 Series
    b. Whatsminer
    c. Avalon
    d. Any other manufacturers or models need to be approved by both parties in writing.

B. **Non-Conforming Equipment Specifications.** If the Client's equipment does not conform with the Client Equipment enumerated in <u>Section 1</u> of <u>Exhibit A</u>, or different equipment is provided, Host will adjust recurring monthly Managed Service Fees based on the Equipment's actual usage based upon metering. Notwithstanding, the Minimum Managed Service Fees on unused power shall still apply.

C. **Container Approval.** Client must provide, and Host must approve, Container specifications prior to scheduling delivery to Facility. Host's approval shall not be unreasonably withheld. If there is a substantial and material discrepancy between the containers listed in <u>Exhibit A</u> and the containers delivered to Host Facility, Host reserves the right to reject said Containers, by providing Client written notice as to the basis for Host's rejection. Client accepts the responsibility for all costs associated with Containers which are properly rejected under the terms contained herein. All Client containers rejected by Host shall be subject to the Minimum Service Fee.

D. **Client Equipment.** Client Equipment includes, but is not limited to, Containers, Miners, <u>Managed</u> Switches, Power Cables, and Power Cable Splitters.

E. **Replacement Parts.** Client will be responsible for providing Host, or the party performing maintenance on any Client Equipment, with replacement parts including, but not limited to Client Equipment filters, miners, containers, and network components.

F. **Default Shipping Fees.** In the event of a Client Default, and upon Client's request for Host to uninstall and pack any Client Equipment, Host may charge an uninstallation and packing fee of $300/miner ("Uninstallation and Packing Fee").

EXECUTABLE COPY

## EXHIBIT C

## HOST ACCEPTABLE USE POLICIES

This Acceptable Use Policy ("Policy") describes prohibited uses of the Services offered by MO POW 3 LLC, or any of its affiliates ("Host") and applies to all subscribers ("you," "your," "customer" or "client") of Host managed Services ("Services"). Violation of this Policy may result contract termination.

We reserve the right to modify this Policy at our discretion and will mark new versions with a corresponding effective date and send to the most recent contact from the Hosting Agreement.

### ILLEGAL, HARMFUL, ABUSIVE, OR OFFENSIVE USE OR CONTENT

You may not use the Host Facilities, Services or resources for any illegal, harmful, fraudulent, infringing or offensive use, or in any manner that interferes with or disrupts other network users, Services or equipment. Prohibited activities and content, include but are not limited to:

1. Use of the Host Facilities, Services or resources in any manner which violates any applicable laws or regulations.
2. Content that infringes or misappropriates the intellectual property or proprietary rights of others. This includes violating the privacy of other users, including intentionally seeking information on, obtaining copies of or modifying files, other data or passwords belonging to other users without permission.
3. Wide-scale distribution of messages to inappropriate forums or mailing lists. This includes sending unsolicited mail messages, including the sending of "spam" or other advertising material to individuals who did not specifically request such material, who were not previous customers or with whom the sender did not have an existing business relationship. Host reserves the right to determine in its sole discretion and based on the information available (1) what constitutes spam as well as (2) what measures are necessary in response to spamming complaints.
4. Propagation of computer worms or viruses, use of the network to make unauthorized entry to other computational, information or communications devices or resources. This includes unauthorized security probing activities or other attempts to evaluate the security integrity of a network or host system without permission. This includes uploading any data or software that is subject to distribution or copyright limits. You have the sole liability for any data or software uploaded by you to MO POW 3.
5. Connecting to sites that promote any illegal activity or content that may be damaging to Host servers or any other server on the Internet. Links to such materials are also prohibited. Examples of unacceptable content or links include pirated software, "hacker" programs, archives of pirated copyright software, any kind of software or shareware, any illegal audio/video (mp3, illegally recorded samples etc.), any MPEG or MP3 content or streaming (i.e., Real Audio or Real Video) content of any kind.
6. Harassment, including but not limited to, through language or frequency or size of messages.
7. Unauthorized use, or forging, of mail header information.
8. Solicitations of mail for any other E-mail address other than of the poster's account or service with the intent to harass or to collect replies.
9. Creating or forwarding "chain letters" or other schemes of any type.
10. Use of unsolicited E-mail originating from within Host's network or networks of other Internet Service Providers on behalf of, or to advertise any service hosted by Host or connected via Host's network.
11. Pornography and pornographic related merchandising. This includes sites that include links to pornographic content elsewhere.
12. Denial of Service attacks or hosting.
13. Hacking or attacks on other server systems.

CONTENT CONTROL

With the exception of information specifically authored by or on behalf of Host, Host does not develop or publish, nor does Host review, censor or edit materials and information accessible through Host, or materials and information which are accessible through other computer networks which may be connected to Host.

It is the responsibility of all Host customers and their constituents who have access to the Host service networks and to the networks of other providers, to comply with this Policy and the policies governing those other networks.

Host customers who publish materials and information which are accessible through the Host service networks are solely responsible for the privacy, content and liability of such materials and information and are solely responsible for knowing and to complying with all laws applicable to the publication of such materials and information. Host exercises no control over such content and is not responsible for the content of the materials and information published by others that is accessible through the Host service networks or the violation of any laws resulting from such publication.

MONITORING AND ENFORCEMENT

We reserve the right, but do not assume the obligation, to investigate any violation of this Policy or misuse of the Host Services. We may:

1. Investigate violations of this Policy or misuse of the Manage Services.
2. Remove, disable access to, or modify any content or resource that violates this Policy or any other agreement we have with you for use of the Managed Services.
3. Report any activity that we suspect violates any law or regulation to appropriate law enforcement officials, regulators, or other appropriate third parties. Our reporting may include disclosing appropriate customer information. We also may cooperate with appropriate law enforcement agencies, regulators, or other appropriate third parties to help with the investigation and prosecution of illegal conduct by providing network and systems information related to alleged violations of this Policy.

REPAIRS

Mo Pow 3, LLC's primary business is providing digital currency data center hosting services, not the repair of Client Equipment. Any routine repairs, including— (1) hashboard replacements, (2) control board replacement, (3) PSU replacements, (4) fan replacements (5) firmware updates, and/or (6) miner consolidation in the event of Defective Equipment, performed at Client's request pursuant to Section 1.2(A)(7) is performed by Host as an ancillary service included in the Monthly Service Fee for up to thirty (30) miners per month. Any repairs exceeding the monthly limit shall be performed at the Host's sole discretion, at a rate agreed upon by the Parties in writing prior to the performance of any repairs.

REPORTING OF VIOLATIONS OF THIS POLICY

If you become aware of any violation of this Policy, you must immediately notify us and provide us with assistance, as requested, to stop or remedy the violation. To report any violation of this Policy please contact support@rebelmines.io.

ACCESS TO HOST FACILITY PHYSICAL SITES

EXECUTABLE COPY

Site visits are permitted upon written notice and coordination with Host, at least forty-eight (48) hours prior to visit per Section 1.2(A) (3). Host will make all reasonable efforts to accommodate the request, but Host reserves the right to schedule the site visit for a later date. While on site, Client agrees to follow all protocol in place and may lose access if protocol is broken. Host reserves the right to restrict access to areas that require further security clearance or are deemed dangerous environments, by way of example but not limitation, high voltage zones. Client takes on full liability for any damages caused directly or indirectly by Client during their visit.