Matthew D. Kaufman, WSB #6-3960
Tyler J. Garrett, WSB #6-4400
Melissa K. Burke, WSB #7-5694
HATHAWAY & KUNZ, LLP
P. O. Box 1208
Cheyenne, WY 82003-1208
(307) 634-7723
(307) 634-0985 (fax)
mkaufman@hkwyolaw.com
tgarrett@hkwyolaw.com
mburke@hkwyolaw.com

ATTORNEYS FOR DEFENDANT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| MO POW 3, LLC and MO POW 4, LLC, | |
| Plaintiffs, | |
| vs. | Civil Action No. 1:22-CV-155-KHR |
| CRYPTO INFINITI LLC, | |
| Defendant. | |

## CRYPTO INFINITI LLC'S RESPONSE TO
## PLAINTIFFS' RULE 12(b)(6) MOTION TO DISMISS

**COMES NOW** Defendant, Crypto Infiniti LLC, by and through undersigned counsel, and hereby Responds to *Plaintiffs' Rule 12(b)(6) Motion to Dismiss Defendant's Counterclaims* [ECF No. 22] as follows:

### INTRODUCTION

Crypto Infiniti paid $4,135,250 to MO POW 3 in accordance with the terms of the contract between the two parties. Yet, MO POW 3 has not performed any of its obligations under the

contract and is now trying to keep the $4,135,250 despite doing nothing. Such a windfall is unsustainable pursuant to precedent.

Because MO POW 3 breached its obligations under the contract, Crypto Infiniti asserts two contractually based claims provided under Wyoming law: (1) breach of contract; and (2) breach of good faith and fair dealing. These claims are pled in accord with Fed. R. Civ. P. 8(a)(2) and the plausibility pleading standard articulated in cases such as *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010), *Houska v. Newkota Servs. & Rentals*, No. 20-CV-68-SWS, 2020 WL 10356992, at *2 (D. Wyo. Aug. 3, 2020), and *McCarty v. Liberty Mut. Ins. Co.*, No. 15-CV-210-KHR, 2016 WL 8290131 (D. Wyo. Feb. 10, 2016). Crypto Infiniti's contractually based claims are plainly supported by enough facts to be plausible on their face. Indeed, the factual content pled in Crypto Infiniti's Counterclaims allows the Court to draw the reasonable inference that MO POW 3 is liable for the misconduct alleged.

MO POW 3 and MO POW 4's attempt to create a heightened pleading standard, a standard under which their own claims would not survive. (*Compare* ECF No. 7.) Precedent is clear that the plausibility standard did not substitute Fed. R. Civ. P. 8(a)(2) that requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *McCarty*, No. 15-CV-210-KHR, 2016 WL 8315740, at *2. As the Court has explained, the "*Twombly* and *Iqbal* standard is a middle ground between the heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *McCarty*, No. 15-CV-210-KHR, 2016 WL 8290131, *2 (cleaned up).

Regarding its claim for conversion, Crypto Infiniti is fully aware of the Court's *Order Granting In Part and Denying In Part Defendant's Motion to Dismiss* (ECF No. 18) that dismissed

MO POW 3 and MO POW 4's fraud claim due to the economic loss rule. However, several reasons compel Crypto Infiniti to plead a conversion claim for the Court's consideration.

First, while the Second Contract between Crypto Infiniti and MO POW 4 was terminated, MO POW 3 and MO POW 4 contend that the Second Contract was an "integrated transaction" with the First Contract. As a result, to the extent MO POW 3 and MO POW 4 attempt to wrongfully keep the $4,135,250 through the Second Contract as integrated *via* the First Contract, such conduct amounts to conversion and is not barred by the economic loss rule because the Second Contract was terminated.

Second, Wyoming precedent indicates that there are circumstances where breach of contract and conversion claims can proceed together past the pleading stage in a way that does not defy the economic loss doctrine. *See Skyco Res., LLP v. Fam. Tree Corp.*, 2022 WY 72, 512 P.3d 11 (Wyo. 2022). Indeed, in *Skyco*, the Wyoming Supreme Court dealt with a ruling at the summary judgment stage and applied the economic loss rule to the fraud claim, but not to the conversion claim. 2022 WY 72, ¶ 36, 512 P.3d 11, 25. While at first blush MO POW 3 and MO POW 4's argument seems cogent, a deeper dive into precedent is necessary for the Court to make an informed decision on the matter.

Third, based upon Crypto Infiniti's affirmative defenses, the validity of the contract between it and MO POW 3 may be called into question by the Court. If that were to occur, then an alternative claim is required to have the Court disgorge the $4,135,250 that MO POW 3 refuses to return to Crypto Infiniti.

Ultimately, after assessing the parties' dueling arguments, the Court should arrive at the conclusion that Crypto Infiniti's contractual based counterclaims are pled in accordance with federal precedent governing procedure. As to the conversion claim, Crypto Infiniti acknowledges

that it is a closer call, but that such a claim should survive the initial pleading stage and be reconsidered after the discovery phase *via* summary judgment pursuant to Fed. R. Civ. P. 56.

## FACTS

On August 28, 2022, a broker approached Crypto Infiniti concerning a 15-megawatt site available in Missouri at $.075 for all-in hosting. (ECF No. 21, at 8.) Crypto Infiniti stressed that it had concerns with sites using EZ Blockchain "EZB" containers for hosting because of overheating issues with digital currency equipment in such an environment. (*Id.*)

On May 16, 2022, a Crypto Infiniti representative conducted a pre-contract "site visit" in Springfield, Missouri. (ECF No. 21, at 9.) Three substations were visited in Springfield at this time by the Crypto Infiniti representative. (*Id.*) MO POW 3 and MO POW 4's representative, Thomas Guel, was present for the site visit and represented that the substation that could connect first to the power grid is where Crypto Infiniti's digital currency equipment would be located. (*Id.*) Mr. Guel represented that MO POW 3 and MO POW 4 would provide data to Crypto Infiniti concerning management of the EZB containers and represented that the EZB containers would be managed in a way to avoid overheating issues. (*Id.*) Mr. Guel also represented that Crypto Infiniti representatives could visit the sites at any time where its digital currency equipment was to be located. (*Id.*)

On May 26, 2022, Crypto Infiniti and MO POW 3 executed a Master Hosting Services Agreement ("First Contract"). (ECF No. 21, Exhibit A.) The First Contract requires that MO POW 3 provide hosting services at a site in Greene County, Missouri with 15 megawatts of power to run Crypto Infiniti's digital currency equipment. (*Id.*) The First Contract provides that MO POW 3's facility is located at 400 North Main, Springfield, Missouri 65802, which is where Crypto Infiniti's equipment was to be shipped. (*Id.*)

Also on May 26, 2022, Crypto Infiniti executed a separate Master Hosting Services Agreement with MO POW 4 ("Second Contract"). (ECF No. 21, Exhibit B.) The Second Contract requires that MO POW 4 provide hosting services at a site in Green County, Missouri with 20 megawatts of power to run Crypto Infiniti's digital currency equipment. (*Id.*) The address for MO POW 4's facility is 5501 East Farm Road 112, Strafford, Missouri 65757, which is where Crypto Infiniti's equipment was to be shipped. (*Id.*)

On May 27, 2022, Crypto Infiniti initiated a test payment, *via* wire, in the amount of $10.00. (ECF No. 21, Exhibit C.) This payment was for the "buy down" Host's typical Managed Services Fee as set forth in the First Contract. (*Id.*) On May 28, 2022, Crypto Infiniti initiated a first payment, *via* wire, in the amount of $1,999,990.00. (ECF No. 21, Exhibit D.) This payment was for the "buy down" Host's typical Managed Services Fee as set forth in the First Contract. (*Id.*) On June 2, 2022, Crypto Infiniti initiated a second payment, *via* wire, in the amount of $2,135,250.00. (ECF No. 21, Exhibit E.) This payment was for the total Down Payment of Managed Services Fees as set forth on the Payment Schedule attached to the First Contract. (*Id.*; *see* Exhibit A.) MO POW 3 and MO POW 4 received all three payments made by Crypto Infiniti, which totaled $4,135,250. (ECF No. 21, at 10.)

On June 7, 2022, Crypto Infiniti representatives conducted a second site visit in Green County, Missouri. (ECF No. 21, at 10.) A representative of MO POW 3 and MO POW 4 showed the newly installed software (foreman.mn) and promised to provide Crypto Infiniti with data of digital currency equipment temperatures upon obtaining permission from Mr. Guel. (*Id.*)

On June 17, 2022, Mr. Guel provided Crypto Infiniti with a bill of laden for transformers and a screen shot for payment of EZB containers. (ECF No. 21, Exhibit F.) In his communication, Mr. Guel admitted that there still had not been permit approval for electric, and that "[t]he

disapproval was at a preliminary stage and has been corrected so all we are waiting for is the final approval . . . ." (*Id.*)

On June 21, 2022, a Crypto Infiniti representative conducted a third site visit in Green County, Missouri. (ECF No. 21, at 10.) During this visit, a representative for MO POW 3 and MO POW 4 refused to provide data concerning digital currency equipment temperatures pursuant to Mr. Guel's instruction. (*Id.*)

On June 24, 2022, counsel for Mr. Guel communicated with Crypto Infiniti, and explained that Mr. Guel had not received $3,066,000 under the Second Contract with MO POW 4, and therefore Mr. Guel "reserves the right to honor the HAS's executed between my client and CI but has no legal obligation to do so." (ECF No. 21, Exhibit G.) Then, on June 27, 2022, Crypto Infiniti had a Zoom meeting with Mr. Guel regarding the First Contract and Second Contract. (ECF No. 21, at 11.) Mr. Guel represented that everything was on schedule for the First Contract, and that he was waiting for payment on the Second Contract. (*Id.*) Crypto Infiniti reaffirmed its concern of the overheating issues relating to the EZB containers that Mr. Guel insisted to use for Crypto Infiniti's digital currency machines. (*Id.*) Crypto Infiniti requested data of digital currency equipment temperatures to assess live operations. (*Id.*) Mr. Guel did not provide such information. (*Id.*)

On June 28, 2022, Crypto Infiniti requested to have its forthcoming deposit payment under the Second Contract be placed in escrow to ensure the money would be used for construction of the site where Crypto Infiniti's digital currency equipment would be located. (ECF No. 21, at 11.) Mr. Guel refused such a request, stating: "Not Gonna happen." (ECF No. 21, Exhibit H.) Crypto Infiniti expressed concern that Mr. Guel used the previous payments totaling of over $4,135,250 for projects not related to Crypto Infiniti's site, which put into question Mr. Guel's ability to

complete the designated site that would house Crypto Infiniti's digital currency equipment. (ECF No. 21, at 11.)

On July 5, 2022, Crypto Infiniti's counsel sent a letter to Mr. Guel informing that Crypto Infiniti accepted Mr. Guel's previous notice of right to terminate on June 24, 2022, regarding the Second Contract with MO POW 4. (ECF No. 21, Exhibit I.) Crypto Infiniti's counsel also reaffirmed that the First contract remained binding, that payment of both the Rate Buy Down payment and the Deposit payment had been paid by Crypto Infiniti in accordance with the terms of the First Contract. (*Id*.) As such, Crypto Infiniti insisted that MO POW 3 fully perform its obligations thereunder. (*Id.*) Crypto Infiniti's counsel made clear that in the event MO POW 3 failed to comply, or delayed compliance, with its obligations under the First Contract, Crypto Infiniti would suffer damages as a direct result of such failure or delay in compliance. (*Id.*)

On July 22, 2022, Crypto Infiniti's counsel requested shipping information so that Crypto Infiniti could ship its digital currency equipment to the designated site in Green County, Missouri. (ECF No. 21, at 12.) Crypto Infiniti's counsel's letter provides in pertinent part:

> Thank you for your email dated July 20, 2022 to our client, Crypto Infiniti LLC (hereinafter "Client"). This letter shall serve as confirmation of our Client's intention to comply with all obligations under the MO POW 3 Master Hosting Agreement executed between the Parties on May 27th, 2022 (hereinafter "Agreement") and as the Shipping Notice under the terms of the Agreement. Pursuant to the terms of the Agreement, the performance of the Agreement shall be independent of and not conditional on, any other agreements including but not limited to the MO POW 4 Master Hosting Agreement.

> Accordingly, our Client seeks confirmation from MO POW 3 LLC of the full address for the Facility, as defined in the Agreement (hereinafter "Facility"), to which our Client may arrange for shipping of all Client Equipment, as defined in the Agreement. Upon receipt of the full address for shipment, our Client shall immediately prepare for shipping of the Client Equipment.

As of the last date upon which the Parties jointly visited the Facility in-person, construction was still ongoing, and the Facility was unfit to provide the Managed Services. Our Client has made multiple attempts to visit the Facility since that date, however, MO POW 3 LLC has declined to allow a subsequent visit. Due to the state of the Facility as of the date of the last visit, our Client seeks confirmation from MO POW 3 LLC that the Facility is presently prepared to offer the Managed Services, as defined in the Agreement, and that MO POW 3 LLC intends to comply with all obligations under the Agreement, including but not limited to the provision of the Managed Services upon receipt of the Client Equipment.

In the event MO POW 3 LLC does not intend to comply with the obligations contained in the Agreement, our Client requests a return of any and all deposits, and the Rate Buy Down payment, as required by Section 3.4(A) of the Agreement, no later than five (5) business days from the date of receipt of this letter. Instructions for return of the funds, including necessary banking and account information, can be found on Exhibit A which is attached hereto.

Our Client is eager to continue the productive long-term relationship contemplated by the Parties under the Agreement and we look forward to your response on the requested information by July 25, 2022 (PST).

(ECF No. 21, Exhibit J.) Neither Mr. Guel nor any other representative from MO POW 3 provided the required shipping information for Crypto Infiniti to ship its digital currency equipment to MO POW 3's hosting site. (ECF No. 21, at 13.)

Unbeknownst to Crypto Infiniti, MO POW 3 filed an action in the U.S. District Court for Wyoming on July 19, 2022, instead of performing its obligations under the First Agreement it executed with Crypto Infiniti. (ECF No. 21, at 13; *see* ECF No. 4.) MO POW 4 is also a named plaintiff in the complaint, even though that contract had been previously terminated by the parties. (*Id.*) In their Amended Complaint (ECF No. 7) and their response to Crypto Infiniti's motion to dismiss (ECF No. 17), MO POW 3 and MO POW 4 asserted that the First Contract and Second Contract formed a supposed "integrated transaction" in hopes of being relieved from performing under the First Contract.

Then, in an attempt to gain some sort of after-the-fact strategic advantage to be used in the litigation, on October 12, 2022, MO POW 3 sent a "legal notice" to Crypto Infiniti, despite the pending litigation that MO POW 3 itself had filed. (ECF No. 21, Exhibit K.) In its "legal notice," MO POW 3 for the first time provided a shipping address for Crypto Infiniti to ship its digital currency equipment. (*Id.*) The shipping address that MO POW 3 provided in its October 12, 2022, "legal notice" was 5501 East Farm Road 11, Strafford, MO 65757, which is different than the shipping address stated in the First Contract (*i.e.*, 400 North Main, Springfield, Missouri 65802). (*Compare* Exhibit K *with* Exhibit A.)

MO POW 3 also unilaterally attempted to change the Managed Services rate set forth in the First Contract. (ECF No. 21, Exhibit K.) Despite the commencement date not being triggered under § 1.1(B)(3) of the First Contract, MO POW 3's "legal notice" also asserted that Crypto Infiniti must pay the first month's invoice for managed service fees and that MO POW 3 would unilaterally terminate the First Contract if payment was not received within fifteen days. (*Id.*) On October 25, 2022, MO POW 3 sent another "notice" that it would be unilaterally terminating the First Agreement if payment for the first month's invoice was not received by October 27, 2022. (ECF No. 21, Exhibit L.)

Mr. Guel then sent Crypto Infiniti a "notice of termination" letter on October 31, 2022, attempting to unilaterally terminate the First Contract (and the previously terminated Second Contract). (ECF No. 21, Exhibit M.) In his letter, Mr. Guel asserted that because Crypto Infiniti did not pay the first month's invoice, MO POW 3 was terminating the First Contract. (*Id.*) Mr. Guel then went on to assert that because Crypto Infiniti did not pay the down payment under the Second Contract, that MO POW 4 was terminating the Second Contract. (*Id.*) Interestingly, the position taken by Mr. Guel in his October 31, 2022, letter confirms that the First Contract and

Second Contract are separate and not an integrated transaction, which is contrary to the arguments made in MO POW 3 and MO POW 4's pleadings filed with the U.S. District Court. (*Compare id. with* ECF No. 7 and ECF No. 17.)

STANDARD OF REVIEW

Because this is a diversity action, the Court applies federal procedural law and state substantive law. *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 660 (10th Cir. 2018). "In examining a claim's sufficiency, the Court may not weigh potential evidence that the parties might present at trial." *McCarty v. Liberty Mut. Ins. Co.*, No. 15-CV-210-KHR, 2016 WL 8290131, at *2 (D. Wyo. Feb. 10, 2016) (cleaned up). Instead, the Court must accept all the well-pleaded allegations of Crypto Infiniti's Counterclaims as true and must construe them in the light most favorable to Crypto Infiniti while assessing whether Crypto Infiniti's Counterclaims alone are legally sufficient to state a claim for which relief may be granted. *Id.*

While Rule 12(b)(6) requires the Court to accept the factual allegations contained in Crypto Infiniti's Counterclaims as true, conclusory allegations need not be accepted by the Court. *Id.* Put plainly, Crypto Infiniti's Counterclaims must be supported by enough facts to be "plausible on its face." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 571–72 (2007)). Crypto Infiniti's Counterclaims have facial plausibility by pleading factual content that allows the Court to draw the reasonable inference that MO POW 3 is liable for the misconduct alleged. *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). That said, the plausibility standard does not replace Fed. R. Civ. P. 8(a)(2), which requires Crypto Infiniti to present only a short and plain statement of the claim showing that the pleader is entitled to relief. *Id.*; Fed. R. Civ. P. 8(a)(2). Thus, the plausibility standard "is a middle ground between the heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of

the elements of a cause of action." *Id.* (quoting *S.E.C. v. Shields*, 744 F.3d 633, 640-641 (10th Cir. 2014)).

Regarding state substantive law, the Court's aim is not to reach its own judgment regarding the substance of common law, but simply to apply Wyoming law in accordance with Wyoming Supreme Court precedent. *Wade v. EMASCO Ins. Co.*, 483 F.3d 657, 665-66 (10th Cir. 2007). However, where there is no controlling precedent from the Wyoming Supreme Court, the Court can attempt to predict what that court would do. *Id.*

## ARGUMENT

### *Counterclaim I: Breach of Contract*

Under the terms of the First Contract, Crypto Infiniti paid a total of $4,135,250. (ECF No. 21, at 10.)  In return, MO POW 3 is required to provide myriad services, including providing Smart Box 3000 containers manufactured by EZ Blockchain for colocation at MO POW 3's site in Green County, Missouri. (ECF No. 21, Exhibit A at 1.) Additionally, MO POW 3 is required to provide managed services that consist of the following:

> Managed Services. Host shall provide rack space allocation for the Client Equipment (the "Client Space"), installation services, electrical power connection, power supply of at least fifteen (15) MW, network connectivity, security, maintenance, repair, and technical support, as outlined in this Agreement (the "Managed Services").

(ECF No. 21, Exhibit A at 3.)

However, MO POW 3 has attempted to escape its managed services obligations by not providing the necessary information to Crypto Infiniti to ship its equipment, which would then trigger the managed services commencement date. The managed services "commencement date" is triggered in two ways:

Commencement Date. Host shall commence the provision of Managed Services ("Commencement Date") on the later of:

(i) Thirty (30) calendar days after the Host's receipt of all Client Equipment; or

(ii) a date agreed to by the Parties in writing as stated in Exhibit A; provided, however, that Host may extend the agreed-upon Commencement Date by up to ninety (90) days with prior written consent from Client.

(ECF No. 21, Exhibit A at 3.)

While Crypto Infiniti gave notice to ship its digital currency mining equipment and requested confirmation of MO POW 3's shipping information (ECF No. 21, Exhibit J), MO POW 3 intentionally did not provide such information in hopes of not having the commencement date triggered and their managed services kick-in. Rather, MO POW 3 raced to the courthouse to file first and further thwart its obligations under the First Contract.[1] Indeed, it was not until after MO POW 3 filed the current action that it finally provided the requisite shipping information. (ECF No. 21, Exhibit K.) Specifically, in its October 12, 2022 "legal notice," MO POW 3 provided the following shipping information: "Equipment Receiving Address, MO POW 3, LLC, 5501 East Farm Road 11, Strafford, MO 65757." (ECF No. 21, Exhibit K.)

Interestingly, in its motion to dismiss, MO POW 3 ignores its October 12, 2022 "legal notice" setting forth the 5501 East Farm Road 11, Strafford, MO 65757 address, and tries to rely on the First Contract's equipment delivery provision that sets forth a different address: 400 North Main, Springfield, Missouri 65802. (*Compare* ECF No. 21, Exhibit A *with* ECF No. 22, at 2-3, 8.)

---

[1] Despite the commencement date not being triggered, MO POW 3 has taken an after-the-fact litigation tactic by attempting to terminate the First Contract for the alleged non-payment of the managed services fee. (ECF No. 21, Exhibits K, L, & M.)

MO POW 3's arguments in its motion to dismiss are contrary to its own actions, as revealed in its

October 12, 2022 "legal notice."

Additionally, Crypto Infiniti made several attempts to visit MO POW 3's facility, as

reflected in its counsel's letter dated July 22, 2022:

> As of the last date upon which the Parties jointly visited the Facility in-person, construction was still ongoing, and the Facility was unfit to provide the Managed Services. Our Client has made multiple attempts to visit the Facility since that date, however, MO POW 3 LLC has declined to allow a subsequent visit. Due to the state of the Facility as of the date of the last visit, our Client seeks confirmation from MO POW 3 LLC that the Facility is presently prepared to offer the Managed Services, as defined in the Agreement, and that MO POW 3 LLC intends to comply with all obligations under the Agreement, including but not limited to the provision of the Managed Services upon receipt of the Client Equipment.

(ECF No. 21, Exhibit J.) MO POW 3's refusal to allow access to the facility is in breach of the

First Contract, which provides:

> *Physical Access*. Access by Client to Facility shall require forty-eight (48) hour written notice to Host prior to requested visit date. Only those person, or representative of named entity, specifically identified in Client's written notice may access the Facility. All visits to the Facility must be supervised by a Host or its representative. Host shall promptly arrange supervision for the requested visit date and shall not use failure to arrange supervision as a reason to prevent Client from accessing the [F]acility. Client shall be solely responsible for any damage or loss caused by any person acting for, or on its behalf, while at the Facility except to the extent that any such damage or loss is due in any part to the contributory negligence of Host.

(ECF No. 21, Exhibit A at 3.)

Based upon review of the facts pled in Crypto Infiniti's Counterclaims, it is plausible that

MO POW 3 breached the First Contract under Wyoming law. *Peterson v. Meritain Health, Inc*.,

2022 WY 54, ¶ 22, 508 P.3d 696, 705 (Wyo. 2022) (reaffirming that the elements of a breach of

contract claim are a lawfully enforceable contract, an unjustified failure to timely perform all or

any part of what is promised, and entitlement of the injured party to damages). As such, the Court should deny MO POW 3 and MO POW 4's motion to dismiss Crypto Infiniti's breach of contract counterclaim against MO POW 3. *See McCarty*, No. 15-CV-210-KHR, 2016 WL 8290131, at *5.

**Counterclaim II: Breach of the Covenant of Good Faith and Fair Dealing**.

As the Court has explained, "'[e]very contract imposes (implies) upon each party a duty of good faith and fair dealing in its performance and its enforcement.'" *McCarty*, No. 15-CV-210-KHR, 2016 WL 8290131, at *5 (D. Wyo. Feb. 10, 2016) (quoting *Hatfield v. Rochelle Coal Co.*, 813 P.2d 1308, 1309 (Wyo. 1991) (quoting Restatement (Second) of Contracts § 205 (1981)). "The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement." *Scherer Const., LLC v. Hedquist Const., Inc.*, 2001 WY 23, ¶ 19, 18 P.3d 645, 653–54 (Wyo. 2001). "Compliance with the obligation to perform a contract in good faith requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party." *Id.* "A breach of the covenant of good faith and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance." *Id.*

Because Crypto Infiniti's breach of contract claim against MO POW 3 is plausible, it necessarily follows that Crypto Infiniti can sustain a claim for breach of the covenant of good faith and fair dealing under Wyoming law. *McCarty*, No. 15-CV-210-KHR, 2016 WL 8290131, at *5. Additionally, the factual allegations set forth in Crypto Infiniti's Counterclaims sufficiently satisfies the elements for its claim at the pleading stage. *See supra* at pp. 4-9, 11-13. For instance, MO POW 3 wrongfully refused to provide necessary shipping information that would then trigger MO POW 3's managed services obligations. *Id.* Further, for example, MO POW 3 wrongfully refused to provide Crypto Infiniti access to the facility. *Id.* The facts pled plainly establish that MO

POW 3 breached the covenant of good faith and fair dealing. Accordingly, Crypto Infiniti's claim is plausible, and the Court should deny MO POW 3's motion to dismiss.

### Counterclaim III: Conversion

MO POW 3 and MO POW 4 generally contend that Crypto Infiniti's counterclaim for conversion is barred by the economic loss rule. However, assessing the counterclaim for conversion on more than just a superficial level reveals that such is plausible and should endure past the pleading stage.

"Conversion occurs when a person treats another's property as his own, denying the true owner the benefits and rights of ownership." *McTiernan v. Jellis*, 2013 WY 151, ¶ 23, 316 P.3d 1153, 1161 (Wyo. 2013) (internal quotations omitted). "To establish a claim for conversion, the following elements must be met: (1) plaintiff had legal title to the converted property; (2) plaintiff either had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff his rights to use and enjoy the property; (4) in those cases where the defendant lawfully, or at least without fault, obtained possession of the property, the plaintiff made some demand for the property's return which the defendant refused; and (5) the plaintiff has suffered damage by the loss of the property." *Id.*; *Skyco Res., LLP v. Fam. Tree Corp.*, 2022 WY 72, ¶ 36, 512 P.3d 11, 24 (Wyo. 2022).

While the Second Contract between Crypto Infiniti and MO POW 4 was terminated (*see* ECF No. 21, Exhibits G & I), MO POW 3 and MO POW 4 contend that the Second Contract was an integrated transaction with the First Contract. As a result, to the extent MO POW 3 and MO POW 4 attempt to wrongfully keep portions of the $4,135,250 through the Second Contract as integrated *via* the First Contract, such conduct amounts to conversion and is not barred by the economic loss rule because the Second Contract was terminated.

Furthermore, Wyoming precedent indicates that there are circumstances where breach of contract and conversion claims can proceed together past the pleading stage in a way that does not defy the economic loss doctrine. *See Skyco Res.*, LLP, ¶¶ 35-36, 512 P.3d 11, 24. In *Skyco*, the Wyoming Supreme Court dealt with a ruling at the summary judgment stage and applied the economic loss rule to the fraud claim, but not to the conversion claim. *Id.* at ¶ 36, 512 P.3d at 25.

The facts of the case involved a revocation of a purchase and sale agreement involving land with mineral interests. *Id.* at ¶¶ 3-9, 512 P.3d at 15-17. The plaintiff was seeking its earnest money following the termination of the agreement; the defendant argued it was not obligated to make any refunds because it was not afforded the opportunity to cure any defaults through notice and the requisite waiting period. *Id.* at ¶ 10, 512 P.3d at 17. The plaintiff claimed that the notice and cure provisions did not apply. *Id.* The Court allowed the conversion claim to proceed after concluding (1) the notice and cure provisions did apply, (2) the plaintiff had repudiated the contract by announcing it would not complete the purchase, and (3) finding that compliance with the notice and cure provision may have been futile. *Id.* at ¶¶ 19-31, 512 P.3d at 19-23. Because there was a factual issue regarding whether the plaintiff was entitled to the return of its earnest money based on the futility of providing notice and the opportunity to cure, the conversion claim was able to proceed. *Id.* at ¶ 36, 512 P.3d at 25. Although the economic loss doctrine was raised below regarding the fraud/intentional misrepresentation claim, the Wyoming Supreme Court did not apply the doctrine to the conversion claim and reversed the district court's order dismissing the conversion claim, thus permitting it to proceed in the face of the economic loss rule. *See id.* Notably, the economic loss doctrine was only considered at the summary judgment stage, not the motion to dismiss stage. *Id.* at ¶ 12, 512 P.3d at 17-18.

The last basis the Court should consider in determining whether the economic loss rule bars the counterclaim for conversion, concerns Crypto Infiniti's affirmative defenses. Based upon several of Crypto Infiniti's affirmative defenses, the First Contract's validity may be called into question by the Court. If that were to occur, then an alternative claim is required to have the Court disgorge the $4,135,250 that MO POW 3 refuses to return.

Take for instance, Crypto Infiniti's affirmative defense that a mutual mistake exists as to the material terms of the First Contract. The Wyoming Supreme Court has set forth the elements of a mutual mistake:

> The essential elements of mutual mistake in a written instrument for which a court of competent jurisdiction may grant appropriate relief are that there was an antecedent agreement which the written instrument undertakes to evidence; that a mistake occurred in the drafting of the instrument and not in the antecedent agreement which it undertakes to evidence; and that in the absence of fraud or inequitable conduct on the part of one of the parties, the mistake was mutual.

*Hansen v. Little Bear Inn Co*., 9 P.3d 960, 964–65 (Wyo. 2000) (internal quotations and citations omitted); Restatement (Second) of Contracts § 151 (1981) (defining mistake as "[a] belief [that] is not in accord with the facts." Comment a to Restatement (Second) of Contracts § 151 elucidates:

> The word "mistake" is not used here, as it is sometimes used in common speech, to refer to an improvident act, including the making of a contract, that is the result of such an erroneous belief. This usage is avoided here for the sake of clarity and consistency. Furthermore, the erroneous belief must relate to the facts as they exist at the time of the making of the contract. A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a "mistake" as that word is defined here.

While MO POW 3 contends that the First Contract was some sort of an "integrated transaction" with the Second Contract, Crypto Infiniti contends that an "integrated transaction" is not a legally recognized concept in Wyoming. Further, if the Second Contract were incorporated

into the First Contract, then such incorporating language was required to be included in the First Contract. Based upon the positions of the parties, the Court decided in its *Order Granting In Part and Denying In Part Defendant's Motion to Dismiss*, that "it is plausible based off the Amended Complaint, part of Defendant's promise for the Second Agreement is included in the First Agreement by these references." (ECF No. 18, at 8.) The Court went on to hold:

> The shared consideration also begs the question of why the parties would mention the fact at all unless it carried some level of importance to the First Agreement. At a minimum, it creates some level of ambiguity in that it is not clear from the face of the First Agreement as to why the shared consideration was mentioned. Thus, it is appropriate, at least at the motion to dismiss stage, to consider that both contracts share the same subject matter, are for a similar purpose of providing hosting services to Defendant, and were concurrently entered into. See Skaf, 2021 WY at ¶ 42, 495 P.3d at 901 (stating contract language is construed in the context it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the agreement in order to find the intent of the parties). Last, while both Plaintiffs are different entities, they are also affiliates owned by the same single member. (ECF No. 7, Ex. 1 & Ex. 2). Viewing all of these facts together, Plaintiffs' First Claim for Relief is plausible and survives Defendant's Motion to Dismiss.

(ECF No. 18, at 8.)

While MO POW 3's "integrated transaction" argument survived the initial pleading stage, it may be revealed through discovery that the parties were mutually mistaken at the time they entered into the First Contract as to the applicability of the Second Contract. Accordingly, if the Court were to find that a mutual mistake exists, the First Contract may be cancelled, *see Hansen*, 9 P.3d at 964, which would require Crypto Infiniti to assert an alternative claim for the Court to disgorge the $4,135,250 that MO POW 3 refuses to return. As a result, the Court should deny MO POW 3 and MO POW 4's motion to dismiss the counterclaim for conversion on this basis as well.

Ultimately, the economic loss doctrine does not conclusively bar tort claims like conversion. If the conversion claim is independent of a breach of contract, it is not barred. Here, Crypto Infiniti has alleged that MO POW 3 obtained possession of its funds through the First Contract but then MO POW 4 terminated the Second Contract, and both are wrongfully retaining the funds for other uses, unrelated to Crypto Infiniti. Thus, the economic loss doctrine should not bar Crypto Infiniti's conversion claim, at least at the motion to dismiss stage before there has been an opportunity to conduct discovery regarding MO POW 3 and MO POW 4's use of the millions of dollars paid by Crypto Infiniti.

### CONCLUSION

For Crypto Infiniti's Counterclaims to survive a Rule 12(b)(6) motion to dismiss, they must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft*, 556 U.S. at 678 (quoting *Atlantic Corp.*, 550 U.S. at 570). In assessing MO POW 3 and MO POW 4's motion, the Court must accept as true all well-pleaded factual allegations in the Counterclaims in a light most favorable to Crypto Infiniti. *Los Lobos Renewable Power,* LLC, 885 F.3d at 660. Applying the applicable standard of review, the Court should hold that Crypto Infiniti has pled sufficient facts concerning its claims for (1) breach of contract, (2) breach of the duty of good faith and fair dealing, and (3) conversion. Accordingly, MO POW 3 and MO POW 4's motion to dismiss should be denied.

**DATED** this 16th day of December 2022.

CRYPTO INFINITI LLC

By: /s/   Tyler J. Garrett
    Matthew D. Kaufman, WSB #6-3960
    Tyler J. Garrett, WSB #6-4400
    Melissa K. Burke, WSB #7-5694
    Hathaway & Kunz, LLP
    2515 Warren Ave. Ste 500
    P.O. Box 1208
    Cheyenne, WY 82003
    Phone:  307-634-7723
    Fax:  307-634-0985
    mkaufman@hkwyolaw.com
    tgarrett@hkwyolaw.com
    mburke@hkwyolaw.com

    ATTORNEYS FOR CRYPTO INFINITI LLC

## CERTIFICATE OF SERVICE

This is to certify that on the 16th day of December, 2022, a true and correct copy of the foregoing was served upon counsel as follows:

Jeffrey S. Pope             [ ✓ ] EM/ECF/Electronic Filing
Kasey J. Schlueter          [   ] U.S. Mail
Holland & Hart, LLP        [   ] Fax:
2515 Warren Avenue, Suite 450   [   ] E-mail
P.O. Box 1347
Cheyenne, WY 82003-1347

*Attorneys for Plaintiffs*

    /s/ Tyler J. Garrett
    Hathaway & Kunz, LLP