

FILED

U.S. Magistrate Judge

10:03 am, 1/27/23

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| MO POW 3, LLC and MO POW 4, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>CRYPTO INFINITI LLC,<br><br>Defendant. | Case No.  22-CV-155-KHR |

## ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS [22]

Before the Court is Plaintiff's Motion to Dismiss Defendant's Counterclaims. (ECF No. 22). Plaintiff alleges Defendant's counterclaims are barred by the economic loss rule, fail to state a claim, and/or do not provide sufficient notice of the alleged breaching conduct. Defendant counters arguing the counterclaims are plausible and its conversion claim is not barred. The Court, being fully advised, grants Plaintiffs' Motion.

### BACKGROUND

This action is related to two agreements entered between Plaintiffs and Defendant.[1] The first is MO POW 3's Master Services Agreement with Defendant (the "First Agreement") and the second is MO POW 4's Master Services Agreement with Defendant

---

[1] The Court will use the same Background facts as used in its Order addressing Defendant's Motion to Dismiss. (ECF No. 18). To the extent facts differ or new facts are raised in Defendant's counterclaims, those will be accepted as true for purposes of Plaintiffs' Motion to Dismiss and listed later in this Order. Additionally, for purposes of clarity, the Court will continue to refer to MO POW 3 and MO POW 4 as "Plaintiffs" and Crypto Infiniti as "Defendant."

(the "Second Agreement"). (ECF No. 7, at 3). Both agreements show the same basic terms and requirements. *Id.* at 4, Ex. 1, Ex. 2. MO POW 3 and MO POW 4 "are part of a consortium of companies providing hosting services for companies that mine for digital currency." *Id.* at 3. The two contracts entered were to provide Defendant with 35 Megawatts (MW) hosting service for its digital currency mining equipment. *Id.* Specifically, the First Agreement provided for 15 MW of power and the Second Agreement provided for 20 MW of power. The facilities for both agreements are located in Greene County, Missouri with one being owned my MO POW 3 and related to the First Agreement while the other was owned by MO POW 4 and related to the Second Agreement. *Id.*

Upon executing the agreements on May 26, 2022, two types of payments—a rate buy down payment and a down payment—were due from Defendant to Plaintiffs.[2] *Id.* at 4, Ex. 1, Ex. 2. The rate buy down payment of $2,000,000 represented the payment Defendant was making to Plaintiffs for their discounted managed colocation services. *Id.* at Ex. 1. Only the First Agreement provided for a rate buy down payment, however, the agreement specified that the payment was to "buy down" both MO POW 3's and MO POW 4's typical managed services fee while referencing both the First Agreement and the Second Agreement. *Id.* The other payments due at signing were a down payment of $2,135,250 for the power usage in the First Agreement and down payment of $3,066,000 for the power usage in the Second Agreement. *Id.* at Ex. 1, Ex. 2. All of these payments were due upon

---

[2] The Court notes that Defendant refers to the $2,000,000 payment as the "down payment" and the $2,135,250 payment as the rate buy down payment. (ECF No. 14, at 7). However, based on the language of the contract and Plaintiffs' Amended Complaint, this is believed to be in error. The amounts are correct, but the purpose of the payments is flipped.

execution of the documents. *Id.* Additionally, each agreement provided a payment schedule for an estimated managed services fee to be made monthly in the future. *Id.*

After both agreements were signed, Defendant was late making the payments required under the First Agreement. *Id.* at 5. As of the date the Amended Complaint was filed, none of the payments required under the Second Agreement had been paid. *Id.* MO POW 4 informed Defendant it was in default of its obligations and Defendant responded demanding MO POW 3 uphold its obligations under the First Agreement even if the Second Agreement was terminated. *Id.* Plaintiffs responded with this action.

After ruling on Defendant's Motion to Dismiss, Defendant filed an Answer asserting three counterclaims: breach of contract, breach of the duty of good faith and fair dealing, and conversion. (ECF No. 21, at 14–17). Plaintiffs now move to dismiss those counterclaims.

## Relevant Law

This is a diversity action. When sitting in diversity, a federal court applies federal procedural law and state substantive law. *E.g., Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 660 (10th Cir. 2018). A "federal court's task is not to reach its own judgment regarding the substance of common law, but simply to 'ascertain and apply the state law'" using the "most recent decisions of the state's highest court." *Wade v. EMASCO Ins. Co.*, 483 F.3d 657, 665–66 (10th Cir. 2007) (quoting *Wankier v. Crown Equip, Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)). However, "'[w]here no controlling state decision exists, [a] federal court must attempt to predict what the state's highest court would do.'" *Id.* at 666 (quoting *Wankier*, 353 F.3d at 866.). "In doing so, it

may seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law." *Id.* (internal citations and quotations omitted).

In considering a motion to dismiss, Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a party may respond to a complaint with a defense of "failure to state a claim upon which relief can be granted." In reviewing a 12(b)(6) motion, a court should "accept as true all well-pleaded factual allegations in a complaint in a light most favorable to the plaintiff." *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009). Additionally, a court "may consider not only the complaint, but also the attached exhibits and documents incorporated into the complaint by reference." *Commonwealth Property Advocates, LLC v. Mortgage Electronic Registration Systems, Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when a plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility does not equal probability. *Id.* A plaintiff must show more than a sheer possibility that the defendant acted unlawfully, passing the line from speculation or conceivability to plausibility. *Id.*; *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

### RULING OF THE COURT

Common to all counterclaims, Defendant states the following facts. Defendant initially expressed concern using EZ Blockchain containers for hosting due to potential overheating issues. (ECF No. 21, at 8). At a pre-contract visit, Thomas Guel, a representative of Plaintiffs, told Defendant it would be provided with data related to the management of the containers, they would be managed in a way to avoid overheating, and Defendant could visit the facility where its containers would be located at any time. *Id.* at 9. The two contracts were then executed ten days later on May 26, 2022. *Id.* In total, Defendant paid $4,135,350 to Plaintiffs—$2,000,000 for the rate buy down payment and $2,135,250 for the down payment on the First Agreement. *Id.* at 9–10.

On June 7, 2022, Defendant conducted a second site visit and a representative of Plaintiffs stated he or she would provide temperature data for the containers after receiving permission from Mr. Guel. *Id.* at 10. At a third visit on June 21, 2022, a representative of Defendants refused to provide temperature data pursuant to Mr. Guel's instruction. *Id.* On June 24, 2022, counsel for Mr. Guel communicated he had not yet received the $3,066,000 down payment for the Second Agreement and that he "reserve[d] the right to honor HAS's executed between my client and CI but has no legal obligation to do so."[3] *Id.*

Defendant and Mr. Guel had a zoom meeting on June 27, 2022, wherein Mr. Guel represented everying was on schedule for the First Agreement but he was still awaiting payment on the Second Agreement. *Id.* at 11. Defendant again expressed concern with

---

[3] Upon reviewing Exhibit G to Defendant's Answer, it appears "HAS's" is a typo meant to be "HSA's" which stands for Hosting Services Agreements and CI stands for Crypto Infiniti.

potential overheating issues of the containers and Mr. Guel did not provide any such information. *Id.* On June 28, 2022, Defendant requested to have its payment for the Second Agreement placed on escrow, but Mr. Guel denied the request. *Id.* This request was made to ensure that the money was used for the construction of the site where Defendant's equipment would be hosted. *Id.*

On July 5, 2022, Defendant's counsel sent a letter to Mr. Guel informing him it accepted his notice of right to terminate the Second Agreement communicated on June 24, 2022. *Id.* Defendant also reaffirmed the First Agreement and insisted MO POW 3 perform its duties. *Id.* On July 22, 2022, in a letter to MO POW 3, Defendant requested shipping information so that it could ship its digital currency equipment to MO POW 3. *Id.* at 12. The letter also mentioned that Defendant had been denied access to the facility after multiple attempts. *Id.* Defendant did not receive a response. *Id.* at 13.

After the present litigation commenced, MO POW 3 sent a legal notice to Defendant on October 12, 2022, providing a shipping address different than what was stated in the First Agreement and attempted to change the Managed Services rate in the First Agreement. *Id.* It also requested Defendant pay the first month's invoice and the First Agreement would be terminated if payment was not received in 15 days. *Id.* at 13–14. Mr. Guel then sent a letter on October 31, 2022, that he was terminating the First Agreement because Defendant did not pay the first month's invoice and the Second Agreement because Defendant did not pay the down payment. *Id.* at 14.

### *Breach of Contract*

From the face of Defendant's counterclaims, it is not clear what breach Defendant is alleging. However, in its response to Plaintiffs' Motion to Dismiss Defendant alleges MO POW 3 attempted to escape its managed services obligations by not providing Defendant the necessary information to ship its equipment, thereby triggering the managed services commencement date. (ECF No. 24, at 11). Even assuming this specific allegation was contained within Defendant's counterclaims, it would fail.

"To establish a prima facie case for breach of contract, a plaintiff must show: (1) a lawfully executed contract, (2) an unjustified failure to timely perform all or any part of what is promised therein, and (3) entitlement of [the] injured party to damages." *Kappes v. Rhodes*, 2022 WY 82, ¶ 17, 512 P.3d 31, 36 (Wyo. 2022) (internal citations and quotations omitted). Defendant's first counterclaim fails at the second requirement. As pointed out by Plaintiffs, the contract does not obligate Plaintiffs to provide a shipping address. Rather, the First Agreement itself provides the shipping address. (ECF No. 7-1, at 2) (1.1 A (1) "*Equipment Delivery*. Client shall promptly deliver its digital currency mining equipment listed in Order Form included as Exhibit A and attached hereto (the "**Equipment**" or "**Client Equipment**") to Host Facility located (the "**Facility**" or "**Host Facility**"). Client shall be solely liable for all expenses related to insuring, transporting, and shipping the Client Equipment to Host's Facility. 400 North Main, Springfield, Missouri, Springfield, MO 65802.").

The contract only requires that Defendant provide notice once it arranged for the equipment to be shipped. *Id.* at 2–3. As the contract states:

1.1 A (2) "*Delivery Notice.* To provide Host adequate time to prepare for Client Equipment delivery to the Facility, once Client has arranged for the Equipment to be shipped to the Host Facility, Client shall provide Host written notice no later than one (1) week prior to the scheduled shipping date ("**Shipping Notice**"). In Client's Shipping Notice, Client shall include any tracking information provided to Client, and Host shall be responsible for monitoring the tracking information for updates as to expected delivery date. Any costs incurred by the Host due to the Client's failure to provide the Shipping Notice for the Equipment shall be borne by the Client. Client's provision of the Shipping Notice shall be sufficient notice for Client to prepare the Facility for delivery and acceptance of the Equipment. Client shall bear responsibility for all loss or damage to the Equipment which is incurred prior to delivery and acceptance of the Equipment to the Host at the Host's Facility.

*Id.* Thus, it is not a breach that Plaintiffs did not provide a shipping address. The contract clearly provided an address for the equipment to be shipped to and a process for how it should occur. Plaintiffs had no obligation to provide a shipping address.

It is also irrelevant that Plaintiffs provided a different shipping address in subsequent correspondence. Defendants attempt to use this to insinuate it did not know where to send the equipment and Plaintiffs had a duty to provide the address. The argument fails as the First Agreement provided the shipping address and process. The mere fact that a different address was later provided does not change the contract language. Had Defendants sent proper notice of the shipment, it would include a tracking number in which Plaintiffs could see where the equipment would be delivered. *Id.* ("In Client's Shipping Notice, Client shall include any tracking information provided to Client, and Host shall be responsible for monitoring the tracking information for updates as to expected delivery date."). Based on the First Agreement, there was no duty to provide a shipping address and Defendant's argument fails.

Defendant also alleges it made several attempts to visit the MO POW 3 facility and Plaintiffs refused access. (ECF No. 24, at 13). This argument also fails. While the First Agreement does Require MO POW 3 to grant access to Defendant after 48-hour notice and the failure to arrange supervision is no reason to prevent entry, that duty does not arise until after MO POW 3 receives the equipment. (ECF No. 7-1, at 4). The First Agreement provides MO POW 3 "shall commence the provision of Managed Services ("Commencement Date") on the later of: thirty (30) calendar days after Host's receipt of all Client Equipment; or a date agreed to by the Parties in writing." *Id.* There is no evidence of a different agreed to date and Defendant never mailed the equipment. As such, the obligation was never triggered. Because Plaintiff fails to state a counterclaim for breach of contract, Counterclaim I for breach of contract is dismissed.

### *Breach of the Duty of Good Faith and Fair Dealing*

Defendant's counterclaim fails to provide specific facts alleging a breach of the duty of good faith and fair dealing. However, in its Response to Plaintiffs' Motion to Dismiss, Defendant states "[b]ecause Infiniti's breach of contract claim against MO POW 3 is plausible, it necessarily follows that Crypto Infiniti can sustain a claim for breach of the covenant of good faith and fair dealing under Wyoming law." (ECF No. 24, at 14). This is not the case. As Defendant states within its counterclaim "[t]he implied covenant of good faith and fair dealing is a claim separate and distinct from a breach of contract claim, the two claims are not mutually dependent." (ECF No. 21, at 15) (quoting *PNS Stores, Inc. v. Cap City Properties, LLC*, 2022 WY 101, ¶ 22, 515 P.3d 606, 611 (Wyo. 2022)). The plausibility of a breach of contract claim does not mean a breach of the duty of good faith

and fair dealing is plausible or vice versa. In any event, Defendant's breach of contract claims fail for the reasons stated above.

Nevertheless, Defendant also alleges the refusal to provide Defendant access to the facility and refusal to provide shipping information constitute a breach of the duty of good faith and fair dealing. (ECF No. 24, at 14). These arguments also fail. "The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement." *Scherer Const., LLC v. Hedquist Const., Inc.*, 2001 WY 23, ¶ 19, 18 P.3d 645, 653 (Wyo. 2001). Compliance requires "a party's actions to be consistent with the agreed upon common purpose and justified expectations of the other party." *Id.* An interference or failure to cooperate leads to a breach of the implied duty. *Id.* Both the contract language and the parties' course of dealings are relevant to determine a breach. *Id.* "The covenant of good faith and fair dealing may not, however, be construed to establish new, independent rights or duties not agreed upon by the parties." *Id.* "The implied obligation 'must arise from the language used or it must be indispensable to effectuate the intention of the parties.'" *Id.* (quoting *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 841 (S.D. 1990)).

The failure to provide an address does not breach the implied duty of good faith and fair dealing because it was already available to Defendant in the First Agreement. It cannot be an interference because the process Defendant was to follow was clearly spelled out in the First Agreement. The refusal to allow Defendant access the facility is also not a breach. Defendant had already visited the facility three separate times and had no right to enter. This is not a failure to cooperate because "Mr. Guel represented everything was on

10

schedule for the First [Agreement]." (ECF No. 21, at 11). Defendant has not alleged why it was wrongful to refuse access to the facility other than they believed they had a contractual right to, which is not the case. Based on the foregoing, Defendant's Counterclaim II for breach of the covenant of good faith and fair dealing is dismissed.

### *Conversion*

Last, Defendant asserts a claim for conversion based on its payment to Plaintiffs without receiving any services in return. "That money may be the subject of a conversion action is an old and well-established legal principle." *Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 978 (Wyo. 1994). A prima facie claim for conversion requires a plaintiff to show: "(1) he had legal title to the converted property; (2) he either had possession of the property or the right to possess it at the time of conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff his rights to use and enjoy the property; (4) in those cases where the defendant[] lawfully, or at least without fault obtained possession of the property, the plaintiff made some demand for the property's return which the defendant refused; and (5) the plaintiff has suffered damage by the loss of the property." *Wagner v. Reuter*, 2009 WY 75, ¶ 18, 208 P.3d 1317, 1323 (Wyo. 2009).

Plaintiffs argue this counterclaim should be dismissed because it is barred by the economic loss rule. Under Wyoming law, "[t]he economic loss rule bars recovery in tort when a plaintiff claims purely economic damages unaccompanied by physical injury to person or property." *Skyco Resources, LLP v. Family Tree Corporation*, 2022 WY 72, ¶ 45, 512 P.3d 11, 27 (Wyo. 2022) (internal citations and quotations omitted). The purpose of the rule is to distinguish proper contract claims from tort claims. *Id.* However, the

economic loss rule does not apply to all tort claims alleging only economic damages. *Id.* at ¶ 47, 512 P.3d at 27. An exception is made when a duty independent of a contract is violated. *Id.*

Wyoming has not specifically addressed a situation akin to the one here. Defendant asserts that *Skyco Resources, LLP*, supports its position that conversion is not barred by the economic loss rule. In that case, the Wyoming Supreme Court did not apply the economic loss rule to a conversion claim when it did apply it to a fraudulent inducement claim. *Id.* at ¶ 36, 51, 512 P.3d at 25, 28. This position is incorrect as it assumes that just because the Wyoming Supreme Court did not apply the economic loss rule to conversion, that means it did not apply. There is no analysis indicating that is the case. Rather, Defendant attempts to use the lack of analysis to support its position. A more plausible explanation is that the issue of whether the economic loss rule barred the conversion claim in *Skyco Resources, LLP* is that it was not raised with the trial court and barred on appeal. "[I]t is well established that '[a] new theory cannot be asserted on appeal.'" *Ricci v. New Hampshire Ins. Co.*, 721 P.2d 1081, 1088 (Wyo. 1986) (quoting *Weber v. Johnston Fuel Liners, Inc.*, 519 P.2d 972, 978 (Wyo. 1974) (alteration in original)). "'[P]arties are bound by the theories they advance below.'" *Id.* (quoting *Appeal of Williams*, 626 P.2d 564, 571 (Wyo. 1981)). "Even if there were substantive merit in their position [it] would be foreclosed." *Id.*

Outside of citing *Skyco Resources, LLP* for authority, Defendant does not direct the Court to an independent duty and the Court does not see one. Defendant has not alleged more than that MO POW 3 "failed to perform its obligations under the First [Agreement]"

which is insufficient. (ECF No 21, at 17). *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186 (Colo. App. 2008) provides an instance where conversion would not be barred by the economic loss rule. While not a Wyoming case, the Wyoming Supreme Court has not directly addressed this issue. When attempting to predict what a state's highest court would do, a district court may turn to "appellate decisions in other states with similar legal principles." *Wade*, 483 F.3d at 666.

In *Rhino Fund, LLLP*, the Colorado Court of Appeals adopted a Florida court's approach. *Rhino Fund, LLLP*, 215 P.3d at 1194. In the Florida Case, an authorized signatory of the plaintiff's savings account that had agreed to receive and deposit Social Security checks on plaintiff's behalf took the funds for his own. *Id.* The focus of the analysis "was not merely a failure to perform, but an affirmative and intentional act of converting the funds to his own use by allegedly stealing the monies [with] which he was entrusted, there is not merely a breach of contract but a separate independent tort." *Id.* (quoting *Burke v. Napieracz*, 674 So.2d 756, 758–59 (Fla. Dist. Ct. App. 1996). The duty the Florida court premised liability for conversion on was the theft of the funds when the defendant was supposed to deposit them. *Id.*

The facts in *Rhino Fund, LLLP* involved plaintiff, Rhino Fund, and defendant, Michael Hutchins, acting through All Terrain Property Funds, who agreed to a loan whereby Rhino Fund would lend $1.25 million to All Terrain and as collateral All Terrain pledged the proceeds from specific nonperforming loans it was in the business of selling. *Id.* at 1189. Their agreement required the proceeds from the sale of the nonperforming loans to be placed in escrow for Rhino Fund's benefit until the loan was paid off. *Id.*

13

Hutchins never put the proceeds in the fund from the sale and used the funds for other purposes. *Id.* Similar to the Florida case, the Colorado Court of Appeals opined there was an independent duty. *Id.* at 1194. Hutchins was not a party to the contract and diverted the funds himself making him liable for conversion. *Id.*

The key is the diversion, noncontractual party actor, and the legislatively created tort of civil theft. After the contract, All Terrain was no longer entitled to the use of the funds and essentially was required to make a payment to the escrow fund. However, the contract could not provide any protection because a non-party was the tortious actor. Additionally, as later clarified by the Colorado Supreme Court in another case, the judicially created doctrine of economic loss cannot bar a statutory claim. *Bermel v. BlueRadios, Inc.* 440 P.3d 1150, 1159 (Colo. 2019). Here, there is no noncontractual party the Court must consider and Wyoming, as far as the Court is aware, does not have an applicable civil theft statute.[4]

There is also the common theme that in both cases the party committing conversion was an intermediary for the funds. The party did not act as a "pass through" and converted the funds for their own use. Here, the funds were a direct payment from Defendant to Plaintiffs for services under a contract. The nonperformance of those services falls under a breach of contract theory, rather than tort, because a contract obligates those services and the payment was intended to be made to the Plaintiffs. As opposed to the above cited cases,

---

[4] As far as the Court is aware, Wyo. Stat. Ann. § 1-1-116 is the only potential civil theft statute and it only relates to services and equitable relief.

not only did the defendants fail to perform the required contractual services, but also took funds for their own use when the funds were never intended to remain with them.

Last, Defendant asserts that its conversion claim should proceed past the pleading stage because if the contract is deemed invalid by the Court, it must pursue alternative claims. This argument was summarily dismissed in the Court's order on Defendant's Motion to Dismiss. (ECF No. 18, at 17–18). Defendant now attempts to flip sides and use Plaintiffs' rejected argument to its benefit. Such a finding would not leave conversion as the only potential claim. Alternative claims, such as unjust enrichment, may be available to Defendant. Based on the foregoing, Defendant's Counterclaim III for conversion is dismissed.

CONCLUSION

Defendant's first two counterclaims fail to put Plaintiffs on adequate notice as to the bases of the claims. Within its Response, Defendant fails to articulate facts related to the claims that could remedy this fault through amendment. While there may be claims for breach of contract and breach of the duty of good faith and fair dealing, Defendant has failed to sufficiently plead those allegations to put Plaintiffs on notice of those claims. Limited to the allegations and clarification in Defendant's Response, the Court cannot assume the role of advocate and characterize Defendant's claims for it. Defendant may seek leave to amend its counterclaims for breach of contract and breach of the duty of good faith and fair dealing to present facts that will properly put Plaintiffs on notice. Defendants counterclaim for conversion is barred by the economic loss rule and is dismissed with prejudice.

NOW, THEREFORE, IT IS ORDERED Plaintiffs' Motion to Dismiss Defendants'

Counterclaims is GRANTED.

Dated this 27th day of January, 2023.

Kelly H. Rankin
United States Magistrate Judge