Jeffrey S. Pope (Wyo. State Bar # 7-4859)
Kasey J. Schlueter (Wyo. State Bar # 8-6521)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
JSPope@hollandhart.com
KJSchlueter@hollandhart.com

ATTORNEYS FOR PLAINTIFFS

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| MO POW 3, LLC and MO POW 4, LLC, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:22-CV-00155-SWS |
| CRYPTO INFINITI LLC, | |
| Defendant. | |

## PLAINTIFFS' COMBINED MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF

## INTRODUCTION

Plaintiffs (MO POW 3 and MO POW 4) and Defendant (Crypto) executed two Agreements designed to provide Crypto with electricity to run computing equipment used to mine crypto currency. Executed together, the Agreements allowed the parties to take advantage of economies of scale to accomplish what the Agreements referred to as a rate buy down structure. In other words, based on the volume of power purchased, Crypto could pay a lower monthly rate. To implement the Agreements, Plaintiffs had to procure the power and provide a site capable of hosting Crypto's equipment. Crypto had simple corresponding duties—provide the computing equipment and pay Plaintiffs per the terms of the Agreements.

Crypto failed its duties. Crypto failed to pay the required payments due upon execution of the Second Agreement. Likewise, Crypto never shipped any equipment, precluding Plaintiffs from performing and making economically beneficial use of the sites in the Agreements.

Plaintiffs now seek summary judgment of both sides' breach of contracts claims based on the plain, unambiguous provisions in the Agreements. Crypto had clear duties, failed to perform those duties, and caused Plaintiffs damages. On the other hand, Crypto's alleged claims related to the Agreements have no connection to the plain language of the Agreements. Crypto's claims related to the First and Second Agreement either: 1) invent obligations that do not exist in the Agreements; or 2) ignore the language of the Agreements that demonstrate certain obligations had not yet begun. Crypto's claim for unjust enrichment also should fail because valid contracts exist, precluding such a claim.

The facts material to these claims are undisputed. Therefore, Plaintiffs ask the Court to enter summary judgment in their favor, finding: 1) Crypto breached both Agreements, damaging Plaintiffs in the amount of $3,920,100; 2) Plaintiffs did not breach either Agreement; and 3) Crypto cannot maintain an unjust enrichment claim.

## UNDISPUTED MATERIAL FACTS

MO POW 3 and MO POW 4 executed two Master Hosting Services Agreements with Crypto on May 26, 2022.[1] (Exhibit 1, First Agreement at 1; Exhibit 2, Second Agreement at 1). The Agreements were for the delivery of a combined 35 megawatts (MW) of hosting service capacity to Crypto's digital currency mining equipment. *Id.* Under the First Agreement, MO POW 3 would provide 15 MW of capacity for its site located in Greene County, Missouri. (Ex. 1

---

[1] Plaintiffs will refer to the contract between MO POW 3 and Crypto as the First Agreement and the contract between MO POW 4 and Crypto as the Second Agreement.

at 1). And under the Second Agreement, MO POW 4 would provide 20 MW of capacity for another site located in Greene County, Missouri. (Ex. 2 at 1). This capacity would have required Plaintiffs to procure energy services from the municipal utility and City Utilities of the City of Springfield pursuant to a combination of multiple property, energy, and economic development agreements.

The basic implementation of the Agreements was simple. Section 1.1(A)(1) of both Agreements requires Crypto to "promptly deliver its digital currency mining equipment listed in Order Form included as Exhibit A and attached hereto (the 'Equipment' or 'Client Equipment') to Host Facility located (the 'Facility' or 'Host Facility')." (Ex. 1 at 1 and Ex. 2 at 1). Plaintiffs then have duties that commenced upon receipt of the equipment. (Ex. 1 at 2-3 and Ex. 2 at 2). These duties included:

- performing "commercially reasonable testing in accordance with prudent industry testing procedures;"

- installing "all properly functioning Client Equipment in the Containers and ultimately at the Facility within thirty (30) calendar days of completing the testing…;" and

- commencing the "provision of Managed Services ('Commencement Date') on the later of: (i) Thirty (30) calendar days after Host's receipt (sic) all Client Equipment; or (ii) a date agreed to by the Parties in writing as stated in Exhibit A; provided, however, that Host may extend the agreed-upon Commencement Date by up to ninety (90) days with prior written consent of Client."

Pursuant to Section 1.3 of both Agreements, the Managed Services that must begin on the Commencement Date are defined as providing "rack space allocation for the Client Equipment (the 'Client Space'), installation services, electrical power connection, power supply of at least

[fifteen (15) MW for the First Agreement and twenty (20) MW for the Second Agreement], network connectivity, security, maintenance, repair, and technical support, as outlined in this Agreement (the 'Managed Services')." (Ex. 1 at 3 and Ex. 2 at 2).

**The Second Agreement's Down Payment**

Both Agreements contain "Payment Terms and Conditions" that require Crypto to pay "Initial Fees." (Ex. 1 at 6 and Ex. 2 at 6).

ARTICLE 2

PAYMENT TERMS AND CONDITIONS

2.1    Initial Fees. The (a) down payment specified in the applicable Order Form (the "**Down Payment**"), and (b) rate buy down payment specified in the applicable Order Form (the "**Rate Buy Down Payment**") shall be due and payable as of the date on which Host, and Client have both executed an Order Form in the same or a substantially similar form included as Exhibit A.

ARTICLE 2

PAYMENT TERMS AND CONDITIONS

2.1    Initial Fees. The down payment specified in the applicable Order Form (the "Down Payment"), shall be due and payable as of the date on which Host and Client have both executed an Order Form in the same or a substantially similar form included as Exhibit A.

(*Id.*) The Second Agreement's Initial Fees are the focus of this case so the referenced sections below all originate from the Second Agreement. The Initial Fees include a "Down Payment" specified on the "Order Form." (Ex. 2 at 6 § 2.1).

The Down Payment in both Agreements referred to the "Down Payment of Managed Service Fees." (Ex. 1 at 20 § 2.A and Ex. 2 at 19 § 2.A). The Agreements obligated Crypto to pay the Down Payments upon contract execution:

2.    **Payment Terms.**

   A.  Due Upon Execution of this Agreement: Down Payment of Managed Service Fees as described in Payment Schedule.

(Ex. 2 at 19). The Payment Schedule referenced in the Order Form presented all costs to Crypto

for the Second Agreement. The Second Agreement's Down Payment amount was $3,066,000.

(*Id.* at 20.)

| Section 2.1 \| Down Payment | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Period | Month | Containers | Nameplate (MW) | Total Nameplate (MW) | Estimated Client Usage (kWh) | Effective Price ( $/kWh) | | Managed Service Fee (Estimated) | |
| 34 | Aug-25 | 7 | 2.86 | 20 | 14,600,000 | $ | 0.070 | $ | 1,022,000 |
| 35 | Sep-25 | 7 | 2.86 | 20 | 14,600,000 | $ | 0.070 | $ | 1,022,000 |
| 36 | Oct-25 | 7 | 2.86 | 20 | 14,600,000 | $ | 0.070 | $ | 1,022,000 |
| Down Payment | | | | | | | | $ | 3,066,000 |

(*Id.*)

     After contract execution on May 26, 2022, Crypto paid the First Agreement's Down

Payment amount but failed to pay the Second Agreement's Down Payment amount of

$3,066,000.00. (Exhibit 3, Zhang Transcript at 45:25-46:2).

**The Rate Buy Down**

     Both Agreements incorporated the concept of a rate buy down. The Rate Buy Down

existed as an exchange of an upfront payment from Crypto to secure a lower kilowatt per hour

(kWh) rate of both the First and Second Agreements. Only the First Agreement contains the Rate

Buy Down price, but Section 1.2 of the First Agreement explains that the Rate Buy Down was

consideration for both Agreements.

> 1.2   <u>2nd Agreement.</u>  The Rate Buy Down is being paid as consideration to "buy down" the Managed Services Rate of this Agreement and the 2nd Agreement.

(Ex. 1 at 3 § 1.2).

     The Rate Buy Down, just as the Down Payments, was due at contract execution. *Id.* at 20

§ 2.A. The Rate Buy Down had a value of $2,000,000 and Crypto paid it. *Id.* at 22 § 2.1. But, as

noted above, the Rate Buy Down existed to buy down the rates of both the First and Second

Agreements. Crypto did not pay the Second Agreement's Down Payment. (Ex. 3, Zhang Tr. at 45:25-46:2).

**Managed Services Fee**

Both Agreements contemplated Crypto's continuous monthly payment for Managed Services Fees. This case centers on the First Agreement's Services Fee so the references below derive from the First Agreement.

2.2    Managed Services Fees. Host shall invoice Client on a monthly basis for all Managed Service Fees as stated in this Agreement, or as agreed to by the Parties in writing from time to time.

(Ex. 1 at 6 § 2.2.)

The Agreements calculated the monthly Managed Services Fee with a value assigned to each kWh multiplied by the MW amount needed per month. The First Agreement assigned at value of $0.065 $/kWh. This value multiplied by 15 MW equaled a monthly Managed Services Fee of $711,750 which was enumerated in the Exhibit A Order Form. *Id.* at 22.

| Section 2.2 | Managed Services Fee Schedule | | | | | | |
|---|---|---|---|---|---|---|---|
| Period | Month | Containers | Nameplate (MW) | Total Nameplate (MW) | Estimated Client Usage (kWh) | Effective Price ( $/kWh) | Managed Services Fee (Estimated) |
| 1 | Jul-22 | 5 | 3.00 | 15 | 10,950,000 | $ 0.065 | $ 711,750 |

(*Id.*)

The Agreement required Crypto to pay its first monthly Managed Services Fee upon commencement of the first term (also denoted as a period) of the Managed Service Fees Schedule. (*Id.*) The Agreement also required payment of the invoice within five days of Crypto receiving it.

2.5    Payment. Client's first payment of the Term is due within five (5) days of receiving a Host invoice and will be prorated based on the number of days left in the calendar month of the Commencement Date.

(*Id.* at 7 § 2.5.)

On October 12, 2022, MO POW 3 issued the first Managed Services Fee invoice and informed Crypto that the Managed Service would commence in November. (Exhibit 4 at MO POW 00085). While the Schedule pictured above lists July as the first period, the periods were projections rather than exact dates, so the Agreements permitted dates later than those listed. (Ex. 1 at 20).

MO POW 3 had also increased the total for the Managed Services Fee from $711,750 listed in Exhibit A's Schedule to $880,380. (Ex. 4 at MO POW 00057). Section 2.4(B) of the First Agreement permitted MO POW 3 to unilaterally pass certain costs to Crypto above the kWh rate listed in Exhibit A's Schedule of each Agreement. (Ex. 1 at 7 § 2.4(B)). Section 2.4(B) of the First Agreement permitted the following:

> **B.**    **Pass-Throughs.** In the event of documented new or additional costs directly in connection with the Managed Services to be provided to Client, and so long as the new or additional costs do not equate to more than a twenty percent (20%) increase the Client's effective kilowatt hour **("kWh")** rate of $0.065 as enumerated in Exhibit A, which is equivalent to $0.078 c/kWh, the Host may pass through such costs to Client (the **"Passed-Through Amounts"**) with no additional markup to Client, and Client shall pay all such amounts in accordance herewith. Such costs shall be limited to newly enacted or amendments to existing state, federal, or international laws and/or regulations, compliance requirements, new or amended taxes, levies, utility tariffs, fees, or other charges, governmental or quasi-governmental fees, lease rates, or other charges with respect to the Managed Services or the Host Facility. Passed-Through Amounts shall not include any taxes, fees, or other amounts related to Host's income, employment related taxes or fees, or any taxes or fees related to the value of Host's Facility. In the event the Managed Services Fees, including Passed-Through Amounts, equal or exceed $0.078 c/kWh, then the Host shall reduce any applicable Minimum Managed Service Fees by fifty percent (50%) until the Managed Services, including Passed-Through Amounts, falls below $0.078 c/kWh.

(*Id.*)

Packaged with the October 12 invoice, MO POW 3 cited the City of Springfield's fuel adjustment rider of $0.0154 c/kWh as justification for an increase from $0.065 c/kWh to $0.0804

c/kWh. (Ex. 4 at MO POW 00057). This resulted in a $880,380 invoice based on the new rate at 15 MW per month.[2] Crypto did not pay the invoice.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if … it could have an effect on the outcome of the lawsuit." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013)). "[T]he substantive law will identify which facts are material." *Sapone v. Grand Targhee*, 308 F.3d 1096, 1100 (10th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In diversity cases like this, "the substantive laws of the forum state" apply, meaning Wyoming law applies. *State Farm Mut. Auto. Ins. Co. v. Blystra*, 86 F.3d 1007, 1010 (10th Cir. 1996).

## ARGUMENT

### I.    Crypto breached the Second Agreement, damaging MO POW 4 in the amount of $3,066,000.

Under Wyoming law, a valid claim for breach of contract requires: 1) a valid contract; 2) breach; and 3) damages. *Schlinger v. McGhee*, 268 P.3d 264, 268 (Wyo. 2012). A valid contract requires an offer, acceptance of that offer, and consideration. *Frost Const. Co. v. Lobo, Inc.*, 951 P.2d 390, 394 (Wyo. 1998). In analyzing what is promised in a contract, courts begin with Wyoming's well-settled rules of contract interpretation. The goal when interpreting a contract "is to discern the intention of the parties to the document." *Comet Energy Servs., LLC v. Powder*

---

[2] MO POW 3 erred by increasing the rate to $0.0804 c/kWh compared to the cap of $0.078 in the First Agreement. MO POW 3 has corrected that error below.

*River Oil & Gas Ventures, LLC*, 185 P.3d 1259, 1261 (Wyo. 2008). In so doing, courts first consider the "specific terms of the contract and give them their plain and ordinary meaning." *Id.* Plain meaning is that "meaning which [the] language would convey to reasonable persons at the time and place of its use." *Moncrief v. Louisiana Land & Expl. Co.*, 861 P.2d 516, 524 (Wyo. 1993). And "[w]hen the provisions in the contract are clear and unambiguous, the court looks only to the 'four corners' of the document in arriving at the intent of the parties." *Jonah Energy Ltd. Liab. Co. v. Wyo. Dep't of Revenue*, 534 P.3d 902, 907 (Wyo. 2023).

### A.    The Second Agreement is a valid contract.

The first element of breach—a valid contract—merits little discussion. MO POW 4 and Crypto negotiated the terms of Second Agreement, arriving at mutual satisfaction with its terms. Crypto accepted this offer by signing the Second Agreement. (Ex. 2 at 18). The First Agreement explicitly discussed the consideration underpinning the First and Second Agreements: Crypto was to pay an upfront payment to MO POW 3 and MO POW 3 would reduce the kWh rate of both Agreements. (Ex. 1 at 3 § 1.2). Crypto would then pay the lower monthly rates to MO POW 4 in exchange for hosting services.

### B.    Crypto breached the terms of the Second Agreement.

The Second Agreement required Crypto to pay an initial fee for a "Down Payment" upon execution with specifics of the payment in the "Order Form." (Ex. 2 at 6 § 2.1). The Order Form—attached to the Second Agreement as Exhibit A—described the Down Payment that was "Due Upon Execution of this Agreement." (*Id.* at 19 § 2.A.) The Order Form also contained a Payment Schedule that lists the Down Payment value—$3,066,000. (*Id.* at 20.) In short, the Second Agreement required Crypto to pay $3,066,000 upon contract execution. Crypto never

paid the $3,066,000 Down Payment upon contract execution or any time after, breaching the

Second Agreement. (Ex. 3, Zhang Tr. at 45:25-46:2).

### C.    The Second Agreement sets out the damages for Crypto's breach.

"In an action for breach of contract, the damages awarded are designed to put the plaintiff

in the same position as if the contract had been performed, less proper deductions." *Capshaw v.

Schieck*, 44 P.3d 47, 52 (Wyo. 2002). If Crypto had performed, Crypto would have paid MO

POW 4 an initial $3,066,000 Down Payment at contract execution with no deductions to reduce

this value. To put MO POW 4 in the same position as if the contract was performed, Crypto must

pay MO POW 4 the $3,066,000 required at contract execution.

## II.    Crypto breached its duties under the First Agreement, damaging MO POW 3 in the amount of $854,100.

### A.    The First Agreement is a valid contract.

The first element of breach—a valid contract—again merits little discussion. MO POW 3

and Crypto negotiated the terms of the First Agreement. Crypto accepted the First Agreement by

signature. (Ex. 1 at 19.) The First Agreement explicitly discussed the consideration underpinning

both Agreements: Crypto's upfront payment to MO POW 3 to buy down the kWh rate of both

Agreements. (*Id.* at 3 § 1.2.) Crypto would then pay the lower monthly rates to MO POW 3 in

exchange for hosting services.

### B.    Crypto breached the terms of the First Agreement.

Crypto breached the First Agreement in two ways. To start, Crypto had a duty to

"promptly deliver its digital currency mining equipment listed in Order Form included as Exhibit

A and attached hereto (the "Equipment" or "Client Equipment") to Host Facility located (the

"Facility" or "Host Facility")." (*Id.* at 1 § 1.1(A)(1).) Promptly means "without delay, very

quickly, or immediately." (Merriam-Webster's Dictionary) Crypto, however, never shipped its equipment. Therefore, it failed to promptly deliver equipment.

Next, Crypto's breach of the Second Agreement also results in a breach of the First Agreement. Section 1.2 of the First Agreement states that "The Rate Buy Down is being paid [by Crypto] as consideration to 'buy down' the Managed Services Rate of this Agreement and the 2nd Agreement." (Ex. 1 at 3 § 1.2); *see also Busch Dev. v. Cheyenne*, 645 P.2d 65, 70 (Wyo. 1982) ("[R]eference in a contract to extraneous writings renders them part of the agreement for indicated purposes."). "Two instruments executed at the same time as one transaction in order to effectuate a single purpose, and each referring to the other, must be considered together." *Wyo. Bank & Tr. Co. v. Waugh*, 606 P.2d 725, 728 (Wyo. 1980) (quoting 17 Am Jur 2d Contracts § 263 (now 17A Am Jur 2d Contracts § 370)). Here, the parties executed the two Agreements simultaneously to effectuate the single purpose of buying down the kWh rate applied across the two locations. In effect, Crypto got to take advantage of economies of scale from the overall amount of power to lower the monthly rate. But that could only occur with performance of both Agreements. Removing either Agreement would break the consideration's foundation and undo the three-year's worth of monthly Managed Services Fees documented in Exhibit A of both Agreements. Failure to perform one agreement also undoes the calculations and basis for the Monthly Services Fee Crypto must pay during the life of the Agreements. Therefore, Crypto's failure to perform the Second Agreement also breached the First.

### C.    The First Agreement sets out the damages for Crypto's breach.

Just like the Second Agreement, damages for Crypto's breach should put Plaintiffs "in the same position as if the contract had been performed, less proper deductions." *Capshaw*, 44 P.3d at 52. Had Crypto performed by shipping equipment and paying under both Agreements,

Plaintiffs would have been able to provide Managed Services and receive compensation for those services. Plaintiffs would also have been able to make use of both sites, eliminating the costs incurred and lost opportunity of having sites with no paying customers.

The best measure of this harm comes from the invoice that MO POW 3 sent to Crypto for payment of the first month's Managed Services Fee, totaling $880,380. (Ex. 4 at MO POW 00085).[3] This invoice represented the amount Crypto would have paid to MO POW 3 but for its failure to ship equipment. It also represents the best approximation of the revenue MO POW 3 would have generated at the time under the agreed upon Rate Buy Down structure.

The Court may wonder why this invoice amount measures damages since the commencement date for Managed Services had not yet occurred. (*See infra* at 13-15). But that is precisely the reason it measures damages. The commencement date had not yet begun because Crypto failed to ship its equipment. As a result, MO POW 3 could not charge Crypto the Managed Services Fee, which was tied directly to payments MO POW 3 had to make for power it had procured from the local utility.[4] Therefore, it represents the best measure of damages.

## III.    MO POW 3 did not breach the First Agreement.

Crypto alleges in its Amended Counterclaims that MO POW 3 breached the First Agreement because MO POW 3 failed to provide: 1) "five Smart Box 3000 containers manufactured by EZ Blockchain for colocation at MO POW 3's facility…rack space allocation for Crypto Infiniti's equipment, installation services, electrical power connection, power supply

---

[3] The invoice contains a math error. Section 2.4(B) restricts the c/kWh increase to .078. (Ex. 1 at 7). The $ .078 c/kWh rate multiplied by 15 MW of monthly usage equates to $854,100. Therefore, the proper amount is $854,100.

[4] Plaintiffs do not seek damages beyond this invoice because they terminated the Agreements on October 28, 2022 to minimize on-going harm. (ECF Doc. 35-13). This resulted in no further invoices and no more requirements for Crypto to pay.

of at least 15 MW, network connectivity, security, maintenance, repair, and technical support;" and 2) failed to "use Crypto Infiniti's payments for MO POW 3's facility located at 400 North Main, Springfield, Missouri 65802, and instead used the money for other purposes not related to the First Contract." (ECF Doc. 35 at ¶¶ 44-45). As noted above, the Court determines if MO POW 3 breached the First Agreement by applying its plain terms. *Comet*, 185 P.3d at 1261. Those plain terms do not support Crypto's breach claim.

### A.    MO POW 3 did not have a duty to provide Managed Services because Crypto failed to ship equipment.

The first part of Crypto's claim misapplies the language and structure of the First Agreement. Section 1.1(A)(1) requires Crypto to "promptly deliver its digital currency mining equipment listed in the Order Form included as Exhibit A and attached hereto (the "Equipment" or "Client Equipment") to Host Facility located (the "Facility" or "Host Facility")." (Ex. 1 at 1 § 1.1(A)(1)). MO POW 3 then has duties that commence upon receipt of the equipment. *Id.* at 2 § 1.1(B)(1). These duties include:

- performing "commercially reasonable testing in accordance with prudent industry testing procedures;"

- installing "all properly functioning Client Equipment in the Containers and ultimately at the Facility within thirty (30) calendar days of completing the testing…;" and

- commencing the "provision of Managed Services ('Commencement Date') on the later of: (i) Thirty (30) calendar days after Host's receipt (sic) all equipment; or (ii) a date agreed to by the Parties in writing as stated in Exhibit A; provided, however, that Host may extend the agreed-upon Commencement Date by up to ninety (90) days with prior written consent of Client."

13

(*Id.* at 2 § 1.1(B).) The Managed Services that must begin on the commencement date are defined as MO POW 3 providing "rack space allocation for the Client Equipment (the 'Client Space'), installation services, electrical power connection, power supply of at least fifteen (15) MW, network connectivity, security, maintenance, repair, and technical support, as outlined in this Agreement (the 'Managed Services')." (*Id.* at 3 § 1.3.)

Collectively, these provisions set up the following simple process. First, Crypto promptly ships its equipment. Second, MO POW 3 tests and installs the equipment so that it can provide Managed Services within the time frame specified in the First Agreement. Third, MO POW 3 provides Managed Services as the First Agreement defines that term. As a practical matter, the process must play out this way because MO POW 3 cannot test, install, or provide services unless and until Crypto ships equipment.

Critically, the First Agreement's language supports the process playing out in the order described above. Section 1.1 requires Crypto to "promptly" ship equipment. As noted above, promptly means "without delay, very quickly, or immediately." (Merriam-Webster's Dictionary.) MO POW 3's testing and installation related obligations begin "upon receipt of Equipment." (*Id.* at 2 § 1.1(B)(1).) Likewise, MO POW 3's duty to provide Managed Services "shall commence" on the later of 30 days after "receipt" of equipment or a date in Exhibit A. (*Id.* at 3 § 1.1(B)(3).) In other words, MO POW 3's obligations require receipt of equipment, meaning that Crypto's shipping duty must come first.

Here, that process dooms the first part of Crypto's claim because Crypto never shipped any equipment. (Ex. 3, Zhang Tr. at 16:9-12, 18:3-9.) Crypto's counterclaim quotes the definition of Managed Services in the First Agreement as a basis for MO POW 3's breach. But as explained above, MO POW 3's duty to provide Managed Services can only begin on the later

of 30 days after receiving equipment or the date in Exhibit A. Exhibit A sets the "projected" commencement date as July 2022. But since Crypto has yet to ship equipment, 30 days after receipt of the equipment is the later of the possible commencement dates. Therefore, MO POW 3's clock to perform Managed Services has not yet run, and MO POW 3 cannot breach a duty that has not yet begun.

Even so, the undisputed facts show MO POW 3 spent over two million dollars buying equipment for the site. (Exhibit 5, Guel Transcript at 28:21-24). This included EZB containers—the very same kind that Crypto alleges MO POW 3 did not provide. MO POW 3, however, never got the chance to put those containers and other equipment to use for Crypto because Crypto did not to ship equipment. Simply put, Crypto prevented MO POW 3 from performing, making it impossible for MO POW 3 to breach.

**B.    MO POW 3 has no duty related to Crypto payments.**

The First Agreement does not require MO POW 3 use funds it received to prepare the site. It does not require MO POW 3 to segregate or track any funds that it received from Crypto. Indeed, the First Agreement says nothing at all about what MO POW 3 can or cannot do with the money received from Crypto. Instead, the First Agreement imposes duties on MO POW 3 to have the site ready within a certain time. (Ex. 1 at 2-3 §1.1(B)). The First Agreement is silent as to the source of the funding used to get the site ready. Therefore, Crypto's breach of contract claim requires the Court to read language into the First Agreement—something expressly prohibited by Wyoming law. *Gumpel v. Copperleaf Homeowners Ass'n,* 393 P.3d 1279, 1293 (Wyo. 2017). Simply put, MO POW 3 cannot breach a provision that does not exist.

**IV.    MO POW 4 did not breach the Second Agreement.**

Crypto alleges in its Amended Counterclaims that MO POW 4 breached the Second Agreement because MO POW 4 failed to: 1) "provide rack space allocation for Crypto Infiniti's

equipment… installation services, electrical power connection, power supply of at least 20 MW, network connectivity, security, maintenance, repair, and technical support;" and 2) "use Crypto Infiniti's payments for MO POW 4's facility…and instead used the money for other purposes not related to the Second Contract." (ECF Doc. 35 at ¶¶ 53-54). As noted above, the Court determines if MO POW 4 breached the Second Agreement by applying its plain terms. For the same reasons as above, MO POW 4 did not breach the Second Agreement.

**A.    MO POW 4 did not have a duty to provide Managed Services because Crypto failed to ship equipment and never made the required initial payments.**

The first part of Crypto's claim suffers from the same problem as its claim related to the First Agreement because the Second Agreement lays out an identical process. Section 1.1(A)(1) of the Second Agreement requires Crypto to "promptly deliver its digital currency mining equipment listed in Order Form included as Exhibit A and attached hereto (the "Equipment" or "Client Equipment") to Host Facility located (the "Facility" or "Host Facility")." (Ex. 2 at 1 § 1.1(A)(1)). MO POW 4 then has duties that commence upon receipt of the equipment. (*Id.* at 2 § 1.1(B).) These duties include:

- performing "commercially reasonable testing in accordance with prudent industry testing procedures;"

- installing "all properly functioning Client Equipment in the Containers and ultimately at the Facility within thirty (30) calendar days of completing the testing…;" and

- commencing the "provision of Managed Services ('Commencement Date') on the later of: (i) Thirty (30) calendar days after Host's receipt (sic) all equipment; or (ii) a date agreed to by the Parties in writing as stated in Exhibit A; provided, however, that Host

may extend the agreed-upon Commencement Date by up to ninety (90) days with prior

written consent of Client."

(*Id.* at 2 § 1.1(B).) The Managed Services that must begin on the commencement date are

defined as MO POW 4 providing "rack space allocation for the Client Equipment (the 'Client

Space'), installation services, electrical power connection, power supply of at least twenty (20)

MW, network connectivity, security, maintenance, repair, and technical support, as outlined in

this Agreement (the 'Managed Services')." (*Id.* at 2 § 1.3.)

      Just like the First Agreement, Crypto must first promptly ships its equipment. Then MO

POW 4 tests and installs the equipment so that it can provide Managed Services within the time

frame specified in the First Agreement. Finally, MO POW 4 provides Managed Services as the

First Agreement defines that term.

      The same language in the First Agreement that supports this process is in the Second

Agreement. Section 1.1 requires Crypto to "promptly" ship equipment. MO POW 4's testing and

installation related obligations begin "upon receipt of Equipment." (*Id.* at 2 § 1.1(B)(1).)

Likewise, MO POW 4's duty to provide Managed Services "shall commence" on the later of 30

days after "receipt" of equipment or a date in Exhibit A. (*Id.* at § 1.1(B)(3).)

      But Crypto never shipped equipment. So, MO POW 4's duty to provide Managed

Services could only begin on the later of 30 days after receiving equipment or the date in Exhibit

A. Exhibit A sets the "projected" commencement date as July 2022. Since Crypto did not ship

equipment, 30 days after receipt of the equipment is the later of the possible commencement

dates. Therefore, MO POW 4's clock to perform Managed Services has not yet run, and MO

POW 4 cannot breach a duty that has not yet begun.

Even so, MO POW 4 had no duty to perform because Crypto had breached the Second Agreement immediately after signing it. A party cannot claim the benefit of a contract if it committed the first material breach. *Maverick Benefit Advisors, LLC v. Bostrom*, 382 P.3d 753, 758 (Wyo. 2016); *Kinstler v. RTB South Greeley, Ltd., LLC*, 160 P.3d 1125, 1127 (Wyo. 2007) ("one party's material breach of an agreement may excuse the other party's performance under that agreement"). As explained above, Crypto breached the Second Agreement by failing to make the required down payment. (*See supra* at 8-9.) As a result, Crypto's breach had excused MO POW 4 of any duty under the Second Agreement.

### B.     MO POW 4 has no duty related to Crypto's payments.

The Second Agreement does not require MO POW 4 use funds it received to prepare the site. It does not require MO POW 4 to segregate or track any funds that it received from Crypto. Indeed, the Second Agreement says nothing at all about what MO POW 4 can or cannot do with the money received from Crypto. Instead, the Second Agreement imposes duties on MO POW 4 to have the site ready within a certain time. (Ex. 2 at 2 § 1.1(B)). The Second Agreement is silent as to the source of the funding used to get the site ready. Therefore, Crypto's breach of contract claim requires the Court to read language into the Second Agreement—something expressly prohibited by Wyoming law. *Gumpel,* 393 P.3d at 1293. But even if such a provision existed, MO POW 4 could still not have breached it because it never received any money from Crypto. (Ex. 3, Zhang Tr. at 45:25-46:2).

## V.     Crypto cannot maintain a claim for unjust enrichment.

Under Wyoming law, "the unjust enrichment remedy is not available when an express contract exists." *Hunter v. Reece*, 253 P.3d 497, 504 (Wyo. 2011) (internal quotations and citations omitted); *Sowerine v. Keith*, 997 P.2d 1018, 1021 (Wyo. 2000). Crypto's counterclaims

admit express agreements exist. (ECF Doc. 35 at ¶¶ 9, 12). As such, unjust enrichment is not a remedy available under Wyoming law.

Further, to recover under a theory of unjust enrichment, enrichment alone "will not suffice to invoke the remedial powers of a court of equity." *Silver Dollar Motel v. Taylor Elec. Co.*, 761 P.2d 1006, 1009 (Wyo. 1988). "Critical is that under the circumstances and as between the two parties to the transaction the enrichment be unjust." *Id.* Here, no evidence exists that Plaintiffs' enrichment was unjust. Crypto voluntarily agreed to a contractual structure in both Agreements that required a down payment. The same contracts required Crypto to ship equipment to begin the process of Plaintiffs providing services. Plaintiffs had no control over whether or when Crypto shipped equipment. Still, Plaintiffs invested millions to buy equipment, secure tariffs, and obtain permits to fulfill their duties under the Agreements. (Ex. 5, Guel Tr. at 24:10-19, 26:11-17, 28:12-17, 33:16-34:6, 111:12-22). Therefore, Plaintiffs' enrichment was just—a result of a voluntary contract that resulted in Plaintiffs also incurring large costs to uphold their end of the bargain.

In ruling on Plaintiffs Motion to Dismiss the Amended Counterclaims, the Court indicated Crypto's claim for Unjust Enrichment could survive in the alternative because the Court was not yet ready to rule on whether an unsatisfied condition precedent existed at "this early stage in the litigation." (ECF Doc. 43 at 2-3). The issue is now ripe for the Court to rule.

A condition precedent is "an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance of a promise arises." *Robert W. Anderson Housewrecking & Excavating v. Bd. of Trs.,* 681 P.2d 1326, 1331 (Wyo. 1984). No such thing exists here. Neither party has alleged the contracts are invalid for any reason. Instead, each party has pled claims relying on the existence of valid contracts. The Agreements do not specify an

event that had to occur before they became binding. Indeed, the Agreements say the opposite, using words and phrases like "promptly" and "due upon execution of this Agreement." As the latter phrase connotes, certain duties begin as soon as the ink was dry on signatures. Comparing these agreements to the situation in *Robert W. Anderson* makes clear no condition precedent exists. In that case, the Wyoming Supreme Court found a condition precedent because the contract award was tentative and only final upon demolition of a building. *Id.* In other words, the terms used showed something must happen first before a contract existed. No such terms exist here.

The alleged condition precedent was simply Crypto twisting the meaning of the shipping, testing, and services process described above. The Agreements' post-execution processes contain provisions that say once X happens, then Y duty begins. That is not a condition precedent. In addressing a similar situation, the Wyoming Supreme Court found the contract valid while also agreeing that given the structure the lack of occurrence of a condition simply meant performance was not yet due. *Whitlock Constr., Inc. v. S. Big Horn Cty. Water Supply Joint Powers Bd.*, 41 P.3d 1261, 1266-67 (Wyo. 2002). The same is true here. Therefore, the Court can rule a valid contract exists and thereby precluding Crypto's unjust enrichment claim.

## CONCLUSION

For the reasons in this brief, Plaintiffs ask the Court to enter judgment in their favor finding:

- Crypto breached the First Agreement, resulting in $854,100 in damages;

- Crypto breached the Second Agreement, resulting in $3,066,000 in damages;

- MO POW 3 did not breach the First Agreement;

- MO POW 4 did not breach the Second Agreement; and

- Crypto cannot state a claim for unjust enrichment.

Dated: December 13, 2023.

/s/ Jeffrey S. Pope

Jeffrey S. Pope (Wyo. State Bar # 7-4859)
Kasey J. Schlueter (Wyo. State Bar # 8-6521)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile: 307.778.8175
JSPope@hollandhart.com
KJSchlueter@hollandhart.com

ATTORNEYS FOR PLAINTIFFS