# **EXHIBIT 3**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF WYOMING

 3   ------------------------------------------------------
     MO POW 3, LLC, and
 4   MO POW 4, LLC,

 5           Plaintiffs,

 6      vs.                          Case No. 1:22-CV-155-SWS

 7   CRYPTO INFINITI, LLC,

 8           Defendant.
     ------------------------------------------------------
 9

10
        30(b)(6) VIDEOCONFERENCE DEPOSITION OF JINWEI ZHANG
11               Taken in behalf of Plaintiffs

12                  9:55 a.m., Thursday
                    November 16, 2023
13

14      PURSUANT TO NOTICE, the 30(b)(6) videoconference

15   deposition of JINWEI ZHANG was taken in accordance with

16   the applicable Federal Rules of Civil Procedure before

17   Randy A. Hatlestad, a Registered Merit Reporter and a

18   Notary Public in and for the State of Wyoming.

19

20

21

22

23

24

25
```

1   and text message much.  He likes to have phone calls.

2   Very older professional gentleman.

3       Q.   Let's go to paragraph 23, the very next one.

4   It talks about how, on June 17, 2022, Mr. Guel provided

5   Crypto Infiniti with a bill of lading for transformers

6   and a screenshot for payment of EZB containers.  Do you

7   see that?

8       A.   Yes.

9       Q.   As of June 17th, 2022, had Crypto Infiniti

10  shipped any equipment to either the MO POW 3 or MO POW 4

11  sites?

12      A.   No, not yet.  Because Mr. Guel told me I need

13  to hold on to it until he figured out where to ship the

14  equipment.

15      Q.   How did Mr. Guel communicate his desire for you

16  to wait?

17      A.   Because the site is not ready.  They don't have

18  a place for storage of the miner.

19      Q.   Sorry.  I probably asked a bad question.  Did

20  Mr. Guel send you an e-mail, text message, or was it a

21  phone call where he communicated --

22      A.   A phone call.  Mr. Guel normally does a phone

23  call because he's an old-style gentleman.  He likes phone

24  calls.

25      Q.   I think you can agree, though, that the

1   on a pallet in Utah.  The first equipment was already on
2   a pallet in Utah.
3       Q.   I think we can agree, though, Crypto Infiniti
4   never shipped equipment to either the MO POW 3 or MO POW
5   4 site.  Is that right?
6                MR. GARRETT:  Objection.  Form.  You can
7   answer.
8       A.   Yes.  We never shipped because we don't have a
9   confirmed address.
10      Q.   (BY MR. POPE)  So let me understand why you
11  needed a confirmed address when we just agreed that both
12  contracts contain shipping addresses.
13      A.   Well, those are very expensive equipment.  Of
14  course we want to confirm that they have the warehouse
15  and the right person to receive the equipment.  We cannot
16  just ship it without anybody there to sign off or receive
17  them.  Those are very expensive equipment.  It's just
18  like you receive an expensive thing.  They ask you to
19  sign off.  And I have to coordinate with the people who
20  receive it to make sure there's somebody there to receive
21  it and a proper place to sign off before I ever ship any
22  equipment.  I cannot just deliver them and leave them in
23  the field and just leave those equipment there.  They're
24  expensive.  And those are computer equipment that needed
25  to be kept in a certain environment.

1    MO POW 3 must use dollars received from Crypto Infiniti?

2              MR. GARRETT: Objection. Form. Calls for

3    a legal conclusion.

4       A.   I cannot refer directly in my memory of the

5    contract. Of course, I don't have the entire contract to

6    say he needed to use exactly that particular dollar into

7    building this facility. No, I don't remember that.

8       Q.   (BY MR. POPE) Scroll down to the next page.

9    This is under "Counterclaim II: Breach of Contract," the

10   second contract. Paragraph 54 also makes a similar claim

11   that there was a breach because MO POW 4 failed to use

12   Crypto Infiniti's payments for the facility. This one is

13   at a different location. Similar question here. What

14   provision of the contract does Crypto Infiniti rely upon

15   to allege that MO POW 4 had to use its payments for the

16   facility located in Strafford, Missouri?

17             MR. GARRETT: Objection. Calls for a

18   legal conclusion.

19      A.   The contract is for buying a service, and the

20   service was not provided. I think for both of your

21   questions, the particular hosting service we tried to

22   purchase was not provided.

23      Q.   (BY MR. POPE) It's true that the MO POW 4

24   hosting service -- excuse me. Hosting -- start over.

25   It's true that the MO POW 4 contract, the payment due,

1   Crypto never made that.  Right?

2        A.   No.  We never made an MO POW 4 payment.

3        Q.   Does Crypto assert as part of any of its claims

4   in this case that MO POW 4 should have provided hosting

5   services without payment?

6        A.   No.  But part of our payment from MO POW 3 --

7   anyway, so we never received MO POW 3.  So we were

8   concerned of its ability to provide us a hosting service.

9   That's the reason we have not made MO POW 4.  The first

10  contract did not get executed by Mr. Guel.

11       Q.   On what provision of the MO POW 3 or 4 contract

12  did Crypto rely upon for your statement just now that it

13  could refuse payment under MO POW 4 because of concerns

14  under MO POW 3?

15            MR. GARRETT:  Objection.  Form.  Calls for

16  a legal conclusion.

17       A.   The buy-down part that we paid $2 million

18  buy-down, that's a buy-down of both the price of MO POW 3

19  and MO POW 4.  A buy-down is lower the price for the

20  hosting for a significant amount because we paid for

21  buy-down for both contracts.

22       Q.   (BY MR. POPE)  So help me understand why having

23  a rate buy-down meant Crypto believed it didn't have to

24  pay money due under MO POW 4.

25            MR. GARRETT:  Objection.  Form.  Calls for

1                    C E R T I F I C A T E

2

3            I, RANDY A. HATLESTAD, a Registered Merit

4   Reporter and a Notary Public of the State of Wyoming, do

5   hereby certify that the aforementioned deponent was by me

6   first duly sworn to testify to the truth, the whole

7   truth, and nothing but the truth;

8            That the foregoing transcript is a true record

9   of the testimony given by the said deponent, together

10  with all other proceedings herein contained.

11           IN WITNESS WHEREOF, I have hereunto set my hand

12  and affixed my notarial seal this 4th day of December,

13  2023.

14

15

16

17  _____
        RANDY A. HATLESTAD
18      Registered Merit Reporter

19

20

21

22

23  My Commission Expires April 2, 2024.

24

25