# EXHIBIT 5

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
Civil Action No. 1:22-CV-00155-KHR
------------------------------------------------
ZOOM 30(b)(6) DEPOSITION OF MO POW 3, LLC, AND
MO POW 4, LLC, BY THOMAS GUEL, AND THOMAS GUEL,
INDIVIDUALLY - November 15, 2023
------------------------------------------------
Plaintiffs:
MO POW 3, LLC AND MO POW 4, LLC,
v.
Defendant:
CRYPTO INFINITI, LLC.
------------------------------------------------
APPEARANCES:
    HOLLAND & HART, LLP
        By Jeffrey S. Pope, Esq.
            2515 Warren Avenue, Suite 450
            Cheyenne, Wyoming 82001
                Appearing via Zoom on behalf of
                Plaintiffs
    HATHAWAY & KUNZ, LLP
        By Tyler J. Garrett, Esq.
            2515 Warren Avenue, Suite 500
            Cheyenne, Wyoming 82001
                Appearing via Zoom on behalf of
                Defendant

Page 2

Pursuant to Notice and the Federal Rules of Civil Procedure, the Zoom 30(b)(6) deposition of MO POW 3, LLC, AND MO POW 4, LLC, BY THOMAS GUEL, AND THOMAS GUEL, INDIVIDUALLY, called by Defendant, was taken on Wednesday, November 15, 2023, commencing at 9:03 a.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

                I N D E X
ZOOM 30(b)(6) DEPOSITION OF MO POW 3, LLC, AND MO POW 4, LLC, BY THOMAS GUEL, AND THOMAS GUEL, INDIVIDUALLY

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Garrett | 4 |

| EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit A | Master Hosting Agreement between MO POW 3 and Crypto Infinity, 5/26/22 | 83 |
| Exhibit B | Master Hosting Agreement between MO POW 4 and Crypto Infinity, 5/26/22 | 85 |
| Exhibit J | Letter from Jessica Vittorio to Jordan Collins, 7/22/22 | 87 |

Page 3

| EXHIBITS (continued) | | INITIAL REFERENCE |
|---|---|---|
| Exhibit K | Email from Jordan Collins to Jinwei Zhang, Jessica Vittorio, Gerald Lau, cc Thomas Guel, re Legal Notice: MO POW 3, LLC, 10/12/22 | 92 |

Page 4

P R O C E E D I N G S
        (Exhibits were marked prior to commencement of the deposition.)
            THOMAS GUEL,
being first duly sworn in the above cause, was examined and testified as follows:
            EXAMINATION
BY MR. GARRETT:
    Q    Good morning, Mr. Guel.  Nice to meet you.  There's a few housekeeping questions or matters that I want to talk to you about initially, and then we can get into the substance of your deposition.  But, just curiously, have you ever been deposed before?
    A    Yes.
    Q    Okay.  How many times, and when were those depositions?
    A    Not that many.  I can't recall the number.  A couple times.
    Q    Range, like two to five?
    A    Three.
    Q    Three times.  Okay.  So you've been deposed before.  You know how a deposition works. Provide audible answers to my questions.  No nodding; no shaking your head.  That isn't going to

Page 21

1  A  It is Epoch Mines.
2  Q  So the trail is that -- or kind of the
3  line of ownership is that MO POW 3 is owned by
4  Epoch Mines. And in turn, Epoch Mines is owned by
5  you in your individual capacity; is that right?
6  A  It is owned by me and -- it is owned
7  actually by Strategic Global Resources, LLC, which
8  is owned by me.
9  Q  Okay. So there's four layers. Epoch
10 Mines is owned by Strategic, and then Strategic is
11 owned by you?
12 A  Correct.
13 Q  Okay. Thank you.
14 A  You're welcome.
15 Q  What is your role with MO POW 3?
16 A  Well, my role as the ultimate leader of
17 the tower of companies was to make sure that things
18 got done, and I assisted in sales, and I assisted
19 in the development side.
20 Q  Let's break that down a bit. So in terms
21 of let's start with management of MO POW 3. Were
22 you the manager of MO POW 3?
23 A  Yes.
24 Q  Is there an operating agreement --
25 A  Yes.

Page 22

1  Q  -- for MO POW 3? Okay. And then you
2  said you did other things with respect to
3  soliciting sales; is that right?
4  A  Well, we were trying to -- yes.
5  Q  Meaning you were trying to get clients to
6  house their digital currency equipment at your --
7  at the MO POW site?
8  A  Correct.
9  Q  Can you explain -- I'm sorry. I'm going
10 to back up for a second. Who else was part of MO
11 POW 3 in terms of whether they are management or an
12 employee or an independent contractor or anything
13 like that?
14     MR. POPE: Mr. Guel, before you answer,
15 real quick just clarification, Counsel. I think we
16 started this line of questioning saying you were
17 asking him in his corporate representative
18 capacity. These are questions that are not in a
19 topic that was listed in the deposition notice. So
20 to the extent you are asking him as a corporate
21 representative, I'm going to object as beyond the
22 scope of the topics.
23     But to be fair to the consolidated
24 deposition, I think these are fair questions in his
25 individual capacity. I just want to make sure

Page 23

1  we're clear on that.
2      MR. GARRETT: Okay.
3  A  Can you clarify the question for me?
4  Q  (BY MR. GARRETT) Yeah. Who else was
5  part of MO POW 3 in terms of management, employees,
6  independent contractors, anybody that did work for
7  MO POW 3?
8  A  Did work is a broad subject or question,
9  so can you try to break that down? Are you talking
10 about, what, contractors?
11 Q  Let's talk first about management. Who
12 else was part of management?
13 A  For MO POW 3, we had other people that
14 worked for Epoch that would also assist in the
15 management, including Mason LaGrange and Charles
16 Ciancanelli. Then there were site techs that would
17 play a role.
18 Q  Do you know who the site techs were?
19 A  You would have Dustin Roberts. That's
20 about it for right now. We would have hired more,
21 but we didn't for -- for those.
22 Q  "For those" meaning --
23 A  For MO POW 3 and 4.
24 Q  -- MO POW --
25     THE REPORTER: One at a time, please.

Page 24

1  A  For MO POW 3.
2  Q  (BY MR. GARRETT) All right. So I think
3  this is a fair question in your representative
4  capacity, because it was in MO POW 3's complaint.
5  Can you explain the consortium of companies that MO
6  POW 3 is a part of?
7  A  Well, we just did, right? Strategic owns
8  Epoch, which owns MO POW 3. It owned MO POW 4. I
9  believe it owned MO POW 1 and 2.
10 Q  Okay. Can you -- can you explain in
11 detail the energy services MO POW 3 procured from
12 the municipal utilities pursuant to a combination
13 of multiple property energy and economic
14 development agreements?
15 A  For MO POW 3, we had an energy services
16 agreement which put us on a large interruptible
17 rate from city utilities. And they also gave us an
18 economic relief Rider D, which had a discount to
19 the demand charges.
20 Q  Okay. And those documents -- I suspect
21 it's all in writing. Have you turned those
22 documents over to your counsel?
23 A  I believe so.
24 Q  Just to loop back. Aside from the
25 project with Crypto Infiniti at the site --

Page 25

1 specific site, which we'll get into here in a bit,
2 I just need to ask what other projects is MO POW 3
3 involved in?  I think before you said there aren't
4 any others.  This was a specific purpose for the
5 specific site, but I just wanted to close that
6 loop.
7     A    Correct, there are none.
8     Q    Did MO POW 3 actually provide any hosting
9 services to Crypto Infiniti as set forth in the
10 master hosting services agreement?
11     A    No, because Crypto breached.
12     Q    And I'm not asking for, like, a legal
13 conclusion.  I totally don't want to go there.
14 Just a simple "No" --
15     A    No.
16     Q    -- would be satisfactory.  Could you
17 repeat that?  We were talking over each other.
18     A    The answer is no.
19     Q    So the site for MO POW 3 was at 400 North
20 Main, Springfield, Missouri; is that correct?
21     A    Correct.
22     Q    The status of the site -- what was the
23 status of the site when the contract with Crypto
24 Infiniti was entered into?
25         MR. POPE:  Object to form.  Vague.  Go

Page 26

1 ahead.
2     A    Do you want to be more specific?
3     Q    (BY MR. GARRETT)  No.
4     A    Are you asking me -- what exactly are you
5 asking me?
6     Q    What was the status of the site?
7     A    The status being what?  Was it a sunny
8 day?  I mean, are we talking about what?
9     Q    Was it built out?
10    A    No.
11    Q    Had anything been done to the site at the
12 time that MO POW 3 entered into the contract with
13 Crypto Infiniti?
14    A    I believe we had a lease secured with
15 city utilities.  I believe we had portions, if not
16 all, of our tariff executed, and that would be at
17 the time of execution.
18    Q    And just to make clear, there was no
19 physical work that had been done at that point?
20    A    No.
21    Q    No, as in, no, there was not any physical
22 development at that point?
23    A    That's correct.
24    Q    What was the status of the site as of
25 July 19th, 2022, when the initial complaint was

Page 27

1 filed by MO POW 3?
2         MR. POPE:  Object to form.  Vague.
3         Go ahead, Mr. Guel.
4     A    Substantially the same.
5     Q    (BY MR. GARRETT)  Meaning there was no
6 physical development of the site at that time?
7     A    That's correct.
8     Q    What was the status of the site as of
9 August 8th, 2022, when the amended complaint was
10 filed by MO POW 3?
11    A    No change.
12    Q    What's the current status of the site?
13    A    The same.
14    Q    So no development, nothing like that; is
15 that fair?
16    A    Correct.
17    Q    Do you still have possession or control
18 over that site?  And by "you," I mean MO POW 3.
19    A    No.
20    Q    So the lease has been terminated?
21    A    Correct.
22    Q    Do you know who now occupies or possesses
23 that property?
24    A    I do not.
25    Q    When you were negotiating this

Page 28

1 contract -- and by "you," again, I mean MO POW 3,
2 since you're the representative -- why couldn't MO
3 POW's site at 400 North Main, Springfield,
4 Missouri, provide the full 35 megawatts to Crypto
5 Infiniti's needs?
6     A    There wasn't enough power available at
7 that substation.
8     Q    Let's turn now to the funds that were
9 paid by Crypto Infiniti to MO POW 3.  Those funds
10 totaled $4,135,250; is that correct?
11    A    Correct.
12    Q    What did MO POW 3 do with that money?
13    A    MO POW 3 purchased five mobile data
14 centers, along with the corresponding transformers.
15 It purchased concrete pads for them to sit on, as
16 well as some other electrical components to connect
17 everything, and poles.
18    Q    And did that deplete -- that work, did
19 that deplete the $4,135,250?
20    A    No.
21    Q    How much did that work that you just
22 summarized cost?
23    A    The exact number, I would have to check,
24 but it was over $2 million.
25    Q    So there is a remaining balance still in

Page 33

```
 1  topic.
 2          There's an allegation in MO POW 3's
 3  complaint that says, Millions invested in the
 4  project by Crypto Infiniti went to waste or would
 5  go to waste.  Did millions invested in the project
 6  by MO POW 3 go to waste?
 7      A   I would think, yes.
 8      Q   How so?  Can you explain that?
 9      A   I would need to review the files to be
10  able to answer that question.  What exactly are you
11  looking for?
12      Q   I don't know.  That was the allegation
13  that MO POW put in the pleading, so I'm just asking
14  you about the facts.
15      A   So what exactly is the question?
16      Q   The question is did millions invested in
17  the project by MO POW 3 go to waste?
18      A   Well, yes.
19      Q   How so?
20      A   Well, equipment was purchased, wasn't
21  able to be used.  We lost the site over their
22  breach and inability to move forward.
23      Q   Were any of the materials able to be
24  repurposed?  Are you using that equipment for
25  somewhere else?
```

Page 34

```
 1      A   They were sold at a loss, big loss.
 2      Q   Can you be specific on that?
 3      A   I think -- not with actual numbers here
 4  right now.
 5      Q   Okay.  So I'm going to ask again --
 6      A   It was a loss.
 7      Q   I'm going to ask again.  You obviously
 8  have records, you just said you do, on this
 9  subject.  We have not received those documents.  Of
10  course, as Jeff noted, we have an additional
11  interrogatory that captures those documents, so I
12  suspect we'll be receiving those.
13          Have you been able to provide those
14  records to your counsel at this point?
15          MR. POPE:  Before you answer that,
16  Mr. Guel, Counsel, are you referring to documents
17  about the sale of the equipment?
18          MR. GARRETT:  Uh-huh.
19          MR. POPE:  Mr. Guel, you can answer that
20  question.  I'll represent to you, Mr. Garrett, that
21  that isn't what the interrogatory called for.  And
22  importantly, the portion of the complaint that
23  you're referencing is the introduction, not one of
24  the numbered allegations.
25          So with that on the record, go ahead,
```

Page 35

```
 1  Mr. Guel.
 2      A   I do not recall at this time if that was
 3  sent to our counsel.
 4      Q   (BY MR. GARRETT)  How long would it take
 5  you to review records and information so you could
 6  recall?
 7      A   I do not have that answer.  I'm not at my
 8  office right now.  I don't know.
 9      Q   What damages is MO POW 3 claiming against
10  Crypto Infiniti?
11      A   For which -- against MO POW 3?  That was
12  the question, for MO POW 3?
13      Q   Correct.
14      A   MO POW 3's damages are the unpaid first
15  month's invoice, and I believe we've forgone -- we
16  were going to forego all the other damages.
17      Q   So in other words -- let's break this
18  down a little bit.  I guess it would be twofold.
19  First, the damages are that you're keeping --
20  you're intending to keep all of the money that
21  Crypto Infiniti has paid to this point, the
22  $4,135,250?
23      A   Yes.
24      Q   And in addition to that, you're claiming
25  damages of what?
```

Page 36

```
 1      A   The unpaid invoices that were due under
 2  the contract.
 3      Q   And how much does that equate to?
 4      A   For MO POW 3, it was $800,000 and change.
 5  I could get the exact number if you need it.
 6      Q   So there's no damages continuing to
 7  accrue?
 8      A   We are taking the position at this time
 9  that we are not going to pursue additional damages.
10      Q   That's fine.  That wasn't answering my
11  question though.  Are those damages continuing to
12  accrue?
13      A   Yes.
14      Q   How so?
15      A   Well, you know what, the answer is -- I
16  don't know the answer if they are accruing still.
17  That was the amount of damages that we decided to
18  pursue.
19      Q   So is it fair to say that the damages are
20  not continuing to accrue?
21      A   I would say it this way.  The answer to
22  the question is we have decided to forego
23  additional damages and limit it at this time to
24  those damages.
25      Q   Okay.  But you're qualifying it with "at
```

Page 109

1  Q  -- with respect to --
2  A  Sorry.
3  Q  Sorry. I didn't mean to -- sometimes I
4  do that, I tail.
5  A  And I jump in, so we're even.
6  Q  All right. Go ahead. You know where I'm
7  going. So who is Jordan Collins?
8  A  Jordan Collins is a lawyer that works for
9  different operations that I have in the lawyer
10 capacity. In MO POW 3 and MO POW 4 capacity, he
11 negotiated the contracts as legal counsel.
12 Q  Okay. And I saw his name on some of
13 these documents, and his contact information was
14 different on several. What is TKO Energy?
15 A  It was an entity that Jordan had when we
16 hired him.
17 Q  Okay. And then he kind of switched to
18 Pangaea Global Management general counsel; is that
19 right?
20 A  We -- yes. We got along, he's a good
21 guy, and we brought him on at Pangaea.
22 Q  And he's still there?
23 A  Yes.
24     MR. GARRETT: When you find a good lawyer
25 that actually has a good personality, snatch them

Page 110

1  up, because there aren't many of them.
2     All right. Let's stop there, and I guess
3  we just have to wait for the ruling of the court
4  around 2:00, and then we can go from there. So
5  we'll pick up after 2:00, and everybody enjoy your
6  lunch.
7     Jeff, is there anything you want to put
8  on the record before we jump off at this point?
9     MR. POPE: Not on the record, no.
10    MR. GARRETT: Okay. We'll go off the
11 record then. Thank you.
12    (Break from 12:16 p.m. to 2:57 p.m.)
13    MR. GARRETT: We are back on the record.
14 Thank you all for your patience throughout the day.
15    Mr. Pope and I had a conference with the
16 court about our dispute over the scope of
17 questioning with respect to how MO POW 3 and 4
18 spent the funds that were paid by Crypto Infiniti.
19    Just to summarize so we're all on the
20 same page, the court ruled that we can't go into
21 the details or the level of specificity that I
22 would like with respect to records or financial
23 statements showing exactly how those funds were
24 spent.
25    So with that, the court did allow for

Page 111

1  additional questions to clarify and make sure in a
2  general way that we know how the funds were spent.
3  I know that we've discussed some questions on the
4  topic generally, and, Mr. Guel, thank you for
5  providing those answers.
6  Q  (BY MR. GARRETT) So just to kind of
7  close the loop on those questions, I guess,
8  initially I had asked you how were the funds spent
9  by MO POW 3 -- and I'll back up for a second. You
10 said there were no funds spent by MO POW 4, and so
11 we can just close that off.
12    So we're just talking about MO POW 3.
13 And with MO POW 3, you said that around $2 million
14 was used for purposes under the first and second --
15 or at least the first contract between MO POW 3 and
16 Crypto Infiniti; is that correct?
17 A  That is correct. I don't remember the
18 exact number, Tyler.
19 Q  And that's okay.
20 A  But it is around $2 million. I believe
21 it's over -- that was spent directly for site
22 development.
23 Q  Okay. And then you said the remaining
24 balance, which would add up to 2 million and some
25 change, went to, I think you said, general

Page 112

1  corporate services. I can't remember the specific
2  term. Can you opine on that again?
3  A  It was spent -- it was not spent on the
4  development of the site.
5  Q  Okay. So just to clarify, and this is as
6  far as I'm going to go, the remainder balance of
7  those funds was used for other purposes not related
8  to the first contract between MO POW 3 and Crypto
9  Infiniti?
10 A  Correct.
11    MR. GARRETT: All right. Well, that's as
12 far as I can go, and so with that, I don't have any
13 more questions. I really do appreciate your time,
14 Mr. Guel. It was really nice meeting you.
15    THE DEPONENT: Thank you.
16    MR. GARRETT: Getting to speak with you
17 brings back a lot of good memories from Chicago.
18    THE DEPONENT: Where were you from?
19    MR. GARRETT: I'm from Cheyenne actually.
20 I'm from here. I spent a number of years in law
21 school and then with a large firm out there between
22 2003 and 2009.
23    THE DEPONENT: Were you in Chicago proper
24 or were --
25    MR. GARRETT: We started out in kind of

**Page 113**

1  the Ravenswood area.
2       THE DEPONENT: Okay. Sure.
3       MR. GARRETT: Just north, and then ended
4  up in a place in Old Irving Park.
5       THE DEPONENT: Nice.
6       MR. GARRETT: I know we're still on the
7  record. We probably shouldn't be. But I'll switch
8  over to Jeff. Do you have anything to add or would
9  you like to ask some questions?
10      MR. POPE: I have no questions. And we
11 will read and sign.
12      THE REPORTER: Can I get your orders,
13 please? Do you both just want etran?
14      MR. GARRETT: Yes.
15      MR. POPE: We'll take an etran too.
16      THE REPORTER: And do you want copies of
17 the exhibits with your transcript?
18      MR. POPE: I don't.
19      MR. GARRETT: I don't either.
20      (The deposition concluded at 3:02 p.m.,
21       November 15, 2023.)
22
23
24
25

**Page 114**

1       I, THOMAS GUEL, do hereby certify that I
2  have read the foregoing transcript and that the
3  same and accompanying amendment sheets, if any,
4  constitute a true and complete record of my
5  testimony.
6
7
8
9            _____
             Signature of Deponent
10
11           (  ) No amendments
             (  ) Amendments attached
12
13
14           Acknowledged before me this _____
15 day of _____, 2023.
16
17           Notary Public: _____
18           My commission expires_____
19           Seal:
20
21 LAD
22
23
24
25

**Page 115**

1  STATE OF COLORADO   )
2                      )  ss. REPORTER'S CERTIFICATE
   COUNTY OF DENVER    )
3
4
5       I, Lisa A. Dague, do hereby certify that
6  I am a Certified Shorthand Reporter and Notary
7  Public within the State of Colorado; that previous
8  to the commencement of the examination, the
9  deponent was duly sworn to testify to the truth.
10      I further certify that this deposition
11 was taken in shorthand by me at the time and place
12 herein set forth and was thereafter reduced to
13 typewritten form, and that the foregoing
14 constitutes a true and correct transcript.
15      I further certify that I am not related
16 to, employed by, nor of counsel for any of the
17 parties or attorneys herein, nor otherwise
18 interested in the result of the within action.
19      In witness whereof, I have affixed my
20 signature this 28th day of November, 2023.
21      My commission expires December 23, 2024.
22
23           _____
             Lisa A. Dague
24           Certified Shorthand Reporter
25

**Page 116**

1  AB LITIGATION SERVICES
   216 - 16th Street, Suite 600
2  Denver, Colorado  80202
3  November 28, 2023
4  Jeffrey S. Pope, Esq.
   2515 Warren Avenue, Suite 450
5  Cheyenne, Wyoming 82001
6  Re:  30(b)(6) DEPOSITION OF MO POW 3, LLC, AND MO POW 4,
        LLC, BY THOMAS GUEL, AND THOMAS GUEL, INDIVIDUALLY
7       MO POW 3, LLC AND MO POW 4, LLC
        v. CRYPTO INFINITI, LLC
8       Civil Action No. 1:22-CV-00155-KHR
9  The aforementioned deposition is ready for
   reading and signing. Please attend to this
10 matter by following BOTH of the items indicated
   below:
11
   _____ Call 303-296-0017 and arrange with us
12       to read and sign the deposition in our
         office
13
   _XXX_ Have the deponent read your copy and sign
14       the signature page and amendment sheets, if
         applicable; the signature page is attached
15
   _____ Read the enclosed copy of the deposition
16       and sign the signature page and amendment
         sheets, if applicable; the signature page
17       is attached
18 _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
19 _____ By _____ due to a trial date of_____
20 Please be sure the original signature page and
   amendment sheets, if any, are SIGNED BEFORE A
21 NOTARY PUBLIC and returned to AB Litigation Services
   for filing with the original deposition. A copy
22 of these changes should also be forwarded to
   counsel of record. Thank you.
23
   AB LITIGATION SERVICES
24
25 cc:  All Counsel