# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
Civil Action No. 1:22-CV-00155-KHR

---

ZOOM 30(b)(6) DEPOSITION OF MO POW 3, LLC, AND MO POW 4, LLC, BY THOMAS GUEL, AND THOMAS GUEL, INDIVIDUALLY - November 15, 2023

---

Plaintiffs:
MO POW 3, LLC AND MO POW 4, LLC,
v.
Defendant:
CRYPTO INFINITI, LLC.

---

APPEARANCES:

HOLLAND & HART, LLP
By Jeffrey S. Pope, Esq.
2515 Warren Avenue, Suite 450
Cheyenne, Wyoming 82001
Appearing via Zoom on behalf of Plaintiffs

HATHAWAY & KUNZ, LLP
By Tyler J. Garrett, Esq.
2515 Warren Avenue, Suite 500
Cheyenne, Wyoming 82001
Appearing via Zoom on behalf of Defendant



Pursuant to Notice and the Federal Rules of Civil Procedure, the Zoom 30(b)(6) deposition of MO POW 3, LLC, AND MO POW 4, LLC, BY THOMAS GUEL, AND THOMAS GUEL, INDIVIDUALLY, called by Defendant, was taken on Wednesday, November 15, 2023, commencing at 9:03 a.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

I N D E X

ZOOM 30(b)(6) DEPOSITION OF MO POW 3, LLC, AND MO POW 4, LLC, BY THOMAS GUEL, AND THOMAS GUEL, INDIVIDUALLY

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Garrett | 4 |

| EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit A | Master Hosting Agreement between MO POW 3 and Crypto Infinity, 5/26/22 | 83 |
| Exhibit B | Master Hosting Agreement between MO POW 4 and Crypto Infinity, 5/26/22 | 85 |
| Exhibit J | Letter from Jessica Vittorio to Jordan Collins, 7/22/22 | 87 |



| EXHIBITS (continued) | | INITIAL REFERENCE |
|---|---|---|
| Exhibit K | Email from Jordan Collins to Jinwei Zhang, Jessica Vittorio, Gerald Lau, cc Thomas Guel, re Legal Notice: MO POW 3, LLC, 10/12/22 | 92 |



P R O C E E D I N G S

(Exhibits were marked prior to commencement of the deposition.)

THOMAS GUEL,

being first duly sworn in the above cause, was examined and testified as follows:

EXAMINATION

BY MR. GARRETT:

**Q Good morning, Mr. Guel. Nice to meet you. There's a few housekeeping questions or matters that I want to talk to you about initially, and then we can get into the substance of your deposition. But, just curiously, have you ever been deposed before?**

A Yes.

**Q Okay. How many times, and when were those depositions?**

A Not that many. I can't recall the number. A couple times.

**Q Range, like two to five?**

A Three.

**Q Three times. Okay. So you've been deposed before. You know how a deposition works. Provide audible answers to my questions. No nodding; no shaking your head. That isn't going to**

A It is Epoch Mines.

**Q So the trail is that -- or kind of the line of ownership is that MO POW 3 is owned by Epoch Mines. And in turn, Epoch Mines is owned by you in your individual capacity; is that right?**

A It is owned by me and -- it is owned actually by Strategic Global Resources, LLC, which is owned by me.

**Q Okay. So there's four layers. Epoch Mines is owned by Strategic, and then Strategic is owned by you?**

A Correct.

**Q Okay. Thank you.**

A You're welcome.

**Q What is your role with MO POW 3?**

A Well, my role as the ultimate leader of the tower of companies was to make sure that things got done, and I assisted in sales, and I assisted in the development side.

**Q Let's break that down a bit. So in terms of let's start with management of MO POW 3. Were you the manager of MO POW 3?**

A Yes.

**Q Is there an operating agreement --**

A Yes.



**Q -- for MO POW 3? Okay. And then you said you did other things with respect to soliciting sales; is that right?**

A Well, we were trying to -- yes.

**Q Meaning you were trying to get clients to house their digital currency equipment at your -- at the MO POW site?**

A Correct.

**Q Can you explain -- I'm sorry. I'm going to back up for a second. Who else was part of MO POW 3 in terms of whether they are management or an employee or an independent contractor or anything like that?**

MR. POPE: Mr. Guel, before you answer, real quick just clarification, Counsel. I think we started this line of questioning saying you were asking him in his corporate representative capacity. These are questions that are not in a topic that was listed in the deposition notice. So to the extent you are asking him as a corporate representative, I'm going to object as beyond the scope of the topics.

But to be fair to the consolidated deposition, I think these are fair questions in his individual capacity. I just want to make sure we're clear on that.



MR. GARRETT: Okay.

A Can you clarify the question for me?

**Q (BY MR. GARRETT) Yeah. Who else was part of MO POW 3 in terms of management, employees, independent contractors, anybody that did work for MO POW 3?**

A Did work is a broad subject or question, so can you try to break that down? Are you talking about, what, contractors?

**Q Let's talk first about management. Who else was part of management?**

A For MO POW 3, we had other people that worked for Epoch that would also assist in the management, including Mason LaGrange and Charles Ciancanelli. Then there were site techs that would play a role.

**Q Do you know who the site techs were?**

A You would have Dustin Roberts. That's about it for right now. We would have hired more, but we didn't for -- for those.

**Q "For those" meaning --**

A For MO POW 3 and 4.

**Q -- MO POW --**

THE REPORTER: One at a time, please.



A For MO POW 3.

**Q (BY MR. GARRETT) All right. So I think this is a fair question in your representative capacity, because it was in MO POW 3's complaint. Can you explain the consortium of companies that MO POW 3 is a part of?**

A Well, we just did, right? Strategic owns Epoch, which owns MO POW 3. It owned MO POW 4. I believe it owned MO POW 1 and 2.

**Q Okay. Can you -- can you explain in detail the energy services MO POW 3 procured from the municipal utilities pursuant to a combination of multiple property energy and economic development agreements?**

A For MO POW 3, we had an energy services agreement which put us on a large interruptible rate from city utilities. And they also gave us an economic relief Rider D, which had a discount to the demand charges.

**Q Okay. And those documents -- I suspect it's all in writing. Have you turned those documents over to your counsel?**

A I believe so.

**Q Just to loop back. Aside from the project with Crypto Infiniti at the site --**

**specific site, which we'll get into here in a bit, I just need to ask what other projects is MO POW 3 involved in? I think before you said there aren't any others. This was a specific purpose for the specific site, but I just wanted to close that loop.**

A Correct, there are none.

**Q Did MO POW 3 actually provide any hosting services to Crypto Infiniti as set forth in the master hosting services agreement?**

A No, because Crypto breached.

**Q And I'm not asking for, like, a legal conclusion. I totally don't want to go there. Just a simple "No" --**

A No.

**Q -- would be satisfactory. Could you repeat that? We were talking over each other.**

A The answer is no.

**Q So the site for MO POW 3 was at 400 North Main, Springfield, Missouri; is that correct?**

A Correct.

**Q The status of the site -- what was the status of the site when the contract with Crypto Infiniti was entered into?**

MR. POPE: Object to form. Vague. Go



ahead.

A Do you want to be more specific?

**Q (BY MR. GARRETT) No.**

A Are you asking me -- what exactly are you asking me?

**Q What was the status of the site?**

A The status being what? Was it a sunny day? I mean, are we talking about what?

**Q Was it built out?**

A No.

**Q Had anything been done to the site at the time that MO POW 3 entered into the contract with Crypto Infiniti?**

A I believe we had a lease secured with city utilities. I believe we had portions, if not all, of our tariff executed, and that would be at the time of execution.

**Q And just to make clear, there was no physical work that had been done at that point?**

A No.

**Q No, as in, no, there was not any physical development at that point?**

A That's correct.

**Q What was the status of the site as of July 19th, 2022, when the initial complaint was**



**filed by MO POW 3?**

MR. POPE: Object to form. Vague.

Go ahead, Mr. Guel.

A Substantially the same.

**Q (BY MR. GARRETT) Meaning there was no physical development of the site at that time?**

A That's correct.

**Q What was the status of the site as of August 8th, 2022, when the amended complaint was filed by MO POW 3?**

A No change.

**Q What's the current status of the site?**

A The same.

**Q So no development, nothing like that; is that fair?**

A Correct.

**Q Do you still have possession or control over that site? And by "you," I mean MO POW 3.**

A No.

**Q So the lease has been terminated?**

A Correct.

**Q Do you know who now occupies or possesses that property?**

A I do not.

**Q When you were negotiating this**



**contract -- and by "you," again, I mean MO POW 3, since you're the representative -- why couldn't MO POW's site at 400 North Main, Springfield, Missouri, provide the full 35 megawatts to Crypto Infiniti's needs?**

A There wasn't enough power available at that substation.

**Q Let's turn now to the funds that were paid by Crypto Infiniti to MO POW 3. Those funds totaled $4,135,250; is that correct?**

A Correct.

**Q What did MO POW 3 do with that money?**

A MO POW 3 purchased five mobile data centers, along with the corresponding transformers. It purchased concrete pads for them to sit on, as well as some other electrical components to connect everything, and poles.

**Q And did that deplete -- that work, did that deplete the $4,135,250?**

A No.

**Q How much did that work that you just summarized cost?**

A The exact number, I would have to check, but it was over $2 million.

**Q So there is a remaining balance still in**

topic.

There's an allegation in MO POW 3's complaint that says, Millions invested in the project by Crypto Infiniti went to waste or would go to waste. Did millions invested in the project by MO POW 3 go to waste?

A I would think, yes.

Q How so? Can you explain that?

A I would need to review the files to be able to answer that question. What exactly are you looking for?

Q I don't know. That was the allegation that MO POW put in the pleading, so I'm just asking you about the facts.

A So what exactly is the question?

Q The question is did millions invested in the project by MO POW 3 go to waste?

A Well, yes.

Q How so?

A Well, equipment was purchased, wasn't able to be used. We lost the site over their breach and inability to move forward.

Q Were any of the materials able to be repurposed? Are you using that equipment for somewhere else?



A They were sold at a loss, big loss.

Q Can you be specific on that?

A I think -- not with actual numbers here right now.

Q Okay. So I'm going to ask again --

A It was a loss.

Q I'm going to ask again. You obviously have records, you just said you do, on this subject. We have not received those documents. Of course, as Jeff noted, we have an additional interrogatory that captures those documents, so I suspect we'll be receiving those.

Have you been able to provide those records to your counsel at this point?

MR. POPE: Before you answer that, Mr. Guel, Counsel, are you referring to documents about the sale of the equipment?

MR. GARRETT: Uh-huh.

MR. POPE: Mr. Guel, you can answer that question. I'll represent to you, Mr. Garrett, that that isn't what the interrogatory called for. And importantly, the portion of the complaint that you're referencing is the introduction, not one of the numbered allegations.

So with that on the record, go ahead,



Mr. Guel.

A I do not recall at this time if that was sent to our counsel.

Q (BY MR. GARRETT) How long would it take you to review records and information so you could recall?

A I do not have that answer. I'm not at my office right now. I don't know.

Q What damages is MO POW 3 claiming against Crypto Infiniti?

A For which -- against MO POW 3? That was the question, for MO POW 3?

Q Correct.

A MO POW 3's damages are the unpaid first month's invoice, and I believe we've forgone -- we were going to forego all the other damages.

Q So in other words -- let's break this down a little bit. I guess it would be twofold. First, the damages are that you're keeping -- you're intending to keep all of the money that Crypto Infiniti has paid to this point, the $4,135,250?

A Yes.

Q And in addition to that, you're claiming damages of what?



A The unpaid invoices that were due under the contract.

Q And how much does that equate to?

A For MO POW 3, it was $800,000 and change. I could get the exact number if you need it.

Q So there's no damages continuing to accrue?

A We are taking the position at this time that we are not going to pursue additional damages.

Q That's fine. That wasn't answering my question though. Are those damages continuing to accrue?

A Yes.

Q How so?

A Well, you know what, the answer is -- I don't know the answer if they are accruing still. That was the amount of damages that we decided to pursue.

Q So is it fair to say that the damages are not continuing to accrue?

A I would say it this way. The answer to the question is we have decided to forego additional damages and limit it at this time to those damages.

Q Okay. But you're qualifying it with "at

**Q -- with respect to --**
A Sorry.
**Q Sorry. I didn't mean to -- sometimes I do that, I tail.**
A And I jump in, so we're even.
**Q All right. Go ahead. You know where I'm going. So who is Jordan Collins?**
A Jordan Collins is a lawyer that works for different operations that I have in the lawyer capacity. In MO POW 3 and MO POW 4 capacity, he negotiated the contracts as legal counsel.
**Q Okay. And I saw his name on some of these documents, and his contact information was different on several. What is TKO Energy?**
A It was an entity that Jordan had when we hired him.
**Q Okay. And then he kind of switched to Pangaea Global Management general counsel; is that right?**
A We -- yes. We got along, he's a good guy, and we brought him on at Pangaea.
**Q And he's still there?**
A Yes.
MR. GARRETT: When you find a good lawyer that actually has a good personality, snatch them



up, because there aren't many of them.
All right. Let's stop there, and I guess we just have to wait for the ruling of the court around 2:00, and then we can go from there. So we'll pick up after 2:00, and everybody enjoy your lunch.
Jeff, is there anything you want to put on the record before we jump off at this point?
MR. POPE: Not on the record, no.
MR. GARRETT: Okay. We'll go off the record then. Thank you.
(Break from 12:16 p.m. to 2:57 p.m.)
MR. GARRETT: We are back on the record. Thank you all for your patience throughout the day.
Mr. Pope and I had a conference with the court about our dispute over the scope of questioning with respect to how MO POW 3 and 4 spent the funds that were paid by Crypto Infiniti.
Just to summarize so we're all on the same page, the court ruled that we can't go into the details or the level of specificity that I would like with respect to records or financial statements showing exactly how those funds were spent.
So with that, the court did allow for



additional questions to clarify and make sure in a general way that we know how the funds were spent. I know that we've discussed some questions on the topic generally, and, Mr. Guel, thank you for providing those answers.
**Q (BY MR. GARRETT) So just to kind of close the loop on those questions, I guess, initially I had asked you how were the funds spent by MO POW 3 -- and I'll back up for a second. You said there were no funds spent by MO POW 4, and so we can just close that off.**
**So we're just talking about MO POW 3. And with MO POW 3, you said that around $2 million was used for purposes under the first and second -- or at least the first contract between MO POW 3 and Crypto Infiniti; is that correct?**
A That is correct. I don't remember the exact number, Tyler.
**Q And that's okay.**
A But it is around $2 million. I believe it's over -- that was spent directly for site development.
**Q Okay. And then you said the remaining balance, which would add up to 2 million and some change, went to, I think you said, general**



**corporate services. I can't remember the specific term. Can you opine on that again?**
A It was spent -- it was not spent on the development of the site.
**Q Okay. So just to clarify, and this is as far as I'm going to go, the remainder balance of those funds was used for other purposes not related to the first contract between MO POW 3 and Crypto Infiniti?**
A Correct.
MR. GARRETT: All right. Well, that's as far as I can go, and so with that, I don't have any more questions. I really do appreciate your time, Mr. Guel. It was really nice meeting you.
THE DEPONENT: Thank you.
MR. GARRETT: Getting to speak with you brings back a lot of good memories from Chicago.
THE DEPONENT: Where were you from?
MR. GARRETT: I'm from Cheyenne actually. I'm from here. I spent a number of years in law school and then with a large firm out there between 2003 and 2009.
THE DEPONENT: Were you in Chicago proper or were --
MR. GARRETT: We started out in kind of

Page 113

the Ravenswood area.

THE DEPONENT: Okay. Sure.

MR. GARRETT: Just north, and then ended up in a place in Old Irving Park.

THE DEPONENT: Nice.

MR. GARRETT: I know we're still on the record. We probably shouldn't be. But I'll switch over to Jeff. Do you have anything to add or would you like to ask some questions?

MR. POPE: I have no questions. And we will read and sign.

THE REPORTER: Can I get your orders, please? Do you both just want etran?

MR. GARRETT: Yes.

MR. POPE: We'll take an etran too.

THE REPORTER: And do you want copies of the exhibits with your transcript?

MR. POPE: I don't.

MR. GARRETT: I don't either.

(The deposition concluded at 3:02 p.m., November 15, 2023.)

Page 114

I, THOMAS GUEL, do hereby certify that I have read the foregoing transcript and that the same and accompanying amendment sheets, if any, constitute a true and complete record of my testimony.

______________________________
Signature of Deponent

( ) No amendments
( ) Amendments attached

Acknowledged before me this ______ day of ________________, 2023.

Notary Public: ___________________
My commission expires______________
Seal:

LAD

Page 115

STATE OF COLORADO )
) ss. REPORTER'S CERTIFICATE
COUNTY OF DENVER )

I, Lisa A. Dague, do hereby certify that I am a Certified Shorthand Reporter and Notary Public within the State of Colorado; that previous to the commencement of the examination, the deponent was duly sworn to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth and was thereafter reduced to typewritten form, and that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

In witness whereof, I have affixed my signature this 28th day of November, 2023.

My commission expires December 23, 2024.

Lisa A. Dague
Certified Shorthand Reporter

Page 116

AB LITIGATION SERVICES
216 - 16th Street, Suite 600
Denver, Colorado 80202
November 28, 2023
Jeffrey S. Pope, Esq.
2515 Warren Avenue, Suite 450
Cheyenne, Wyoming 82001
Re: 30(b)(6) DEPOSITION OF MO POW 3, LLC, AND MO POW 4, LLC, BY THOMAS GUEL, AND THOMAS GUEL, INDIVIDUALLY
MO POW 3, LLC AND MO POW 4, LLC
v. CRYPTO INFINITI, LLC
Civil Action No. 1:22-CV-00155-KHR

The aforementioned deposition is ready for reading and signing. Please attend to this matter by following BOTH of the items indicated below:

_____ Call 303-296-0017 and arrange with us to read and sign the deposition in our office

_XXX_ Have the deponent read your copy and sign the signature page and amendment sheets, if applicable; the signature page is attached

_____ Read the enclosed copy of the deposition and sign the signature page and amendment sheets, if applicable; the signature page is attached

_XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
_____ By _______ due to a trial date of________

Please be sure the original signature page and amendment sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC and returned to AB Litigation Services for filing with the original deposition. A copy of these changes should also be forwarded to counsel of record. Thank you.

AB LITIGATION SERVICES

cc: All Counsel