Matthew D. Kaufman, WSB #6-3960
Tyler J. Garrett, WSB #6-4400
Melissa K. Burke, WSB #7-5694
Kari Hartman, WSB #8-6507
HATHAWAY & KUNZ, LLP
P. O. Box 1208
Cheyenne, WY  82003-1208
(307) 634-7723
(307) 634-0985 (fax)
mkaufman@hkwyolaw.com
tgarrett@hkwyolaw.com
mburke@hkwyolaw.com
khartman@hkwyolaw.com

ATTORNEYS FOR DEFENDANT

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| MO POW 3, LLC and MO POW 4, LLC, | ) |
| Plaintiffs, | ) |
| vs. | ) Civil Action No. 1:22-CV-00155-KHR |
| CRYPTO INFINITI LLC, | ) |
| Defendant. | ) |

**CRYPTO INFINITI'S MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant, Crypto Infiniti LLC ("Crypto Infiniti"), by and through its counsel, HATHAWAY & KUNZ, LLP, and hereby submits this *Memorandum in Support of Motion for Summary Judgment* filed contemporaneously with its *Motion for Summary Judgment*.

### INTRODUCTION

This case arises out of a contractual dispute between Mo Pow 3, LLC ("Mo Pow 3"), Mo Pow 4, LLC ("Mo Pow 4") (collectively "Plaintiffs"), and Crypto Infiniti. The parties entered into two separate agreements that required Plaintiffs to provide hosting services for Crypto Infiniti's

digital currency mining equipment. Crypto Infiniti paid $4,135,250 for these services. However, it quickly became apparent that Plaintiffs did not intend to hold up their end of the bargain, as they (1) failed to address overheating concerns which would impact the minimum service operating levels required under the Agreements, (2) failed to cooperate with Crypto Infiniti in providing the necessary information to facilitate Crypto Infiniti shipping its equipment, and (3) failed to even begin physical development of the sites which would host Crypto Infiniti's equipment. Despite their lack of performance, Plaintiffs kept Crypto Infiniti's money. Because of Plaintiffs' failures under the Agreements, this Court should grant judgment in favor of Crypto Infiniti.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1) On May 26, 2022, Crypto Infiniti and Mo Pow 3 executed a Master Hosting Agreement (the "First Agreement"). ECF No. 35-1. On May 26, 2022, Crypto Infiniti and Mo Pow 4 executed a separate Master Hosting Agreement (the "Second Agreement"). ECF No. 35-2.

2) Thomas Guel signed on behalf of Mo Pow 3 and Mo Pow 4. ECF No. 35-1 at 20; ECF No. 35-2 at 19. Mr. Guel did not have much experience in the crypto industry or with Bitcoin mining hosting sites. *Exhibit A*, Deposition Transcript of Thomas Guel, 15:18-19:9.

3) The First Agreement contained a rate buy down structure where consideration was paid by Crypto Infiniti to buy down the rate of services under both Agreements. ECF No. 35-1 at 3.

4) The rate buy down structure was Mr. Guel's idea. *Exhibit B*, Deposition Transcript of Jinwei Zhang, 58:3-10.

5) Both Agreements require Plaintiffs to test Crypto Infiniti's equipment, install all properly functioning equipment, and commence the provision of services including providing rack space allocation, installation services, electrical power connection, power supply, network

connectivity, security, maintenance, repair, and technical support. ECF No. 35-1 at 3-4, ECF No. 35-2 at 3.

6) Both Agreements require Crypto Infiniti to provide a written shipping notice prior to shipping any equipment. ECF No 35-1 at 2-3; ECF No. 35-2 at 2.

7) The minimum service level required under both Agreements is "uninterrupted for ninety five percent (95%) of the time per quarter." ECF No. 35-1 at 4; ECF No. 35-2 at 4.

8) If Plaintiffs do not provide services by the commencement date under each Agreement, Crypto Infiniti is entitled to interest, compounded on a monthly basis, equal to the total of any onboarding fees and down payments at a rate of 15% per annum, or the maximum allowed by law, whichever is lesser. ECF No. 35-1 at 9; ECF No. 35-2 at 8.

9) Further, if Plaintiffs fail to perform under each Agreement, Crypto Infiniti is "entitled to a refund of any and all fees paid to [Plaintiffs] for (i) the three (3) service month's preceding the then-current service month, (ii) any Down Payment of Managed Services not rendered during the Initial or Renewal Term, and (iii) the remaining, pro rata portion of the Rate Buy Down Payment not applied to the Client's Payment Schedule." ECF No. 35-1 at 10; ECF No. 35-2 at 10.

10) Crypto Infiniti paid Plaintiffs $4,135,250. ECF Nos. 35-3, 35-4, 35-5.

11) At the outset, Crypto Infiniti had concerns with Plaintiffs' use of EZB containers to host its mining equipment due to overheating from prior experiences. *Ex. B*, 10:9-11:9

12) Temperature is relevant to the minimum service level required under the Agreements because if it's too hot, the equipment will shut down. *Ex. B*, 30:15-25.

13) Crypto Infiniti also began to have concerns that Plaintiffs were not using its money for Crypto Infiniti's sites because construction was not progressing. *Ex. B*, 35:10-36:3.

14) Indeed, Mo Pow 3 never physically developed the site for Crypto Infiniti. *Ex. A*, 26:11-27:16.

15) The Mo Pow 4 site was likewise never physically developed. *Ex. A*, 51:17-52:20.

16) Per the Order Forms to the Agreements, the Mo Pow 3 site was projected to be operational by July 2022 and the Mo Pow 4 site was projected to be operational by August 2022. ECF No. 35-1 at 21, ECF No. 35-2 at 20. However, there was no evidence that construction was progressing to show the sites would be ready to be operational by the time listed in the Agreements. *Ex. B*, 60:20-61:17.

17) Because the sites were never under construction, they could never be complete. *Ex. B*, 43:24-44:1.

18) Crypto Infiniti did not pay Plaintiffs any additional amounts because it did not believe Plaintiffs were going to provide the required services. *Ex. B*, 46:11-47:6.

19) Instead, Crypto Infiniti reasonably asked to pay by an escrow account, which was rejected by Mr. Guel. Significantly, though, Mr. Guel told Crypto Infiniti "[d]o not send any money until we are on the same page." ECF No. 35-8 at 2-3.

20) The sites were never ready for Crypto Infiniti to ship any equipment because upon receipt of the equipment, Plaintiffs only had 30 days to commence operations, at most. So, the sites needed to be developed before equipment could be shipped and then installed in order to be operational within the timelines in the Agreements. *Ex. B*, 36:4-37:17; ECF No. 35-1 at 4; ECF No. 35-2 at 3.

21) Crypto Infiniti provided a shipping notice on July 22, 2022. ECF No. 35-10. It sought confirmation of the full address to coordinate Plaintiffs receiving the equipment. *Id.* Specifically, it requested the full address including the name of the person receiving the

equipment, as it is expensive equipment, and someone would need to be there to receive the equipment and ensure it is kept in the proper environment. *Ex. B*, 18:8-20:10, 22:7-14.

22) No response was provided by Plaintiffs until October 12, 2022 (after this lawsuit was filed). ECF No. 35-11; *Ex. A*, 92:4-13. The response included a different shipping address than what was included in the First Agreement. *Compare* ECF No. 35-1 at 1 *with* ECF No. 35-11; *Ex. A*, 92:14-93:16.

23) Crypto Infiniti needed the information regarding shipping because the addresses in the Agreements are empty lots, and Plaintiffs' representative needed to be on site to sign for the equipment. *Ex. B*, 48:24-49:5.

24) Ultimately, Plaintiffs admit they only spent some of Crypto Infiniti's money on items related to the Agreements. *Ex. A*, 28:12-20.

25) The remainder of Crypto Infiniti's money was used for "general corporate purposes" unrelated to the Agreements between Plaintiffs and Crypto Infiniti. *Ex. A*, 28:25-29:6, 111:23-112:10.

26) Equipment that Plaintiffs purchased with Crypto Infiniti's money for the sites it failed to develop was resold by Plaintiffs. *Ex. A*, 33:23-34:1.

27) As a result of Plaintiffs' failure to perform under the Agreements, Crypto Infiniti has suffered damages, including costs for the facility to store its equipment, lost income, costs of capital, and the $ 4,135,250 it paid plus interest. *Ex. B*, 63:5-64:22.

## STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it would affect the outcome

of the suit under the governing law; irrelevant factual disputes are not considered. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden to identify the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet this initial burden, the movant must support its motion with materials such as documents, electronically stored information, affidavits or declarations, depositions, answers to interrogatories, admissions, stipulations, or other materials. FED. R. CIV. P. 56 (c)(1). The nonmovant "must respond with specific facts showing the existence of a genuine factual issue to be tried." *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252. When reviewing a motion for summary judgment, the court's role is not to weigh the evidence, but to determine whether a genuine issue of material fact exists. *Id.* at 249. All justifiable inferences must be drawn in favor of the non-moving party. *Id.* at 255. This inquiry is also guided by applicable evidentiary standards. *Id.*

## ARGUMENT

### I. Declaratory Judgment Claims.

Both parties assert claims for declaratory judgment. Each asks the Court to answer the question regarding the relationship between the First and Second Agreements such that performance of one agreement is or is not dependent on the other. ECF No. 7 at 9, ECF No. 35 at 14. Crypto Infiniti begins with these claims because they inform later analyses regarding the breach of contract and bad faith claims. Ultimately, Crypto Infiniti is entitled to judgment as a matter of law on the dueling claims.

At the pleading stage, Plaintiffs argued that the two agreements formed an "integrated transaction." ECF No. 17 at 5. However, this Court declined to extend Wyoming law to include the purported doctrine of integrated transactions, and instead analyzed the issue as that of incorporation pursuant to Wyoming law. ECF No. 18 at 5-6. Crypto Infiniti therefore analyzes the issue as one of incorporation by reference as provided for under Wyoming precedent.

The First Agreement makes three references to the Second Agreement. And those references do not rise to the level of incorporation by reference:

> WHEREAS Client is also concurrently entering into a second hosting agreement (the "2nd Agreement") with Host's affiliate MO POW 4, LLC for colocation at MO POW 4's facility located at 5501 East Farm Road 112, Strafford, Missouri 65757;
>
> WHEREAS Client desires to "buy down" Host's typical Managed Services Fee and also MO POW 4's typical Managed Services Fee, by providing a two million dollars ($2,000,000) payment for discounted Managed Services in this Agreement and the 2nd Agreement during the Initial Term;
>
> 1.2 2nd Agreement. The Rate Buy Down is being paid as consideration to "buy down" the Managed Services Rate of this Agreement and the 2nd Agreement.

ECF No. 7-1 at 2, 4.

"[I]n order for an instrument to be incorporated into and become part of a contract, the instrument must actually be incorporated. It is not enough for the contract to merely mention the instrument; the referring language in the contract must demonstrate the parties intended to incorporate all or part of the referenced instrument." *Sinclair Wyoming Refinery Co. v. A&B Builders, Ltd.*, 2019 WL 13177821, at *12 (D. Wyo. June 11, 2019) (quoting *Pennaco Energy, Inc. v. KD Co. LLC*, 2015 WY 152, ¶ 79, 363 P.3d 18, 38–39 (Wyo. 2015).

The First Agreement does not even come close to saying it is incorporating the Second Agreement into the terms of the First Agreement. *See generally* ECF No. 35-1. The terms of the two Agreements confirm there was no intent to incorporate the terms of the Second Agreement

into the terms of the First Agreement. The reason being, is that they are two separate and distinct agreements. To construe the Agreements any other way would require the Court to crunch conflicting terms together.

For example, if the Second Agreement was read into the First Agreement, it would be unclear when Plaintiffs would be required to commence operations, as each Agreement has a separate commencement date. ECF No. No. 35-1 at 21, 35-2 at 20. The initial terms of the two Agreements are also distinct. *Id.* Indeed, the payment schedules are different for each Agreement. ECF No. 35-1 at 23, ECF No. 35-2 at 21. It would further be unclear where Crypto Infiniti was to ship its equipment because each Agreement has a different location. ECF No. 35-1 at 2, ECF No. 35-2 at 2. If the parties intended to incorporate the Second Agreement by reference into the First Contract, they would have included it as an Exhibit to the First Agreement as they did with numerous other documents like the order form, payment schedule, onboarding policies, and acceptable use policies. ECF No. 35-1 at 21-27.

Simply because agreements are executed at the same time and a discount of services is provided through the agreements cannot mean that the agreements are a single document. That was not the intent of the parties. *See Sawyer v. Guthrie*, 215 F. Supp. 2d 1254, 1260 (D. Wyo. 2002) ("Under Wyoming law, the purpose of contract interpretation is to determine the true intention and understanding of the parties.").

## II.   Breach of contract claims.

Plaintiffs' Amended Complaint alleges two claims for breach of contract. ECF No. 7 at 5-6. They claim that Crypto Infiniti breached the First Agreement and Second Agreement by failing to pay under the Second Agreement. *Id.* Crypto Infiniti also has counterclaims for breach of contract of the First Agreement and Second Agreement. ECF No. 35 at 10-11. The claims allege

that Plaintiffs breached the First and Second Agreement by failing to provide the services under the two Agreements and failing to use Crypto Infiniti's money for the sites, while retaining Crypto Infiniti's money. *Id.* Crypto Infiniti is entitled to judgment in its favor on both the counterclaims and Plaintiffs' claims.

The elements of a breach of contract claim include: "(1) a lawfully enforceable contract, (2) an unjustified failure to timely perform all or any part of what is promised therein, and (3) entitlement of the injured party to damages." *Kappes v. Rhodes*, 2022 WY 82, ¶ 17, 512 P.3d 31, 36 (Wyo. 2022). Here, there are two distinct Agreements signed by Plaintiffs and Crypto Infiniti. ECF Nos. 35-1 and 35-2. It is undisputed that Crypto Infiniti paid $4,135,250. ECF No. 35-3, ECF No. 35-4, ECF No. 35-5. Plaintiffs did not perform the terms of these Agreements, however. It is undisputed that Plaintiffs never began construction on the sites for Crypto Infiniti; thus, it never provided services to Crypto Infiniti under either of the Agreements. *Ex. A*, 26:18-27:16, 51:17-52:20. The projected commencement date was July of 2022 for the First Agreement and August of 2022 for the Second Agreement. ECF No. 35-1 at 4, Exhibit A, Order Form; ECF No. 35-2 at 3, Exhibit A, Order Form. However, Crypto Infiniti began to have concerns about the lack of construction because during the three site visits it conducted, the sites were never under construction. *Ex. B*, 40:9-20. Both Agreements require Plaintiffs to test Crypto Infiniti's equipment, install it, and then provide managed services, including rack space, electrical power connection, power supply, network connectivity, security, maintenance, repair, and technical support. ECF No. 35-1 at 3-4, ECF No. 35-2 at 3-4. The failure to construct the sites which would host Crypto Infiniti's equipment is a breach of both Agreements because without construction of the sites, Plaintiffs could not provide the services to Crypto Infiniti under the Agreements.

While Plaintiffs may claim that it was not required to provide any services because Crypto Infiniti never shipped its equipment, Plaintiffs prevented Crypto Infiniti from shipping its equipment. "When a party prevents performance by the other party, the nonperformance is excused, and the party preventing performance is in breach of contract." *Alpine Climate Control, Inc. v. DJ's, Inc.,* 2003 WY 138, ¶ 13, 78 P.3d 685, 689 (Wyo. 2003). The Agreements required Crypto Infiniti to provide a shipping notice a week before shipping the equipment. ECF No. 35-1 at 2, ECF No. 35-2 at 2. Crypto Infiniti provided a shipping notice dated July 22, 2022, in accordance with the Agreements and attempted to get confirmation regarding the address for shipping. ECF No. 35-10. Plaintiffs did not respond to the shipping notice until October 12, 2022, after they had already filed the lawsuit. ECF No. 35-11. By failing to respond to Crypto Infiniti's correspondence regarding shipping and then filing a lawsuit, Plaintiffs prevented Crypto Infiniti from shipping its equipment.

Additionally, Crypto Infiniti had concerns regarding overheating. In the Agreements there is a specific provision that requires Plaintiffs to provide the Hosting and Managed Services "uninterrupted for ninety five (95%) of the time per quarter of the Client's Term." ECF No. 35-1 at 4, ECF No. 35-2 at 4. When the temperature is too hot, the equipment shuts down, which is a general understanding in the digital currency mining industry. *Ex. B*, 30:15-25. However, during the process of what was supposed to be the construction of the sites for Crypto Infiniti, Mr. Guel declined to address concerns with overheating of the containers. *Ex. A*, 59: 12-23.

Plaintiffs try to counter these undisputed facts by surmising that Crypto Infiniti was the first to breach the Agreements because it did not make payment under the Second Agreement. ECF No. 7 at 5-6. As discussed above, performance of the First Agreement is not dependent upon Crypto Infiniti's performance under the Second Agreement because they are two distinct

Agreements. Second, any payment issue was waived by Mr. Guel on behalf of the companies via text message. "A party to a contract may waive its rights provided in the contract if the following elements exist: (1) there is an existing right provided by the contract; (2) the waiving party has knowledge of that right; and (3) the waiving party has the intent to relinquish that right." *Rogers v. Wright*, 2016 WY 10, ¶ 43, 366 P.3d 1264, 1277–78 (Wyo. 2016). The Second Agreement provided that Crypto Infiniti was to make a down payment of $3,066,00. ECF No. 35-2 at 7, 20-21. Crypto Infiniti did not make that payment, which Plaintiffs acknowledged when they sent an email dated June 24, 2022. ECF No. 35-7. With that knowledge, Mr. Guel specifically texted a Crypto Infiniti representative on June 29, 2022, and said "[d]o not send any money until we are on the same page." ECF No. 35-8 at 3. This is a clear waiver of nonpayment because Mr. Guel told Crypto Infiniti not to make any payment. Then, Plaintiffs filed suit shortly after on July 18, 2022, preventing Crypto Infiniti from making any payments under the Second Agreement. ECF No. 1. Shortly after that, Plaintiffs tried to terminate both Agreements as part of some sort of after-the-fact litigation tactic. ECF No. 35-13.

Crypto Infiniti suffered damages caused by Plaintiffs' lack of performance. It had to find other arrangements to store the mining equipment, it paid over $4 million but did not receive any services under the Agreements, it suffered lost income that would have been obtained had the mining equipment been operational, and it suffered the costs of capital. *Ex. B*, 62:20-64:22.

Ultimately, it is undisputed that Plaintiffs failed to provide any services to Crypto Infiniti after taking its money; in fact, there was never any attempt to physically develop the sites to facilitate the provision of services by Plaintiffs for Crypto Infiniti under the Agreements (let alone to develop the sites such that they would provide uninterrupted services 95% of the time). Plaintiffs made it legally impossible for Crypto Infiniti to comply with any obligations under the Agreements

which Plaintiffs complain of. Mo Pow 4 waived the nonpayment issue by instructing Crypto Infiniti not to make any payment and then turned around and filed a lawsuit and terminated the Agreements, preventing Crypto Infiniti from making any payment. Further, Plaintiffs prevented Crypto Infiniti from shipping any equipment by failing to respond to the shipping notice and instead, turning around and filing a lawsuit. There is no genuine dispute of fact and Crypto Infiniti is entitled to judgment as a matter of law that Plaintiffs breached the First and Second Agreements. As such, dismissal of Plaintiffs' corresponding breach of contract claims is also warranted.

Because of Plaintiffs breaches of the Agreements, Crypto Infiniti is entitled to damages, including the return of its $4,135,250 (plus interest as set forth in the Agreements), lost profits, and other damages related to Plaintiffs breaches.

### III.    Breach of the Implied Covenant of Good Faith and Fair Dealing.

Plaintiffs allege a claim for breach of the implied covenant of good faith and fair dealing, relying on the allegation that they expected the two separate agreements would leverage economies of scale to provide 35 MW of energy at a lower cost. ECF No. 7 at 8. Crypto Infiniti also has asserted a claim for bad faith because Plaintiffs took its money but never provided any services; instead, filing this lawsuit and trying to terminate the Agreements post-litigation and then refusing to return Crypto Infiniti's money. ECF No. 35 at 12-13. Like the breach of contract claims, Crypto Infiniti is entitled to summary judgment in its favor on the claim and counterclaim.

All the actions by Plaintiffs which constitute a breach of contract also constitute a breach of the implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing requires that "neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement." *Skyco Res., LLP v. Fam. Tree Corp.*, 2022 WY 72, ¶ 37, 512 P.3d 11, 25 (Wyo. 2022). A breach occurs "when a party interferes or fails to cooperate in the

other party's performance." *Id.* Plaintiffs' myriad failures—including failing to construct the sites for Crypto Infiniti, failing to cooperate with the shipping process after Crypto Infiniti sent its shipping notice and requested confirmation, failing to satisfy Crypto Infiniti's concerns regarding overheating which would preclude Crypto Infiniti's equipment from operating uninterrupted 95% of the time as required under the Agreements, and failing to work with Crypto Infiniti regarding payment for the Second Agreement—all constitute bad faith. *See supra* pp. 9-12. Because Plaintiffs' actions interfered with Crypto Infiniti's ability to execute on the Agreements, they cannot now claim damages for any alleged bad faith when it was their own concerning conduct that caused the collapse of the two Agreements.

## IV. Unjust Enrichment

An alternative analysis must also be addressed, as there is a condition precedent set forth in the Agreements that was unmet. As the Court previously recognized, there was an unmet condition precedent because Crypto Infiniti did not ship its equipment. ECF No. 33 at 4-5. To the extent the unmet condition precedent controls the outcome of the case, then at the very least, Crypto Infiniti is entitled to receive its money back through its unjust enrichment claim.

A condition precedent is "an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance of a promise arises." *Robert W. Anderson Housewrecking and Excavating, Inc. v. Board of Trustees, School District No. 25, Fremont County, Wyoming*, 681 P.2d 1326, 1331 (Wyo.1984). "A condition precedent must be performed before an agreement shall become a binding contract." *Id.* If not shipping the equipment results in an unmet condition precedent, then pursuant to Wyoming law the two Agreements are not binding, and Crypto Infiniti is entitled to a return of its money through this equitable claim. ECF No. 33 at 6-7.

The elements of unjust enrichment are: "1) valuable services were rendered; 2) to the party to be charged; 3) which services were accepted, used and enjoyed by the charged party; and 4) under circumstances that reasonably notified the party being charged that the other party would expect payment for the services." *Davidson-Eaton v. Iversen*, 2022 WY 135, ¶ 48, 519 P.3d 626, 641 (Wyo. 2022). As discussed above, it is undisputed that Plaintiffs received $4,135,250 from Crypto Infiniti. ECF Nos. 35-3, 35-4, 35-5. Thus, Plaintiffs obtained value through that amount. The money was given in exchange for hosting services. *See* ECF No. 35-1. Plaintiffs accepted the money and have not returned it. *Ex. A*, 28:12-29:6, 111:6-112:10. Plaintiffs have never provided any services to Crypto Infiniti under the Agreements because the sites were never developed to permit the provision of services. *Ex. A*, 26:11-27:16, 51:17-52:20. Under the circumstances where two Agreements were executed by Plaintiffs containing two sections that provide Crypto Infiniti with avenues to recoup its money if Plaintiffs failed to perform, but a condition precedent was not met, Plaintiffs were on notice that Crypto Infiniti would want its money back if services were not provided. *See* ECF No. 35-1 at 9-10, ECF No. 35-2 at 8-10. Thus, if the Court finds there was an unmet condition precedent, Crypto Infiniti is entitled to judgment as a matter of law returning its $4,135,250 that it provided to Plaintiffs who provided no services in return.

## CONCLUSION

For the reasons stated above, Crypto Infiniti is entitled to judgment as a matter of law on its counterclaims and Plaintiffs' claims.

DATED this 21st day of December 2023.

HATHAWAY & KUNZ, LLP,

By: */s/   Tyler Garrett*
   Matthew D. Kaufman, WSB #6-3960
   Tyler J. Garrett, WSB #6-4400
   Melissa K. Burke, WSB #7-5694
   Kari Hartman, WSB #8-6507
   Hathaway & Kunz, LLP
   2515 Warren Ave. Ste 500
   P.O. Box 1208
   Cheyenne, WY 82003
   Phone:  307-634-7723
   Fax:  307-634-0985

   ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

This is to certify that on the 21st day of December 2023, a true and correct copy of the foregoing was served upon counsel as follows:

| | |
|---|---|
| Jeffrey S. Pope | [✓] CM/ECF/Electronic Filing |
| Kasey J. Schlueter | [ ] U.S. Mail |
| Holland & Hart, LLP | [ ] Fax: |
| 2020 Carey Ave Suite 800 | [ ] E-mail |
| P.O. Box 1347 | |
| Cheyenne, WY 82003-1347 | |

   */s/ Candice Hough*
   Hathaway & Kunz, LLP