# EXHIBIT B

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3    ----------------------------------------------------------
     MO POW 3, LLC, and
4    MO POW 4, LLC,

5          Plaintiffs,

6      vs.                        Case No. 1:22-CV-155-SWS

7    CRYPTO INFINITI, LLC,

8               Defendant.
     ----------------------------------------------------------
9

10

        30(b)(6) VIDEOCONFERENCE DEPOSITION OF JINWEI ZHANG
11               Taken in behalf of Plaintiffs

12                 9:55 a.m., Thursday
                  November 16, 2023
13

14        PURSUANT TO NOTICE, the 30(b)(6) videoconference

15   deposition of JINWEI ZHANG was taken in accordance with

16   the applicable Federal Rules of Civil Procedure before

17   Randy A. Hatlestad, a Registered Merit Reporter and a

18   Notary Public in and for the State of Wyoming.

19

20

21

22

23

24

25

```
1              A P P E A R A N C E S

2    For the Plaintiffs:      MR. JEFFREY S. POPE
                              Attorney at Law
3                             HOLLAND & HART
                              2020 Carey Avenue, Suite 800
4                             Cheyenne, Wyoming 82001
                              (Appearing via videoconference)
5

6    For the Defendant:       MR. TYLER J. GARRETT
                              Attorney at Law
7                             HATHAWAY & KUNZ
                              2515 Warren Avenue, Suite 500
8                             Cheyenne, Wyoming 82001
                              (Appearing via videoconference)
9

10                 I N D E X

11   30(b)(6) VIDEOCONFERENCE DEPOSITION OF
     JINWEI ZHANG:
12                                              PAGE

13   Examination by Mr. Pope                      3

14               E X H I B I T S

15   No.            Description           Identified
16
     1    Notice of Deposition                    6
17
     2    Defendant's First Amended Counterclaims 8
18
     3    Prudentia Law Corporation Letter       21
19
     4    Master Hosting Agreement               47
20
     5    Defendant's Answer and Counterclaims   53
21

22

23

24

25
```

1      Q.     Was there any other information that the broker

2    provided?

3      A.     How much it is and the price of hosting, and

4    how big is the site.  15 megawatts.  And I think I also

5    was told [unintelligible] EZ Blockchain's container.

6    That also was mentioned.  And I think I stressed the

7    concern [unintelligible].

8                   (Court reporter clarification.)

9      A.     Jeff Taylor gave me information about the site.

10   There was an e-mail sent to me after I signed the NDA.

11   It has information over the site.  It has a drawing with

12   a set plan.  I think they are planning to go in to get a

13   permit.  And it gave me the price of the hosting and how

14   big is the site.  And he also mentioned to me on the

15   phone call that they are going to use EZ Blockchain's

16   container.  And I remember I talked to Jeff several times

17   talking about my concern over the overheating problem of

18   the EZ Blockchain's container.

19     Q.     (BY MR. POPE)  I want to pick up with that last

20   sentence.  Why did you have concerns about overheating

21   issues with the EZ Blockchain containers?

22     A.     We have a site in Georgia that EZ Blockchain

23   hosting where miners were inside of their container.  And

24   they had a serious overheating issue.  And also, the

25   design of the EZ Blockchain's container is a V-shaped

1   rack.  And if you don't know, a V shape, you have two

2   machines which are venting very close to each other, so

3   they heat each other up.  So it's the design of the

4   container.  Most other containers, it's one line, so one

5   side intake, one side outtake.  And the EZ Blockchain

6   container is a V shape like this.  So, out of this

7   corner, you'll have two outtake -- like two machines

8   which vent out to each other.  And that particular

9   corner, that's always our problem.

10       Q.    Are you aware of any studies or data collection

11  that demonstrate the overheating concerns you just

12  referenced?

13       A.    I believe at a different site of Thomas, they

14  have the software to collect data of the container.  And

15  I haven't tried to ask to see the data, and I never

16  received it.

17       Q.    So is it fair to say, then, that you have not

18  seen data or a study that shows the overheating issues

19  you referenced?

20       A.    No.  I have seen the overheating issue I

21  referenced in a different site.  Not Thomas' site, but EZ

22  Blockchain's site in Georgia.  And how they're using the

23  site is dropping of a miner online.  And we can see in

24  real-time.  And the goal is the change of temperature.

25  And there was a lot of conversation with EZ Blockchain to

1    on a pallet in Utah.   The first equipment was already on

2    a pallet in Utah.

3         Q.    I think we can agree, though, Crypto Infiniti

4    never shipped equipment to either the MO POW 3 or MO POW

5    4 site.  Is that right?

6                  MR. GARRETT:  Objection.  Form.  You can

7    answer.

8         A.    Yes.  We never shipped because we don't have a

9    confirmed address.

10        Q.    (BY MR. POPE)  So let me understand why you

11   needed a confirmed address when we just agreed that both

12   contracts contain shipping addresses.

13        A.    Well, those are very expensive equipment.  Of

14   course we want to confirm that they have the warehouse

15   and the right person to receive the equipment.  We cannot

16   just ship it without anybody there to sign off or receive

17   them.  Those are very expensive equipment.  It's just

18   like you receive an expensive thing.  They ask you to

19   sign off.  And I have to coordinate with the people who

20   receive it to make sure there's somebody there to receive

21   it and a proper place to sign off before I ever ship any

22   equipment.  I cannot just deliver them and leave them in

23   the field and just leave those equipment there.  They're

24   expensive.  And those are computer equipment that needed

25   to be kept in a certain environment.

1      Q.    What document, be it an e-mail, a letter, text

2   message, are you aware of where Crypto Infiniti explained

3   that it needed confirmation on the site not just for the

4   address, but to ensure a proper set of personnel to

5   receive the equipment and proper storage facilities for

6   the equipment?

7      A.    That's industry standard practice.  And I don't

8   believe we actually spend the time to text or e-mail each

9   other about those details, those industry standard

10   practice.

11      Q.    On what do you base your statement that that is

12   the industry standard practice?

13      A.    Based on the practice of crypto mining.  We

14   have a contract.  Our other site to receive equipment, we

15   would have a lot of communication over which one is the

16   right date and who will be there.  Before we ship the

17   equipment, we would need a bill of lading of who's going

18   to be the one receiving.  What's his phone number?

19   What's his name?  What's his e-mail?  Like all that

20   information to make sure the guy with the truck to

21   deliver it knows who to contact.  So this information you

22   need to provide to the shipping company before the

23   equipment is even able to leave the site, needing the

24   contacting information, the guy's contact information,

25   the guy who is going to sign off on the equipment.

 1    That's a standard industry practice.

 2              Also, logistical practice with a logistics

 3    company would require this information.  And the thing is

 4    Mr. Guel is not -- is not leaving me, so he's not

 5    on-site.  So we definitely need somebody else's

 6    contacting information, whoever will be on-site, whoever

 7    is going to be able to sign off on this equipment.

 8    Without this information, I cannot even fill out the bill

 9    of lading for the shipping company to take the equipment

10    away.

11        Q.    So help me understand something.  I appreciate

12    the need for that logistical information.  What I don't

13    understand and would like your help with is you had a

14    shipping address in the contracts.  Why wasn't there a

15    communication before June 17th or even after June 17,

16    2022, where Crypto Infiniti outlined those pieces of

17    information?

18        A.    We asked him to confirm the shipping address

19    with our lawyer's letter only because Mr. Guel filed a

20    lawsuit against us and stopped direct communication with

21    him.  So the way we try to communicate is through the

22    letter of our lawyer.  We were advised we should not have

23    any direct communication with Mr. Guel without our

24    lawyer's knowledge.

25        Q.    I want to clarify something.  You told me a

1    shipping address?

2        A.    Yes.

3        Q.    I think I'll zoom in here so we can see it.  I

4    think you're referring to this second paragraph that

5    begins with "Accordingly."  Is that correct?

6        A.    Yes.  Yes.

7        Q.    Can you agree with me that in that paragraph,

8    there is no request for information about what personnel

9    would receive the equipment and what storage facilities

10   were available at the sites?

11       A.    They stated a full address.  Normally, if

12   people ask for full address, it means you give them the

13   name and the address.  If you send a letter to someone,

14   you need a name, the full address.

15       Q.    I understand it says "full address."  My

16   question, though, is can we agree that it does not seek

17   information about the personnel, their qualifications,

18   their e-mail or information about storage equipment?

19       A.    Yeah.  I think it does not mention that.

20   Uh-huh.

21       Q.    The date of this letter -- I'll scroll up

22   here -- is July 22nd, 2022.  That's approximately two

23   months after Crypto Infiniti executed the contracts with

24   MO POW 3 and MO POW 4.  Correct?

25       A.    Sorry.  I cannot remember which day the

1    Mr. Guel and Crypto Infiniti.  And then it says that,

2    "Crypto Infiniti reaffirmed its concerns of the

3    overheating issues relating to the EZB containers that

4    Mr. Guel insisted to use for Crypto Infiniti's digital

5    currency machines."  What part of either the MO POW 3 or

6    the MO POW 4 contract did Crypto Infiniti believe

7    required Mr. Guel to turn over that information?

8        A.    I cannot recall the clause of the contract, but

9    our contract -- a clause in the contract confirms

10   Mr. Guel needed to provide a certain percentage of --

11   guarantee a certain percentage of equipment function

12   properly.

13       Q.    Would you agree there's a difference between a

14   guarantee that equipment would function properly --

15       A.    I'm sorry.  Let me rephrase it.  Not that

16   equipment function properly, but his hosting will provide

17   the equipment with a direct connection and with the right

18   environment and the right maintenance.  I think there was

19   a long paragraph over it to say his hosting service

20   includes, and within that, to give this equipment the

21   environment that it will function properly.  And the

22   problem of this, all the Crypto equipment, is the

23   temperature.  When the temperature is too hot, they shut

24   down.  That's standard industry practice.  Everybody

25   knows that.

1      A.    There's no clause for that.

2      Q.    (BY MR. POPE)   The next sentence indicates

3   Mr. Guel refused that request.   And then it says, "Crypto

4   Infiniti expressed concern that Mr. Guel used the

5   previous payments totaling of over $4,135,250 for

6   projects not related to Crypto Infiniti's site, which put

7   into question Mr. Guel's ability to complete the

8   designated site that would house Crypto Infiniti's

9   digital currency equipment."

10          What facts did Crypto Infiniti rely upon for

11   its concern that Mr. Guel had not used the $4 million for

12   Crypto Infiniti's sites?

13      A.    At the very beginning, I received a drawing

14   that Mr. Guel prepared, was supposed to prepare for us.

15   And that particular site, I believe at the moment, there

16   was no construction happening there.

17      Q.    So I asked a little bit of a different

18   question.   Paragraph 28 says that Crypto had concerns

19   that it had paid money under the MO POW 3 contract and

20   that those dollars had not been used to get the site

21   ready.   My question is what facts supported Crypto

22   Infiniti's concern that the $4 million was not used to

23   get the sites ready?

24      A.    Because the site is not ready.   I didn't

25   receive any photos or any information to show me the site

1    is ready.  I mean, I could or you could or anybody could

2    fly to the site to see if it's ready.  I think it's not

3    ready.  Not until they say.

4        Q.    Did Crypto Infiniti understand that the

5    contracts provided MO POW 3 and 4 a particular period of

6    time to complete the sites after receiving equipment?

7                  MR. GARRETT:  Objection to form.

8        A.    No.

9                  MR. GARRETT:  Calls for a legal

10   conclusion.

11       A.    The contract says there's a particular period

12   before they promise equipment will turn on.  And they

13   require about 30 days to put the equipment into the site,

14   to rack the equipment.  There's a practice called

15   racking.  Means you take the equipment and you're putting

16   them into the container and then you connect them.  That

17   takes time because it's lots of equipment for 15

18   megawatts.  So 15 megawatts of equipment is about 15

19   times 300.  So that's the amount of computing you need to

20   connect.  So that time is for connecting computer.  That

21   time is not for getting the site ready.

22       Q.    (BY MR. POPE)  What part of the contract do you

23   rely upon for your statement that there's a distinction

24   between site readiness and what I will refer to as

25   installation?

1     A.     There's an exhibit over payment, over days

2     when -- I think it's at the end.  There's a certain date

3     they needed to turn things on.  I think there's an

4     exhibit over payment, over once things is running, how

5     we're going to make payment.  That was starting August.

6     So we're expecting the site to be on in August.  I think

7     it's August.  I could be wrong.  But I think there was

8     three days or something -- three months or something of

9     getting the site ready.

10          But that's different with equipment arrived

11     with it.  There's a difference between when we sign the

12     contract and we're expecting the first equipment to turn

13     on.  And 30 days after we ship the equipment, we'll have

14     30 days to rack the equipment and connect them.  Doesn't

15     want to take responsibility if our equipment arrive later

16     and he cannot connect them on time because it's lots of

17     equipment.

18     Q.     Let's go back to paragraph 28.  Paragraph 28

19     specifically references the $4,135,250 in payments under

20     the MO POW 3 contract.  On what contract provision did

21     Crypto Infiniti rely for its expectation that its dollars

22     would be specifically used to get the sites ready?

23               MR. GARRETT:  Object to the form.

24     A.     These dollars were paid to purchase a hosting

25     service.  I think that's what these dollars were paid

1    ready, but it didn't really matter whether its dollars or

2    someone else's dollars were used to get the site ready?

3                    MR. GARRETT:  Objection.  Form.

4        A.    We wanted the hosting service provided, yes.

5    And I would say if the hosting service is provided and

6    the site is coming, getting built, and they provide

7    hosting service more than a year ago and everything is

8    met, then met the contract.

9        Q.    (BY MR. POPE)  So, still on paragraph 28, very

10   last part of that sentence says that Crypto Infiniti

11   believed the failure to use the $4 million put into

12   question Mr. Guel's ability to complete the designated

13   site.  On what facts does Crypto rely for its concern

14   that Mr. Guel would not have the ability to complete the

15   designated site?

16       A.    The designated site was not under construction.

17   My understanding is not until my last site visit.  I

18   don't know if it's under construction ever.  It was not

19   under construction, was not even starting construction.

20   Didn't even start.

21       Q.    Does Crypto Infiniti have any understanding of

22   the time required to construct a site to provide hosting

23   services?

24       A.    What do you mean by my understanding?  Because

25   Mr. Guel's practice shouldn't be my responsibility to

1    Q.    (BY MR. POPE)  Did Crypto Infiniti ever ask

2    Mr. Guel or anyone affiliated with MO POW 3 or MO POW 4

3    how long it would take to construct a site?

4    A.    Did we what?  Did we ask?

5    Q.    Yes.  Did you ask?

6    A.    Yeah.  I definitely had a conversation with

7    Mr. Guel about how long the site would be ready, and my

8    understanding is that he can have it ready within three

9    months, yeah.

10    Q.    So he said within three months?

11    A.    Yeah.  I mean, the three months means start

12    construction.  That has nothing to do if our equipment

13    arrives or not.

14    Q.    So paragraph 28 makes a statement that Crypto

15    Infiniti didn't believe Mr. Guel would be able to

16    complete the site, not complete the site within a certain

17    period of time.  So let me ask this question one more

18    time.  On what facts does Crypto Infiniti rely for the

19    statement that it had concern that Mr. Guel could not

20    complete the site?

21            MR. GARRETT:  Objection.  Form.  Asked and

22    answered.  Mischaracterizes the testimony.

23    Q.    (BY MR. POPE)  You can answer.

24    A.    Okay.  I believe the site Mr. Guel promised was

25    never under construction.  Not the last time I know it.

1    If construction didn't start, how would it be complete?

2                    MR. POPE:  We've been going about an hour

3    and 15.  Just kind of bearing in mind we're going to come

4    up a little bit on lunchtime, can we take ten and come

5    back?  Let's go off the record.

6                    (Deposition proceedings recessed

7                    11:14 a.m. to 11:27 a.m.)

8                    MR. POPE:  Let's go back on the record.

9    Q.    (BY MR. POPE)  When we broke, we were talking

10   about the allegations in Crypto Infiniti's first amended

11   counterclaims.  The document should still be on your

12   screen.  Can you see it?

13   A.    Yes.

14   Q.    So I've scrolled down a little bit in the

15   document.  And I want to talk to you about paragraph 45,

16   which is under the "Counterclaim I, Breach of Contract."

17   Paragraph 45 says, "Upon information and belief, this

18   breach also includes MO POW 3's failure to use Crypto

19   Infiniti's payments for MO POW 3's facility located at

20   400 North Main, Springfield, Missouri 65802 and instead

21   used the money for other purposes not related to the

22   contract."

23                    I just want to clarify something.  We talked a

24   little bit about this earlier.  Can we agree that there

25   is not a provision in the contract that says here is how

1    Crypto never made that.  Right?

2        A.    No.  We never made an MO POW 4 payment.

3        Q.    Does Crypto assert as part of any of its claims

4    in this case that MO POW 4 should have provided hosting

5    services without payment?

6        A.    No.  But part of our payment from MO POW 3 --

7    anyway, so we never received MO POW 3.  So we were

8    concerned of its ability to provide us a hosting service.

9    That's the reason we have not made MO POW 4.  The first

10   contract did not get executed by Mr. Guel.

11       Q.    On what provision of the MO POW 3 or 4 contract

12   did Crypto rely upon for your statement just now that it

13   could refuse payment under MO POW 4 because of concerns

14   under MO POW 3?

15              MR. GARRETT:  Objection.  Form.  Calls for

16   a legal conclusion.

17       A.    The buy-down part that we paid $2 million

18   buy-down, that's a buy-down of both the price of MO POW 3

19   and MO POW 4.  A buy-down is lower the price for the

20   hosting for a significant amount because we paid for

21   buy-down for both contracts.

22       Q.    (BY MR. POPE)  So help me understand why having

23   a rate buy-down meant Crypto believed it didn't have to

24   pay money due under MO POW 4.

25              MR. GARRETT:  Objection.  Form.  Calls for

1    a legal conclusion.

2        A.    That's not what -- we paid the money.  And, of

3    course, the contract was not executed.  And he already

4    breached the contract.  It does not make business sense

5    to give them another couple million dollars knowing he's

6    not going to provide us the service.

7        Q.    (BY MR. POPE)  So, if I understood you

8    correctly, you just asserted that MO POW 3 breached the

9    contract.

10            I've put on the screen -- we've already looked

11    at this.  We'll go ahead and mark this -- I think we're

12    at Exhibit 4.

13                        (Exhibit No. 4 marked for

14                         identification.)

15       Q.    (BY MR. POPE)  This is the master hosting

16   agreement between Crypto and MO POW 3.  Please identify

17   for me the provision that Crypto believes MO POW 3

18   breached.  And I realize we're on page 1.  Happy to

19   scroll to whatever pages you need.

20            MR. GARRETT:  Objection.  Form.  Calls for

21   a legal conclusion.

22       A.    I believe it breached the entire contract,

23   which it is a provider of a hosting service, but it did

24   not provide us a hosting service.

25       Q.    (BY MR. POPE)  Help me understand factually how

1    MO POW 3 could provide hosting services if it had never

2    received Crypto Infiniti equipment.

3         A.    Because the site was not ready.  Didn't ever

4    provide us the full address we requested to ship the

5    equipment.

6         Q.    So we're on page 1 here.  We'll zoom in.  Very

7    bottom of page 1, Section 1.1A(1) says, "Equipment

8    Delivery."  And under that section, it says, "Client

9    shall promptly deliver its digital currency mining

10   equipment listed in order form included as Exhibit A and

11   attached hereto to host facility located.  Client shall

12   be solely liable for all expenses related to insuring,

13   transporting and shipping the client equipment to host

14   facility, 400 North Main, Springfield, Missouri,

15   Springfield, MO 65802."

16           Do you see that?

17        A.    Uh-huh.  Yeah.

18        Q.    So we've established there's an address in the

19   contract.  Just to be clear, what Crypto wanted was

20   information about who on-site would receive the equipment

21   and where it would be stored.  Correct?

22           MR. GARRETT:  Objection.  Form.

23   Mischaracterizes the testimony.  Asked and answered.

24        A.    Yeah.  We needed a full address.  Full address

25   means including a contact person's information and also

1    includes when the equipment should be delivered and

2    stored.  Especially delivered.  Somebody needs to be

3    on-site to sign.  The address is a parking lot.  It's

4    empty.  I don't want to say parking lot.  Maybe it's used

5    for parking.  Yes, it's empty parking lot.

6         Q.   (BY MR. POPE)  The contract itself -- and we

7    can look at it -- it provides points of contact for each

8    party, does it not?

9         A.   I don't know that it provides a point of

10   contact for each party.  Can you just refresh my memory

11   on that?

12        Q.   Sure.  I'm scrolling too fast.  So here at the

13   bottom, Thomas Guel signs on behalf of MO POW 3.

14   Correct?

15        A.   Uh-huh.

16        Q.   Now, maybe I'm using the incorrect terminology

17   here, so I'll ask it this way.  Did Crypto Infiniti

18   understand that it could contact Thomas Guel about this

19   contract?

20        A.   Yeah, we did.  And we sent them a letter asking

21   for it.  We did not get a reply.

22        Q.   The contract was executed May 26th, 2022.

23   Correct?

24        A.   Yes.

25        Q.   At no point between May 26th, 2022, and the end

1    A.    No, they did not.

2              (Discussion off the record.)

3    Q.    (BY MR. POPE)  We talked a little earlier at a

4    high level about the rate buy-down structure.  Why did

5    Crypto Infiniti request a rate buy-down structure?

6    A.    We did not request it.  It was offered by

7    Mr. Guel.  It was his idea.  We did not require it.

8    Because we never had that structure in any of our other

9    contracts.  This is the only one.  And it was requested

10   by Mr. Guel.

11   Q.    The two contracts in this case call for roughly

12   35 megawatts of power.  Why did Crypto Infiniti need 35

13   megawatts of power?

14   A.    We actually originally only required 15

15   megawatts.  And another 20 megawatts was suggested by

16   Mr. Guel to say, "Sign this too and we give you a good

17   rate."  It was a rate buy-down and was not our original

18   work we requested.  We requested only the 15-megawatt in

19   the beginning when Jeff contacted me for it.

20   Q.    Was Crypto Infiniti ever going to need 35

21   megawatts of power?

22   A.    Well, at the moment, we think in the future we

23   do need more power, yes, at the moment, and at the

24   moment, have a better price for it.

25   Q.    So, if I'm understanding you correctly, you're

1    of 2022.   The first payment under MO POW 4 was due upon

2    execution of the agreement in May.   Why is it that the

3    lawsuit was when you -- when Crypto decided not to

4    perform?

5         A.    Because we feel like it's not planning to

6    execute the first contract.   We feel like that's a

7    possibility.   Because we have not seen the first contract

8    been executed in any way after two months of viewing the

9    site and everything else.   But when he filed a lawsuit, I

10   feel like he just wanted to put the whole contract on

11   pause.

12        Q.    I put the first contract back on the screen.

13   I'd like for you to identify for me which provision

14   Crypto believes required construction of the site before

15   it should ship its equipment.   And I'm happy to scroll.

16        A.    Can you scroll down to the back?

17        Q.    To which part?

18        A.    The back, the amendments, the back, the

19   exhibits.   Go back.   Stop right here.

20             So, in July, we sent them a letter and asked

21   for the full shipping address, and we did not hear back.

22   And the commerce date is supposed to be July.   And it is

23   contingent to the equipment delivery date.   So, yes, the

24   commerce date should be contingent on when the equipment

25   should be delivered.   They have 30 days to have it up.

1    But by July, they should be able to have all the site

2    ready for the equipment to be racked up.  And Mr. Guel

3    never provided me any of that information in July to

4    convince me that they have the site ready for us, which

5    the commerce date was originally set for July 2022, which

6    the site takes -- my understanding, it just doesn't come

7    out overnight like magic.

8            So we did not see any information on site

9    construction, and neither they provided me the permit

10   approval to say they gathered the permit approval ready

11   to do construction.  I have no information from Mr. Guel

12   to show me the site is ready.  So the Number 4 on this

13   schedule shows the site should be ready, and the commerce

14   date will be contingent to the delivery date.  But the

15   site does not even exist.  And it's like I bought a

16   house, and the house is not there, and you ask me to move

17   in.

18       Q.    So I appreciate that you're referring to the

19   projected deployment schedule.  I would like you to

20   identify for me the provision in the contract Crypto

21   Infiniti believes requires the site to be built before

22   Crypto asked to ship its equipment.

23       A.    They did not provide us a full service to say

24   where to ship the equipment, so we don't ship it.  I

25   mean, my understanding, this is a part of the contract.

1    This is a provision, whatever you call it.  I don't know.

2    I don't understand the difference over the legal term.

3    But this exhibit, which is a part of the contract, from

4    my understanding, is part of the contract and has a legal

5    meaning.

6         Q.    So, just to be clear, the part of the contract

7    you're relying upon is the Exhibit A order form.  Is that

8    correct?

9         A.    Yes.  That's my understanding of that.  And

10   there's also the payment schedule you can look at in the

11   back, which is kind of where we responded to how are they

12   talking about --

13        Q.    The payment schedule you're referring to, is

14   that what I have on the screen right now?

15        A.    Yeah.  I think that was the period, July 2022.

16   That was the date the site should be powered up and

17   running.  We couldn't make the equipment shipped in July

18   when we asked for the full service address to ship the

19   equipment.  And we couldn't have it in July.

20        Q.    Last topic for you.  I'd like to talk about the

21   damages Crypto alleges it has suffered in this case.

22   What are the categories of damages Crypto Infiniti

23   believes it has suffered?

24        A.    Lost income and the cost of capital.

25        Q.    What was the second one?  I'm sorry.

1       A.      Cost of capital.

2       Q.      Let's take those in sequence.  What is the

3  total lost income Crypto alleges it has suffered in this

4  case?

5       A.      That, I have to go back to calculate them day

6  by day.  And I can't give you a number at the moment,

7  because as each day goes by, there will be more loss of

8  income.  The loss of income will be calculated based on

9  the amount generated minus amount over what's needed to

10  pay to Mr. Guel.  And every single day, that will be a

11  different number.

12       Q.      What has Crypto Infiniti done to mitigate the

13  loss of income?

14       A.      We tried to find the other site to be able to

15  host us, but we have not successfully found a location

16  for all our miners.  So we have a loss of miners in the

17  Utah facility.  Sorry.  I need to add one more thing.

18  The cost of our facility will have the storage of those

19  miners.

20       Q.      Let's stay on the cost of the storage.  What is

21  the cost to Crypto Infiniti of storing the miners?

22       A.      I have to check on the invoice that we get from

23  the Utah facility.  And I can get that to you later.

24       Q.      I think the other category you mentioned was

25  cost of capital.  Why does Crypto Infiniti assert it has

1    suffered cost-of-capital damages in this case?

2        A.    Well, we paid Mr. Guel over $4 million.  And

3    the $4 million has a cost for us to get it and also

4    has -- if we invest in another place in order to have

5    income, that is also a loss.  So the cost of capital has

6    a category underneath that.  Simply, inflation would put

7    the capital in the bank, how much interest we're going to

8    make.  And then there's also loss of investment

9    opportunity.  And there's also kind of the cost of

10   capital of things we could -- anyway, so it's lost

11   opportunity to invest in capital and the cost of the

12   inflation and everything and depreciation of money.

13   There's just a lot of things including the cost of

14   capital.

15       Q.    What is the amount of cost-of-capital damages

16   Crypto alleges it has suffered in this case?

17       A.    We have to look into that.  We can give you a

18   number later.  And I think as each single day passes by,

19   that number changes.  With current, the interest rate is

20   so high.  I believe it's probably even higher every

21   single day.  Hard for me to just give you a number at the

22   moment.

23       Q.    For the cost-of-capital calculation, is that a

24   number that your accounting or someone who handles your

25   finances would need to generate?

MO POW 3 and MO POW 4 v. Cyrpto Infiniti                    1:22-CV-155-SWS

66

1                       DEPONENT'S CERTIFICATE

2              I, Jinwei Zhang, do hereby certify that I have

3    read the foregoing transcript of my testimony consisting

4    of 65 pages taken on November 16, 2023, and that the same

5    is a full, true and correct transcript of my testimony.

6

7

8

9              _____
                         JINWEI ZHANG

10    ( ) No changes          ( ) Changes attached

11

12          Subscribed and sworn to before me this _____

13    day of _____, 2023.

14

15

16              _____
                         Notary Public

17

18
     My Commission Expires_____.
19

20

21

22

23

24

25

MO POW 3 and MO POW 4 v. Cyrpto Infiniti                    1:22-CV-155-SWS

67

```
 1               C E R T I F I C A T E

 2

 3          I, RANDY A. HATLESTAD, a Registered Merit

 4   Reporter and a Notary Public of the State of Wyoming, do

 5   hereby certify that the aforementioned deponent was by me

 6   first duly sworn to testify to the truth, the whole

 7   truth, and nothing but the truth;

 8          That the foregoing transcript is a true record

 9   of the testimony given by the said deponent, together

10   with all other proceedings herein contained.

11          IN WITNESS WHEREOF, I have hereunto set my hand

12   and affixed my notarial seal this 4th day of December,

13   2023.

14

15

16

17   _____
              RANDY A. HATLESTAD
18          Registered Merit Reporter

19

20

21

22

23   My Commission Expires April 2, 2024.

24

25
```