Matthew D. Kaufman, WSB #6-3960
Tyler J. Garrett, WSB #6-4400
Melissa K. Burke, WSB #7-5694
Kari Hartman, WSB #8-6507
HATHAWAY & KUNZ, LLP
P. O. Box 1208
Cheyenne, WY  82003-1208
(307) 634-7723
(307) 634-0985 (fax)
mkaufman@hkwyolaw.com
tgarrett@hkwyolaw.com
mburke@hkwyolaw.com
khartman@hkwyolaw.com

ATTORNEYS FOR DEFENDANT

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| MO POW 3, LLC and MO POW 4, LLC, | ) |
| Plaintiffs, | ) |
| vs. | ) Civil Action No. 1:22-CV-00155-KHR |
| CRYPTO INFINITI LLC, | ) |
| Defendant. | ) |

## DEFENDANT CRYPTO INFINITI'S RESPONSE IN OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR SUMMARY JUDGMENT

Crypto Infiniti LLC ("Crypto Infiniti"), by and through its counsel, HATHAWAY & KUNZ, LLP, submits this *Response* in opposition to Plaintiffs' amended motion for summary judgment, ECF No. 51.

In light of the parties filing cross-motions for summary judgment, much of the evidence and controlling law that refutes Plaintiffs' amended motion is included in Crypto Infiniti's own motion for summary judgment. ECF Nos. 52-53. Thus, in ode to brevity and limiting redundancy,

1

Crypto Infiniti relies on what it has already provided the Court and will utilize this *Response* to succinctly highlight a few of Plaintiffs' unpersuasive arguments.

## INTRODUCTION

Distilled down, Plaintiffs are seeking a windfall for some easy money. Through discovery, Plaintiffs finally had to admit that they spent much of the millions that Crypto Infiniti paid them on other things unrelated to the subject agreements. Having spent all the money, Plaintiffs' only option is to litigate in hopes of convincing the Court to let them reap millions despite really doing nothing.

Under the First Agreement, Crypto Infiniti paid $4,135,250.00 to MO POW 3. While Crypto Infiniti performed under the First Agreement, MO POW 3 did not. So, MO POW 3 has had to come up with an ever-evolving litigation strategy to escape its liability:

- MO POW 3 and MO POW 4 raced to the courthouse and filed this action. But in their haste, they overlooked that filing this lawsuit plainly amounts to anticipatory repudiation, which provides Crypto Infiniti with an immediate claim to damages for total breach, in addition to discharging Crypto Infiniti for any performance under the First and Second Agreements.

- Knowing it was still on the hook under the First Agreement, MO POW 3 then proposed a new legal doctrine that the First and Second Agreements formed an "integrated transaction." However, this Court declined to extend Wyoming law to include the purported doctrine of integrated transactions, and instead analyzed the issue as that of incorporation. ECF No. 18, pp. 5-6. Furthermore, while MO POW 3 devised a concept called "economies of scale" to conflate the agreements, the reason there were two separate agreements (as admitted by Plaintiffs' own witnesses) is that MO POW 3's site could only provide a limited amount of

2

power. So, another site that was operated by a separate company, MO POW 4, was needed to provide additional power. That's it, there was no complicated "economies of scale" structure.

- MO POW 3 then pivoted again and tried to terminate the First Agreement in October 2022, months after filing this lawsuit. ECF No. 35-13. Despite the commencement date not being initiated pursuant to Section 1.1(B)(3) of the First Agreement, MO POW 3 asserted that Crypto Infiniti must pay the first month's invoice, otherwise MO POW 3 would unilaterally terminate the First Agreement. This strategy failed miserably for MO POW 3, as the commencement date was plainly never triggered.

- Also, during its post-litigation October 2022 tactics, MO POW 3 finally provided shipping information, but the address provided was different than the address listed in the First Agreement. *Compare* ECF No. 35-1 at 1 *with* ECF No. 35-11.

- Having been unsuccessful in its other approaches, MO POW 3 argued that it had no obligation to perform under the First Agreement because Crypto Infiniti's equipment was never shipped. But this argument backfired for MO POW 3, as the Court enlightened that "[a] condition precedent is an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance of a promise arises. A condition precedent must be performed before an agreement shall become a binding contract." ECF No. 33 at 5 (quoting *Robert W. Anderson Housewrecking and Excavating, Inc. v. Board of Trustees, School Dist. No. 25, Freemont County, Wyo.*, 681 P.2d 1326, 1331 (Wyo. 1984)). Thus, it became evident that MO POW 3 was either obligated to perform under the First Agreement or the First Agreement was not binding on the parties because the condition precedent was unmet.

As for MO POW 4, its legal fate fares no better. Crypto Infiniti did not pay under the Second Agreement because of valid concerns that Plaintiffs were using Crypto Infiniti's money

3

for unrelated matters. Instead, Crypto Infiniti reasonably requested to pay under the Second Agreement by an escrow account, which was rejected by MO POW 4. MO POW 4 then instructed Crypto Infiniti "[d]o not send any money until we are on the same page." ECF No. 35-8, p. 3. Crypto Infiniti followed this instruction. Yet, despite directing Crypto Infiniti not to send money, MO POW 4 then filed this lawsuit, which was undoubtedly an anticipatory repudiation. As such, Crypto Infiniti was relieved from performance as a matter of law. No amount of masterful maneuvering can change this unavoidable legal reality.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

Many of the undisputed material facts are already set forth in Crypto Infiniti's motion for summary judgment (ECF Nos. 52-53); as such, Crypto Infiniti provides the following facts for additional detail as to why Plaintiffs' positions are unpersuasive:

1. The owner of MO POW 3 and MO POW 4—through a series of shell companies—is a gentleman by the name of Thomas Guel. *Exhibit A*, Deposition Transcript of Thomas Guel, pp. 19-21, 47. Mr. Guel by all accounts is a serial entrepreneur, having started companies ranging from real estate to selling hemp to hosting crypto mining equipment. *Exhibit A*, pp. 7-21, 47. However, Mr. Guel has little experience in the crypto industry. *Id.*, pp. 15-19. Indeed, MO POW 3 and MO POW 4 were only formed in early 2022. *Id.*, pp. 19, 46.

2. There were two separate agreements entered into in May 2022 for one simple reason—limited availability of power at the first site. There was no complicated "economies of scale" structure.

---

[1] While Local Rule 7.1(2)(D) notes that a summary judgment response brief must contain a statement of material facts cited by the movant to which the non-movant contends a genuine issue does exist, Crypto Infiniti does not believe there are genuine issues of material fact for trial, but it believes that it should be granted summary judgment instead of Plaintiffs. As such, Crypto Infiniti relies on a statement of undisputed material facts to oppose Plaintiffs' motion. Crypto Infiniti recommends that the Court also review the "Facts Common to All Counterclaims" set forth in Crypto Infiniti's *Amended Counterclaims* (ECF No. 35), as the facts set forth therein are detailed in chronological order that provide context as to the very short timeline in which all the events took place.

Mr. Guel's own deposition testimony debases MO POW 3 and MO PW 4's arguments to this Court:

> Q. (BY MR. GARRETT): Yeah. So there are two separate contracts. One has a certain amount of megawatt, the other a certain amount of megawatt. Both contracts are with separate entities. One is with MO POW 3; one is with MO POW 4. Why was the agreements -- why were the agreements structured that way?
>
> A. [BY Mr. GUEL] The initial agreements were separated due to availability of power at different sites.
>
> Q. Okay. So MO POW 3, its capacity only had up to, what, 15 megawatts; is that correct?
>
> A. I believe close to that number, yes. I don't recall the exact availability of the city utility substation, but yes.
>
> Q. Okay.
>
> A. It's fair to say it could not accommodate all 35.
>
> Q. Okay. That makes sense. All right. Was MO POW 3 operating at both sites?
>
> A. No.
>
> Q. Just the one site, 400 North Main?
>
> A. Correct.
>
> Q. Was MO POW 4 operating at any other site except the Strafford site?
>
> A. No.
>
> Q. So they were very isolated, and this was their sole, I guess, operations, respectively, for MO POW 3 and MO POW 4?
>
> A. Correct.

*Exhibit A*, pp. 97-98; *see Exhibit B,* Deposition of Charles Ciancanelli, p. 15.

3. On May 16, 2022, a Crypto Infiniti representative, Jinwei Zhang, conducted a pre-contract site visit in Springfield, Missouri. *Exhibit C*, Deposition of Jinwei Zhang, pp. 12-14. During this

visit, she and Mr. Guel discussed data concerning the EZB containers. *Exhibit C*, pp. 12-14; *Exhibit A*, pp. 58-61.

4. On May 26, 2022, Crypto Infiniti and MO POW 3 executed the First Agreement. ECF No. 35-1. The First Agreement requires that MO POW 3 provide hosting services with 15 megawatts of power to run Crypto Infiniti's digital currency equipment. *Id.* It provides that these services are to be provided at MO POW 3's facility specifically located at 400 North Main, Springfield, Missouri 65802. *Id*.

5. Also on May 26, 2022, Crypto Infiniti executed the Second Agreement with MO POW 4. ECF No. 35-2. The Second Agreement requires that MO POW 4 provide hosting services with 20 megawatts of power to run Crypto Infiniti's digital currency equipment. *Id.* It provides that these services are to be provided at MO POW 4's facility specifically located at 5501 East Farm Road 112, Strafford, Missouri 65757. *Id.*

6. On May 27, 2022, Crypto Infiniti initiated a test payment, *via* wire, in the amount of $10.00. ECF No. 35-3. This payment was for the "buy down" Host's typical Managed Services Fee as set forth in the First Agreement. ECF No. 35-1. On May 28, 2022, Crypto Infiniti initiated a first payment, *via* wire, in the amount of $1,999,990.00. ECF No. 35-4. This payment was for the "buy down" Host's typical Managed Services Fee as set forth in the Agreement. ECF No. 35-1. On June 2, 2022, Crypto Infiniti initiated a second payment, *via* wire, in the amount of $2,135,250.00. ECF No. 35-5. This payment was for the total Down Payment of Managed Services Fees as set forth on the Payment Schedule attached to the First Agreement. ECF No. 35-1. MO POW 3 received all three payments made by Crypto Infiniti, which totaled $4,135,250.00 *Exhibit A*, p. 28; *Exhibit C*, pp. 38-39.

7. On June 17 and 21, 2022, Crypto Infiniti representative Ms. Zhang conducted site visits of MO POW 3 and 4's respective sites in Green County, Missouri and observed that none of the sites were ready for Crypto Infiniti's equipment. *Exhibit C*, pp. 16-23, 28-29. Consequently, Crypto Infiniti could not ship its equipment because the sites were not ready, and because Plaintiffs refused to confirm the shipping address, as Ms. Zhang explained:

> Q. [By Mr. Pope] As of June 17th, 2022, did Crypto Infiniti have equipment assembled and ready to ship?
>
> A. [By Ms. Zhang]. Yes.
>
> Q. Where was the equipment assembled?
>
> A. At a different location. We have different equipment, and some of them were in Utah, and some of them were in Georgia.
>
> Q. Did you or anyone at Crypto Infiniti e-mail anyone affiliated with MO POW 3 or MO POW 4 and inform them that your equipment was ready to ship?
>
> A. I believe there was a letter from our previous lawyer and sent to Mr. Guel and asked for the shipping address, and that was never answered.
>
> Q. I think I understand the letter you're referencing. My question was a little different, though. I understand there's a letter requesting confirmation of the shipping address. My question, though, is did Crypto Infiniti ever inform anyone affiliated with MO POW 3 or MO POW 4 that you had assembled equipment ready to ship?
>
> A. I told Mr. Guel during our meetings that once ready, we're ready to ship equipment anytime. They were on a pallet in Utah. The first equipment was already on a pallet in Utah.
>
> Q. I think we can agree, though, Crypto Infiniti never shipped equipment to either the MO POW 3 or MO POW site. Is that right?
>
>> MR. GARRETT: Objection. Form. You can answer.
>
> A. Yes. We never shipped because we don't have a confirmed address.
>
> Q. (BY MR. POPE) So let me understand why you needed a confirmed address when we just agreed that both contracts contain shipping addresses.

> A. Well, those are very expensive equipment. Of course we want to confirm that they have the warehouse and the right person to receive the equipment. We cannot just ship it without anybody there to sign off or receive them. Those are very expensive equipment. It's just like you receive an expensive thing. They ask you to sign off. And I have to coordinate with the people who receive it to make sure there's somebody there to receive it and a proper place to sign off before I ever ship any equipment. I cannot just deliver them and leave them in the field and just leave those equipment there. They're expensive. And those are computer equipment that needed to be kept in a certain environment.
>
> \*   \*   \*
>
> Q. Why did Crypto Infiniti wait two months after it signed these contracts to attempt to confirm a shipping address?
>
> A. Because during all three visits, I have not seen a site ready for us.
>
> Q. Was it Crypto Infiniti's expectation that the sites would be fully ready before Crypto shipped its equipment?
>
> A. That was the conversation between me and Mr. Guel. During the site visit, he said, "Yes. We ship the equipment when the site is ready." We needed to have the equipment before the site is ready, but the site takes time to build. That's why I think the time of turnaround was three months or something. It was under contract. There was a period of time before the site would be turned around because they needed time to get the site reviewed.

*Exhibit C*, pp. 17-18, 23-24; *see generally id.* pp. 16-28.

8. On June 24, 2022, counsel for Mr. Guel communicated with Crypto Infiniti and explained that Mr. Guel had not received $3,066,000.00 under the Second Agreement with MO POW 4, and therefore Mr. Guel "reserves the right to honor the HSA's executed between my client and CI but has no legal obligation to do so." ECF No. 35-7.

9. On June 29, 2022, Crypto Infiniti reasonably asked to pay under the Second Agreement through an escrow account, which was rejected. ECF No. 35-8 at 2-3. However, Mr. Guel told Crypto Infiniti (*via* text to Ms. Zhang) "[d]o not send any money until we are on the same page":



ECF No. 35-8 at 2-3.

10. On July 5, 2022, Crypto Infiniti's counsel sent a letter to Mr. Guel informing him that Crypto Infiniti accepted Mr. Guel's previous notice of right to terminate on June 24, 2022, regarding the Second Agreement with MO POW 4. ECF No. 35-9. Crypto Infiniti's counsel also reaffirmed that the First Agreement remained binding; that both the "buy down" payment and the deposit payment had been paid in full by Crypto Infiniti in accordance with the terms of the First Agreement. *Id*. As such, Crypto Infiniti insisted that MO POW 3 fully perform its obligations thereunder. Crypto Infiniti's counsel made clear that in the event MO POW 3 failed to comply, or delayed compliance, with its obligations under the First Agreement, Crypto Infiniti would suffer damages as a direct result of such failure or delay in compliance. *Id.*

11. On July 22, 2022, Crypto Infiniti (through counsel) requested shipping information confirmation so that Crypto Infiniti could ship its digital currency equipment to the designated site in Green County, Missouri. Crypto Infiniti's counsel's letter provides in pertinent part:

> Thank you for your email dated July 20, 2022 to our client, Crypto Infiniti LLC (hereinafter "Client"). This letter shall serve as confirmation of our Client's intention to comply with all obligations under the MO POW 3 Master Hosting Agreement executed between the Parties on May 27th, 2022 (hereinafter "Agreement") and as the Shipping Notice under the terms of the Agreement. Pursuant to the terms of the Agreement, the performance of the Agreement shall be independent of and not conditional on, any other agreements including but not limited to the MO POW 4 Master Hosting Agreement.
>
> Accordingly, our Client seeks confirmation from MO POW 3 LLC of the full address for the Facility, as defined in the Agreement (hereinafter "Facility"), to which our Client may arrange for shipping of all Client Equipment, as defined in the Agreement. Upon receipt of the full address for shipment, our Client shall immediately prepare for shipping of the Client Equipment.
>
> As of the last date upon which the Parties jointly visited the Facility in-person, construction was still ongoing, and the Facility was unfit to provide the Managed Services. Our Client has made multiple attempts to visit the Facility since that date, however, MO POW 3 LLC has declined to allow a subsequent visit. Due to the state of the Facility as of the date of the last visit, our Client seeks confirmation from MO POW 3 LLC that the Facility is presently prepared to offer the Managed Services, as defined in the Agreement, and that MO POW 3 LLC intends to comply with all obligations under the Agreement, including but not limited to the provision of the Managed Services upon receipt of the Client Equipment.
>
> In the event MO POW 3 LLC does not intend to comply with the obligations contained in the Agreement, our Client requests a return of any and all deposits, and the Rate Buy Down payment, as required by Section 3.4(A) of the Agreement, no later than five (5) business days from the date of receipt of this letter. Instructions for return of the funds, including necessary banking and account information, can be found on Exhibit A which is attached hereto.
>
> Our Client is eager to continue the productive long-term relationship contemplated by the Parties under the Agreement and we look

forward to your response on the requested information by July 25, 2022 (PST).

ECF No. 35-10.

12. Neither Mr. Guel nor any other representative from MO POW 3 provided the required shipping information as requested by Crypto Infiniti; as a result, Crypto Infiniti was prevented from shipping its digital currency equipment to MO POW 3's hosting site or to receive container approval from MO POW 3 as required in the Onboarding Policies of the First Agreement prior to scheduling delivery of the equipment. ECF No. 35-1.

13. Then, months later, on October 12, 2022, MO POW 3 sent a "legal notice" to Crypto Infiniti, despite the pending litigation that MO POW 3 itself had filed. ECF No. 35-11. In its "legal notice," MO POW 3 for the first time provided a shipping address for Crypto Infiniti to ship its digital currency equipment. *Id.* However, the shipping address provided was different then the shipping address listed in the First Agreement. *Compare* ECF No. 35-1, p. 1 *with* ECF No. 35-11; *Ex. A*, pp. 92-93.

14. Despite the commencement date not being triggered pursuant to Section 1.1(B)(3) of the First Agreement, MO POW 3's "legal notice" also asserted that Crypto Infiniti must pay the first month's invoice and that MO POW 3 would unilaterally terminate the First Agreement if payment was not received within fifteen days. ECF 35-11. However, Section 1.1(B)(3) of the First Agreement and Section 2.B of Exhibit A attached thereto provide, respectively:

> *Commencement Date.* Host shall commence the provision of Managed Services ("Commencement Date") on the later of:
> 
> (i)   Thirty (30) calendar days after Host's receipt all Client Equipment; or
> 
> (ii)  a date agreed to by the Parties in writing as stated in Exhibit A; provided, however, that Host may extend the agreed-upon Commencement Date by up to ninety (90) days with prior written consent of Client.

> B. <u>Due Upon Commencement Date</u>: First month's invoice, including (if applicable), any fees, costs, or expenses incurred by Host – (i) due to Client's failure to meet Hosting Agreement onboarding responsibilities, and (ii) any repair costs incurred by Host due to Client's Defective Equipment prior to Commencement Date.

15. The commencement date was never triggered. MO POW 3 never received Crypto Infiniti's equipment, and (2) the parties never agreed to a date in writing as stated in Exhibit A of the First Agreement. As such, pursuant to the First Agreement and Exhibit A attached thereto, the first month's invoice was never due.

16. Nevertheless, on October 25, 2022, MO POW 3 sent another baseless "notice" that it would be unilaterally terminating the First Agreement if payment for the first month's invoice was not received by October 27, 2022. ECF No. 35-12.

17. Mr. Guel then sent Crypto Infiniti a "notice of termination" letter on October 31, 2022, attempting to unilaterally terminate the First and Second Agreements. ECF No. 35-13. In his letter, Mr. Guel asserted that because Crypto Infiniti did not pay the first month's invoice, MO POW 3 was terminating the First Agreement. Mr. Guel then went on to assert that because Crypto Infiniti did not pay the down payment under the Second Agreement that MO POW 4 was terminating the Second Agreement. The position taken by Mr. Guel in his October 31, 2022, letter confirms that the First Agreement and Second Agreement are separate and not an integrated transaction, which is contrary to the arguments made in MO POW 3 and MO POW 4's pleadings filed with the Court.

## STANDARD OF REVIEW

Summary judgment is only appropriate if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The movant bears the initial burden to either affirmatively disprove an essential element of the

non-movant's case, or to demonstrate the non-movant lacks evidence to support the claim at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). To meet this initial burden, the movant must support its motion with materials such as affidavits, depositions, answers to interrogatories, admissions, stipulations, or discovery requests. FED. R. CIV. P. 56 (c)(1). To defeat a motion for summary judgment, the non-movant must show more than "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position . . . there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252. When reviewing a motion for summary judgment, the court's role is not to weigh the evidence, but rather to assess the threshold consideration of whether a genuine issue of material fact exists. *Id.* at 249. All reasonable inferences must be resolved in the light most favorable to the non-moving party. *Id.* at 255. This inquiry is also guided by applicable evidentiary standards. *Id.*

## ARGUMENT[2]

### I.  MO POW 4 Repudiated the Second Agreement.

MO POW 4 argues it did not breach the Second Agreement because it did not have a duty to provide Managed Services since Crypto Infiniti's equipment had not been shipped. For the reasons set forth in Crypto Infiniti's own motion for summary judgment (ECF Nos. 52-53), MO POW 4 is incorrect. As discussed in Crypto Infiniti's own motion for summary judgment, Mr. Guel rejected Crypto Infiniti's request to pay under the Second Agreement with MO POW 4 through an escrow account, and instead instructed Crypto Infiniti "[d]o not send any money until we are on the same page." ECF No. 35-8 at 2-3. Accordingly, Crypto Infiniti did not send the money. Then, MO POW 4 turned around and filed this action. This amounts to a repudiation.

---

[2] The points made in the argument section of this *Response* provide further refinement to those points already made by Crypto Infiniti in its own motion for summary judgment. ECF Nos. 52-53.

Anticipatory repudiation occurs when a party repudiates its duty under a contract before the time for performance has arrived. *Roussalis v. Wyoming Med. Ctr., Inc.*, 4 P.3d 209, 254 (Wyo. 2000). A repudiation is a manifestation by a party that it will not perform at least some of its obligations under the contract. *Id.* Precedent provides that "an anticipatory repudiation gives the injured party an immediate claim to damages for total breach, in addition to discharging that party's remaining duties of performance." *Id*. (quoting E. Allan Farnsworth, Farnsworth on Contracts § 8.20, at 470 (1990)); *Skyco Res., LLP v. Fam. Tree Corp.*, 2022 WY 72, ¶¶ 20-21, 512 P.3d 11, 19-20 (Wyo. 2022) (concluding that a party repudiated the contract).

By filing this action and making manifestations in the complaint (and amended complaint) that it would not perform under the Second Agreement, MO POW 4 repudiated the Second Agreement. As such, Plaintiffs are not entitled to summary judgment on their breach of contract claims because Crypto Infiniti is discharged from performing under the Second Agreement.

## II.     MO POW 3 Repudiated the First Agreement.

MO POW 3 also argues it did not breach the First Agreement because it did not have a duty to provide Managed Services since Crypto Infiniti's equipment had not been shipped. For the reasons provided in Crypto Infiniti's own motion for summary judgment (ECF Nos. 52-53), that is not the case.

MO POW 3 filed this action despite being paid millions by Crypto Infiniti. Yet, in its complaint (and amended complaint), MO POW 3 manifested its intent not to perform under the First Agreement. Indeed, MO POW 3 requested that this Court specifically declare "MO POW 3 does not have to perform MO POW 3's First Master Hosting Services Agreement . . . ." ECF No. 1, p. 8; ECF No. 7, p. 9.

By filing this action and making manifestations in the complaint that it would not perform under the Second Agreement, MO POW 3 repudiated the Second Agreement. *Skyco Res.*, LLP, ¶¶ 20-21, 512 P.3d at 19-20. As such, Plaintiffs are not entitled to summary judgment on their breach of contract claims because Crypto Infiniti is discharged from performing under the Second Agreement.

### III.   MO POW 3's Post-Litigation Attempt to Provide a Shipping Address and then Claim a Breach is Unsustainable.

On October 12, 2022—three months after filing this lawsuit—MO POW 3 for the first time provided confirmation for the shipping address for Crypto Infiniti to ship its digital currency equipment. ECF No. 35-11. While the address listed in the First Agreement is 400 North Main, Springfield, Missouri 65802, MO POW 3 provided the following shipping address in its October 12, 2022, correspondence:

> Equipment Receiving Address:
>
> MO POW 3, LLC
> 5501 East Farm Road 11
> Strafford, MO 65757

*Compare* ECF No. 35-1 *with* ECF No. 35-11.

While Crypto Infiniti requested confirmation of the shipping address back on July 22, 2022 (ECF No. 35-10), MO POW 3 and MO POW 4 now try to spin the facts in their motion for summary judgment by arguing that Crypto Infiniti breached by not shipping its equipment at some point after October 12, 2022, even though this litigation had been commenced months earlier. Such an argument is unsustainable.

### IV.  MO POW 3's Post-Litigation Attempt to Manufacture a Claim for the First Month's Invoice in the Amount of $880,380.00 is Insincere.

Also on October 12, 2022, MO POW 3's "legal notice" asserted that Crypto Infiniti must pay the first month's invoice ($880,380.00) and that MO POW 3 would unilaterally terminate the First Agreement if payment was not received within fifteen days. ECF No. 35-11. However, the commencement date was never triggered. Again, Section 1.1(B)(3) of the First Agreement and Section 2.B of Exhibit A attached thereto provide, respectively:

> *Commencement Date.* Host shall commence the provision of Managed Services ("Commencement Date") on the later of:
>
> (i)  Thirty (30) calendar days after Host's receipt all Client Equipment; or
>
> (ii) a date agreed to by the Parties in writing as stated in Exhibit A; provided, however, that Host may extend the agreed-upon Commencement Date by up to ninety (90) days with prior written consent of Client.

> B.  Due Upon Commencement Date: First month's invoice, including (if applicable), any fees, costs, or expenses incurred by Host – (i) due to Client's failure to meet Hosting Agreement onboarding responsibilities, and (ii) any repair costs incurred by Host due to Client's Defective Equipment prior to Commencement Date.

On October 25, 2022, MO POW 3 sent another contrived "notice" that it would be unilaterally terminating the First Agreement if payment for the first month's invoice was not received by October 27, 2022. ECF No. 35-12. Mr. Guel then sent Crypto Infiniti a "notice of termination" letter on October 31, 2022, attempting to unilaterally terminate the First and Second Agreements. ECF No. 35-13. In his letter, Mr. Guel asserted that because Crypto Infiniti did not pay the first month's invoice, MO POW 3 was terminating the First Agreement. *Id*.

Because the Commencement Date was never triggered, Crypto Infiniti did not breach the First Agreement. Consequently, MO POW 3 had no legal basis to unilaterally terminate the First

16

Agreement. MO POW 3's attempt to now use the first month's invoice amount of $880,380.00 as a basis for damages is insincere and should be summarily rejected.

## CONCLUSION

For the reasons stated above, MO POW 3 and MO POW 4's motion for summary judgment should be denied.

DATED this 12th day of January 2024.

HATHAWAY & KUNZ, LLP,

By: */s/ Tyler Garrett*_____
    Matthew D. Kaufman, WSB #6-3960
    Tyler J. Garrett, WSB #6-4400
    Melissa K. Burke, WSB #7-5694
    Kari Hartman, WSB #8-6507
    Hathaway & Kunz, LLP
    2515 Warren Ave. Ste 500
    P.O. Box 1208
    Cheyenne, WY 82003
    Phone: 307-634-7723
    Fax: 307-634-0985

    ATTORNEYS FOR DEFENDANT

## **CERTIFICATE OF SERVICE**

   This is to certify that on the 12th day of January 2024, a true and correct copy of the foregoing was served upon counsel as follows:

| | |
|---|---|
| Jeffrey S. Pope | [ ✓ ]  CM/ECF/Electronic Filing |
| Kasey J. Schlueter | [   ]  U.S. Mail |
| Holland & Hart, LLP | [   ]  Fax: |
| 2515 Warren Avenue, Suite 450 | [   ]  E-mail |
| P.O. Box 1347 | |
| Cheyenne, WY 82003-1347 | |

                 */s/ Hayley Wheelerv*
                 Hathaway & Kunz, LLP