EXHIBIT C

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF WYOMING

3    ----------------------------------------------------
     MO POW 3, LLC, and
4    MO POW 4, LLC,

5          Plaintiffs,

6      vs.                        Case No. 1:22-CV-155-SWS

7    CRYPTO INFINITI, LLC,

8                Defendant.
     ----------------------------------------------------
9

10

          30(b)(6) VIDEOCONFERENCE DEPOSITION OF JINWEI ZHANG
11                  Taken in behalf of Plaintiffs

12                    9:55 a.m., Thursday
                      November 16, 2023
13

14        PURSUANT TO NOTICE, the 30(b)(6) videoconference

15   deposition of JINWEI ZHANG was taken in accordance with

16   the applicable Federal Rules of Civil Procedure before

17   Randy A. Hatlestad, a Registered Merit Reporter and a

18   Notary Public in and for the State of Wyoming.

19

20

21

22

23

24

25

1    say, "Sorry, miners who are online, because it's hot

2    today."

3        Q.    Was any of that data from the Georgia site that

4    you just referenced stored and saved anywhere?

5        A.    I don't know.

6        Q.    Let's talk about paragraph 8 of the first

7    amended complaint.  It's on the screen.  And the first

8    sentence references a May 16th, 2022, site visit.  Who

9    from Crypto Infiniti attended the May 16th site visit?

10        A.    I did.

11        Q.    Was there anyone else from Crypto Infiniti with

12    you?

13        A.    No.

14        Q.    I'm going to drop to the sentence that starts

15    at the very bottom of the page that says, "Mr. Guel

16    represented" -- and then it goes on to the next page to

17    say -- "that MO POW 3 and MO POW 4 would provide data to

18    Crypto Infiniti concerning management of the EZB

19    containers and represented that the EZB containers would

20    be managed in a way to avoid overheating issues."

21            Are you aware of a documentation, be it a text

22    message or an e-mail, that contains those statements from

23    Mr. Guel?

24        A.    I don't recall.  I believe Mr. Guel -- most

25    conversations I had with him was on a phone call and in

1   person.  This visit, we had a conversation in person.

2       Q.    The last sentence of this paragraph says,

3   "Mr. Guel also represented that Crypto Infiniti

4   representatives could visit the sites at any time where

5   its digital currency equipment was to be located."  Do

6   you have any documentation, text message, e-mail, for

7   example, that contains those statements?

8       A.    I cannot confirm or deny that.  I don't recall

9   any text message, but maybe they exist.  But I would say

10  I don't remember that.

11      Q.    I should clarify.  When I say "you" in today's

12  deposition, I am referring to Crypto Infiniti, the

13  company, since you're here as the corporate

14  representative.  So would there be any other employees or

15  owners of Crypto Infiniti that would have or may have

16  communications with Mr. Guel?

17      A.    No.

18      Q.    I've scrolled down in the first amended

19  complaint to paragraph number 22.

20      A.    Yes.

21      Q.    This paragraph says, "A representative of

22  MO POW 3 and MO POW 4 showed the newly installed

23  software" -- and then in parentheses, it says

24  "foreman.mn" -- "and promised to provide Crypto Infiniti

25  with data of digital currency equipment temperatures upon

MO POW 3 and MO POW 4 v. Cyrpto Infiniti                                1:22-CV-155-SWS

14

1    obtaining permission from Mr. Guel."

2            First question, what representative promised to

3    provide Crypto Infiniti with data if Mr. Guel approved?

4        A.    There was a guy working on the site.  It's

5    Mr. Guel's employee.  I can't recall his name.  I don't

6    really have a direct communication with him just because

7    he's Mr. Guel's employee.  I feel it will be implied if I

8    communicated directly with him without Mr. Guel.  He

9    promised me he will provide me -- actually, Mr. Guel

10   promised me that he will provide me all the information I

11   need.  And he actually showed me that time on-site of how

12   the software works.

13           And also, "foreman.mn," the owner of the

14   software company was on-site that day.  So both of them

15   showed me how the software works.  But at that time,

16   there was no machine running at the time.  They only

17   showed me how the software worked.  There was no miner

18   yet running.  At the moment, they were just finishing

19   installing the site that they showed me.  But in my later

20   visit, those miners were out, and I wasn't provided the

21   last information.

22       Q.    Now, it's true, isn't it, that Mr. Guel

23   followed up on this request for data about temperatures

24   and denied the request?  Correct?

25       A.    No, it's not true.  He promised me he would

1    and text message much.  He likes to have phone calls.

2    Very older professional gentleman.

3         Q.    Let's go to paragraph 23, the very next one.

4    It talks about how, on June 17, 2022, Mr. Guel provided

5    Crypto Infiniti with a bill of lading for transformers

6    and a screenshot for payment of EZB containers.  Do you

7    see that?

8         A.    Yes.

9         Q.    As of June 17th, 2022, had Crypto Infiniti

10   shipped any equipment to either the MO POW 3 or MO POW 4

11   sites?

12        A.    No, not yet.  Because Mr. Guel told me I need

13   to hold on to it until he figured out where to ship the

14   equipment.

15        Q.    How did Mr. Guel communicate his desire for you

16   to wait?

17        A.    Because the site is not ready.  They don't have

18   a place for storage of the miner.

19        Q.    Sorry.  I probably asked a bad question.  Did

20   Mr. Guel send you an e-mail, text message, or was it a

21   phone call where he communicated --

22        A.    A phone call.  Mr. Guel normally does a phone

23   call because he's an old-style gentleman.  He likes phone

24   calls.

25        Q.    I think you can agree, though, that the

1    contracts for the MO POW 3 and MO POW 4 sites provide

2    shipping locations.  Correct?

3         A.    Correct.  I think I do recall to see a

4    location, yeah, shipping location.

5         Q.    As of June 17th, 2022, did Crypto Infiniti have

6    its equipment assembled and ready to ship?

7         A.    Yes.

8         Q.    Where was the equipment assembled?

9         A.    At a different location.  We have different

10   equipment, and some of them were in Utah, and some of

11   them were in Georgia.

12        Q.    Did you or anyone at Crypto Infiniti e-mail

13   anyone affiliated with MO POW 3 or MO POW 4 and inform

14   them that your equipment was ready to ship?

15        A.    I believe there was a letter from our previous

16   lawyer and sent to Mr. Guel and asked for the shipping

17   address, and that was never answered.

18        Q.    I think I understand the letter you're

19   referencing.  My question was a little different, though.

20   I understand there's a letter requesting confirmation of

21   the shipping address.  My question, though, is did Crypto

22   Infiniti ever inform anyone affiliated with MO POW 3 or

23   MO POW 4 that you had assembled equipment ready to ship?

24        A.    I told Mr. Guel during our meetings that once

25   ready, we're ready to ship equipment anytime.  They were

1   on a pallet in Utah.  The first equipment was already on

2   a pallet in Utah.

3        Q.    I think we can agree, though, Crypto Infiniti

4   never shipped equipment to either the MO POW 3 or MO POW

5   4 site.  Is that right?

6              MR. GARRETT:  Objection.  Form.  You can

7   answer.

8        A.    Yes.  We never shipped because we don't have a

9   confirmed address.

10       Q.    (BY MR. POPE)  So let me understand why you

11  needed a confirmed address when we just agreed that both

12  contracts contain shipping addresses.

13       A.    Well, those are very expensive equipment.  Of

14  course we want to confirm that they have the warehouse

15  and the right person to receive the equipment.  We cannot

16  just ship it without anybody there to sign off or receive

17  them.  Those are very expensive equipment.  It's just

18  like you receive an expensive thing.  They ask you to

19  sign off.  And I have to coordinate with the people who

20  receive it to make sure there's somebody there to receive

21  it and a proper place to sign off before I ever ship any

22  equipment.  I cannot just deliver them and leave them in

23  the field and just leave those equipment there.  They're

24  expensive.  And those are computer equipment that needed

25  to be kept in a certain environment.

 1       Q.    What document, be it an e-mail, a letter, text

 2    message, are you aware of where Crypto Infiniti explained

 3    that it needed confirmation on the site not just for the

 4    address, but to ensure a proper set of personnel to

 5    receive the equipment and proper storage facilities for

 6    the equipment?

 7       A.    That's industry standard practice.  And I don't

 8    believe we actually spend the time to text or e-mail each

 9    other about those details, those industry standard

10    practice.

11       Q.    On what do you base your statement that that is

12    the industry standard practice?

13       A.    Based on the practice of crypto mining.  We

14    have a contract.  Our other site to receive equipment, we

15    would have a lot of communication over which one is the

16    right date and who will be there.  Before we ship the

17    equipment, we would need a bill of lading of who's going

18    to be the one receiving.  What's his phone number?

19    What's his name?  What's his e-mail?  Like all that

20    information to make sure the guy with the truck to

21    deliver it knows who to contact.  So this information you

22    need to provide to the shipping company before the

23    equipment is even able to leave the site, needing the

24    contacting information, the guy's contact information,

25    the guy who is going to sign off on the equipment.

1    That's a standard industry practice.

2           Also, logistical practice with a logistics

3    company would require this information.  And the thing is

4    Mr. Guel is not -- is not leaving me, so he's not

5    on-site.  So we definitely need somebody else's

6    contacting information, whoever will be on-site, whoever

7    is going to be able to sign off on this equipment.

8    Without this information, I cannot even fill out the bill

9    of lading for the shipping company to take the equipment

10   away.

11       Q.    So help me understand something.  I appreciate

12   the need for that logistical information.  What I don't

13   understand and would like your help with is you had a

14   shipping address in the contracts.  Why wasn't there a

15   communication before June 17th or even after June 17,

16   2022, where Crypto Infiniti outlined those pieces of

17   information?

18       A.    We asked him to confirm the shipping address

19   with our lawyer's letter only because Mr. Guel filed a

20   lawsuit against us and stopped direct communication with

21   him.  So the way we try to communicate is through the

22   letter of our lawyer.  We were advised we should not have

23   any direct communication with Mr. Guel without our

24   lawyer's knowledge.

25       Q.    I want to clarify something.  You told me a

1    moment ago the reason you needed to confirm the shipping

2    address was because Mr. Guel had told you to wait because

3    he wasn't sure what site he wanted the equipment sent to.

4    You just said you asked for confirmation because of the

5    lawsuit.

6        A.    No.  That's not what I said.  What I said is we

7    asked for confirmation through our lawyer because of a

8    lawsuit.  I would have asked for confirmation myself if

9    not because of a lawsuit.  We asked for confirmation

10   through our lawyer because of a lawsuit.  But my

11   understanding, that's the proper way to do it, and that's

12   what I was advised.

13       Q.    Okay.  I appreciate that clarification.  Thank

14   you.  Can you see on the screen a letter from -- I

15   believe it's pronounced Prudentia Law Corporation?

16       A.    Yes.

17             MR. POPE:  We'll mark this as Exhibit 3.

18             (Exhibit No. 3 marked for

19              identification.)

20             MR. POPE:  And, Mr. Garrett, I apologize.

21   I didn't send this to you.  I had not intended to use it

22   as an exhibit.  But based on testimony, I'd like to talk

23   about it.

24       Q.    (BY MR. POPE)  Is this the letter you referred

25   to from your lawyer asking for confirmation of the

1    shipping address?

2        A.    Yes.

3        Q.    I think I'll zoom in here so we can see it.  I

4    think you're referring to this second paragraph that

5    begins with "Accordingly."  Is that correct?

6        A.    Yes.  Yes.

7        Q.    Can you agree with me that in that paragraph,

8    there is no request for information about what personnel

9    would receive the equipment and what storage facilities

10   were available at the sites?

11       A.    They stated a full address.  Normally, if

12   people ask for full address, it means you give them the

13   name and the address.  If you send a letter to someone,

14   you need a name, the full address.

15       Q.    I understand it says "full address."  My

16   question, though, is can we agree that it does not seek

17   information about the personnel, their qualifications,

18   their e-mail or information about storage equipment?

19       A.    Yeah.  I think it does not mention that.

20   Uh-huh.

21       Q.    The date of this letter -- I'll scroll up

22   here -- is July 22nd, 2022.  That's approximately two

23   months after Crypto Infiniti executed the contracts with

24   MO POW 3 and MO POW 4.  Correct?

25       A.    Sorry.  I cannot remember which day the

1    contract was executed.  If you think it's two months,

2    that may be.  I cannot remember that.

3        Q.    Well, I don't want to make you guess, so let me

4    pull up the first contract for you.  Can you see it on

5    your screen, the master hosting agreement?

6        A.    Yeah.

7        Q.    Do you see here in the first line that it's

8    entered into on the 26th of May, 2022?

9        A.    Uh-huh.

10       Q.    Is that a yes?

11       A.    Yes.  Uh-huh.

12       Q.    So let's go back to the letter.  Just so that

13   you've seen that now, can we agree that this letter is

14   approximately two months after this execution date of the

15   contract?

16       A.    Yes.  Uh-huh.

17       Q.    Why did Crypto Infiniti wait two months after

18   it signed these contracts to attempt to confirm a

19   shipping address?

20       A.    Because during all the three visits, I have not

21   seen a site ready for us.

22       Q.    Was it Crypto Infiniti's expectation that the

23   sites would be fully ready before Crypto shipped its

24   equipment?

25       A.    That was the conversation between me and

1    Mr. Guel.  During the site visit, he said, "Yes.  We ship

2    the equipment when the site is ready."  We needed to have

3    the equipment before the site is ready, but the site

4    takes time to build.  That's why I think the time of

5    turnaround was three months or something.  It was under

6    contract.  There was a period of time before the site

7    would be turned around because they needed time to get

8    the site reviewed.

9        Q.    So let's unpack that.  It seems like you --

10   Crypto Infiniti understood that there would be time

11   between getting the equipment to the site and when that

12   equipment was turned on and ready to be used.  Is that

13   correct?

14       A.    Yes, that's correct.

15       Q.    So it seems to me, then, that Crypto understood

16   that the sites would not be fully ready when Crypto's

17   equipment arrived at those sites.  Is that correct?

18       A.    No, that's not correct.

19       Q.    Why is that not correct?

20       A.    It can be fully ready.  It can be not fully

21   ready.  Maybe they need another electrician to connect

22   it.  But they needed to have the block in place to put of

23   those equipment.  But my understanding from Mr. Guel,

24   based on our conversation during the site visit, is we

25   are going to communicate about where to ship the

MO POW 3 and MO POW 4 v. Cyrpto Infiniti                    1:22-CV-155-SWS

25

1    equipment, and we are going to communicate about the

2    detail, and we're going to communicate a temperature.

3    We're going to communicate those later, yeah.

4        Q.    I understand --

5        A.    That's why I called to confirm where to ship

6    the equipment, because the site showed us -- at the

7    moment, it was a piece of a parking lot that did not have

8    a facility.  It's not like they already had a warehouse

9    there.  They did not have a facility there to be able to

10   host the equipment.  So my understanding is we needed to

11   ship equipment to a different location other than the

12   site hosting us because there's -- at the moment, they

13   have nothing there to host the equipment.

14           Mr. Guel talked about he will try to get a

15   contract to rent.  The existing building there belonged

16   to the utility company.  And I don't know where that

17   goes.  And I don't know if he actually rented a building.

18   I don't know.

19       Q.    Is there an e-mail, text message or other

20   written document that memorializes these representations

21   about how shipping was going to work?

22       A.    Well, Mr. Guel only does phone calls or in-

23   person talk.  I mentioned that twice already, maybe more.

24       Q.    And the nature of depositions is I'll ask some

25   questions to get the same answer.

26

1      A.    No problem.  No problem.

2      Q.    I appreciate that.  I think that we can agree

3 that both Crypto Infiniti and MO POW 3 and MO POW 4

4 understood that the terms of the contracts that they

5 signed ultimately controlled their rights and

6 responsibilities.  Correct?

7            MR. GARRETT:  Objection.  Form.

8      A.    I can't answer that question because I don't

9 know what is my right.  And that is a question not in my

10 field.  I can't say yes or no to that.

11     Q.    (BY MR. POPE)  I'll rephrase.  Did Crypto

12 Infiniti believe that it had to do anything beyond what

13 the contracts it signed with MO POW 3 and MO POW 4

14 required?

15            MR. GARRETT:  Objection.  Form.

16     A.    Can you rephrase that question?  I'm not quite

17 understanding what you mean by "beyond."  Amendment of a

18 contract?  What do you mean by that?

19     Q.    (BY MR. POPE)  I'm asking, Crypto Infiniti

20 signed a contract.

21     A.    Yeah.

22     Q.    Did Crypto Infiniti believe it had to do

23 anything other than what was in the contract?

24     A.    A lot of the coordinating began -- the contract

25 does not cover everything.

1      Q.    I understand that the contract doesn't cover

2    every scenario that could come up.  But when you signed

3    the contract, did Crypto believe that the contract

4    covered what was necessary to make this transaction

5    happen?

6      A.    The contract is only necessary for what a

7    contract means.  And the contract is not necessary to

8    cover the information that a shipping company requires to

9    ship equipment.  That is not detailed in the contract.  I

10   would say it only covered what it needed to cover in the

11   contract.  The hosting agreement is needed to cover what

12   you have to do for hosting.

13     Q.    You mentioned things that the shipping company

14   would require.  This is going to be a similar thing to

15   something we already talked about.  Did Crypto Infiniti

16   ever provide someone at MO POW 3 or MO POW 4 a document

17   that says, "Here's what the shipping company requires"?

18     A.    I think that's standard of practice.  When

19   Mr. Guel sent me the bill of lading, they clearly have

20   all that information on it.  And if they didn't check it,

21   that's industrial standard of practice.  I don't think

22   it's my job to have to tell Mr. Guel how to deal with the

23   shipping company.

24     Q.    Did I understand you to say just there at the

25   end that you don't believe it was your job to tell

1   Mr. Guel how to deal with the shipping company?

2       A.    Yes.  So Mr. Guel should have a standard of

3   practice with the shipping company.  And the shipping

4   company has a standard of practice that's standard of

5   practice in the industry that when you ship something,

6   you need a contacting person's information.

7       Q.    Well, Mr. Guel wasn't the one shipping the

8   equipment.  It was Crypto Infiniti.  Correct?

9       A.    Yes.  That's correct.  But if Mr. Guel had a

10  deal with the shipping company for many, many years, he

11  should have a standard understanding.  Plus, the bill of

12  lading he sent to me clearly has a contact person's

13  information.

14      Q.    Let's go back to the first amended

15  counterclaims.  Go back to -- go down to paragraph 25.

16  This says during -- it's referencing a June 21, 2022,

17  site visit.  It says, "A representative from MO POW 3 and

18  MO POW 4 refused to provide data concerning digital

19  currency equipment temperatures pursuant to Mr. Guel's

20  instruction."  Who is that representative?

21      A.    I don't remember his name.  And he was a guy

22  working for Mr. Guel.

23      Q.    Who was present from Crypto during this June

24  21st, 2022, site visit?

25      A.    I was there.  Yes, I was there.  And there were

1    people that came with me.  And the people who came with

2    me were working for the equipment company.  So I took

3    people who understand the equipment temperature with me.

4    And they were working for Bitmain.  And they came just to

5    help me to understand the Bitmain's equipment that will

6    be able to run properly on the site.  Because their

7    equipment, it's good, but their equipment is temperature-

8    sensitive.

9        Q.    Let's look at paragraph 27 [sic].  This says,

10    "On June 24th, 2022, counsel for Mr. Guel communicated

11    with Crypto Infiniti and explained that Mr. Guel had not

12    received $3,066,000 under the second contract with MO POW

13    4, and therefore, Mr. Guel reserves the right to honor

14    the HSAs executed between my client and CI but has no

15    legal obligation to do so."

16            Oh, I'm sorry.  I read the wrong paragraph.

17    That was paragraph 26.  But let me ask you a question

18    about that now that I've read it.  Do you agree that

19    Crypto Infiniti did not pay the $3,066,000 under the

20    second contract with MO POW 4?

21        A.    Yes.  We did not pay that for the second

22    contract.  But it was paid in full for the first

23    contract.

24        Q.    Now let's go to paragraph 27.  Sorry about

25    that.  Paragraph 27 refers to a Zoom meeting between

38

1    for.  And for them to provide the hosting service, they

2    needed to have the container outside and connected with

3    power and the Internet ready.  Then they can -- then they

4    can take our equipment and connect them inside of the

5    container.  So we are paying for the hosting service,

6    which you could have a deposit to get the site ready.

7        Q.    (BY MR. POPE)  I understand that general

8    explanation.  My question, though, was more specific.  On

9    what provision of the MO POW 3 or MO POW 4 contract does

10   Crypto Infiniti rely upon for its expectation that the

11   dollars it paid would be specifically used to ready the

12   sites?

13              MR. GARRETT:  Objection.  Form.  Asked and

14   answered.  Calls for a legal conclusion.

15       Q.    (BY MR. POPE)  Before you answer, let me

16   address that objection.  I'm not asking for a legal

17   conclusion.  I just want to know that they looked at

18   something, thought of something, and it has not been

19   answered.  Go ahead.

20              MR. GARRETT:  Let me respond for the

21   record.  You're asking a question about a provision of

22   interpretation of a contract, which is a legal analysis

23   that's currently pending before the Court.  You're asking

24   for a legal conclusion.  Go ahead.  You may answer.

25       A.    I believe the 4 million -- a little more than

1    $4 million was paid to exchange hosting service.  There's

2    a clause that defines what it means, a hosting service,

3    and it includes power, Internet connection, all those

4    things.  And I believe that's what we paid for.

5        Q.    (BY MR. POPE)  I'm following that.  So let me

6    ask the question a little bit differently.  Why did it

7    matter to Crypto Infiniti that the dollars it paid were

8    used to ready the sites as opposed to dollars from other

9    sources being used to ready the sites?

10                MR. GARRETT:  Objection.  Form.

11        A.    I don't have information of what exactly

12    they're planning to use to pay for the site.  That is

13    Mr. Guel's business practice.  The dollar

14    [unintelligible].  How do I know exactly?  I don't know.

15    I don't quite understand this question.

16        Q.    (BY MR. POPE)  So let me rephrase it.  Does it

17    matter to Crypto Infiniti the source of the dollars used

18    to get the sites ready if the sites are ready?

19                MR. GARRETT:  Objection.  Form.

20        A.    If the site is ready, they provide us a

21    service.  What exactly he's planning to spend to build

22    it, it's not my business to tell Mr. Guel how to do

23    business practice.

24        Q.    (BY MR. POPE)  So is it fair to say, then, that

25    Crypto Infiniti's expectation was that the sites were