Jeffrey S. Pope (Wyo. State Bar # 7-4859)
Kasey J. Schlueter (Wyo. State Bar # 8-6521)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
JSPope@hollandhart.com
KJSchlueter@hollandhart.com

ATTORNEYS FOR PLAINTIFFS
MO POW 3, LLC AND MO POW 4, LLC

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| MO POW 3, LLC and MO POW 4, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CRYPTO INFINITI LLC,<br><br>Defendant. | Civil Action No. 22-CV-155-SWS |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO FOR SUMMARY JUDGMENT

### Introduction

"It is not the function of this Court or any court to write terms into a contract." *Gumpel v. Copperleaf Homeowners Ass'n*, 393 P.3d 1279, 1293 (Wyo. 2017). Yet that is exactly what Defendant (Crypto) asks the Court to do. Crypto alleges Plaintiffs (MO POW) should have built the sites before Crypto shipped equipment. That requirement does not exist in the Agreements. Crypto alleges MO POW should have used Crypto funds solely for Crypto's benefit. That requirement does not exist in the Agreements. And Crypto alleges MO POW had to provide information about the heat levels of equipment of other customers. That requirement does not exist in the Agreements. In other words, the primary premise of Crypto's motion is contrary to a

bedrock principle of Wyoming contract law. To be sure, Crypto has other arguments. But they all share the same fundamental flaw—they are disconnected from the terms in the Agreements.

**Additional Material Facts**

MO POW does not dispute the facts alleged in Crypto's motion. But additional facts are necessary for the Court to resolve certain arguments. Those facts are as follows:

A. To prepare each of the sites described in the Agreements, MO POW spent millions of dollars to get mobile data centers, concrete pads, transformers, leases, permits, and tariffs necessary to ready the sites for Crypto's equipment. (Exhibit 1, Thomas Guel Deposition Transcript, at 24:10-19, 26:11-17, 28:12-24; Exhibit 2, Thomas Guel Affidavit, at ¶ 2.)

B. Had Crypto shipped equipment to either site, MO POW could have completed the site between the time of shipping and the commencement date in the Agreements. (Ex. 2, ¶ 3.) The reason for this is that MO POW does not build the sites in the traditional sense; it assembles them using prefabricated equipment and infrastructure. (*Id.*) As explained above, MO POW had already secured the prefabricated materials. (*Id.*) To assemble a site, MO POW, on day one of the assembly, would set the prefabricated concrete pads, the transformers and mobile data units with a crane; then over the next few days, run the necessary electrical wiring to the transformer and then to their corresponding mobile data units. (*Id.*) In tandem, MO POW would run the fiber optic cable for internet access to the data centers and install MO POW's control server equipment. (*Id.*; *See also* Exhibit 3, Charles Ciancanelli Deposition Transcript at 16:24-17:10.) Moreover, MO POW's team had experience assembling these kinds of sites, giving them the expertise to be efficient. (Ex. 2 at ¶ 3.)

C. While it is true Crypto requested heating data, MO POW could not provide heating data on other customers equipment pursuant to the contracts with those clients. (Ex. 1 at 65:24-66:6, 71:21-72:11; Ex. 2, ¶ 4.) Heating data is kept confidential because it is sensitive

information related to other customers that could provide information about hash rate, operating procedures, and revenues. (*Id.* at 66:1-6; Ex. 2, ¶ 4.)

   D. Thomas Guel with MO POW and Jinwei Zhang with Crypto exchanged text messages before, during, and after the parties executed the Agreements. On June 29, 2022—a month after executing the Agreements—Ms. Zhang and Mr. Guel had the following exchange:



3



(ECF 35-8 at 2-4.) Nowhere in this text exchange or in any other does a MO POW representative tell Crypto not to pay amounts owed under either Agreement.

E.      Four days before this string of text messages, MO POW's in-house counsel emailed Crypto notifying it of the failure to pay under the Second Agreement and demanding the same payment pursuant to the notice provisions in the Second Agreement. (ECF 35-7.) The email stated, "[f]ailing to provide the initial down payment provided MO POW 4 with grounds for termination after June 6, 2022 – 10 days after the down payment was due (May 26, 2022) pursuant to HSA Section 3.3(B)." (*Id.*)

F.      Approximately three weeks after the email and text exchange, MO POW filed its lawsuit that sought payment under both Agreements. (ECF 1.)

## Argument

**I.      MO POW did not breach either Agreement.**

Before addressing Crypto's specific arguments, it is important to note Crypto never cites nor discusses Wyoming law on contract interpretation. That is a telling omission in a breach of contract case. So it is best to begin there. The goal when interpreting a contract "is to discern the intention of the parties to the document." *Comet Energy Servs., LLC v. Powder River Oil & Gas Ventures, LLC*, 185 P.3d 1259, 1261 (Wyo. 2008). In so doing, courts first consider the "specific terms of the contract and give them their plain and ordinary meaning." *Id.* Plain meaning is that "meaning which [the] language would convey to reasonable persons at the time and place of its use." *Moncrief v. Louisiana Land & Expl. Co*., 861 P.2d 516, 524 (Wyo. 1993). And "[w]hen the provisions in the contract are clear and unambiguous, the court looks only to the 'four corners' of the document in arriving at the intent of the parties." *Jonah Energy Ltd. Liab. Co. v. Wyo. Dep't of Revenue*, 534 P.3d 902, 907 (Wyo. 2023). Courts do not rewrite contracts or read terms into them. *Pope v. Rosenberg*, 361 P.3d 824, 830, 832 (Wyo. 2015).

MO POW has already explained in its Motion for Summary Judgment how this law interacts with the plain language of the Agreements. (ECF 51 at 9-15.) But the process the

Agreements set up bears repeating. First, Crypto pays the initial payments set out in each Agreement. (*Id.* at 9-10.) Then, Crypto promptly ships its equipment. (*Id.* at 13-14.) Next, MO POW tests and installs the equipment so that it can provide Managed Services within the time specified in the Agreements. (*Id.*) Finally, MO POW provides Managed Services as of the commencement date in the Agreements. (*Id.* at 14-15.) As a practical matter, the process must play out this way because MO POW cannot test, install, or provide services unless and until Crypto ships equipment. With this process in mind, Crypto's view of the Agreements makes no sense.

      **A.     Neither Agreement required MO POW to ready the sites before Crypto shipped equipment.**

Crypto first argues MO POW breached the Agreements because they "never began construction on the sites for Crypto" and therefore did not provide services to Crypto. (ECF 53 at 9.) The latter part of this argument is a red herring. MO POW never provided services to Crypto because Crypto never shipped its equipment, making it impossible to provide services. The real question before the Court is—what did the Agreements require related to site construction?

Nothing. The Agreements do not set a construction schedule for the sites. That is not to say MO POW had no duty to have the sites ready. Of course, they did. The Agreements have an implied deadline—the date when MO POW had to begin providing Managed Services. (*See* ECF 51-1 at 4.) (defining commencement date for Managed Services). But even if MO POW did not have the sites in the Agreements ready and Crypto delivered equipment, the Agreements allow MO POW to "find other comparable facilities to host Client Equipment before the Facility is ready to accept the Equipment ('Host-Paid Temporary Relocation') and all such costs related to the Host-Paid Temporary Relocation shall be the responsibility of Host." (ECF 51-1 at 3.) To

breach the Agreements, MO POW would have to not have the sites ready and not have had a temporary location. But that is a vastly different scenario than what Crypto argues.

Crypto's real argument is the Agreements required MO POW to have the sites ready before Crypto had a duty to ship equipment. Unless that is true, MO POW could not have breached the Agreements by waiting to ready the sites until receiving Crypto's equipment. Problem is that no part of the Agreements requires site readiness before Crypto had to ship equipment. *See Grumpel*, 393 P.3d at 1293-94 ("Where a contract is silent on a particular matter that easily could have been drafted into it, a court should refrain from supplying the missing language under the pretext of contract interpretation"). Instead, the Agreements require Crypto to "promptly" ship its equipment—something Crypto failed to do. (*See* ECF 51-3 at 3.) The failure to ship also meant the commencement date for providing Managed Services could never happen. (ECF 51 at 14-15.)

Importantly, Crypto's argument also relies on the unproven assumption that MO POW would never and could never have the sites ready. Crypto, however, has no proof of this. In fact, the opposite is true. MO POW spent millions of dollars to get the mobile data centers, concrete pads, transformers, leases, permits, and tariffs necessary to provide Managed Services. (Ex. 1 at 24:10-19, 26:11-17, 28:12-24; Ex. 2, ¶ 2.) The reason for this is that MO POW does not build the sites in the traditional sense; it assembles them using prefabricated equipment and infrastructure. (*Id.*) As explained above, MO POW had already secured the prefabricated materials. To assemble a site, MO POW, on day one of the assembly, would set the prefabricated concrete pads, the transformers and mobile data units with a crane; then over the next few days, run the necessary electrical wiring to the transformer and then to their corresponding mobile data units. (*Id.*) In tandem, MO POW would run the fiber optic cable for internet access to the data centers and install MO POW's control server equipment. (*Id.*; *See also* Ex. 3 at 16:24-17:10.) Moreover,

MO POW's team had experience assembling these kinds of sites, giving them the expertise to be efficient. (Ex. 2, ¶ 3.) As a result, MO POW would have been able to meet the commencement date had Crypto shipped its equipment. (*Id*.) But Crypto never gave MO POW the chance.

### B.  MO POW did not prevent Crypto from shipping equipment.

To justify its failure to ship equipment under the First Agreement, Crypto argues MO POW prevented Crypto from shipping because MO POW never confirmed the shipping address in response to a July 22, 2022 "shipping notice."[1] (ECF 53 at 10.) This argument is untenable.

To start, Section 1.1(A)(1) in the First Agreement has a shipping address for the host facility. (ECF 51-1 at 2.) MO POW had nothing to confirm. And no language in the Agreement required confirmation. To the extent, Crypto wanted MO POW to confirm or provide information beyond the shipping address, Crypto never made such a request. The July 22, 2022 letter requested only "the full address for shipment"—exactly the information in the Agreement. (*See* ECF 35-10.) Further, Crypto's July 22nd letter is not a shipping notice. Section 1.1(A)(2) states the shipping notice "shall include any tracking information provided to Client…." (ECF 51-1 at 2-3.) The July 22nd letter had no tracking information. (*See* ECF 35-10.)

Even so, whether MO POW confirmed shipping information does not excuse Crypto's prior breach. As explained in MO POW's Motion for Summary Judgment, Crypto breached the First Agreement well before July 22, 2022 by not paying under the Second Agreement and not promptly shipping equipment. (ECF 51-1 at 10-12.) It is telling that Crypto uses a letter sent nearly two months after the parties signed the Agreements to justify the failure to make immediate payment and take prompt action. In other words, MO POW could not have prevented performance when Crypto did not try.

---

[1] This argument applies only to the First Agreement because the July 22, 2022 letter only referenced shipping under that Agreement and claimed that Agreement was independent of the Second Agreement.

### C. MO POW did not have a duty to supply heating information.

Crypto next alleges MO POW breached the agreements because it had "concerns regarding overheating" and MO POW declined to address those concerns. (ECF 53 at 10.) Here again, Crypto fails to provide the part of the Agreements that required MO POW to provide heating information. That is because it does not exist. *See Grumpel*, 393 P.3d at 1293-94.

Crypto does discuss the 95% reliability requirement in the Agreements. But this is inapplicable for three reasons. First, it misapplies the Agreements. MO POW would have needed Crypto's equipment to provide Managed Services because the 95% threshold is tied to Managed Services. (*See* ECF 51-1 at 4.) That, however, never happened. Second, having Crypto's equipment was necessary to provide heating data. MO POW could not provide heating data on other customers equipment pursuant to the contracts with those clients. (Ex. 1 at 65:24-66:6, 71:21-72:11; Ex. 2, ¶ 4.) Finally, the argument assumes MO POW would not have met the 95% requirement due to overheating. But no proof of that exists because Crypto never gave MO POW a chance to provide Managed Services.

### D. MO POW did not waive payment under the Second Agreement.

Contrary to the premise of this case, Crypto claims MO POW waived "any payment issue" because Mr. Guel sent a text on June 29, 2022 that said "[d]o not send any money until we are on the same page." (ECF 53 at 11.) While conduct can imply waiver of a contract right, the conduct "should speak the intent clearly." *Jensen v. Fremont Motors Cody, Inc.*, 58 P.3d 322, 327 (Wyo. 2002). The burden to prove that intent lies with Crypto. *See id*.

Here, Crypto offers no proof beyond the text message itself. Importantly, the text does not say do not pay ever. It says to wait until the parties are on the same page. The context of the message is critical. The prior exchange of texts concerns Crypto's ask for MO POW to set up an escrow account for payment and MO POW's refusal to do so. (ECF 35-8.) In the same string of

9

texts, Mr. Guel states "[I] would like to see proof of your groups ability to immediately pay another almost 1.8m in 1st months fees." (*Id.* at 4.) In context, Mr. Guel is not refusing or waiving payment but working to ensure payment is made correctly.

Beyond the text message, Crypto fails to tell the Court that 4 days before the text exchange, MO POW's in-house counsel emailed Crypto notifying it of the failure to pay under the Second Agreement and demanding the same payment pursuant to the notice provisions in the Second Agreement. (ECF 35-7.) Three weeks after the text exchange, MO POW filed its lawsuit that sought payment. That means both before and after the text exchange, MO POW demanded payment under the Second Agreement. Therefore, MO POW spoke its intent clearly to ensure Crypto paid what was due under both Agreements.

Crypto does suggest the lawsuit prevented it from making payment. (ECF 53 at 11.) Why? How? Crypto does not say. No legal doctrine would have prevented Crypto from tendering the amounts owed. Indeed, doing so would have mooted at least part of MO POW's lawsuit.[2] The truth is Crypto chose not to pay.

**II.      MO POW did not breach the implied covenant of good faith and fair dealing.**

Crypto argues MO POW's alleged breaches of the Agreements also breached the implied covenant of good faith and fair dealing because those acts "constitute bad faith." (ECF 53 at 13.) MO POW has already addressed why it did not breach the Agreements. Even so, Crypto does not explain why the breaches meet the bad faith standard. That alone should be fatal because Crypto bears the burden of proof to show bad faith. *Skyco Res., Ltd. Liab. P'ship v. Family Tree Corp.*, 512 P.3d 11, 26 (Wyo. 2022).

---

[2] Crypto also states MO POW "tried to terminate both Agreements…." (ECF 53 at 11.) Crypto never explains why that matters. And MO POW has terminated both Agreements without objection from Crypto.

Still, the acts cited by Crypto are not bad faith. The court in *Skyco* cited to the Second Restatement of Contracts, which gives examples of bad faith like "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Restat 2d of Contracts,* § 205, cmt d. Only the final of these examples resembles Crypto's allegations. But MO POW has explained why it did not interfere in Crypto's performance. To the extent, Crypto claims this lawsuit and the termination of the Agreements amounts to bad faith, a party exercising its contractual rights does not breach of the implied covenant. *Skyco*, 512 P.3d at 25.

In truth, MO POW is the party most likely to prevail on the breach of the implied covenant of good faith and fair dealing.[3] The undisputed facts show:

- Crypto did not pay amounts due in the Second Agreement. (ECF 51-3 at 6.)
- The payment structure in the Agreements were designed to work together to accomplish a rate buy down. (ECF 51 at 4-6.)
- Crypto never shipped its equipment, preventing MO POW from providing Managed Services. (ECF 51-3 at 3.)

In other words, Crypto made it impossible for MO POW to derive the economic benefits of the Agreements—the very definition of breaching the implied covenant of good faith and fair dealing. *Skyco*, 512 P.3d at 25 (the implied covenant requires "neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement.") More to the point, Crypto made it impossible to perform the underlying obligations in the Agreements and now attempts to shift the responsibility to MO POW. That is bad faith.

---

[3] MO POW did not move on its claim because it did not want potential disputes of fact to prevent the Court from reaching the merits on the other claims.

**III.     The Agreements expressly incorporated the overlapping payment obligations.**

Contracts can incorporate all or part of another document or agreement that causes the two documents to be construed together. *Pennaco Energy, Inc. v. Sorenson*, 371 P.3d 120, 127-28 (Wyo. 2016). The contract must do more than mention the other document, it must "demonstrate the parties intended to incorporate all or part of the referenced instrument." *Id.* Crypto takes this law and argues the parties did not intend to incorporate the entirety of both Agreements. (ECF 53 at 7-8.) Crypto is right. Crypto has also missed the point.

MO POW has never contended the parties intended to incorporate all of each Agreement into the other. Rather, MO POW has argued the two Agreements work together to create a rate buy down structure that allows Crypto to purchase electricity at a lower rate based on the volume of power purchased. (ECF 51 at 11.) It is akin to buying down interest points on a loan by paying more upfront. To make that structure viable, the Agreements required upfront payments (just like the loan scenario) to produce a lower monthly payment. Knowing the combined upfront payments were key to making the deal work, the parties incorporated those upfront payment provisions into the consideration for both Agreements: "1.2 <u>2nd Agreement</u>. The Rate Buy Down is being paid as consideration to 'buy down' the Managed Services Rate of this Agreement and the 2nd Agreement." (ECF 51-1 at 4.) That language demonstrates an intent to tie the buy down of the First Agreement to the Managed Services Rate in the Second Agreement, which goes back to the need for a large volume of power purchased to allow a lower monthly rate. Therefore, the parties demonstrated an intent to incorporate specific payment obligations of each Agreement to provide the required consideration.

**IV.     Crypto has failed to prove the prerequisite for its unjust enrichment claim.**

Crypto argues it should receive summary judgment on its alternative claim for unjust enrichment. (ECF 53 at 13-14.) But Crypto skips a critical step. Crypto has no argument for why

12

a condition precedent exists or what that condition is. Crypto just says the Court must find a condition precedent to consider its claim and then moves on. But as MO POW explained in its motion for summary judgment, no condition precedent exists. (ECF 51 at 19-20.) The potential condition precedent is simply a sequence for when certain duties arise after the Agreements became binding. Therefore, Crypto cannot prevail on this claim. *Hunter v. Reece*, 253 P.3d 497, 504 (Wyo. 2011) (unjust enrichment is "not available when an express contract exists.")

## V.   Crypto failed to prove damages.

It is unclear if Crypto wants the Court to enter a liability finding or a liability and damages finding. Crypto certainly alleges it suffered damages like lost profits. (ECF 53 at 12.) But beyond asking for the return of funds already paid to MO POW, Crypto does not specify any other amounts. Given the lack of clarity, MO POW will address the lost profits claim.[4] It is not recoverable for two reasons.

First, the Agreements expressly prohibit recovery of lost profits. Section 5.3(B) of each Agreement states "In no event shall host be liable to client…in any respect, including, without limitation, for any indirect, consequential, special, incidental, reliance, exemplary, or punitive damages, including **loss of profits**, loss of revenue…arising out of or relating to the subject matter of this agreement even if advised of the possibility thereof." (ECF 51-1 at 15, 51-2 at 14.) (emphasis added)

Second, Crypto has not submitted any evidence of lost profits with its briefing. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.") Indeed, the only evidence disclosed in this case related to this subject came on the final day of discovery, after depositions and the

---

[4] A refund is a remedy that matters only if Crypto prevails on its breach arguments, which MO POW has already addressed.

ability for MO POW to submit written discovery. Crypto disclosed a document purporting to calculate lost profits. The document does not say who prepared it, when it was prepared, the method used to prepare it, the origin of any numbers it contains, or the underlying documents supporting the numbers. MO POW attempted to discover damages information during depositions, but Crypto's representative testified she had not gathered the information. (Exhibit 4, Jinwei Zhang Deposition Transcript, at 63:5-11; 64:15-22.) And for some calculations, Crypto admitted it would have to rely on outside professionals. (*Id.* at 64:23-65:2.)

Should Crypto attempt, either at this stage or later, to introduce the document as evidence of lost profits, it is inadmissible expert testimony. The calculations rely on specialized knowledge that comes from an expert. *See* Fed. R. Evid.702. If Crypto wished to rely on an expert, it had to disclose the opinions (retained or not) by September 6, 2023. (ECF 40 at 6.) But Crypto never did. Therefore, Crypto cannot seek those type of damages, now or later.

## Conclusion

For the reasons explained herein, the Court should deny Crypto's Motion for Summary Judgment.

DATED: January 12, 2024.

*/s/ Jeffrey S. Pope*
Jeffrey S. Pope (Wyo. State Bar # 7-4859)
Kasey J. Schlueter (Wyo. State Bar # 8-6521)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
JSPope@hollandhart.com
KJSchlueter@hollandhart.com

ATTORNEYS FOR PLAINTIFFS
MO POW 3, LLC and MO POW 4, LLC