# EXHIBIT 1

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

Civil Action No. 1:22-CV-00155-KHR

---------------------------------------------

ZOOM 30(b)(6) DEPOSITION OF MO POW 3, LLC, AND

MO POW 4, LLC, BY THOMAS GUEL, AND THOMAS GUEL,

INDIVIDUALLY - November 15, 2023

---------------------------------------------

Plaintiffs:

MO POW 3, LLC AND MO POW 4, LLC,

v.

Defendant:

CRYPTO INFINITI, LLC.

---------------------------------------------

APPEARANCES:

    HOLLAND & HART, LLP

        By Jeffrey S. Pope, Esq.

        2515 Warren Avenue, Suite 450

        Cheyenne, Wyoming 82001

            Appearing via Zoom on behalf of

            Plaintiffs

    HATHAWAY & KUNZ, LLP

        By Tyler J. Garrett, Esq.

        2515 Warren Avenue, Suite 500

        Cheyenne, Wyoming 82001

            Appearing via Zoom on behalf of

            Defendant

**Page 2**

1        Pursuant to Notice and the Federal Rules
2  of Civil Procedure, the Zoom 30(b)(6) deposition of
3  MO POW 3, LLC, AND MO POW 4, LLC, BY THOMAS GUEL,
4  AND THOMAS GUEL, INDIVIDUALLY, called by Defendant,
5  was taken on Wednesday, November 15, 2023,
6  commencing at 9:03 a.m., via remote
7  videoconference, before Lisa A. Dague, Certified
8  Shorthand Reporter and Notary Public within and for
9  the State of Colorado.
10
11           I N D E X
12  ZOOM 30(b)(6) DEPOSITION OF MO POW 3, LLC, AND
    MO POW 4, LLC, BY THOMAS GUEL, AND THOMAS GUEL,
13  INDIVIDUALLY
14  EXAMINATION BY:                PAGE
15    Mr. Garrett                 4
16
17                         INITIAL
    EXHIBITS                 REFERENCE
18
19  Exhibit A    Master Hosting Agreement      83
                between MO POW 3 and
19                Crypto Infinity, 5/26/22
20
    Exhibit B    Master Hosting Agreement      85
21                between MO POW 4 and
                Crypto Infinity, 5/26/22
22
    Exhibit J    Letter from Jessica          87
23                Vittorio to Jordan
                Collins, 7/22/22
24
25

**Page 3**

1                         INITIAL
    EXHIBITS (continued)          REFERENCE
2
    Exhibit K    Email from Jordan Collins    92
3                to Jinwei Zhang, Jessica
                Vittorio, Gerald Lau, cc
4                Thomas Guel, re Legal
                Notice: MO POW 3, LLC,
5                10/12/22
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1  P R O C E E D I N G S
2        (Exhibits were marked prior to
3  commencement of the deposition.)
4            THOMAS GUEL,
5  being first duly sworn in the above cause, was
6  examined and testified as follows:
7            EXAMINATION
8  BY MR. GARRETT:
9    Q    Good morning, Mr. Guel.  Nice to meet
10  you.  There's a few housekeeping questions or
11  matters that I want to talk to you about initially,
12  and then we can get into the substance of your
13  deposition.  But, just curiously, have you ever
14  been deposed before?
15    A    Yes.
16    Q    Okay.  How many times, and when were
17  those depositions?
18    A    Not that many.  I can't recall the
19  number.  A couple times.
20    Q    Range, like two to five?
21    A    Three.
22    Q    Three times.  Okay.  So you've been
23  deposed before.  You know how a deposition works.
24  Provide audible answers to my questions.  No
25  nodding; no shaking your head.  That isn't going to

Page 21

```
 1     A    It is Epoch Mines.
 2     Q    So the trail is that -- or kind of the
 3  line of ownership is that MO POW 3 is owned by
 4  Epoch Mines.  And in turn, Epoch Mines is owned by
 5  you in your individual capacity; is that right?
 6     A    It is owned by me and -- it is owned
 7  actually by Strategic Global Resources, LLC, which
 8  is owned by me.
 9     Q    Okay.  So there's four layers.  Epoch
10  Mines is owned by Strategic, and then Strategic is
11  owned by you?
12     A    Correct.
13     Q    Okay.  Thank you.
14     A    You're welcome.
15     Q    What is your role with MO POW 3?
16     A    Well, my role as the ultimate leader of
17  the tower of companies was to make sure that things
18  got done, and I assisted in sales, and I assisted
19  in the development side.
20     Q    Let's break that down a bit.  So in terms
21  of let's start with management of MO POW 3.  Were
22  you the manager of MO POW 3?
23     A    Yes.
24     Q    Is there an operating agreement --
25     A    Yes.
```

Page 22

```
 1     Q    -- for MO POW 3?  Okay.  And then you
 2  said you did other things with respect to
 3  soliciting sales; is that right?
 4     A    Well, we were trying to -- yes.
 5     Q    Meaning you were trying to get clients to
 6  house their digital currency equipment at your --
 7  at the MO POW site?
 8     A    Correct.
 9     Q    Can you explain -- I'm sorry.  I'm going
10  to back up for a second.  Who else was part of MO
11  POW 3 in terms of whether they are management or an
12  employee or an independent contractor or anything
13  like that?
14        MR. POPE:  Mr. Guel, before you answer,
15  real quick just clarification, Counsel.  I think we
16  started this line of questioning saying you were
17  asking him in his corporate representative
18  capacity.  These are questions that are not in a
19  topic that was listed in the deposition notice.  So
20  to the extent you are asking him as a corporate
21  representative, I'm going to object as beyond the
22  scope of the topics.
23        But to be fair to the consolidated
24  deposition, I think these are fair questions in his
25  individual capacity.  I just want to make sure
```

Page 23

```
 1  we're clear on that.
 2        MR. GARRETT:  Okay.
 3     A    Can you clarify the question for me?
 4     Q    (BY MR. GARRETT)  Yeah.  Who else was
 5  part of MO POW 3 in terms of management, employees,
 6  independent contractors, anybody that did work for
 7  MO POW 3?
 8     A    Did work is a broad subject or question,
 9  so can you try to break that down?  Are you talking
10  about, what, contractors?
11     Q    Let's talk first about management.  Who
12  else was part of management?
13     A    For MO POW 3, we had other people that
14  worked for Epoch that would also assist in the
15  management, including Mason LaGrange and Charles
16  Ciancanelli.  Then there were site techs that would
17  play a role.
18     Q    Do you know who the site techs were?
19     A    You would have Dustin Roberts.  That's
20  about it for right now.  We would have hired more,
21  but we didn't for -- for those.
22     Q    "For those" meaning --
23     A    For MO POW 3 and 4.
24     Q    -- MO POW --
25        THE REPORTER:  One at a time, please.
```

Page 24

```
 1     A    For MO POW 3.
 2     Q    (BY MR. GARRETT)  All right.  So I think
 3  this is a fair question in your representative
 4  capacity, because it was in MO POW 3's complaint.
 5  Can you explain the consortium of companies that MO
 6  POW 3 is a part of?
 7     A    Well, we just did, right?  Strategic owns
 8  Epoch, which owns MO POW 3.  It owned MO POW 4.  I
 9  believe it owned MO POW 1 and 2.
10     Q    Okay.  Can you -- can you explain in
11  detail the energy services MO POW 3 procured from
12  the municipal utilities pursuant to a combination
13  of multiple property energy and economic
14  development agreements?
15     A    For MO POW 3, we had an energy services
16  agreement which put us on a large interruptible
17  rate from city utilities.  And they also gave us an
18  economic relief Rider D, which had a discount to
19  the demand charges.
20     Q    Okay.  And those documents -- I suspect
21  it's all in writing.  Have you turned those
22  documents over to your counsel?
23     A    I believe so.
24     Q    Just to loop back.  Aside from the
25  project with Crypto Infiniti at the site --
```

**Page 25**

1  specific site, which we'll get into here in a bit,
2  I just need to ask what other projects is MO POW 3
3  involved in?  I think before you said there aren't
4  any others.  This was a specific purpose for the
5  specific site, but I just wanted to close that
6  loop.
7      A    Correct, there are none.
8      Q    Did MO POW 3 actually provide any hosting
9  services to Crypto Infiniti as set forth in the
10  master hosting services agreement?
11     A    No, because Crypto breached.
12     Q    And I'm not asking for, like, a legal
13  conclusion.  I totally don't want to go there.
14  Just a simple "No" --
15     A    No.
16     Q    -- would be satisfactory.  Could you
17  repeat that?  We were talking over each other.
18     A    The answer is no.
19     Q    So the site for MO POW 3 was at 400 North
20  Main, Springfield, Missouri; is that correct?
21     A    Correct.
22     Q    The status of the site -- what was the
23  status of the site when the contract with Crypto
24  Infiniti was entered into?
25          MR. POPE:  Object to form.  Vague.  Go

**Page 26**

1  ahead.
2      A    Do you want to be more specific?
3      Q    (BY MR. GARRETT)  No.
4      A    Are you asking me -- what exactly are you
5  asking me?
6      Q    What was the status of the site?
7      A    The status being what?  Was it a sunny
8  day?  I mean, are we talking about what?
9      Q    Was it built out?
10     A    No.
11     Q    Had anything been done to the site at the
12  time that MO POW 3 entered into the contract with
13  Crypto Infiniti?
14     A    I believe we had a lease secured with
15  city utilities.  I believe we had portions, if not
16  all, of our tariff executed, and that would be at
17  the time of execution.
18     Q    And just to make clear, there was no
19  physical work that had been done at that point?
20     A    No.
21     Q    No, as in, no, there was not any physical
22  development at that point?
23     A    That's correct.
24     Q    What was the status of the site as of
25  July 19th, 2022, when the initial complaint was

**Page 27**

1  filed by MO POW 3?
2          MR. POPE:  Object to form.  Vague.
3          Go ahead, Mr. Guel.
4      A    Substantially the same.
5      Q    (BY MR. GARRETT)  Meaning there was no
6  physical development of the site at that time?
7      A    That's correct.
8      Q    What was the status of the site as of
9  August 8th, 2022, when the amended complaint was
10  filed by MO POW 3?
11     A    No change.
12     Q    What's the current status of the site?
13     A    The same.
14     Q    So no development, nothing like that; is
15  that fair?
16     A    Correct.
17     Q    Do you still have possession or control
18  over that site?  And by "you," I mean MO POW 3.
19     A    No.
20     Q    So the lease has been terminated?
21     A    Correct.
22     Q    Do you know who now occupies or possesses
23  that property?
24     A    I do not.
25     Q    When you were negotiating this

**Page 28**

1  contract -- and by "you," again, I mean MO POW 3,
2  since you're the representative -- why couldn't MO
3  POW's site at 400 North Main, Springfield,
4  Missouri, provide the full 35 megawatts to Crypto
5  Infiniti's needs?
6      A    There wasn't enough power available at
7  that substation.
8      Q    Let's turn now to the funds that were
9  paid by Crypto Infiniti to MO POW 3.  Those funds
10  totaled $4,135,250; is that correct?
11     A    Correct.
12     Q    What did MO POW 3 do with that money?
13     A    MO POW 3 purchased five mobile data
14  centers, along with the corresponding transformers.
15  It purchased concrete pads for them to sit on, as
16  well as some other electrical components to connect
17  everything, and poles.
18     Q    And did that deplete -- that work, did
19  that deplete the $4,135,250?
20     A    No.
21     Q    How much did that work that you just
22  summarized cost?
23     A    The exact number, I would have to check,
24  but it was over $2 million.
25     Q    So there is a remaining balance still in

Page 65

1    today, yes.
2    Q    And so I think this is kind of where you
3    come into play a little more.  During this third
4    site visit, a representative of MO POW 3 and 4
5    refused to provide data concerning digital currency
6    equipment temperatures pursuant to your
7    instruction; is that correct?
8    A    Correct.
9    Q    And again, do you remember who that MO
10   POW 3 and 4 representative was during that third
11   site visit on June 21st, 2022?
12   A    No, not right off.
13   Q    I think you alluded to it in your answer
14   a little bit ago, but why did you instruct the MO
15   POW 3 and 4 representative not to provide Crypto
16   Infiniti with data concerning digital currency
17   equipment temperatures?
18   A    Because we have confidentiality
19   agreements in our contracts with other customers.
20   They had no contractual right to see it, and we
21   have no contractual ability to show it.  They were
22   also told that they couldn't have third-party
23   information.  So we denied it.
24   Q    We're just talking about temperatures of
25   equipment here.  How is that confidential?

Page 66

1    A    So temperatures of the equipment equate
2    immediately to hash rate.  Hash rate is what
3    dictates the amount of bitcoin mined.  It is
4    sensitive confidential information pertaining to
5    another company's revenues, and it can't be shared,
6    and it's confidential.
7    Q    Was that going to be the same space where
8    Crypto Infiniti's equipment was going into?
9    A    Which Crypto Infiniti's?
10   Q    Their digital mining equipment.
11   A    For MO POW 3?  MO POW 4?
12   Q    MO POW 3, because obviously there wasn't
13   anything on MO POW 4's site, as you testified.  All
14   there was that currently existed during this time
15   frame was something on MO POW 3's site.
16   A    So what are you asking me?
17   Q    I'm asking you was Crypto Infiniti's
18   digital currency mining equipment going into that
19   same space as your other customer?
20   A    You say Crypto Infiniti, but do you mean
21   for MO POW 3?
22   Q    Yeah, in the MO POW 3 space.
23   A    No.
24   Q    It would have been on the same site, but
25   a different container?

Page 67

1    A    It would have been on a different site,
2    period.
3    Q    Help me out there.  I'm really confused
4    now.
5    A    I don't know how to fix that.
6    Q    So there's one site that was up and
7    running, and that was MO POW 3's site located --
8    A    No.
9    Q    -- at 400 North Main, Springfield,
10   Missouri; is that correct?
11   A    400 North Main in Springfield was never
12   built.
13   Q    So neither site specifically identified
14   in the contracts were ever built?  That's what
15   you're saying?
16   A    Neither site was built or expanded to
17   accommodate neither Crypto in MO POW 3 nor MO POW
18   4.
19   Q    So where was this other client's
20   equipment being housed?
21   A    On the Strafford site.
22   Q    But you said that the Strafford site, as
23   it relates at least to MO POW 4, nothing had ever
24   been built there.  You just testified to that.
25   A    For MO POW 4.

Page 68

1    Q    So there were other entities that were
2    using the site?
3    A    Correct.
4    Q    And what were those entities?
5    A    As it relates to who?
6    Q    That were just simply at the Strafford
7    site.  So let's be clear here, because this is new
8    information, and it's very nuanced; and I don't
9    know if you're intending it to be that way or what.
10   A    Your questions aren't clear.
11   Q    Let's start with 5501 East Farm Road 112,
12   Strafford, Missouri.
13   A    Okay.
14   Q    That's the MO POW 4 site.  You have
15   testified that with respect to MO POW 4, nothing
16   was ever built out; is that correct?
17   A    That's correct.
18   Q    Okay.  But that site seems to not be
19   exclusive to MO POW 4.  There were other companies
20   that were using that site to host digital currency
21   mining equipment; is that correct?
22   A    Correct.
23   Q    And what were those other entities?
24   A    Entities being who?
25   Q    The companies that were on that site

Page 69

1  hosting --
2      A    Customers, companies of ours.
3      Q    Companies of yours?
4      A    MO POW 1 and MO POW 2.
5      Q    What about MO POW 3's site located at 400
6  North Main, Springfield, Missouri.  Did MO POW 3
7  have any infrastructure on that site?
8      A    What exactly are you asking me?
9      Q    I'm just asking was MO POW 3 running --
10  doing anything on that site?  Had it built out
11  anything on 400 North Main Springfield, Missouri?
12      A    No.  I've stated already, no.
13      Q    Were any of your other companies
14  operating on that site?
15      A    No.
16      Q    So that site was just completely vacant,
17  I guess, for lack of a better term?
18      A    Correct.
19      Q    Okay.  And just to clarify for the
20  record, the other site for MO POW 4, while it was
21  not operating on that site and had not done
22  anything to that site, there were other entities
23  that were owned by your consortium of companies,
24  those being specifically MO POW 1 and 2, that were,
25  in fact, operating at that time on that site?

Page 70

1      A    Correct.
2      Q    When did MO POW 1 and -- I think you
3  answered this.  When did MO POW 1 and MO POW 2 end
4  their services on, I guess, the site located at
5  Strafford?
6      A    I do not recall off the top of my head a
7  date for you.
8      Q    But we can at least agree that nothing
9  currently is being operated on that site?
10      A    Nothing is currently being operated on
11  that site by any consortium of companies related to
12  this.
13      Q    Are you aware of any other companies,
14  albeit not related, that are operating on that
15  site?
16      A    Yes.
17      Q    And what companies are those?
18      A    I do not recall at the moment.
19      Q    Are you related to those companies in any
20  way?
21      A    Yes.
22      Q    How so?
23      A    I am a partner in an entity that has
24  interests in that site.
25      Q    And what's that entity?

Page 71

1      A    I'm not sure it's relevant.
2          MR. POPE:  You can answer, Mr. Guel.
3      A    So there is another power subsidiary that
4  is owned by Amalgamated Energy Assets, of which I
5  am the partner in Pangaea, who is the owner.
6      Q    (BY MR. GARRETT)  What is that entity
7  that's operating on the -- I guess we call it the
8  Strafford site?
9      A    I believe it's MP 1.
10      Q    And it's currently operating on that
11  site?
12      A    Correct.
13      Q    So looking back as to why you instructed
14  the MO POW 3 and 4 tech not to provide any data
15  concerning digital currency equipment temperatures
16  was because the customer or client's information
17  that was being housed there, it was, in your
18  opinion, confidential, but also the company that
19  was running that site was not even MO POW 4 or 3?
20      A    Please restate the actual question.
21      Q    Again, I just need to clarify then, the
22  data concerning digital currency equipment that was
23  requested by Crypto Infiniti, you denied that
24  request because of why?  I'll let you answer.
25      A    First of all, we had no contractual

Page 72

1  obligation to provide that.  Number two, I had a
2  contractual obligation elsewhere not to provide
3  that.
4      Q    Let's stop there for a second.  You said,
5  "I had a contractual obligation."
6      A    "I" by a different company.
7      Q    What company?
8      A    MO POW 1 and MO POW 2.
9      Q    Okay.
10      A    MO POW 1 and MO POW 2 had an obligation
11  not to show it.  Crypto Infiniti had no rightful
12  duty -- or no rightful reason to obtain that, and
13  they were already in default.
14      Q    So on June 27th, 2022, you had a Zoom
15  meeting with a Crypto Infiniti representative.  Do
16  you recall that?
17      A    Yes.
18      Q    And during the meeting, a Crypto Infiniti
19  representative requested data on digital currency
20  equipment temperatures from the site to assess live
21  operations.  Do you recall that request?
22      A    Yes.
23      Q    And did you provide the requested data on
24  digital currency equipment temperatures?
25      A    No.

**Page 113**

1 the Ravenswood area.
2        THE DEPONENT:  Okay.  Sure.
3        MR. GARRETT:  Just north, and then ended
4 up in a place in Old Irving Park.
5        THE DEPONENT:  Nice.
6        MR. GARRETT:  I know we're still on the
7 record.  We probably shouldn't be.  But I'll switch
8 over to Jeff.  Do you have anything to add or would
9 you like to ask some questions?
10        MR. POPE:  I have no questions.  And we
11 will read and sign.
12        THE REPORTER:  Can I get your orders,
13 please?  Do you both just want etran?
14        MR. GARRETT:  Yes.
15        MR. POPE:  We'll take an etran too.
16        THE REPORTER:  And do you want copies of
17 the exhibits with your transcript?
18        MR. POPE:  I don't.
19        MR. GARRETT:  I don't either.
20        (The deposition concluded at 3:02 p.m.,
21          November 15, 2023.)
22
23
24
25

**Page 114**

1        I, THOMAS GUEL, do hereby certify that I
2 have read the foregoing transcript and that the
3 same and accompanying amendment sheets, if any,
4 constitute a true and complete record of my
5 testimony.
6
7
8
9        _____
               Signature of Deponent
10
11        (   ) No amendments
          (   ) Amendments attached
12
13
14        Acknowledged before me this _____
15 day of _____, 2023.
16
17        Notary Public:  _____
18        My commission expires_____
19        Seal:
20
21 LAD
22
23
24
25

**Page 115**

1 STATE OF COLORADO   )
2                     ) ss. REPORTER'S CERTIFICATE
  COUNTY OF DENVER    )
3
4
5        I, Lisa A. Dague, do hereby certify that
6 I am a Certified Shorthand Reporter and Notary
7 Public within the State of Colorado; that previous
8 to the commencement of the examination, the
  deponent was duly sworn to testify to the truth.
10        I further certify that this deposition
11 was taken in shorthand by me at the time and place
12 herein set forth and was thereafter reduced to
13 typewritten form, and that the foregoing
14 constitutes a true and correct transcript.
15        I further certify that I am not related
16 to, employed by, nor of counsel for any of the
17 parties or attorneys herein, nor otherwise
18 interested in the result of the within action.
19        In witness whereof, I have affixed my
20 signature this 28th day of November, 2023.
21        My commission expires December 23, 2024.
22
23        *Lisa A. Dague*
            Lisa A. Dague
24        Certified Shorthand Reporter
25

**Page 116**

1 AB LITIGATION SERVICES
  216 - 16th Street, Suite 600
2 Denver, Colorado  80202
  November 28, 2023
3 Jeffrey S. Pope, Esq.
  2515 Warren Avenue, Suite 450
4 Cheyenne, Wyoming 82001
5 Re:  30(b)(6) DEPOSITION OF MO POW 3, LLC, AND MO POW 4,
     LLC, BY THOMAS GUEL, AND THOMAS GUEL, INDIVIDUALLY
6      MO POW 3, LLC AND MO POW 4, LLC
7      v. CRYPTO INFINITI, LLC
     Civil Action No. 1:22-CV-00155-KHR
8 The aforementioned deposition is ready for
9 reading and signing.  Please attend to this
  matter by following BOTH of the items indicated
  below:
10
11 _____ Call 303-296-0017 and arrange with us
         to read and sign the deposition in our
12         office
13
  _XXX_ Have the deponent read your copy and sign
14       the signature page and amendment sheets, if
       applicable; the signature page is attached
15
       Read the enclosed copy of the deposition
16       and sign the signature page and amendment
       sheets, if applicable; the signature page
17       is attached
  _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
18 By _____ due to a trial date of_____
19 Please be sure the original signature page and
  amendment sheets, if any, are SIGNED BEFORE A
20 NOTARY PUBLIC and returned to AB Litigation Services
  for filing with the original deposition.  A copy
21 of these changes should also be forwarded to
  counsel of record.  Thank you.
22
23 AB LITIGATION SERVICES
24
25 cc:  All Counsel