

FILED

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

4:43 pm, 2/20/24

**U.S. Magistrate Judge**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| MO POW 3, LLC and MO POW 4 LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>CRYPTO INFINITI, LLC,<br><br>Defendant. | Case No.  22-CV-155-KHR |

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGEMENT

Before the Court are the parties' cross motions for summary judgment. Plaintiffs Mo Pow 3 and Mo Pow 4 bring two claims for breach of contract, claims one and two; breach of the covenant of good faith and fair dealing, claim four; and for declaratory judgment, claim five.[1] Defendant Crypto Infiniti brings counterclaims for breach of contract, counterclaims one and two; breach of the covenant of good faith and fair dealing, counterclaim three; unjust enrichment in the alternative, counterclaim four; and declaratory judgment, counterclaim five. The Court, having reviewed the briefing and hearing oral argument finds neither party is innocent. Mo Pow 3 breached the First Agreement by unjustifiably terminating it on October 28, 2022. Crypto Infiniti breached the Second Agreement by unjustifiably terminating it on July 5, 2022.

---

[1] Plaintiffs' claim for fraudulent inducement, claim three, was dismissed at the pleading stage.

## BACKGROUND

The material facts in this case, as laid out in the parties' briefing, are largely undisputed. On May 26, 2022, Plaintiffs and Defendant entered into two agreements, both having the same basic terms and requirements. The first is a Master Hosting Agreement between Mo Pow 3 and Crypto Infiniti (the "First Agreement"). (ECF No. 51-1). The second, is a Master Hosting Agreement between Mo Pow 4 and Crypto Infiniti (the "Second Agreement"). (ECF No. 51-2). Both agreements were intended to provide Crypto Infiniti with hosting, or managed services for digital currency mining equipment. Those managed services included: "rack space allocation for [Crypto Infiniti's] equipment, installation services, electrical power connection, power supply …, network connectivity, security, maintenance, repair, and technical support as outlined in the agreement." (ECF No. 51-1, at 4); (ECF No. 51-2, at 3). One differing aspect of the agreements was that the First agreement called for a power supply of 15 MW and the Second Agreement called for 20 MW.[2] In total, the parties agreed to 35 MW of power supply between the two agreements at different locations.

Section 2.1 of both agreements states the down payment and the rate buy down are due on the date the parties execute an Order Form.[3] An Order Form is included as Exhibit A to the agreements. Crypto Infiniti paid the rate buy down and the down payment for the

---

[2] The Court will also note that the First Agreement contains four recitals, while the Second Agreement contains only one recital. The recitals in the First Agreement mention the parties are concurrently entering into the Second Agreement and recite a rate buy down for both Mo Pow 3's and Mo Pow 4's managed services. As noted above, the Second Agreement was for 20 MW of power supply. Because of this, the Second Agreement called for seven EZ Smart Box 3000 containers, as opposed to five in the First Agreement, and had a higher effective price per kilowatt hour. Other than these differences, the agreements are identical as to duties and obligations.

[3] Only the First Agreement requires the "rate buy down" payment, but as stated in the recitals, it is paid to buy down both Mo Pow 3's and Mo Pow 4's managed services.

First Agreement, but not for the Second Agreement. Both agreements required a monthly payment from Crypto Infiniti in consideration for the managed services Mo Pow 3 and Mo Pow 4 would provide. Yet, Crypto Infiniti did not make any of these payments.

After the parties executed the agreements, their relationship went sour. Crypto Infiniti developed concerns about potential overheating of the smart boxes, that Plaintiff was not using the down payment to prepare the sites, and construction for the sites had not begun.[4] Due to those circumstances, Crypto Infiniti had doubts Plaintiffs would not provide the agreed managed services, so it did not make the down payment for the Second Agreement. Counsel for Plaintiffs communicated to Crypto Infiniti on June 24, 2022, that Plaintiffs had not received the rate buy down payment due under the Second Agreement, but sought to honor the agreements even though Crypto Infiniti was in breach. Counsel for Crypto Infiniti responded to that letter on July 5, 2022, accepting what it deemed a termination of the Second Agreement but its intent to continue under the First Agreement.

In between that exchange, a text message conversation between Jinwei Zhang, a representative for Crypto Infiniti, and Thomas Guel, a representative for the Mo Pow companies, occurred on June 29, 2022, Crypto Infiniti stated its intent to make the rate buy down payment for the Second Agreement shortly. However, Crypto Infiniti asked to make the payment into an escrow account to ease its concerns. Plaintiffs rejected that offer and asked for assurances Crypto Infiniti would be able to pay the forthcoming monthly payments. Crypto Infiniti similarly denied that request. Mr. Guel also stated "do not send

---

[4] The Court notes that while construction had not begun, Plaintiffs intended to use prefabricated materials to construct the sites once the smart boxes were shipped and received.

any money until we are on the same page" when denying the request to make the second payment through escrow.

Plaintiffs subsequently filed this lawsuit a few weeks after that exchange and Crypto Infiniti was served with the original complaint on July 21, 2022. On July 22, 2022, Crypto Infiniti sought a confirmation of the shipping address to mail the equipment related to the First Agreement. No response was received until October 12, 2022. Now, each party asserts breaches against the other for the events that took place.

### RELEVANT LAW

Rule 56 of the Federal Rules of Civil Procedure provides a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." A fact is material if it is necessary to determine the outcome of the case. *Roberts v. Jackson Hole Mountain Resort Corporation*, 884 F.3d 967, 972 (10th Cir. 2018). A dispute is genuine if evidence exists that it may lead a reasonable trier of fact to return a verdict for the non-moving party. *Olivero v. Trek Bicycle Corporation*, 291 F. Supp. 3d 1209, 1218 (D. Colo. 2017). When determining whether a genuine dispute of material fact exists, a court will draw all favorable inferences of factual ambiguities in favor of the non-movant. *Morlock v. United Parcel Service, Inc.*, No. 08-CV-44, 2008 WL 11411456, at *2 (D. Wyo. Oct. 9, 2008).

If a movant meets their burden in showing that no genuine dispute exists, the non-movant must submit sufficient evidence in specific factual form showing that a dispute does exist. *Id.* This requires more than a scintilla of evidence—providing more than mere assertions and conjecture. *Brennan v. Jackson Hole Snowmobile Tours, Inc.*, No. 08-CV-

265, 2009 WL 10700292, at * 2 (D. Wyo. Aug. 4, 2009). "[S]ummary judgment is appropriate when the non-movant is unable to present facts on which a reasonable jury could find in his or her favor." *Id.* In sum, summary judgment is an opportunity to determine the legal sufficiency of a claim to proceed to trial, not to balance or weigh factual disputes.

When sitting in diversity, a federal court applies federal procedural law and state substantive law. *E.g., Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 660 (10th Cir. 2018). A "federal court's task is not to reach its own judgement regarding the substance of common law, but simply to 'ascertain and apply the state law'" using the "most recent decisions of the state's highest court." *Wade v. EMASCO Ins. Co.*, 483 F.3d 657, 665–66 (10th Cir. 2007) (quoting *Wankier v. Crown Equip, Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)). However, "'[w]here no controlling state decision exists, [a] federal court must attempt to predict what the state's highest court would do.'" *Id.* at 666 (quoting *Wankier*, 353 F.3d at 866). "In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law." *Id.* (internal citations and quotations omitted).

## RULING OF THE COURT

### BREACH OF CONTRACT – FIRST AGREEMENT

The first claims to be addressed are each parties' claims for breach of contract. "To establish a prima facie case for breach of contract, a plaintiff must show: (1) a lawfully

enforceable contract, (2) an unjustified failure to timely perform all or any part of what is promised therein, and (3) entitlement of the injured party to damages." *Kappes v. Rhodes*, 2022 WY 82, ¶ 17, 512 P.3d 31, 36 (Wyo. 2022) (internal citations and quotations omitted).

### Incorporation

The validity of each agreement does not appear to be at issue. The only related issue is whether the First Agreement incorporated the Second Agreement. At the pleading stage, the Court ruled Plaintiffs had plausibly pled the agreements incorporated each other. (ECF No. 18). Wyoming's law on contract incorporation is clear:

> [W]hen a contract refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both the instruments are to be construed together. However, in order for an instrument to be incorporated into and become part of a contract, the instrument must actually be incorporated. It is not enough for the contract to merely mention the instrument; the referring language in the contract must demonstrate the parties intended to incorporate all or part of the referenced instrument. Parties do not undertake obligations contained in a separate document unless their contract clearly says so. A reference in a contract to another instrument will incorporate the other instrument only to the extent indicated and for the specific purpose indicated.

*Fleig v. Estate of Fleig by and through Fleig*, 2018 WY 30, ¶ 9, 413 P.3d 638, 641–42 (Wyo. 2018) (quoting *Pennaco Energy, Inc. v. Sorenson*, 2016 WY 34, ¶ 32, 371 P.3d 120, 127–28 (Wyo. 2016)).

As stated, contract incorporation is not an all-or-nothing act. *See id.* ("A contract may "incorporate all or part of the referenced instrument"). Here, there are three references to the Second Agreement contained in the First Agreement:

> WHEREAS Client is also concurrently entering into a second hosting agreement (the "2nd Agreement") with Host's affiliate MO POW 4, LLC for

colocation at MO POW 4's facility located at 5501 East Farm Road 112, Strafford, Missouri 65757;

WHEREAS Client desires to "buy down" Host's typical Managed Services Fee and also MO POW 4's typical Managed Services Fee, by providing a two million dollars ($2,000,000) payment for discounted Managed Services in this Agreement and the 2nd Agreement during the Initial Term;

1.2 2nd Agreement. The Rate Buy Down is being paid as consideration to "buy down" the Managed Services Rate of this Agreement and the 2nd Agreement.

(ECF No. 51-1). The rate buy down is in reference to the managed services provided in both agreements. Those services included a power supply of 15 MW under the First Agreement and 20 MW under the Second Agreement. However, that is where the incorporation ends.

Contract interpretation is a question of law. *Pope v. Rosenberg*, 2015 WY 142, ¶ 21, 361 P.3d 824, 830 (Wyo. 2015). When interpreting contracts, a court aims to determine the intent of the parties. *Holding v. Luckinbill*, 2022 WY 10, ¶ 14, 503 P.3d 12, 17 (Wyo. 2022). As such, courts look to the plain meaning of a contract. *Id.* In doing so, a contract is interpreted as whole, reading each provision in light of the others and giving meaning to each provision so as to avoid finding inconsistencies that render other provisions meaningless. *Id.* The contract language is construed in the context it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the agreement in order to find the intent of the parties. *Skaf v. Wyoming Cardiopulmonary Services, P.C.*, 2021 WY 105, ¶ 42, 495 P.3d 887, 901 (Wyo. 2021). However, a court may not save parties from poorly drafted agreements or unwise bargains under the guise of judicial construction.

*Id.* Rather, a court must adhere to the language of the contract as written unless there is ambiguity. *Id.*

Plaintiffs argue the "Agreements allowed the parties to take advantage of economies of scale to accomplish what the Agreements referred to as a rate buy down structure." (ECF No. 51, at 1). Yet, nothing substantiates that claim. Nowhere in either agreement is there a reference to economies of scale. Based on the language of the contract, the Court can only assume that "rate buy down" payment means exactly what it states; a "payment for discounted Managed Services in this Agreement and the 2nd Agreement during the Initial Term," i.e., a payment for a discounted rate. Using Plaintiffs' own example, "[i]t is akin to buying down interest points on a loan by paying more up front." (ECF No. 59, at 12). Such a payment has nothing to do with the scale of the purchase, rather it is an up-front payment to reduce a rate. The payment itself causes the rate reduction, not the scale of the power supply purchased. This is not a Costco bargain, but a separate payment to secure a reduced rate.

Even construing the rate buy down structure as an ambiguity, Plaintiffs offer no evidence the parties were attempting to take advantage of economies of scale. The only evidence presented on that point comes from Thomas Guel's deposition. There, he states "[t]he initial agreements were separated due to the availability of power at different sites" when asked why the agreements were separated. (ECF No. 58, at 5); *accord* (ECF No. 51-5, at 4) ("There wasn't enough power available at that substation.").

Accordingly, a breach of one agreement does not per se create a breach in the other agreement. Each agreement presents independent duties between Plaintiffs and Defendant.

The rate buy down payment did not link the agreements to become one. Rather, it merely bought the effective rate that the respective agreements would charge for managed services. That is the extent of the incorporation of the two agreements as no other obligations are tied together. Using Plaintiffs' view, it would be a breach of both agreements if the power supply of one hosting location was lost for some reason, while the other hosting location continued operations without issue. That would be an illogical result when each site is governed by a different contract and company providing managed services.

### Crypto Infiniti did not Breach the First Agreement

Plaintiffs argue that Crypto Infiniti breached the First Agreement in two ways. First, that Crypto Infiniti had a duty to "promptly deliver its digital currency mining equipment listed in Order Form … to Host Facility." (ECF No. 51-1, at 2). Second, that the breach of the Second Agreement constituted a breach of the First Agreement. As discussed above, a potential breach of the Second Agreement here does not constitute a breach of the First Agreement. Plaintiffs' first theory also fails.

During the time between the execution of the agreements and the filing of the lawsuit, Ms. Zhang made three site visits and had discussions with Mr. Guel where they discussed the readiness of the sites. In those discussions, Mr. Guel told Ms. Zhang to "ship the equipment when the site is ready." (ECF No. 58, at 8). Crypto further requested heating data of other equipment Mo Pow 3 hosted and to confirm a shipping address that went unanswered. (ECF No. 59-1, at 5); (ECF No 59, at 8). When Mo Pow 3 entered into the First Agreement with Crypto Infiniti, it had secured a lease for city utilities for the project. (ECF No. 51-5, at 4). At the time the Complaint was filed, there had been no physical

development of the site and no development has occurred to date. *Id.* Mo Pow 3 no longer has custody or control of the site. *Id.* There was never any physical preparation of the hosting site.

Plaintiffs assert that the sites would be constructed using prefabricated materials. (ECF No. 59, at 2). To construct in this manner, Plaintiffs would not prepare the sites until it received the equipment from Crypto Infiniti. *Id.*; (ECF No. 59-2). However, the Court is not aware that this position was ever communicated to Crypto Infiniti. The only communication of which the Court is aware, is that Mr. Guel provided bills of lading to Crypto Infiniti for transformers and EZB containers on June 17, 2023. (ECF No. 51-3, at 3); (ECF No. 35-6). Mr. Guel's communication further stated final approval for construction of the site would happen on June 21, 2022. (ECF No. 35-6). All of these facts remained undisputed at the February 8, 2024, hearing on the parties' motions for summary judgment.

Considering these undisputed facts, no breach occurred during the performance of the First Agreement nor after the filing of this lawsuit. The second element for a breach of contract claim is "an unjustified failure to timely perform all or any part of what is promised therein." *Kappes*, 2022 WY 82, ¶ 17, 512 P.3d at 36. First, there is no set date under the First Agreement. Exhibit A to the First Agreement includes a projected delivery date of July 2022, yet that is not a binding timeframe as it was "projected." Rather, Crypto Infiniti was required to ship its equipment promptly.[5]

---

[5] Additionally, Section 1.1(B)(3) of the First Agreement states the commencement date for managed services does not begin until the later of 30 days after receipt of equipment or a date agreed to in Exhibit A. (ECF No. 51-1, at 4). The

"[W]ords used in the contract are afforded the plain meaning that a reasonable person would give to them." *Caballo Coal Co. v. Fid. Expl. & Prod. Co.*, 2004 WY 6, ¶ 11, 84 P.3d 311, 314 (Wyo. 2004). The Wyoming Supreme Court has "recognized that 'promptly is not an exact term.'" *Matter of U.S. Currency Totaling $470,040.00*, 2020 WY 30, ¶ 21, 459 P.3d 430, 436 (Wyo. 2020) (quoting *Elec. Wholesale Supply Co. Inc. v. Fraser*, 2015 WY 105, ¶¶ 25–26, 356 P.3d 254, 261 (Wyo. 2015)). "The plain meaning of 'prompt' is 'at once,' 'without delay,' or 'quick to act as occasion demands.' As the definition recognizes, what is 'prompt' depends upon the situation" *Id.* (quoting *Elec. Wholesale Supply Co. Inc. v. Fraser*, 2015 WY 105, ¶ 26, 356 P.3d. at 261).

Turning to the present situation, the undisputed facts do not show Crypto Infiniti failed to act promptly in shipping the equipment. Crypto Infiniti did not receive notice Mo Pow 3 had procured any construction materials until June 17, 2022. Even then, there was no final approval for construction. Ms. Zhang's undisputed statement she understood the equipment did not need to be shipped until the site was ready at a minimum shows there was confusion about the project. Crypto Infiniti's unanswered requests for a shipping address confirmation and for heating information bolster that confusion. A letter from Mo Pow 3's counsel to Crypto Infiniti on June 24, 2022, stating Plaintiffs retained the right to honor the agreements, but had no obligation to do so added another layer of confusion. (ECF No. 35-7). Crypto Infiniti responded and sought to connect further to resolve the outstanding issues but it went unanswered. (ECF No. 35-9).

---

fact the contract contains both of these possibilities further supports that equipment could be received after the dates provided in Exhibit A as it recognizes performance begins on the later of the two possibilities.

Plaintiffs' arguments that the contract contained a shipping address and confidentiality prevented the disclosure of the heating information do not allay these concerns. As Ms. Zhang stated, Crypto Infiniti would be shipping very expensive equipment. (ECF No. 53-2, at 6). To Crypto Infiniti's knowledge, the address in the First Agreement was an empty plot. Any shipped equipment would need to be signed for and stored in a building. As for the heating information, the Court understands why Mo Pow 3 could not disclose the requested information as it was confidential. However, the information's confidentiality was never relayed as the reason for nondisclosure to Crypto Infiniti, as far as the Court is aware.

Regardless of the confusion and miscommunication, the Court recognizes that Crypto Infiniti shipment of the equipment was required at some point. On July 22, 2022, counsel for Crypto Infiniti emailed counsel for Mo Pow 3 stating Crypto Infiniti would immediately prepare for shipment upon confirmation of a shipping address. (ECF No. 35-10). Crypto Infiniti further reaffirmed its desire to continue under the First Agreement. *Id.* This letter was sent only a month after the final approval date in Mo Pow 3's June 17, 2022, letter. No response was received until October 12, 2022, when Mo Pow 3 provided a shipping address and included an invoice for the first month's managed services fee. (ECF No. 35-11). Mo Pow 3 then demanded payment for the first month's invoice on or before October 27, 2022, in another letter shortly thereafter. (ECF No. 35-12). Mo Pow 3 then terminated the First Agreement on October 28, 2022. (ECF No. 35-13).

Crypto Infiniti could hardly be expected to ship its equipment after the filing of this lawsuit. As part of its claim for declaratory judgment, Mo Pow 3 asked this Court to declare

that it did not have to perform under the First Agreement "until [Crypto] Infiniti fulfills its duties under the Second [Agreement]." (ECF No. 7, at 9). Coupled with other allegations of breach of contract, the rights and obligations of the parties required judicial determination before performance continued in these circumstances.[6] *See* 17A Am. Jur. 2d Contracts § 597 (2024) ("Delay in the performance of a contract will, as a rule, be excused where it is caused by the party who objects to or seeks damages for the delay…. If both parties contribute to the delay, neither may recover damages, unless there is proof that allows a clear apportionment of the delay and expenses attributable to each party.").

It is readily apparent communication deteriorated between the parties and that caused confusion in shipping the equipment. That created a situation where "promptly" does not mean days or a couple weeks like it might in some circumstances. Rather, the occasion demanded more communication between the parties to remedy the uncertainty. Crypto Infiniti never knew if the site was prepared to receive equipment. (ECF No. 35-10). Without that knowledge, a successful shipment was in jeopardy and the equipment's safe delivery was a critical aspect of the First Agreement's performance. At a minimum, Mo Pow 3 could have demanded shipment before filing the lawsuit which it never did. Based on the situation, Crypto Infiniti's time to promptly ship the equipment had not run when

---

[6] The Court will not go so far as to say Plaintiffs' filing of the lawsuit amounted to anticipatory repudiation. Nevertheless, the policy behind anticipatory repudiation supports a finding that contractual duties are held in abeyance when a lawsuit is filed, at least in these circumstances. "A repudiation is a manifestation by one party to the other that the first cannot or will not perform at least some of its obligations under the contract." *Roussalis v. Wyoming Medical Center, Inc.*, 4 P.3d 209, 254 (Wyo. 2000) (quoting Allan Farnsworth, Farnsworth on Contracts § 8.20, at 470 (1990)). This may happen by conduct or words and gives a party a claim for damages. *Id.* At 254–55. While the filing of a lawsuit may or may not manifest an intent a party will not perform its contractual obligations, it certainly hinders future performance of the contract. With that in mind, continued performance under a contract should cease until a lawsuit is resolved.

Plaintiffs filed the present lawsuit. *Matter of U.S. Currency Totaling $470.040.00*, 2020 WY 30, ¶ 21, 459 P.3d at 436.

### Mo Pow 3 did not Breach the First Agreement Under Defendant's Theories

Crypto Infiniti also asserts a counterclaim against Mo Pow 3 for breach of contract of the First Agreement under two theories. First, that Mo Pow 3 did not use the payments made under the First Agreement to construct the site. Second, that Mo Pow 3 did not provide any services under the First Agreement. Both arguments fail.

The First Agreement required Mo Pow 3 to provide certain hosting services to Crypto Infiniti and for Crypto Infiniti to make payments in consideration of those services. Crypto Infiniti made the required rate buy down payment and down payment of managed service fee. However, nowhere does the First Agreement specify how that money must be spent.

Certainly, it is reasonable to assume that those payments would be put to use towards the purposes stated in the First Agreement. Along those lines, Mo Pow 3 did purchase prefabrication materials to construct the sites. It spent roughly two million dollars to purchase five mobile data centers, corresponding transformers, concrete pads, other electrical components, and poles. (ECF No. 53-1, at 12). Bills of lading for the transformers and a screenshot of payment for the containers were provided to Crypto Infiniti on June 17, 2022. (ECF No. 51-3, at 3). The remainder of the payments were used for general corporate purposes by Mo Pow 3. (ECF No. 53-1, at 13). Crypto Infiniti takes issue that the sites were never constructed, but Mo Pow 3 planned to construct the site after it received Crypto Infiniti's equipment. (ECF No. 59-2).

14

Those undisputed facts do not come close to a breach. Mo Pow 3 was not in a fiduciary relationship requiring the payments to remain separate from its other funds. No terms in the First Agreement stated how the money was to be spent. The only deadline for construction and operation of the site was thirty days after receipt of the equipment. (ECF No. 57-1, at 3–4). In any event, a large portion of the payments were used to purchase materials for the site. As for the remaining funds, there were other obligations Mo Pow 3 would perform upon receipt of the equipment, e.g., testing, construction of the site, installation, etc. *Id.* Last, as with any commercial agreement, there is an expectation of profit when providing services. Simply put, Mo Pow 3 was never given an opportunity to breach its obligations.

The fact the sites were never constructed here differs than how "promptly" was construed above.  There, promptly was considered in light of the situation. *Matter of U.S. Currency Totaling $470.040.00*, 2020 WY 30, ¶ 21, 459 P.3d at 436. Because construction had not yet occurred, there was a question of if Mo Pow 3 was prepared to receive the equipment, adding to the confusion and miscommunication during those months. Thus, it was proper to consider when determining if Crypto Infiniti had promptly shipped its equipment. Here, the question is if the construction status amounts to breach. To breach, there must be "an unjustified failure to timely perform all or any part of what is promised therein." *Kappes*, 2022 WY 82, ¶ 17, 512 P.3d at 36. Crypto Infiniti's concerns about the lack of construction are valid to construe whether it acted "promptly" in shipping the equipment. However, concerns do not amount to a breach when Mo Pow 3 had no present obligation to perform.

The First Agreement did not require construction before shipment, nor require the funds specifically be used for preparing the site. Pursuant to the First Agreement, Mo Pow 3 was required to test, install, and begin providing managed services within 30 days of receiving the equipment. (ECF No. 57-1, at 3–4). It never received the equipment and therefore never had an opportunity to breach those provisions.

The circumstances here are best illustrated in the Restatement (Second) of Contracts § 234. It provides:

> (1) Where all or part of the performances to be exchanged under an exchange of promises can be rendered simultaneously, they are to that extent due simultaneously, unless the language or the circumstances indicate the contrary.
> (2) Except to the extent stated in Subsection (1), where the performance of only one party under such an exchange requires a period of time, his performance is due at an earlier time than that of the other party, unless the language or the circumstances indicate the contrary.

*Id.* In layman's terms, simultaneous performance of obligations in a contract is the standard, unless the circumstances or contract obligations require otherwise. While this provision has not been considered by the Wyoming Supreme Court, it often applies and cites to the Restatement (Second) of Contracts in its decisions. Additionally, surrounding states have cited to this provision. *See Ideal Family and Youth Ranch v. Whestine*, 655 P.2d 429, 430 (Colo. App. 1982); *PDQ Lube Center, Inc. v. Huber*, 949 P.2d 792, 798–99 (Utah Ct. App. 1997); *International Ass'n of Firefighters Local 1596 v. City of Lawrence*, 798 P.2d 960, 969 (Kan. Ct. App. 1990) ("Centuries ago, the principle became settled that where work is to be done by one party and payment is to be made by the other, the

performance of the work must precede payment, in the absence of a showing of a contrary intention.").[7]

At the pleading stage, the Court stated Crypto Infiniti's obligation to ship the equipment could be a condition precedent. (ECF No. 33, at 4–5). After further development of the case, it is clear that there was no condition precedent to the contract. Rather, the First Agreement is one "where different periods are fixed within which each party is to perform." Restatement (Second) of Contracts § 234 comment b. The First Agreement could not be performed simultaneously. Mo Pow 3 required the equipment before it could offer any managed services and the First Agreement provided Mo Pow 3 with 30 days to begin offering managed services after receipt of the equipment.

"The rule stated in Subsection (2) usually finds its application to contracts involving services, such as construction." § 234 comment f. The restatement further explains:

> Where the performance of one party requires a period of time and the performance of the other party does not, their performance can not be simultaneous. Since one of the parties must perform first, he must forego the security that a requirement of simultaneous performance affords against disappointment of his expectation of an exchange of performances, and he must bear the burden of financing the other party before the latter has performed.

§ 234 comment e. Accordingly, Mo Pow 3 could not breach its duties under the First Agreement before receipt of the equipment. After receipt, Mo Pow 3 would have 30 days

---

[7] Wyoming has cited to an earlier version of § 234. *McHale v. Goshen Ditch Co.*, 52 P.2d 678, 681 (Wyo. 1935) (citing to Restatement (First) of Contracts § 269). Section 269 provides "[i]f in promises for an agreed exchange different times are fixed for respective performances of the parties it is just to require the performance for which the earlier date is fixed to be performed before performance on the other side. Performance at the precise time stated in the contract is not a condition precedent under this rule, but performance at some time before the other performance for which a later time was fixed is a condition." In *McHale*, the Court recognizes that in certain contracts there are duties that must be performed before corresponding duties are due. *McHale*, 52 P.2d at 681.

to begin providing managed services before a breach would occur—a chance it never had. *See McHale*, 52 P.2d at 681 (recognizing in certain contracts one duty must be fulfilled before the other).

### No Breach of the Implied Covenant of Good Faith and Fair Dealing Under the First Agreement

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Scherer Const., LLC v. Hedquist Const., Inc.*, 2001 WY 23, ¶ 18, 18 P.3d 645, 653 (Wyo. 2001) (quoting Restatement (Second) of Contracts § 205). A breach of "[t]he implied covenant of good faith and fair dealing is a claim separate and distinct from a breach of contract claim, and the two claims are not mutually dependent. Thus, a party may breach the implied covenant of good faith and fair dealing even if it did not breach the express terms of a contract." *Bear Peak Resources, LLC v. Peak Powder River Resources, LLC*, 2017 WY 124, ¶ 68, 403 P.3d 1033, 1054 (Wyo. 2017) (internal citations omitted).

"A breach of the covenant of good faith and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance." *Scherer*, 2001 WY at ¶ 19, 18 P.3d at 653. A court should consider the contract language and the course of dealings of the contracting parties in determining whether there has been a breach. *Id.* "The covenant of good faith and fair dealing may not, however, be construed to establish new, independent rights or duties not agreed on between the parties." *Id.* The obligation must either arise from the contract language or be indispensable to effectuate the intention of the parties. *Id.* Absent self-dealing or a breach of the community standards of decency, fairness, or

18

reasonableness, exercising contractual rights alone will not be considered a breach. *Id.* at ¶ 19, 18 P.3d at 654. Determining whether there has been a breach requires a factual inquiry into the contract and what the parties have agreed upon. *Id.*

The undisputed record shows there was no breach of the implied covenant of good faith and fair dealing under the First Agreement. Plaintiffs did not move for summary judgment on its breach of the implied covenant of good faith and fair dealing. (ECF No. 59, at 11 n.3). Nevertheless, the theory for breach of the covenant of good faith and fair dealing was that the two agreements were meant to act together "to leverage economies of scale." (ECF No. 7, at 8). As discussed in detail above, the agreements did not incorporate each other to the extent where the performance of one necessitated the performance of the other. Accordingly, there is no breach of the covenant of good faith and fair dealing under that theory. The Court will also find that the fact the equipment was not shipped does not constitute a breach of the covenant of good faith and fair dealing. (ECF No. 59, at 11). The Court's determination of what "promptly" means under the First Agreement, negates this argument as breakdown in communication needed to be rectified before performance became due.

Similarly, Crypto Infiniti's claim for breach of the covenant and good faith and fair dealing fails. The deteriorated communication between the parties was not unilateral and Mo Pow 3 was not required to use the payments in any specific manner. Even if it was, Mo Pow 3 provided bills of lading for materials it secured to construct the site upon receipt of the equipment. Mo Pow 3 further could not provide any services under the First Agreement until it received the equipment from Crypto Infiniti. In any event, Mo Pow 3 ultimately

breached the First Agreement as discussed below, providing Crypto Infiniti the relief it seeks.

### Termination of the First Agreement

After the present litigation ensued, Mo Pow 3 sent a letter to counsel for Crypto Infiniti on October 12, 2022. (ECF No. 35-11). That letter contained an updated shipping address and an invoice demanding payment within five days pursuant to Section 2.5 of the First Agreement. *Id.* Another letter was sent on October 17, 2022, stating Mo Pow 3 had not received payment and it would terminate the First Agreement if payment was not received by October 27, 2022, pursuant to section 3.3(B) of the First Agreement. (ECF No. 35-12). Crypto Infiniti never sent any payment and Mo Pow 3 terminated the First Agreement on October 28, 2022. (ECF No. 35-13). This was a fatal mistake on Mo Pow 3's part.

First, the termination was not proper under the First Agreement. Section 3.3 of the First Agreement provides:

> Host may immediately terminate this Agreement by written notice if Client fails to pay any sum for Managed Services when such payment is due (and such failure remains uncured for a period of ten (10) calendar days).

(ECF No. 51-1, at 10). Mo Pow 3 did provide an invoice for payment of managed serviced in the October 12, 2022, letter, but the managed services portion of the agreement never commenced. As Mo Pow 3 correctly states in its Motion for Summary Judgment, "MO POW 3's duty to provide Managed Services can only begin on the later of 30 days after receiving equipment or the date in Exhibit A." (ECF No. 51, at 14–15).

Section 1.1(B)(3) of the First Agreement states the commencement date for managed services does not begin until 30 days after receipt of equipment or a date agreed to in Exhibit A. (ECF No. 51-1, at 4). The section of the First Agreement Mo Pow 3 sent its invoice, section 2.5, was part of the managed services portion of the First Agreement. *Id.* At 8. Those obligations and rights are only triggered upon the commencement date. Because the commencement date never occurred, Mo Pow 3 had no right to terminate the First Agreement.[8] The unjustified termination of the agreement is assuredly a breach. *See Kappes*, 2022 WY 82, ¶ 17, 512 P.3d at 36. Thus, Crypto Infiniti is entitled to damages.

### Damages

In its Motion for Summary Judgment, Crypto Infiniti seeks a return of its payments plus interest, damages for lost profits, and other damages. Lost profits are unrecoverable under the First Agreement. Section 5.3(B) affords Mo Pow 3 limitations on liability, including lost profits. (ECF No. 51-1, at 15). The Court finds no reason not to enforce that provision in these circumstances.

While there is no direct Wyoming decision on this issue that the Court is aware of, Wyoming caselaw is well defined as to waivers of liability for negligence—a more stringent standard. In those circumstances, a waiver is enforceable if it does not contravene public policy. *Massengill v. S.M.A.R.T. Sports Medicine Clinic, P.C.*, 996 P.2d 1132, 1136 (Wyo. 2000). To determine if a liability waiver violates public policy, a court considers four factors:

---

[8] The First Agreement also provided it could be terminated for any material breach. (ECF No. 51-1, at 9). However, as explained in detail above, there was no material breach of the First Agreement.

> (1) whether a duty to the public exists; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language.

*Id.* (quoting *Schutkowski v. Carey*, 725 P.2d 1057, 1060 (Wyo. 1986)). Here, there was no duty to the public, it was a commercial agreement that was fairly bargained for, and the waiver is clearly expressed in all caps. Accordingly, all factors weigh in favor of enforcing the clause. The Wyoming Supreme Court has similarly enforced releases when those releases are part of a valid contract. *Hall v. Perry*, 2009 WY 83, ¶ 9, 211 P.2d 489, 493 (Wyo. 2009) (citing to *Massengill* when stating releases and exculpatory clauses are treated as contracts).

As to interest, Crypto Infiniti cites to section 2.8(B) of the First Agreement. (ECF No. 53, at 3). The provision, however, is only triggered if Mo Pow 3 does not provide managed services by the commencement date. (ECF No. 51-1, at 9). As explained above, the commencement date was never initiated because there was never a receipt of equipment. Crypto Infiniti does not dispute the commencement date was never triggered. (ECF No. 58, at 11). Therefore, Crypto Infiniti is not entitled to interest under that provision.

At this juncture, the proper measure of damages for Mo Pow 3's breach of the First Agreement is unclear to the Court based upon the present briefing. At a minimum, it would appear that Crypto Infiniti is entitled to a full return of its down payment for managed services and a partial repayment for its rate buy down payment because it also relates to the Second Agreement. However, other outstanding damages may exist as a result of Mo Pow 3's breach. Accordingly, the parties shall further brief this issue with the Court.

**BREACH OF CONTRACT – SECOND AGREEMENT**

The circumstances surrounding the Second Agreement present a much simpler review. Mo Pow 4 asserts Crypto Infiniti breached the Second Agreement because it never made the $3,066,000 down payment required. (ECF No. 51, at 10). Crypto Infiniti argues that Mo Pow 4 either waived its right to payment or that it repudiated the Second Agreement by filing this lawsuit. (ECF No. 53, at 10–11); (ECF No. 58, at 10–13).

"A party to a contract may waive its rights provided in the contract if the following elements exist: (1) there is an existing right provided by the contract; (2) the waiving party has knowledge of that right; and (3) the waiving party has the intent to relinquish that right." *Rogers v. Wright*, 2016 WY 10, ¶ 43, 366 P.3d 1264, 1277–78 (Wyo. 2016). The material facts regarding waiver are not in dispute and is therefore appropriate for summary judgement. *Scherer v. Schuler Custom Homes Constr., Inc.*, 2004 WY 109, ¶ 15, 98 P.3d 159, 163 (Wyo. 2004) (applying de novo review to a finding of waiver when the material facts are not in dispute).

Crypto Infiniti's argument for waiver hinges on a text conversation between Mr. Guel and Ms. Zhang on June 29, 2022. (ECF No. 58, at 8). The conversation began by Ms. Zhang stating Crypto Infiniti was planning to send the down payment for the Second Agreement, but wished to do so through escrow. (ECF No. 59, at 3). Mr. Guel unequivocally denied that request because he "didn't have to."[9] *Id.* At 4. In that same text, Mr. Guel stated "[d]o not send any money until we are on the same page." *Id.* However,

---

[9] The Court agrees that Crypto Infiniti had no right to require payment through escrow under the Second Agreement.

the waiver issue need not be fully decided because Crypto Infiniti subsequently breached the Second Agreement.

To the extent any waiver occurred, which this Court will not determine, in no way was there a waiver of Crypto Infiniti's required down payment for managed services at some point. It is clear through Mr. Guel and Ms. Zhang's conversation that Mr. Guel still expected payment at some point, just not through escrow. Five days before the text conversation, on June 24, 2022, Mo Pow 4's counsel sent a letter to Crypto Infiniti stating Crypto Infiniti's failure to pay the initial down payment for the Second Agreement provided Mo Pow 4 with grounds for termination after June 6, 2022. (ECF No. 35-7). Without waiving its right to termination, Mo Pow 4 still sought to foster a long-term relationship with Crypto Infiniti. *Id.* This, the Court can only assume, is what prompted the text conversation between Mr. Guel and Ms. Zhang.

Crypto Infiniti's breach came six days after the text conversation on July 5, 2022. (ECF No. 35-9). On that date, Crypto Infiniti's counsel sent a letter to Mo Pow 4 stating:

> We understand from your letter dated June 25th,[10] 2022 that you intend to terminate the MP 4 Agreement on the grounds for termination cited by you in such letter, and we hereby accept your notice of termination for the MP 4 Agreement.

(ECF No. 35-9). In no way could the June 24, 2022, letter be construed as a termination. It did lay out that Crypto Infiniti was in breach of the Second Agreement, but that Mo Pow 4

---

[10] The letter states "letter dated June 25th, 2022," however, the "25th" is a typo meant to reference the June 24th, 2022, letter. Crypto Infiniti's Answer clarifies this discrepancy as it references the letter as an exhibit when stating "On July 5, 2022, Crypto Infiniti's counsel sent a letter to Mr. Guel informing him that Crypto Infiniti accepted Mr. Guel's previous notice of right to terminate on June 24, 2022, regarding the Second Contract with MO POW 4." (ECF No. 35, at 6).

wished to "foster a long-term, productive, and profitable relationship" without waiver of any rights. (ECF No. 35-7). Bolstering that is Ms. Zhang's text to Mr. Guel on June 29, 2022, stating she wished to make the payment through escrow. (ECF No. 59, at 3). Then, Crypto Infiniti turned face on July 5, 2022, stating it accepted the termination. (ECF No. 35-9). A far different position than it had six days earlier attempting to make payment under the Second Agreement.

The July 5, 2022, letter is a clear "manifestation by one party to the other that the first cannot or will not perform at least some of its obligations under the contract." *Roussalis v. Wyoming Medical Center, Inc.*, 4 P.3d 209, 254 (Wyo. 2000) (quoting Allan Farnsworth, Farnsworth on Contracts § 8.20, at 470 (1990)). It is a total breach as Crypto Infiniti states it is terminating the Second Agreement. Even assuming the June 24, 2022, letter did terminate the Second Agreement, it was for Crypto Infiniti's breach of not paying the managed services down payment when due. Crypto Infiniti has never denied its failure to make the payment. (ECF No. 53, at 10). The down payment for managed services was due and payable to Mo Pow 4 on the day the Second Agreement was signed. (ECF No. 51-2, at 7, 20). A failure to pay provided Mo pow 4 with grounds for termination on June 6, 2022, pursuant to section 3.3(B). *Id.* at 9.

In each scenario Crypto Infiniti is in breach because it is either unjustifiably terminating the Second Agreement in the first, or accepting and admitting its breach in the second. Accordingly, Mo Pow 4 is entitled to damages. The amount of those damages remains uncertain to the Court. It would appear Mo Pow 4 is entitled to damages in the amount of the down payment for managed services, but no term in the First Agreement

calls for that amount as liquidated damages. "In an action for breach of contract, the plaintiff is entitled to such damages as would put him in the same position as if the contract had been performed, less proper deductions." *Stone v. Devon Energy Prod. Co., L.P.*, 2008 WY 49, ¶ 24, 181 P.3d 936, 944 (Wyo. 2008). Further, "[c]ontract damages, like tort damages, are intended to compensate the plaintiff for his loss. Accordingly, where the plaintiff has suffered no loss, there are no damages." *Id.* (internal citations omitted). It is unclear to the Court if all or part of the payment would result in profit to Mo Pow 4. As a result, more briefing is needed to determine damages.

### No Breach of the Implied Covenant of Good Faith and Fair Dealing Under the Second Agreement

The undisputed record shows that Mo Pow 4 did not breach the implied covenant of good faith and fair dealing under the Second Agreement. The reason being that Crypto Infiniti never made a payment under the Second Agreement. If there was any breach of the covenant of good faith and fair dealing under the Second Agreement, it was Crypto Infiniti that breached. Crypto Infiniti did not make any payment, when payment was untimely offered it was conditioned on escrow, and it subsequently terminated the agreement. Those facts ultimately show that Crypto Infiniti conditioned its performance of the Second Agreement on what it deemed proper performance of the First Agreement.

### CONCLUSION

The tumultuous relationship between Mo Pow 3, Mo Pow 4, and Crypto Infiniti resulted in breaches on both sides. Mo Pow 3 breached the First Agreement by unjustifiably terminating it after the litigation ensued. Similarly, Crypto Infiniti unjustifiably terminated

the Second Agreement with its July 5, 2022, letter. The Court will set a status conference to schedule briefing on the remaining issue of damages.

NOW, THEREFORE, IT IS ORDERED Plaintiffs' Motion for Summary Judgment is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED Defendant's Motion for Summary Judgement is GRANTED in part and DENIED in part.

Dated this 20th day of February, 2024.

Kelly H. Rankin
United States Magistrate Judge