Matthew D. Kaufman, WSB #6-3960
Tyler J. Garrett, WSB #6-4400
Melissa K. Burke, WSB #7-5694
Kari Hartman, WSB #8-6507
HATHAWAY & KUNZ, LLP
P. O. Box 1208
Cheyenne, WY 82003-1208
(307) 634-7723
(307) 634-0985 (fax)
mkaufman@hkwyolaw.com
tgarrett@hkwyolaw.com
mburke@hkwyolaw.com
khartman@hkwyolaw.com

ATTORNEYS FOR DEFENDANT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| MO POW 3, LLC and MO POW 4, LLC, | ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. 1:22-CV-00155-KHR |
| CRYPTO INFINITI LLC, | ) ) | |
| Defendant. | ) ) | |

---

## CRYPTO INFINITI'S MOTION TO STRIKE
## MO POW 4 LLC'S EXPERT DAVID HALL

---

Defendant Crypto Infiniti LLC ("Crypto Infiniti"), by and through its counsel, HATHAWAY & KUNZ, LLP, hereby submits this *Motion* to strike MO POW 4 LLC's ("Mo 4") expert, David Hall.

### BACKGROUND

Mo 4 filed a motion for summary judgment on December 13, 2023. ECF No. 51. Mo 4's theory of liability and damages was that Crypto Infiniti breached the Second Agreement between the parties by failing to make the down payment, thus "damaging Mo [] 4 in the amount of

$3,066,000." *Id.* at 8-10. This Court entered an order finding that Crypto Infiniti breached the Second Agreement by sending a letter to Mo 4 accepting termination of the Second Agreement because Mo 4's prior communications could not be construed as a termination and even if the prior communication was a termination, Crypto Infiniti failed to make the down payment when due. ECF No. 64 at 24-25. The Court found that Mo 4's damages were uncertain at that point, noting no term in the Agreement called for the $3,066,000 amount as a liquidated damage and it was unclear if that payment would result in a profit, as opposed to compensation. *Id.* at 25-26.

After the parties submitted their briefing on damages, the Court entered its order and acknowledged that Mo 4 solely argued the measure for its damages was the down payment amounting to $3,066,000. ECF No. 79 at 5-6. However, the Court found that Mo 4 was seeking expectation damages and there was insufficient information to determine such. *Id.* at 6-7. Then, on its own initiative, the Court offered Mo 4 the opportunity to retain an expert. *Id.* at 7.

Mo 4 eventually designated David Hall on October 11, 2024, and sought a damage amount higher than it ever claimed before. *See* ECF No. 91-1. Mr. Hall opined that Mo 4 is supposedly entitled to $5,374,000 in lost profits, basing his calculations on a Texas site, despite the bargained-for location being Missouri. *Id.* at 7-13. Because Mr. Hall relies upon a wholly different and irrelevant site to inflate Mo 4's damages, his entire calculation is not based on a reliable methodology reliably applied to the facts of the case. Furthermore, Mr. Hall relies upon documents and information related to the Texas site that were not timely disclosed in Plaintiffs' initial disclosures or during the discovery phase; consequently, Mr. Hall cannot rely upon these documents as a matter of law. *See id.* at 19, 21. Finally, Mr. Hall's opinions fail to consider various terms of the Second Agreement, additional costs, and rate variances which impact his calculations. Ultimately, this Court must strike Mr. Hall as an expert in this matter.

## LEGAL STANDARD

Expert testimony is governed by Rule 702 of the Federal Rules of Evidence. The Court is no doubt well versed with this rule, which states:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Rule imposes a gatekeeper obligation on the district courts. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003). "The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 of the Federal Rules of Evidence by a preponderance of the evidence." *Becerra v. Schultz*, 499 F. Supp. 3d 1142, 1146 (D. Wyo. 2020) (citing *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592 (1993)).

"Relevant expert testimony must 'logically advance a material aspect of the case,' ... and be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Id.* at 1149 (quoting *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011). An inference or assertion must be supported by good grounds, as opposed to conjecture or speculation. *Addleman v. Keller Transp., Inc.*, 2014 WL 10222535, at 2 (D. Wyo. Nov. 18, 2014) (citing *Dodge,* 328 F.3d at 1222). "[A]ny step that renders the analysis unreliable … renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Dodge*, 328 F.3d at 1222 (quoting *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 782 (10th Cir. 1999)). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

**ARGUMENT**

Mr. Hall's expert opinions will not assist the Court (sitting as the trier of fact) in resolving any question of damages because his conclusions are not based on sufficient facts or data, and his methodology is not reliable. Therefore, the Court should strike Mr. Hall from this matter.

A.     *Mr. Hall's opinions are not based on sufficient facts or data.*

The Second Agreement between Mo 4 and Crypto Infiniti identifies the location of the bitcoin mining site as Strafford, Missouri. ECF No. 1-2 at 2. Yet, Mr. Hall uses a location in Odessa, Texas for all his calculations regarding lost profits. ECF No. 91-1 at 7.[1] He has no factual basis for his reliance on the Texas location. Indeed, the only reason to use such a location is to allow Mo 4 to inflate its purported damages.

The Second Agreement does permit relocation of the facility upon 30 days' prior written notice and cooperation to facilitate relocation if necessary or desirable for efficient use of the facility. ECF No. 1-2 at p. 5, § 1.3(A)(8)(i). However, Mr. Hall concedes that no notice of relocation was given to Crypto Infiniti while implying that notice was not required because of Crypto Infiniti's breach of contract and failure to pay, a legal conclusion that he is not qualified to reach, and which is impermissible for expert testimony. ECF No. 91-1 at 7; *Broderick v. State Farm Fire & Cas. Co.*, No. 23-CV-00147-KHR, 2024 WL 4525182, at *4 (D. Wyo. Aug. 9, 2024) (court can strike an expert for stating legal conclusions). The Second Agreement does not permit Mo 4 to unilaterally relocate the facilities for Crypto Infiniti without a basis for relocation, notice, and cooperation with Crypto Infiniti. Indeed, it is unclear why Mo 4 would have needed to relocate Crypto Infiniti's facilities, what purported steps it took to secure a location in Texas pre-execution

---

[1] Mr. Hall includes a footnote that states the site he relies upon was only 14 miles from the planned Mo 4 site and would have been in the same load zone. ECF No. 91-1 at p. 7 n. 12. This is misleading because it appears he is referring to the site in Texas, not the planned site in Missouri, as Missouri is clearly not 14 miles away from Texas.

of the Second Agreement, or whether it would have been sufficient to service Crypto Infiniti as referenced in Mr. Hall's report because he does not provide any basis for these statements. ECF No. 91-1 at 7.

Mr. Hall likewise has an insufficient basis for his opinions because of Mo 4's failure to properly disclose the documents he relies upon as part of the discovery process. Under Rule 26(a)(1) of the Federal Rules of Civil Procedure, Mo 4 was required to provide Crypto Infiniti (without a discovery request) with a copy or description of all documents that it might use to support its claims or defenses and a computation of damages. Mo 4 never supplemented their initial disclosures to include any of the documents that its expert relies upon and which it is using to support its damages claim, nor did it provide a calculation of damages for lost profits.

While Mo 4 attempted to supplement its document production in response to prior requests for production well after the discovery period closed, this is insufficient. *See Willmore v. Savvas Learning Co. LLC*, 344 F.R.D. 546, 563-64 (D. Kan. 2023) (litigant attempted to rely upon documents to prove her claims but did not provide them in her initial disclosures and only produced photos of them in response to a document request, but the court found this was insufficient because discovering information in response to a request for production is not the same as discovering the opposing party intends to rely on that information in support of its claim). Crypto Infiniti had no notice that Mo 4 was going to seek such inflated damages since Mo 4 was only seeking the down payment initially, let alone notice that it was going to rely upon unproduced documents to support its damages claim. *See* ECF No. 51 at 10. Further, Mo 4's supplemental production in response to requests for production was after the discovery period had already come and passed. *See* ECF No. 40 at 7. Because Mo 4 did not properly disclose these documents, its expert, Mr. Hall, cannot now

rely upon them to support Mo 4's damages claim. As such, Mr. Hall's conclusions have no underlying basis in fact or data.

B.    *Mr. Hall's opinions are not reliable.*

The importance of the use of the Texas location, instead of Missouri, is primarily the difference in electrical rates which impacts Mo 4's newfound lost profits calculation. Mr. Hall uses the electrical rates for the Texas site which vary from $ .0434 to $ .0456 per kW/h. ECF No. 91-1 at 16.[2] These rates are based on an average of the electricity rates for the Texas site over 13 billing periods. *Id.* at 19. However, the industrial electrical rates charged by City Utilities of Springfield, Missouri (which services Strafford) is $ .0739 per kW/h. ECF No. 95-1 at 11-12. Even assuming Mo 4 could have negotiated the Missouri rates down still yields a higher rate than that which Mr. Hall utilizes. *See id.*

Mr. Hall's opinions are not reliable because his methodology is flawed in that he uses the wrong electrical rates for his calculations, which improperly inflates the entire lost profits calculation. His use of the Texas electrical rates is based on a flawed assumption that those rates would apply to the Crypto Infiniti site with no underlying support. Failure to consider other rates and provide a valid basis for his use of the Texas electrical rates renders his methodology unreliable. *See Jones v. Novartis Pharmaceuticals Corp*., 235 F. Supp. 3d 1244, 1281-82 (N.D. Ala. 2017) (finding that an expert's reliance on a background rate that he failed to substantiate and his failure to explain why he did not review other rates calls the admissibility of his opinions into question).

---

[2] Interestingly, Mr. Hall uses the effective kilowatt hour from the Second Agreement to reach his calculations regarding lost revenue, but then uses electricity rates from the Texas site for his calculations of costs. ECF No. 91-1 at pp. 8, 16, 19. Further, he purports to take an average of the electricity rates from the Texas site, but then uses a different rate than the average for his calculation of costs for the last year. *Id.* at 16, 19.

To further skew the electricity calculations in Mo 4's favor, Mr. Hall also fails to conduct an analysis for his estimate of "uptime" or the time when the bitcoin mining equipment would be operational. Mr. Hall estimates 95% uptime presumably because the Second Agreement requires it, but he provides no actual basis for that number and fails to consider that the equipment may not have been able to achieve that rate of uptime. ECF No. 91-1 at 16; ECF No. 1-2 at 4. There is no consideration of temperature or other factors that could impact the ability of the equipment to remain operational at that rate of time, especially in the climate in Missouri (or hotter climate in Texas, as Mr. Hall has unilaterally chosen to use for his calculations). The estimate of uptime impacts the managed services fee estimate because electrical usage is a factor that is considered per the Second Agreement. ECF No. 1-2 at 21.

Mr. Hall's methodology is also flawed in that he fails to consider reductions in managed services fees that are explicitly provided for in the Second Agreement, which benefit Crypto Infiniti, not Mo 4. The Second Agreement contemplates that there will be circumstances where part or all of Crypto Infiniti's equipment will not be utilizing Mo 4's managed services and provides for a minimum managed services fee. ECF No. 1-2 at p. 7, § 2.3(A). There are circumstances where bitcoin mining is not profitable, and Crypto Infiniti may have chosen to shut down some or all its machines to avoid costs when bitcoin rates are down or when temperatures are too high to operate efficiently. Indeed, the Second Agreement provides that if the rate for bitcoin falls below $20,000 for more than 30 consecutive calendar days, Mo 4 must reduce its minimum managed service fees by 50% until the rate exceeds $20,000. *Id.* at § 2.3(B).[3] Nowhere in Mr. Hall's report does he conduct an analysis regarding adverse market conditions, the possibility that Crypto Infiniti may shut down its equipment under any circumstance, and the

---

[3] The price of Bitcoin fell below $20,000 from November 8, 2022 to January 13, 2023. https://finance.yahoo.com/quote/BTC-USD/history/.

resulting reduction of managed services fees. *See generally* ECF No. 91-1. The managed services fee calculations should have been reduced and Mr. Hall's failure to even consider the adverse market conditions and downtime as required by the Second Agreement renders his methodology unreliable.

Finally, Mr. Hall's methodology is unreliable because he fails to properly account for various costs when computing purported lost profits. As noted *supra*, the Second Agreement requires Mo 4 to provide an uptime rate of 95%. ECF No. 1-2 at 4. However, Mr. Hall fails to conduct an analysis of the climates where the facilities would be operating and the costs of cooling. *See generally* ECF No. 91-1. His discount rate calculation to account for investment risk is likewise unreliable because he uses a yield rate that is too low, he fails to explain the basis for this rate, and the rate he uses contradicts the rate that is recommended to be used in the publication where his data comes from (the Navigator). ECF No. 91-1 at 20; ECF No. 95-1 at 20-25. The premiums he uses to compute the discount rate are also unreliable because he did not use companies that are actually comparable to Mo 4 and he did not use data directly related to Mo 4. *Id.* The numerous flaws in Mr. Hall's methodology render his opinions unreliable and inadmissible.

## CONCLUSION

Mr. Hall's skewed and inflated lost profits calculation which is based on the improper physical location of the facilities, documents that were not properly produced, and flawed methodology that fails to consider the proper electrical rates, additional costs, the proper discount rate for investment risk, adverse market conditions, and downtime of operations must be excluded. Crypto Infiniti respectfully requests this Court strike Mo 4's expert.

DATED this 30th day of December 2024.

HATHAWAY & KUNZ, LLP,

By: */s/   Tyler Garrett*_____
    Matthew D. Kaufman, WSB #6-3960
    Tyler J. Garrett, WSB #6-4400
    Melissa K. Burke, WSB #7-5694
    Kari Hartman, WSB #8-6507
    Hathaway & Kunz, LLP
    2515 Warren Ave. Ste 500
    P.O. Box 1208
    Cheyenne, WY 82003
    Phone:  307-634-7723
    Fax:  307-634-0985

    ATTORNEYS FOR DEFENDANT

## **CERTIFICATE OF SERVICE**

This is to certify that on the 30th day of December 2024, a true and correct copy of the foregoing was served upon counsel as follows:

Jeffrey S. Pope            [ ✓ ] CM/ECF/Electronic Filing
Kasey J. Schlueter        [   ] U.S. Mail
Holland & Hart, LLP     [   ] Fax:
2020 Carey Ave Suite 800  [   ] E-mail
P.O. Box 1347
Cheyenne, WY 82003-1347

    */s/ Hayley Wheeler*_____
    Hathaway & Kunz, LLP

MOTION TO STRIKE DAVID HALL
9
