Jeffrey S. Pope (Wyo. State Bar # 7-4859)
Kasey J. Schlueter (Wyo. State Bar # 8-6521)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
JSPope@hollandhart.com
KJSchlueter@hollandhart.com

ATTORNEYS FOR PLAINTIFFS/COUNTER DEFENDANTS
MO POW 3, LLC AND MO POW 4, LLC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| MO POW 3, LLC and MO POW 4, LLC,<br><br>Plaintiffs/Counter Defendants,<br><br>v.<br><br>CRYPTO INFINITI LLC,<br><br>Defendant/Counter Claimant. | Civil Action No. 1:22-CV-155-KHR |

**PLAINTIFFS/COUNTER DEFENDANTS' WITNESS STATEMENT OF EXPERT DAVID HALL**

1. My name is David A. Hall, and I am a Managing Director in the Denver office of Alvarez & Marsal Disputes & Investigations, LLC ("A&M"), and my qualifications to provide expert opinions on lost profits damages include:

   - I have a Master of Business Administration (MBA) degree from the University of Texas and a Bachelor of Arts degree from the University of Michigan.

   - I am a Certified Management Accountant (CMA), a Certified Valuation Analyst (CVA), and a Certified Fraud Examiner (CFE).

   - I have over 35 years of experience analyzing the financial performance of companies in different industries, and I have extensive experience both preparing and evaluating lost profits damage claims.

   - I have testified as a damages and business valuation expert 60 times in U.S. and Canadian courts and U.S. arbitrations.  Many of these testimonies involved lost profits damages.  My resume is Exhibit 2 and my testimonies for the last four years is Exhibit 3.

2. I was retained by Holland & Hart ("Counsel") on behalf of Mo Pow 3, LLC and Mo Pow 4, LLC ("MO 3 & 4") to provide my opinion on MO 4's lost profit damages. My hourly billing rate on this matter is $725. Neither mine nor A&M's compensation is contingent upon the outcome of this litigation.

3. My testimony in this matter relates to the Court's Order for Experts and Further Briefing which stated "Courts are not in the business of guessing damages. Rather, courts are tasked to put a nonbreaching party in the position they would be in had there been no breach." MO 4 is seeking its expectation damages which the Court stated "provides that the injured party has a right to damages based on his expectation interest as measured by:

   a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus

   b) any other loss, including incidental or consequential loss, caused by the breach, less

   c) any cost or other loss that he has avoided by not having to perform."

4. The "loss in the value" to MO 4 is reasonably measured as the profits MO 4 would have earned but for Infiniti's breach of the Second Agreement— MO 4's lost profits.

**Summary of Opinions**

5. I have reasonably estimated MO 4's lost profits from Infiniti's breach of the Second Agreement are $5,374,000 for the three-years August 1, 2022 through July 31, 2025.[1] I have read and analyzed Don Drysdale's (Infiniti's damage expert) expert report and have incorporated two of his critiques to show the impact of his critiques to my lost profits calculation and incorporating his critiques yields damages of $4,650,000.[2]

---

[1] See Exhibits 4-8. I prepared Exhibits 2-14A and they accurately reflect my work in this case.

[2] *See* Exhibits 9 and 9A. This calculation accounts for 67 consecutive days that the price of Bitcoin was below $20,000 and Mr. Drysdale's 24% discount rate.

6. To calculate MO 4's lost profits, I used the *incremental* profit method which is widely-used and measures what profits MO 4 would have earned on the revenue that it would have achieved absent Infiniti's breach. Incremental profits are lost revenues less avoided costs—the costs that MO 4 would have incurred but did not (thus the term "avoided costs"), had it earned the revenue lost as the result of Infiniti's breach. Mr. Drysdale did not criticize my method for calculating lost profits.

**Move to Texas Plan for MO 3 & 4**

7. In my October 11, 2024 report, I described that MO 3 & 4 planned to co-locate 35.0 MW of digital mining equipment and provide its hosting services for MO 4 in Texas. It had taken steps to secure a location in Texas prior to the execution of the Infiniti hosting agreements and made a decision to move MO 3 & 4 immediately after execution on May 26, 2022. Mr. Tom Guel stated to me that he did not give notice of its intention to move MO 3 & 4 because of Infiniti's breach and failure to pay. He said that the Texas site would have been located at 2501 S Grandview Ave, Odessa, Texas 79766 (the "Alternative Site"). This site is large enough to host both MO 3 & 4.

8. MO 3 & 4 believes it has the contractual right to relocate the Infiniti equipment from the original Host Facility to an alternative site pursuant. I do not have a legal opinion on that belief but note the following in the Second Agreement.:

   "If it is necessary or desirable for Host's efficient use of the Facility to relocate the Client Equipment or Client Space to another area of the Facility or another Host Facility, Host shall provide Client thirty (30) days prior written notice of Host's intention to relocate Client Equipment or Client Space and following expiration of the thirty (30) day notice period the Parties shall cooperate in good faith to facilitate such relocation within a reasonable time . . . ."

9. Mr. Guel has experience building and operating sites in Texas, such as TX POW 1. Mr. Guel informed me that electricity cost would have been lower in Texas than in Missouri and that to achieve the highest profit they could reasonably earn, he would move a customer's equipment to a Texas site including the Infinity equipment. This

3

is a strong economic motive to move to lower cost Texas. He also indicated that he had the contractual clause above included in the Second Agreement.

10. Mr. Drysdale concluded that MO 4 would have lost money operating in Missouri. This supports that it is reasonable to conclude that MO 4 would have moved Infiniti site to Texas where electricity rates are lower and chances of earning profit are higher.

11. Mr. Guel, Managing Member of MO 3 & 4, estimated that the site would have taken three to six weeks to construct. The TX POW 1 site (14 miles away from planned MO 4 site) took 4 weeks to build.

**Lost Revenue**

<u>Hosting Revenue</u>

12. The Second Agreement describes the revenue MO 4 would generate from Infiniti and includes Hosting Revenue in the form of Managed Service Fees billed monthly for the three years from August 1, 2022 through July 2025. Part of the Hosting Revenue is a Down Payment of $3,066,000. This represents three months of estimated Managed Service Fees and was "due and payable as of the date on which [MO 4] and [Infiniti] have both executed an Order Form in the same or a substantially similar form included as Exhibit A." For my calculation, I assume that MO 4 would have received the $3,066,000 Down Payment in Year 1—August 1, 2022 through July 31, 2023.

13. The Second Agreement states "[MO 4] shall invoice [Infiniti] on a monthly basis for all Managed Services Fees as stated in this [Second] Agreement…" and includes a Managed Services Fees schedule which estimates $1,022,000 of monthly Managed Service Fee for August 2022 through July 2025. I model MO 4's Hosting Revenue based on 20.0 MW and an effective price of $0.07 per kWh. I assumed a 95% uptime for Infiniti Equipment, rather than 100% assumed in the Second Agreement's Managed Services Fees Schedule.

14. I calculated MO 4's Hosting Revenue as follows: Year 1 – $11,650,800, Year 2 – $11,650,800, and Year 3 – $8,738,100. See Damages Exhibits 4 and 4A, Line 1.

    Repair Revenue

15. MO 4 asserts that if Infiniti had not breached, it would have also earned repair revenue. I estimated MO 4's Repair Revenue based on the ratio of its Repair Revenue (named additional services revenue) to Hosting Revenue on its TX Pow 1's profit and loss statements ending December 31, 2023 and ending September 30, 2024. TX Pow 1's total Additional Services revenue of $345,778 is 7.65% of its Hosting Revenue. Applying 7.65% to MO 4's estimated Hosting Revenue yields an estimated Repair Revenue of $891,286 annually. See Exhibits 4 and 4A, Line 2.

16. In total, I estimate that MO 4 would have earned $37,779,559 of Hosting and Repair Revenue (including the Down Payment of $3,066,000) from August 2022 through July 2025. Damages Exhibit 4, Line 3.

**Incremental or Avoided Costs**

17. MO 4's costs to earn the $37.779 million of revenue I estimated are in three main categories—site buildout costs, electricity, and hosting service expenses.

    Site Electricity Expense

18. Electricity cost is the single highest cost to provide managed hosting services. MO 4 intended to provide hosting services to the Infiniti Equipment in Texas because the cost of electricity (termed the lowest cost of energy or LCOE) was significantly less in Texas due to more favorable electricity market regulations.

19. MO 4 identified a site in Odessa, Texas with more than 65.0 MW of electrical capacity – far more than the 20.0 MW required by the Infiniti Equipment. Mr. Guel informed me that through an affiliate company, they proposed an option to lease the Alternative Site in May 2022, and ultimately secured the Alternative Site in October 2022 with a fully executed lease. MO 4 asserts that the delay in executing the Alternative Site lease was caused by Infiniti's lack of performance on the Second

Agreement. The Alternative Site had an active, 24.0 MW substation with available electrical capacity required for the Second Agreement in addition to a second substation with 65.0 MW of electrical capacity.

20. I calculated MO 4's annual electricity expense based on 20.0 MW and an energy rate of $0.0434 kW per hour. I have assumed 95.0% uptime for the data center and used the average electricity rate for the TX Pow 1 site spanning August 2023 through September 2024. I received and reviewed 13 Pumpjack Power invoices billed to TX Pow I, LLC, a site located in Texas. The electricity rates relied upon for my estimation represent the average price paid for electricity in the specified billing period. Based on the invoices reviewed, MO 4's average electricity price per kWh was $0.0434. See Exhibit 5.

21. I applied this average rate to Years 1 and 2, assuming 730 hours in a month and 95.0% uptime. In Year 3, I increased the rate by 5.0%, resulting in a rate of $0.0456. See Exhibit 4A, Line 3. For the entire time period, I estimate that MO 4 would incur $22,031,663 in electricity costs from August 2022 through July 2025. See Exhibit 4, Line 4.

Site Buildout Expense

22. In order to build a site for Infiniti, MO 4 would have purchased mobile data units, pad mount transformers, and other hardware. For this site, MO 4 would have needed to purchase 10 mobile data units costing $290,000 per unit and 10 pad mount transformers, each costing $85,000. These site buildout costs: 10 x $290,000 = $2,900,000. And, 10 x $85,000 = $850.000. See Exhibit 4A, Lines 11 and 12.

23. In addition to these hardware expenses, MO 4 would have incurred construction costs to build the facility and hired a contractor to provide construction services. I have reviewed a Master Engineering, Construction, and Procurement Agreement relevant to a Texas site to estimate construction costs related to building the MO 4 site. This agreement stipulates a total contract price for an 8.0 MW site in Texas for $358,954,

$44,869 per MW. For this 20.0 MW site, the cost would be: 20 x $44,869 = $897,387 of construction costs to build the site. See Exhibit 4A, Line 13.

24. Adding the three components of the Site Buildout costs ($2,900,000 + $850,000 + $897,387 = yields $4,647,387). To be conservative (because I am adding costs and reducing profit), I added 10% of that amount (so 10% x $4,647,387 = $464,739) as Contingency to cover unexpected additional costs. 10% contingency amount is a conservative/high contingency percentage based on the relatively straightforward nature of construction project. $4,647,387 + $464,739 = $5,112,126 Total Site Buildout Expense. See Exhibit 4, Line 12.

Financing Expense

25. I also included a financing expense related to site buildout by assuming a $1,000,000 loan for Year 1 knowing that the $3.1 million deposit from Infiniti would be available. I calculate interest expense on the loan using an annual rate of 9%. I assume that MO 4 would have made monthly payments on the loan using Infiniti monthly payments, reducing the principal amount and interest expense over time. I calculate interest expense to be $45,000 in Year 1 (see Exhibit 4A, Line 14 and Exhibit 4, Line 13) and the loan paid off with cash flow generated by MO 4.

Hosting Services Expense

26. MO 4 would have also incurred Hosting Service expenses consisting of personnel, sales commissions, software, and other expenses.

27. For MO 4's other costs such as onsite technicians, internet & software, sales commission, alarm system, property lease, and trash expenses, I estimated all of these expenses using historical invoices and other information provided by MO 4. To account for inflation in Year 3, I applied an inflation factor of 5.0% to onsite technician, internet & software, alarm system, and trash expenses.

28. MO 4's Mr. Guel informed me that one onsite technician is required for every 8.0 to 12.0 MW of site capacity so I have assumed that two onsite technicians would have

7

been required for the 20.0 MW MO 4 site. To estimate MO 4's onsite technician expense, I reviewed an April 25, 2023 employment offer letter indicating that the annual salary for an onsite technician is $55,000. To account for other fringe benefits, I have assumed $15,000 (27.0% of salary) making the total cost per technician $70,000, thus resulting in total onsite technician expense of $427,000 from August 2022 through July 2025. See Exhibit 4, Line 6.

29. My estimate of MO 4's internet and software is based on invoices including: AT&T invoices for internet service at a comparable site, a Sonicwall Security invoice for a server and one year of software (initial fee of and an annual renewal fee), and Microsoft Azure invoices. I also included a cost estimate for Foreman Software based on its invoice provided by MO 4. In total, I estimate that MO 4's internet and software expenses would total approximately $160,000 from August 2022 through July 2025. See Exhibit 4, Line 7.

30. Mr. Guel stated that the industry standard is to pay 3.0% commission to account executives / leasing agents for hosting service revenues, so I multiplied hosting revenue by 3.0% in each of the three years. This 3.0% commission totals approximately $1,048,572 for the three-year contract period. See Exhibit 4, Line 8.

31. I also estimated MO 4's alarm expense based on alarm invoices. I also included an estimate for a site required camera system. For the alarm, camera system, and monthly monitoring fees, I estimate MO 4's total alarm expense would be $17,351 from August 2022 through July 2025. See Exhibit 4, Line 9.

32. To estimate the lease cost for the site, I used the sublease agreement between Allegiance Organization, LP and TX Pow 1, LLC, a Texas site, which sets forth a rate of $2,000 per MW of electrical capacity available to the leased land. I estimate that MO 4's lease expense based on the fee per MW included in the sublease agreement and assuming 730 hours in a month and 95.0% uptime yields an annual lease cost of $456,000. See Exhibit 4, Line 10.

33. I estimated MO 4's repair expense as a percentage of Repair Revenue, utilizing TX Pow 1's P&Ls for the five months ended December 31, 2023 and the nine months ended September 30, 2024. The TX Pow 1 "Equipment Repairs" and "Repairs & Site Maintenance" expenses are its repair expenses. TX Pow 1's total repair expense of $116,868 is 33.8% of its Additional Services revenue. I have estimated MO 4's expense to be $301,225 annually, 33.8% of annual Repair Revenue of $891,286. See Exhibit 4, Line 5. See Exhibit 4A, Lines 4 – 10 for further description of these estimates which also includes my estimate for MO 4's trash expense.

34. I calculate the total MO 4 incremental costs of executing the Second Agreement for Infiniti at approximately $31,121,000. See Exhibit 4, Lines 4, 11, 12, and 13.

**Discounting Estimated Lost Profits**

35. Economic damages should be discounted to present value using an appropriate discount rate that accounts for both the time value of money and risk factors. I discounted MO 4's nominal lost profits by applying an ex-ante discounting methodology to the date of first damage (August 2022). The cost of equity is often used as a discount rate, and I used the build-up method to estimate MO 4's cost of equity at 18.0%. Additionally, I have employed a mid-year convention, which assumes that the lost profits would have been earned evenly throughout the year. See Exhibit 6 for the basis of my discount rate.

**Lost Profits Conclusions**

36. After deducting avoided costs (for each year) from the lost revenue and then applying a discount rate to discount the lost profits to August 1, 2022, MO 4's total lost profits total $5,374,000. See Exhibit 8.

37. In his November 27, 2024 expert report, Mr. Drysdale notes that the Second Agreement allows for a reduction in the Managed Services Fee if the price of Bitcoin falls below $20,000.[3] Section 2.3(B) of the Second Agreement reads "In the event

---

[3] November 27, 2024 Expert Report of Don Drysdale, p. 10.

9

that the CoinDesk reference rate for bitcoin digital currency ("XBX") falls below twenty thousand dollars ($20,000) for more than thirty (30) consecutive calendar days (hereinafter 'Adverse Market Conditions'), the Host shall reduce any applicable Minimum Managed Service Fees by fifty (50%) until the XBX reference rate exceeds twenty thousand dollars ($20,000.00)."[4] Mr. Drysdale claims that my report should have reduced the Managed Services Fee by 50% from November 8, 2022 to January 13, 2023.[5]

38. Additionally, Mr. Drysdale recomputes my discount rate of 18% by adjusting the estimated company-specific premium. He concludes an appropriate discount rate is 24%.[6] Based only on his adjustment to discount rate, Mr. Drysdale recomputes my lost profits and presents total lost profits of $5,153,000.[7] Mr. Drysdale does not adjust my calculation for his Bitcoin critique.

39. At the request of Counsel, I have performed an alternative calculation that considers the reduction in revenue from "Adverse Market Conditions" under Section 2.3(B) of the Second Agreement.

40. According to MarketWatch, the price of Bitcoin fell below $20,000 from November 9, 2022 to January 14, 2023.[8] During this period, I have assumed that the site would not be utilized (uptime of 0%) and MO 4 would have earned 50% of the Minimum Managed Services Fee described in Section 2.3(A) of the Second Agreement and outlined in Exhibit A to the Second Agreement. Making this adjustment to MO 4's

---

[4] The Second Agreement, Section 2.3(B).

[5] November 27, 2024 Expert Report of Don Drysdale, p. 10.

[6] November 27, 2024 Expert Report of Don Drysdale, p. 21.

[7] November 27, 2024 Expert Report of Don Drysdale, p. 22.

[8] Exhibit 10.

lost profits presented in my October 11, 2024 report results in lost profits of $4,964,000.[9]

41. My assumption of 0% site uptime beginning on November 9, 2022 for 67 days is a conservative approach, as Infiniti may not have shut down all of its equipment on the first day of the "Adverse Market Conditions" period.

42. I have also performed alternative calculations that consider a) the reduction in revenue from "Adverse Market Conditions" described above and b) either Mr. Drysdale's discount rate of 24% or a discount rate of 21%. These calculations result in lost profits of either $4,650,000[10] (discount rate of 24%) or $4,802,000[11] (21% discount rate). A 21% discount rate represents the midpoint between my discount rate of 18% and Mr. Drysdale's rate of 24%. By adjusting my calculation of MO 4's lost profits to account for the "Adverse Market Conditions" described above, I have removed risk associated with the profits MO 4 would have earned. While I have conservatively chosen not to reduce my 18% discount rate, I believe that Mr. Drysdale's 24% discount rate is unreasonably high given that Mr. Guel has experience with this business and has achieved profitable operations for TX Pow 1 (see Exhibit 7). Therefore, I have performed alternative calculations using the midpoint rate of 21% to show the impact of splitting the difference between the judgements of both damages experts in this case. See the table below for a summary of all alternative lost profits calculations performed.

---

[9] Exhibits 11 and 11A.
[10] Exhibits 9 and 9A.
[11] Exhibits 12 and 12A.

|  | Discount Rate | | |
| --- | --- | --- | --- |
|  | Hall 18% | Midpoint 21% | Drysdale 24% |
| **No Adjustment for Adverse Market Conditions** | $ 5,374,238 [1] | $ 5,206,887 [2] | $ 5,049,763 [3] |
| **Adjustment for Adverse Market Conditions** | $ 4,964,463 [4] | $ 4,802,224 [5] | $ 4,650,024 [6] |

Notes:
[1] *See* Exhibits 4 and 4A.
[2] *See* Exhibits 13 and 13A.
[3] *See* Exhibits 14 and 14A.
[4] *See* Exhibits 11 and 11A.
[5] *See* Exhibits 12 and 12A.
[6] *See* Exhibits 9 and 9A.

43. Of the six calculations presented above, my opinion is that MO 4's total lost profits are most reasonably measured as $4,964,463. This calculation accounts for a reduction in revenue attributable to "Adverse Market Conditions" defined under Section 2.3(B) of the Second Agreement and discounts MO 4's lost profits using my discount rate of 18%.

44. To evaluate the reasonableness of my lost profits conclusion, I reviewed TX Pow 1's P&Ls for August 1 to December 31, 2023 and January 1 to September 30, 2024 (see Exhibit 7) and compared the gross profit margins and net income margins for the P&Ls with my gross profit margin and net annual cash flows for my lost profits conclusion. This comparison showed that TX Pow 1 has earned over 55% profit margin to-date which is much higher than 13.9%.[12] MO 4 has demonstrated that it can earn significant profits performing the same type of service it would have performed for Infiniti based on the Second Agreement.

---

[12] *See* Exhibits 7 and 11.

DATED: June 5, 2025.

/s/ *Jeffrey S. Pope*
Jeffrey S. Pope (Wyo. State Bar # 7-4859)
Kasey J. Schlueter (Wyo. State Bar # 8-6521)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
JSPope@hollandhart.com
KJSchlueter@hollandhart.com

ATTORNEYS FOR PLAINTIFFS/
COUNTER DEFENDANTS
MO POW 3, LLC AND MO POW 4, LLC

35058289_v4