

**FILED**

**Margaret Botkins**
**Clerk of Court**

*9:12 am, 7/28/25*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

MO POW 3, LLC and MO POW 4, LLC,

  Plaintiffs,

  vs.

CRYPTO INFINITI LLC,

  Defendant.

Case No. 22-CV-155-R

---

## ORDER ON DAMAGES

This matter is before the Court on Mo Pow 4, LLC's request for damages. On June 12, 2025, the Court held an evidentiary hearing on the matter. The Court, having carefully considered the parties' filings, relevant law, hearing testimony, and exhibits, finds that Mo Pow 4, LLC is not entitled to any damages.

### BACKGROUND

#### I.    Underlying Facts

On May 26, 2022, the parties entered into two agreements. Both agreements related to Mo Pow 3, LLC ("Mo Pow 3") and Mo Pow 4, LLC ("Mo Pow 4") providing Crypto Infiniti with hosting or managed services for digital currency mining equipment. The parties' relationship deteriorated, and the instant suit followed with various contract-related

claims and counterclaims, including breach of contract, breach of the covenant of good faith and fair dealing, declaratory judgment, and unjust enrichment.

## II.    Procedural History

On February 20, 2024, the Court granted in part and denied in part the parties' cross motions for summary judgment. [ECF No. 64]. In short, the Court concluded Mo Pow 3 breached the first agreement, but Crypto Infiniti breached the second agreement with Mo Pow 4, leaving the remaining issue of damages. *Id.* at 26–27. After receiving briefing on damages, the Court concluded that it lacked sufficient information to determine Mo Pow 4's damages and allowed Mo Pow 4 to designate an expert on the issue of lost profits. [ECF No. 79, at 11]. Accordingly, Mo Pow 4 retained David A. Hall to calculate its lost-profits damages. [ECF No. 91]. In response, Defendant hired Don Drysdale to rebut Mr. Hall's opinion. [ECF No. 95].

## III.    Damages

### A. Crypto Infiniti's Damages

Per the Court's prior order, Crypto Infiniti is entitled to: (1) full return of its down payment of $2,135,250, for managed services fees; and (2) a partial 15/35th repayment for its rate buy-down payment of $2 million, which totals $857,142.86.[1] [ECF No. 79, at 3]. Therefore, Crypto Infiniti's total damages against Mo Pow 3 are $2,992,392.86.[2]

---

[1]    2,000,000 x (15/35) = 857,142.857143.

[2]    857,142.857143 + 2,135,250 = 2,992,392.85714.

### B. Mo Pow 4's Damages

Initially, Mr. Hall opined that Mo Pow 4 is entitled to $5,374,000 in damages. [ECF No. 91-1, at 6].[3] In conducting the analysis, Mr. Hall based his opinions on the hosting site being located in Odessa, Texas, *id.* at 7, despite the agreement specifying Strafford, Missouri as the hosting site. [ECF No. 51-2, at 2]. Mr. Hall interpreted that, under the second agreement, Mo Pow 4 could elect to relocate. [ECF No. 91, at 7]; *see* [ECF No. 51-2, at 5]. Thus, Mr. Hall used the Texas site in his analysis because Mo Pow "had taken steps to secure a location in Texas prior to the execution of the [Crypto] Infiniti hosting agreements and made a decision to move MO [Pow] 3 & 4 immediately after execution on May 26, 2022." [ECF No. 91-1, at 7].

In contrast, Mr. Drysdale based his opinion by using the Missouri site and concluded that Mo Pow 4 would have actually lost money had the parties performed. [ECF No. 95]. In response to Mr. Drysdale's criticisms, Mr. Hall now opines that Mo Pow 4's lost profits are actually $4,650,000 based on the site in Odessa, Texas. [ECF No. 117].

On June 12, 2025, the Court held an evidentiary hearing to determine Mo Pow 4's damages. The findings are discussed below.

### STANDARD OF REVIEW

Because the Court sits in diversity, it will apply substantive state law and procedural federal law. *McAnulty v. Standard Ins. Co.*, 81 F.4th 1091, 1096 (10th Cir. 2023). "The measure of damages for breach of contract is undoubtedly substantive law, as to which the

---

[3]     Pinpoint citations to ECF documents refer to the electronic court filing page number and not the document's local pagination.

state law is controlling." *Henderson v. Nat'l Fid. Life Ins. Co.*, 257 F.2d 917, 919 (10th Cir. 1958). In a Wyoming breach of contract case, damages are intended to place the nonbreaching party "in the same position as if the contract had been performed, less proper deductions." *JBC of Wyo. Corp. v. City of Cheyenne*, 843 P.2d 1190, 1195 (Wyo. 1992). The party seeking damages carries the burden to produce sufficient evidence for proof of its damages. *Capshaw v. Schieck*, 44 P.3d 47, 52 (Wyo. 2002). Such a figure need not be exact; rather, the damages "must be proven to a reasonable degree of certainty." *Crouch v. Cooper*, 2024 WY 98, ¶ 31, 556 P.3d 199, 208 (Wyo. 2024). A district court's findings on damages are reviewed for clear error. *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1221 (10th Cir. 2007).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

While the parties have minor objections to the accuracy of some of the figures produced, the remaining issue of damages hinges on one factual question: Did Mo Pow 4 plan to move the hosting site to Texas immediately after performance was due? For the reasons discussed below, the Court finds the answer to this question is simply no.

Mo Pow 4 insists such a move would have been immediate, and its damages calculation reflects as much. Because the Court finds that Mo Pow 4's expert's assumption is not credible, the Court would be left to speculate on: (1) when, if ever, a move would have occurred; and (2) more importantly, what would the actual lost profits be under a realistic analysis—that is, one not premised on a theory that came to light after the Court requested further briefing on the matter. Since it is Mo Pow 4's burden to prove its damages, the Court declines to speculate on such matters and finds that Mo Pow 4 fails to

4

meet its burden. Because the only other available lost profits analysis concludes that the Missouri site would have lost money, the Court finds that Mo Pow 4 is not entitled to any damages.

### I.    Mo Pow 4 is not entitled to damages.

As stated, Mo Pow 4 claims that it is entitled to $4,650,000 in damages based on an evaluation of moving the hosting site from Missouri to Texas immediately. [ECF No. 91-1, at 6]. "Neither judges nor juries are required to accept expert testimony when acting as the trier of fact." *ELA v. AAB*, 2016 WY 98, ¶ 15, 382 P.3d 45, 49 (Wyo. 2016). Triers of fact are responsible for weighing the probative value of expert opinion. *Mealey v. City of Laramie*, 472 P.2d 787, 793 (Wyo. 1970). Thus, "[t]he trier of fact may disregard an expert opinion if he finds the opinion unreasonable or not adequately supported by the facts upon which the opinion is based." *Anastos v. Gen. Chem. Soda Ash*, 2005 WY 122, ¶ 20, 120 P.3d 658, 666 (Wyo. 2005) (quoting *Clark v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 934 P.2d 1269, 1271 (Wyo. 1997)).

During the damages hearing, the Court heard testimony from Mo Pow 4's representative, Thomas Guel, who provided Mr. Hall with the underlying factual assumption that Mo Pow 4 would have moved to Texas immediately. Mr. Guel owns the parent company that owns Mo Pow 3 and Mo Pow 4. [ECF No. 119, at 12]. Mr. Guel explained that he had secured a site in Texas through one of his other companies prior to executing the May 2022 contract with Crypto Infiniti. *Id.* at 14. For support, Mo Pow 4 presented a letter of intent for a site in Texas in April of 2022. *Id.* A Texas site lease was eventually executed in September 2022 for one of Mr. Guel's companies. *Id.* at 15.

Mr. Hall's report estimates Mo Pow 4's lost profits based on an August 1, 2022, move to Texas. [ECF No. 91-1, at 15]. When asked about the gap between August and September, Mr. Hall said (more or less) that Mr. Guel noted the lack of funding was a reason for the delay and Mo Pow 4 would have secured the Texas site sooner "but for" Crypto Infiniti's not paying the down payment. [ECF No. 119, at 93–94].

The Court finds that Mo Pow 4 is not credible in its assertion that it would have moved the hosting site to Texas site immediately, and accordingly, the factual basis underlying Mr. Hall's opinions are not adequately supported. There are multiple areas of impeachment. The Court finds this discredits Mr. Guel's testimony, and in hand, Mr. Hall's underlying factual basis of his report.

### A. Mr. Guel's deposition testimony discredits a move to Texas.

There are two moments from Mr. Guel's deposition that the Court finds Mr. Guel's hearing testimony conflicts. First, at Mr. Guel's deposition on November 15, 2023, the following colloquy occurred:

> [By Crypto Infiniti's counsel]
> Q: What is your professional experience in the crypto industry?
>
> [By Mr. Guel]
> A: We've run a number of sites for a period of time.
>
> Q: But you specifically, I want to know your background, experience in the crypto industry.
>
> A: I just told you; I've run a couple of data centers for that for a couple of years.
>
> Q: Okay. And let's go through those. Are you referring to Mo Pow 1 through 4?

A: Those would be included, yes.

Q: What others?

A: *There's a site in Texas.*

Q: And what's that one called and what entity runs that?

A: *It is unrelated to Mo Pow 3 and 4.*

[ECF No. 119, at 18–19, 36] (cleaned up); *see* [ECF No. 100-1, at 3]. In attempting to explain his answers that the Texas site was "unrelated," Mr. Guel explained that "unrelated meant the companies operating in Texas" which "were not related to MO POW." [ECF No. 120, at 6–7] (citing [ECF No. 119, at 19, 35–38]). In addition, Mr. Guel thought the context of the questions meant that Crypto Infiniti's counsel was only referring to developed sites, as opposed to undeveloped sites. *Id.* at 6; [ECF No. 119, at 37–38].

Based on the hearing testimony, the Texas site referred to in the deposition was in reference to TX Pow 1, LLC, a different company under Mr. Guel's control. [ECF No. 119, at 21]. Plaintiff apparently planned to move Crypto Infiniti's equipment to a different Texas site—one now occupied by another company controlled by Mr. Guel called TX Pow 2, LLC. [ECF No. 119, at 15, 26].

It is not abundantly clear to the Court, but based on Mr. Guel's explanation at the hearing, it appears the TX Pow 2 site was not built out until much later. Despite securing the lease in September 2022, it can be inferred that the site was not developed at the time of the November 2023 deposition. Mo Pow 4 would attribute the delays due to lack of funding traceable to Crypto Infiniti's nonpayment, but Mo Pow 4 does not meet its burden to demonstrate how this assertion is true. Thus, it was not reliable for Mr. Hall to base his

opinion on a move to Texas in August of 2022. Since it took, at the very least, over a year for the site to be built out, the Court cannot assume that Crypto Infiniti's "but-for" payment would have established the site was up and running by August 2022.

Additionally, the Court views Mr. Guel's answer and subsequent explanation as improper gamesmanship to deprive Crypto Infiniti of a meaningful opportunity to discover relevant matters properly sought.

> The discovery process is designed to permit all parties to litigation to discover the facts relevant to presenting the issues to the jury. It is not a game of hide and seek or twenty questions, requiring each party to use the "magic language" the opposing party desires before clearly discoverable and relevant information is produced.

*Est. of Cummisky ex rel. Midfirst Tr. Co. v. Estes Express Lines*, No. CIV-11-42-C, 2012 WL 12846989, at *2 (W.D. Okla. Oct. 25, 2012). Mr. Guel's attempt to explain how he understood Crypto Infiniti's counsel's line of questioning is unpersuasive. Crypto Infiniti's counsel did not ask about developed sites specifically. Rather, the line of questioning was generally about *all* of Mr. Guel's experience in cryptocurrency industry, which could plausibly include undeveloped sites. In light of the Federal Rules of Civil Procedure's general prohibition against "hide and seek," such statements and omissions are too convenient for the Court to believe that Mr. Guel intended to move Crypto Infiniti to Texas immediately.

This is especially true when viewing other portions of Mr. Guel's deposition. At the same November 2023 deposition, the following dialogue took place:

[By Crypto Infiniti's counsel]

> Q: Aside from the project with Crypto Infiniti at the site at 5501 East Farm Road 112, Strafford, Missouri, what other projects was MO POW 4 involved in?
>
> [By Mr. Guel]
> A: None.

[ECF No. 100-1, at 4]; *see* [ECF No. 119, at 39] (Mr. Guel admitting that he said in his deposition the Crypto Infiniti site was in Strafford, Missouri). This back-and-forth leaves little doubt that Mo Pow 4's intent to move the Crypto Infiniti site to Texas immediately is insincere. It shows that Mr. Guel was, in essence, asked about any other potential projects for Mo Pow 4, and he said there was not. Thus, Mr. Guel's explanation that Crypto Infiniti's counsel did not ask about undeveloped sites is untrue.

What the foregoing deposition testimony and unpersuasive subsequent explanations demonstrate is that the move to Texas was likely manufactured after the Court ordered expert opinion for lost profits in order to inflate Mo Pow 4's damages. Tellingly, and as discussed below, this factual dispute was not disclosed or briefed until after the close of discovery. Therefore, the Court finds that an immediate move to Texas lacks veracity, and in turn, Mr. Hall's assumption is unreliable.[4]

---

[4] To find otherwise would implicate, among other concerns, a horizontal piercing of the corporate veil. A horizontal pierce occurs when entities share common ownership but fail to maintain the legal separateness between the supposedly distinct entities. *See* 1 Fletcher Cyc. Corp. § 41.10. If shown, a court may disregard the legal separateness of entities. *See id.* Crypto Infiniti does not raise this issue, so the Court need not engage in this analysis. Nevertheless, the Court highlights this point to say that Mo Pow 4 cannot have it both ways. In other words, Mr. Guel cannot conveniently omit discoverable information for the purpose of maintaining separateness between Mo Pow 4 and TX Pow 1 to later claim that Mo Pow 4 and TX Pow 2 were related, such that Mo Pow 4 could easily access TX Pow 2's site for Crypto Infiniti's equipment.

**B.  Mo Pow did not claim damages under a Texas lost profits analysis until late in the proceedings.**

The case is in a unique procedural posture. As mentioned above, the Court granted in part and denied in part each party's motion for summary judgment on February 20, 2024. [ECF No. 64]. On March 12, 2024, the Court held a telephonic status conference, and the parties agreed to a briefing schedule for deciding on the remaining issues. [ECF No. 66]. During the scheduled briefing, Mo Pow 4 sought $3,066,000 in damages. [ECF No. 77]. This figure represented the down payment Crypto Infiniti was supposed to pay under the agreement. [ECF No. 51-2]. The Court concluded that it lacked sufficient information to conclude that Mo Pow 4 would be entitled to the down payment because that figure failed to account for deductions like "the cost Mo Pow 4 would spend on electricity each month, what it spent to prepare the sites, how much it would cost Mo Pow 4 to provide their managed services, etc." [ECF No. 79, at 7]. As stated, Mo Pow 4 now seeks lost profits based on a Texas location.

Given the unique procedural posture, the Court cannot locate any case that addresses the issue of whether a trier of fact can consider a party's changed theory of damages after a court ordered expert opinion for impeachment purposes. Some cases come close. *See Dugan v. EMS Helicopters, Inc.*, 915 F.2d 1428, 1432 (10th Cir. 1990) ("[P]rior pleadings may be introduced on cross examination for use as an impeachment tool under Fed. R. Evid. 613."); *Bettis v. Hall*, 543 F. App'x 819, 822 (10th Cir. 2013) (holding it was not clearly erroneous for a district court "to hold the plaintiffs at trial to their own prior [damages] representations and calculations"); *Bennett v. Emerson Elec. Co.*, 64 F. App'x

708, 714 (10th Cir. 2003) (indicating that the defendant was able to present contradictory damages claims between trial and the Social Security Administration, which the jury did not find availing).

Nevertheless, the Court cannot ignore how oddly convenient this theory came to light. Because Mr. Guel admitted that Mo Pow 4 only sought $3,066,000 up until recently in the proceedings, [ECF No. 119, at 23], the Court considers for the purposes of impeachment that Mo Pow 4 did not argue, brief, or otherwise disclose the Texas site until after the Court ordered further briefing. *See Idearc Media Corp. v. Kimsey & Assocs., P.A.*, No. 8:07-CV-1024-T-17EAJ, 2009 WL 928556, at *5 (M.D. Fla. Mar. 31, 2009) ("In the case of a discrepancy between a party's discovery responses and evidence attained by the opposing party, lacking a 'clear showing of egregious conduct … allegations of inconsistency, non-disclosure, even falseness, can be brought to the [trier of fact's] attention through cross-examination or impeachment.'" (alterations in original) (quoting *Hughes v. Matchless Metal Polish Co.*, No. 2:04-CV-485-FTM-29DN, 2007 WL 2774214, at *3 (M.D. Fla. Sept. 24, 2007)); *Williams v. Union Carbide Corp.*, 790 F.2d 552, 556 (6th Cir. 1986) (holding the district court erred in prohibiting evidence of the plaintiff's allegations from a prior lawsuit where there was "no question that the plaintiff's attorney was fully authorized to act and speak for the plaintiff"). While there does not appear to be a Tenth Circuit case directly on point, triers of fact generally can consider inconsistent positions to impeach a party in other contexts. *See Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1291 (10th Cir. 2022) (in the employment context, a trier of fact could "reasonably infer pretext when an employer provides one explanation for an adverse action

11

but later affirmatively disclaims or otherwise abandons the rationale"); *United States v. Scarborough*, 128 F.3d 1373, 1376 (10th Cir. 1997) (in the criminal context, the defendant could cross-examine the government's witness on a late-disclosed report that did not did not constitute a *Brady* violation); *In re Johnson*, 518 F.2d 246, 252 (10th Cir. 1975) ("Under the doctrine of judicial estoppel a party and his privies who have knowingly and deliberately assumed a particular position are estopped from assuming an inconsistent position to the prejudice of the adverse party."); *see also Jenkins v. Anderson*, 447 U.S. 231, 239 (1980) (in the context of prearrest silence, "[c]ommon law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted."). This further supports the general principle that cross-examination can reveal ulterior motives. *Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested."); *United States v. Buchanan*, 891 F.2d 1436, 1443 (10th Cir. 1989) ("A vital means of impeaching a witness is revealing possible biases, prejudices or ulterior motives of the witness relating to the personalities at trial.").

The Court sees no reason why the alleged ulterior motive—that is, using a Texas site to inflate damages calculations—cannot be explored by impeaching a party based on prior briefing, where a court ordered expert opinion after the close of discovery and the basis of a party's claimed lost profits appears to come out of left field. Certainly, such matters are relevant for a disputed fact: when the move to Texas was planned. Thus, the Court will consider the differences in the initial briefing to make the disputed fact of an immediate move to Texas more or less probable.

In the initial damages brief, there is no discussion whatsoever of moving Crypto Infiniti's equipment to Texas. As mentioned, Mo Pow 4 only claimed damages $3,066,000 for loss of the down payment. [ECF No. 73]. In doing so, Mo Pow 4 noted that this figure served another purpose. It argued that "Crypto's actions represent a loss to MO POW of over $36,000,000.00 in revenue," i.e., the payments received over the span over the lease agreement, and the $3,066,000 "would represent an 8.33% profit margin." *Id.* at 4. Why Mo Pow 4 would be entitled to an 8.33% profit margin under the agreement was a mystery, as it offered no evidence on, for instance, what profit it usually generates from such agreements. *C.f. Robert W. Anderson Housewrecking & Excavating v. Bd. of Trs., Sch. Dist. No. 25, Fremont Cnty.*, 681 P.2d 1326, 1332–33 (Wyo. 1984) (upholding the award of 26% of the revenue value on a contract when the district court heard testimony that contracts typically profit between 62% to 64.5% but discredited that amount after cross-examination). Thus, the Court ordered further briefing on lost profits because "there must be a legitimate basis for what those damages are, not a symbolic number." [ECF No. 79, at 6–7].

It is not problematic that the amounts—the $3,066,000 claimed then and the $4,650,000 claimed now—differs. Indeed, parties can generally claim more damages throughout litigation if warranted. *Beam v. Concord Hosp., Inc.*, No. 93-4188-SAC, 1996 WL 455020, at *5 n.2 (D. Kan. July 8, 1996); *Rucinski v. Torian Plum Condo. Owners Ass'n, Inc.*, No. 08-CV-02798-WJM-MJW, 2012 WL 3938822, at *3 (D. Colo. Sept. 10, 2012); So*lv-Ex Corp. v. Deutsche Bank AG*, No. CIV 99-003 MV/KBM, 1999 WL

35809382, at *1 (D.N.M. Aug. 26, 1999). Instead, the issue lies in how it appears Plaintiff is taking advantage of the current posture of the case.

From the Court's perspective, it is telling that the Texas site was disclosed late in the proceedings. It would appear that Mo Pow 4 conducted a similar analysis to Mr. Drysdale and found that the Missouri site would have lost money. In an effort to find a way to be awarded some damages, it appears that Mo Pow 4 shifted its damages theory and premised its lost profits on a Texas relocation. Certainly, if Mo Pow 4 intended to relocate to Texas immediately, it is likely that such facts would have been raised before, either in prior disclosures, its damages briefing, or other filings. Because the Court believes such factual assertions would have been raised earlier, Mo Pow 4's failure to do so impeaches its credibility. Therefore, the Court finds that Mo Pow 4 failed to meet its burden to demonstrate an immediate move to Texas was planned on this ground, as well.

### C. Other Considerations

Additional considerations lead the Court to conclude an immediate move to Texas was not planned. First, Mr. Guel cannot pinpoint the specific date that the move to Texas would have occurred, other than stating he was pursuing opportunities for TX Pow 2—a different company—in 2021. [ECF No. 119, at 26, 39]. Second, Crypto Infiniti presented evidence, and the Court heard testimony, on Mo Pow 4 preparing the Missouri site for Crypto Infiniti's equipment, as late as a third site visit in June of 2022. *Id.* at 30. Mo Pow 4 also continued to request shipments of equipment to the Missouri site. *Id.* at 46, 52. Third, Mr. Guel stated the reason that he stopped building out the Missouri site was because of nonpayment from Crypto Infiniti, not because of a potential move to Texas. *Id.* at 40.

Fourth, the Court generally did not find Mr. Guel to be a credible witness. For these reasons, the Court would also find against Mo Pow 4 on these grounds.

## CONCLUSION

Based on the foregoing analysis, the Court concludes that the underlying factual basis of Mr. Hall's report is unreliable. Accordingly, his opinion is disregarded. To be clear, the Court does not question Mo Pow 4's ability to move Crypto Infiniti to Texas. It is indeed possible that Mo Pow 4 would have moved the equipment there at some point—possibly months or years into the lease. However, Mr. Hall's entire opinion is based on an *immediate* move, which is inadequately supported for the reasons stated. The Court will not speculate on when this hypothetical move would have occurred, but it is evident that such a move would not have occurred immediately. Therefore, the Court finds that Mo Pow 4 is not entitled to any damages because it fails to carry its burden.

Dated this 28th day of July, 2025.

Kelly H. Rankin
United States District Judge